# United States Court of Appeals
# for the Federal Circuit

---

ALEXION PHARMACEUTICALS, INC.,
ALEXION PHARMA INTERNATIONAL OPERATIONS LTD.,

*Plaintiffs-Appellants,*

v.

SAMSUNG BIOEPIS CO. LTD.,

*Defendant-Appellee,*

---

On Appeal from the United States District Court
for the District of Delaware (No. 1:24-CV-00005-GBW) (Williams, J.)

---

## APPELLEE'S NON-CONFIDENTIAL OPPOSITION TO MOTION FOR INJUNCTION PENDING APPEAL

---

JONATHAN DAVIES
COOLEY LLP
1299 Pennsylvania Ave., NW
Suite 700
Washington, DC 20004

ORION ARMON
COOLEY LLP
1144 15th St., Suite 2300
Denver, CO 80202

MICHELLE S. RHYU
DANIEL J. KNAUSS
COOLEY LLP
3175 Hanover Street
Palo Alto, CA 94304

PATRICK J. HAYDEN
COOLEY LLP
55 Hudson Yards
New York, NY 10001

ALEXANDER ROBLEDO
COOLEY LLP
500 Boylston Street
Boston, MA 02116

*Counsel for Appellee Samsung Bioepis Co. Ltd.*

## <u>CERTIFICATE OF INTEREST</u>

Counsel for Appellee Samsung Bioepis Co. Ltd., Michelle S. Rhyu, certifies the following:

1. **Represented Entities.** Provide the full names of all entities represented by undersigned counsel in this case. Fed. Cir. R. 47.4(a)(1).

   Samsung Bioepis Co., Ltd.

2. **Real Party in Interest.** Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities. Fed. Cir. R. 47.4(a)(2).

   Not applicable.

3. **Parent Corporations and Stockholders.** Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities. Fed. Cir. R. 47.4(a)(3).

   Samsung Biologics Company

4. **Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

   Brianna Patterson (Cooley LLP)
   Andrew C. Mayo (Ashby & Geddes, P.A.)

5. **Related Cases.** Provide the case titles and numbers of any case known to be pending in this court or any other court or agency

that will directly affect or be directly affected by this court's decision in the pending appeal. Do not including the originating case number(s) for this case. Fed. Cir. R. 47.4(a)(5).

- *Alexion Pharmaceuticals, Inc. et al. v. Samsung Bioepis Co. Ltd.*, 1:24-cv-00005-GBW (D. Del.)
- *Samsung Bioepis Co., Ltd. v. Alexion Pharmaceuticals, Inc.*, IPR2023-00933 (P.T.A.B.)
- *Samsung Bioepis Co., Ltd. v. Alexion Pharmaceuticals, Inc.*, IPR2023-00998 (P.T.A.B.)
- *Samsung Bioepis Co., Ltd. v. Alexion Pharmaceuticals, Inc.*, IPR2023-01069 (P.T.A.B.)
- *Samsung Bioepis Co., Ltd. v. Alexion Pharmaceuticals, Inc.*, IPR2023-01070 (P.T.A.B.)
- *Samsung Bioepis Co., Ltd. v. Alexion Pharmaceuticals, Inc.*, IPR2023-00999 (P.T.A.B.)

**6. Organizational Victims and Bankruptcy Cases.** Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

Not applicable.

Dated: July 1, 2024                    */s/ Michelle S. Rhyu*
                                       _____

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................. 1

BACKGROUND .................................................................. 2

    A.   Factual Background ............................................... 2

    B.   Procedural History ............................................... 4

STANDARD OF REVIEW ....................................................... 6

ARGUMENT .................................................................... 7

I.   Alexion Has Failed to Make a Strong Showing of Likelihood of Success on the Merits ....................................................... 7

    A.   The District Court Did Not Clearly Err in Finding Substantial Questions of Validity Regarding the PNH Claim ('189 Patent) ............................................. 8

        1.   The District Court Correctly Recognized that the PTAB Has Already Found Substantial Questions of Validity Regarding the PNH Claim ('189 Patent) ...................... 9

        2.   Alexion's Estoppel Arguments Are Meritless ............. 11

        3.   As the District Court Recognized, the PTAB Evaluated Extensive Evidence and Correctly Found a Reasonable Likelihood of Invalidity ............................... 13

    B.   The District Court Did Not Clearly Err in Finding Substantial Questions of Validity Regarding the aHUS Claim ('176 Patent) ............................................. 16

        1.   The aHUS Claim Is Obvious in View of Noris (2005) and the SOLIRIS® Label (2007) ................................. 16

        2.   The aHUS Claim Is Anticipated by Chatelet (2008) ... 20

II.  Alexion Has Failed to Demonstrate Irreparable Harm Absent an Injunction ................................................................. 23

Page

III.    The Remaining Factors Do Not Support an Injunction ................26

CONCLUSION .........................................................................................27

## NOTICE REGARDING CONFIDENTIALITY

Pursuant to Federal Circuit Rule 25.1, Appellee Samsung Bioepis Co. Ltd. has attached a public version of an exhibit in support of this opposition that omits certain of Appellants' confidential information. Specifically, Exhibit D contains testimony of Appellants' expert witness pertaining to Appellants' alleged prior invention history and related communications.   The omitted information was designated as confidential by the parties under a sealing order entered by the District Court.

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adidas Am., Inc. v. Skechers USA, Inc.,*
2017 WL 2604310 (D. Or. June 12, 2017) .......................................... 10

*Altana Pharma AG v. Teva Pharms. USA, Inc.,*
566 F.3d 999 (Fed. Cir. 2009) ................................................................ 7

*Am. Express Travel Related Servs., Inc. v. Sidamon-Eristoff,*
669 F.3d 359 (3d Cir. 2012) .................................................................... 8

*Cyntec Co. v. Chilisin Elecs. Corp.,*
84 F.4th 979 (Fed. Cir. 2023)................................................................ 18

*Duramed Pharms., Inc. v. Watson Lab'ys, Inc.,*
426 F. App'x 905 (Fed. Cir. 2011)...................................................... 7, 8

*E.I. DuPont de Nemours & Co. v. Phillips Petroleum Co.,*
835 F.2d 277 (Fed. Cir. 1987) ................................................................ 9

*Eli Lilly & Co. v. Actavis Elizabeth, LLC,*
2010 WL 3374123 (Fed. Cir. Aug. 26, 2010) ........................................ 8

*Entegris, Inc. v. Pall Corp.,*
490 F.3d 1340 (Fed. Cir. 2007) .............................................................. 8

*Genentech, Inc. v. Amgen Inc.,*
2019 WL 3290167 (D. Del. July 18, 2019), *aff'd*, 796 F. App'x 726
(Fed. Cir. 2020).................................................................................... 24

*Genentech, Inc. v. Novo Nordisk A/S,*
108 F.3d 1361 (Fed. Cir. 1997) .............................................................. 9

*Koninklijke Philips N.V. v. Thales DIS AIS USA LLC,*
39 F.4th 1377 (Fed. Cir. 2022)............................................................... 7

*Laborers' Int'l Union of N. Am., AFL-CIO v. Foster Wheeler Energy
Corp.,*
26 F.3d 375 (3d Cir. 1994) .................................................................... 18

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Murata Mach. USA, Inc. v. Daifuku Co.,*
2016 WL 4287040 (D. Utah Aug. 15, 2016) ....................................... 11

*Nichia Corp. v. Everlight Americas, Inc.,*
855 F.3d 1328 (Fed. Cir. 2017) .......................................... 25

*Parus Holdings, Inc. v. Google LLC,*
70 F.4th 1365 (Fed. Cir. 2023)............................................ 22

*Pfizer, Inc. v. Apotex, Inc.,*
480 F.3d 1348 (Fed. Cir. 2007) .......................................... 19

*Pfizer, Inc. v. Teva Pharm., USA, Inc.,*
429 F.3d 1364 (Fed. Cir. 2005) .......................................... 24

*Polaris PowerLED Techs., LLC v. Dell Techs. Inc.,*
2024 WL 1546973 (W.D. Tex. Mar. 5, 2024)...................................... 15

*Procter & Gamble Co. v. Kraft Foods Glob., Inc.,*
549 F.3d 842 (Fed. Cir. 2008) ............................................ 10

*Respect Maine PAC v. McKee,*
562 U.S. 996 (2010) ................................................................ 6

*Rodriguez v. Dep't of Veterans Affs.,*
8 F.4th 1290 (Fed. Cir. 2021)....................................... 2, 23

*S. Bay United Pentecostal Church v. Newsom,*
140 S. Ct. 1613 (2020) ...................................................... 6, 8

*Standard Havens Prods., Inc. v. Gencor Indus., Inc.,*
897 F.2d 511 (Fed. Cir. 1990) ......................................... 10

*Takeda Pharms. U.S.A., Inc. v. Mylan Pharms. Inc.,*
967 F.3d 1339 (Fed. Cir. 2020) ......................................... 24

*TAS Energy, Inc. v. Stellar Energy Ams., Inc.,*
2015 WL 6156149 (M.D. Fla. Oct. 19, 2015)..................................... 10

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*United Therapeutics Corp. v. Liquidia Techs., Inc.*,
  74 F.4th 1360 (Fed. Cir. 2023), *cert. denied*, 144 S. Ct. 873 (2024) ... 12

*Winter v. NRDC*,
  555 U.S. 7 (2008) ................................................................. 6, 23

## Statutes

42 U.S.C.
  § 262(*l*)(8)(A) ...................................................................... 4
  § 262(*l*)(8)(B) ...................................................................... 24

## INTRODUCTION

Far from asking this Court to "maintain the status quo," Mot. 1, Alexion seeks to upend it: its extraordinary motion requests injunctive relief that the District Court has twice denied. Alexion has failed to meet its burden for this Court to grant such relief.

Alexion addresses only one of the four factors for an injunction pending appeal—likelihood of success on the merits—and it falls well short of demonstrating a "strong" showing that it will prevail. As to the first of the two claims at issue ("PNH claim"), Alexion identifies no clear error in the District Court's finding that the PTAB's institution of *inter partes* review ("IPR")—in a 67-page decision that considered precisely the same arguments and evidence Alexion offers here—demonstrates, at a minimum, a "substantial question" regarding the validity of the claim. Instead, Alexion urges this Court to ignore the IPR altogether, offering an unprecedented estoppel theory the District Court correctly rejected. And as to the second claim ("aHUS claim"), Alexion again fails to identify any clear error in the District Court's finding of a substantial question as to the claim's validity.

Most remarkably, however, Alexion urges this Court to grant an extraordinary injunction without providing any substantive argument—just one sentence—as to irreparable harm, the balance of the equities, or the public interest, all of which *must* be demonstrated before this Court may grant the requested relief. "An issue that is merely alluded to and not developed as an argument in a party's brief is deemed waived." *Rodriguez v. Dep't of Veterans Affs.*, 8 F.4th 1290, 1305 (Fed. Cir. 2021). Alexion has thus waived any argument as to these factors, which weigh in Samsung's favor in any event.

This Court should deny Alexion's motion.

## BACKGROUND

### A.    Factual Background

Alexion's two asserted claims cover methods of treatment for two related diseases that account for two of the four indications on the SOLIRIS® drug label. Claim 1 of U.S. Patent No. 10,590,189 ("the '189 patent") recites a method of treating paroxysmal nocturnal hemoglobinuria ("PNH"), and claim 1 of U.S. Patent No. 9,447,176 ("the '176 patent") recites a method of treating atypical hemolytic uremic syndrome ("aHUS"). Both PNH and aHUS are complement mediated

hemolytic diseases, where red blood cells are destroyed due to hyperactivation of the complement system, a part of the immune system that helps cells fight infection. *See* Ex. 24 ¶¶ 40-63.[1] While PNH and aHUS are caused by different defects in the complement system, in both diseases the defects cause hyperactivation of the same complement system. *Id.* ¶¶ 40, 58-59, 63-64. SOLIRIS® (also known as "eculizumab") is an antibody that blocks one of the final activation steps in the complement system, preventing the complement hyperactivation and accompanying hemolysis that occurs in both PNH and aHUS. *Id.* ¶¶ 39-40, 45-46, 62-67.

As to claim 1 of the '189 patent ("PNH claim"), the Patent Trial and Appeal Board ("PTAB") has already found in an IPR proceeding that Samsung has demonstrated a "reasonable likelihood of showing" that the claim is unpatentable, providing an extensive technical analysis of three separate "Grounds" in a 67-page decision. *See* Ex. A.

The second claim on which Alexion bases its motion is claim 1 of the '176 patent ("aHUS claim"), which recites a dosing schedule for

---

[1] Citations to Exhibits 1-30 refer to exhibits attached to Alexion's motion (Dkt. 13); citations to Exhibits A-M refer to exhibits attached to this opposition.

eculizumab that was known and approved by 2007 to reduce hemolysis and block hyperactivation of the complement system. The aHUS claim recites an initial dose of "at least 600 [milligrams] of eculizumab once per week for four consecutive weeks" and "maintenance doses of at least 900 mg" every two weeks thereafter, Ex. 4 ('176 patent, claim 1) at 59—the same previously approved dosing schedule that appears on the 2007 SOLIRIS® Label for the treatment of PNH, Ex. B § 2.1.

## B. Procedural History

On July 7, 2023, Samsung provided Alexion notice that it expected to receive FDA approval of its SOLIRIS® biosimilar product, SB12, "in the first half of 2024" with a label directed to the PNH and aHUS indications. Ex. C. In that letter, Samsung also provided Alexion a Notice of Commercial Marketing pursuant to 42 U.S.C. § 262(*l*)(8)(A), notifying Alexion that it would not launch SB12 within a period of 180 days, which ended on January 3, 2024. *Id.*

Alexion waited until the very last day of that 180-day period— January 3, 2024—to file suit. Ex. 3. More than a month later, on February 12, 2024, Alexion filed its motion for a preliminary injunction, Ex. 2—then waited until its reply brief to submit the declaration of a new

expert (Dr. Blasco) as to the aHUS claim, Ex. 22. On April 29, 2024, after briefing was complete, Samsung deposed Dr. Blasco. Ex. D.

On May 6, 2024, the District Court denied Alexion's motion. The District Court concluded that Samsung had established a "substantial question of validity" as to the PNH claim, including because of the PTAB's institution decision for IPR of the claim. Ex. 1 at 3-5. For the aHUS claim, the District Court also concluded that Samsung had established a substantial question of validity based on obviousness in light of Noris (2005) and the SOLIRIS® label (2007), further strengthened by Samsung's argument based on anticipation by Chatelet (2008). *Id.* at 5-7. Since Samsung had established a substantial question of validity as to each of these claims, the District Court held that Alexion had failed to establish a likelihood of success on the merits of its claims, which provided a sufficient basis to deny Alexion's motion. *Id.* at 7.

After filing a notice of appeal, Alexion filed an emergency motion for an injunction pending appeal in District Court. Ex. 7. The District Court denied the motion on June 17, 2024, explaining that "Alexion's arguments re-hash the arguments it has already made, and do not

convince the Court that it has clearly erred or abused its discretion." Ex. 8. On June 21, 2024, Alexion filed the instant motion before this Court.

## STANDARD OF REVIEW

In any context, an injunction is "an extraordinary remedy never awarded as of right." *Winter v. NRDC*, 555 U.S. 7, 24 (2008). But Alexion requests even more drastic relief: a request from this Court for an injunction in the first instance "demands a significantly higher justification" because such "an injunction does not simply suspend judicial alteration of the status quo but grants judicial intervention that has been withheld by lower courts." *Respect Maine PAC v. McKee*, 562 U.S. 996, 996 (2010) (quotation marks omitted) (contrasting with motion for stay pending appeal). "This power is used where the legal rights at issue are indisputably clear and, even then, sparingly and only in the most critical and exigent circumstances." *S. Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613, 1613 (2020) (Roberts, C.J., concurring) (quotation marks omitted).

In evaluating such a request, this Court's "determination is governed by four factors, the first two of which are the most critical: (1) whether the movant has made a strong showing of likelihood of success

on the merits; (2) whether the movant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Duramed Pharms., Inc. v. Watson Lab'ys, Inc.*, 426 F. App'x 905, 906 (Fed. Cir. 2011) (unpublished).

When this appeal is ultimately heard on the merits, this Court will review the District Court's denial of Alexion's motion for abuse of discretion, which requires a "showing that the court made a clear error of judgment in weighing relevant factors or exercised its discretion based upon an error of law or clearly erroneous factual findings." *Koninklijke Philips N.V. v. Thales DIS AIS USA LLC*, 39 F.4th 1377, 1379 (Fed. Cir. 2022) (quotation marks omitted). "An appellant carries a heavier burden when seeking to reverse the denial of a preliminary injunction than seeking to reverse the grant of a preliminary injunction." *Altana Pharma AG v. Teva Pharms. USA, Inc.*, 566 F.3d 999, 1005 (Fed. Cir. 2009).

## ARGUMENT

## I.  ALEXION HAS FAILED TO MAKE A STRONG SHOWING OF LIKELIHOOD OF SUCCESS ON THE MERITS

As the District Court's ruling reflects, a "party's failure to show a likelihood of success on the merits must necessarily result in the denial

of a preliminary injunction." *Am. Express Travel Related Servs., Inc. v. Sidamon-Eristoff*, 669 F.3d 359, 366 (3d Cir. 2012) (quotation marks omitted). Alexion suggests that it need only demonstrate "a substantial case on the merits," Mot. 3, but that is incorrect—instead, Alexion must provide a "strong showing," *Duramed Pharms.*, 426 F. App'x at 906, and the "legal rights at issue" must be "indisputably clear," *S. Bay United Pentecostal Church*, 140 S. Ct. at 1613 (citation omitted).[2] Alexion has fallen well short of such a "strong" showing here.

## A. The District Court Did Not Clearly Err in Finding Substantial Questions of Validity Regarding the PNH Claim ('189 Patent)

A patent holder seeking a preliminary injunction "bears the burden of establishing a likelihood of success on the merits with respect to the patent's validity." *Entegris, Inc. v. Pall Corp.*, 490 F.3d 1340, 1351 (Fed. Cir. 2007). At the preliminary injunction stage, an alleged infringer who has asserted an invalidity defense, as Samsung has here, need only raise a "substantial question" concerning the validity of the asserted patent to

---

[2] The "substantial case" standard Alexion invokes, Mot. 3, is inapplicable—that standard applies only when "the harm factors militate in [the movant's] favor," *Eli Lilly & Co. v. Actavis Elizabeth, LLC*, 2010 WL 3374123, at *1 (Fed. Cir. Aug. 26, 2010), but here, Alexion provides no substantive argument regarding the "harm factors" at all, Mot. 20-21.

defeat the motion. *Genentech, Inc. v. Novo Nordisk A/S*, 108 F.3d 1361, 1364 (Fed. Cir. 1997). As the District Court correctly found, Samsung has raised such substantial questions as to both the PNH and aHUS claims.

> **1.    The District Court Correctly Recognized that the PTAB Has Already Found Substantial Questions of Validity Regarding the PNH Claim ('189 Patent)**

As the District Court explained, "the PTAB's institution of IPR against the '189 patent raises a substantial question of validity." Ex. 1 at 4. Far from clear error, that finding comports with this Court's longstanding precedent, decisions from across the country concerning IPR proceedings, and the PTAB's detailed determinations supporting its decision.

For decades and in a variety of contexts, this Court has recognized that the USPTO's determinations in parallel proceedings may raise substantial questions of validity. *See, e.g.*, *E.I. DuPont de Nemours & Co. v. Phillips Petroleum Co.*, 835 F.2d 277, 278 (Fed. Cir. 1987) (holding that "PTO examiner's rejection of [a plaintiff's] claims as invalid" after court found the claims valid showed that "substantial legal questions concerning claim interpretation exist," thus warranting stay of the

district court's judgment); *Standard Havens Prods., Inc. v. Gencor Indus., Inc.*, 897 F.2d 511, 514-16 (Fed. Cir. 1990) (holding that alleged infringer had a "substantial chance of prevailing" in an appeal challenging infringement judgment because Commissioner of Patents and Trademarks had ordered reexamination of the infringed patents, which "show[ed] a substantial legal question exists regarding validity" and warranted stay pending appeal); *Procter & Gamble Co. v. Kraft Foods Glob., Inc.*, 549 F.3d 842, 847-48 (Fed. Cir. 2008) (directing district court to "consider the current posture of the *inter partes* reexamination proceedings at the PTO when evaluating [the plaintiff's] likelihood of success on the merits").

Consistent with this reasoning, courts across the country have thus recognized that the PTAB's decision to institute IPR raises substantial questions regarding validity. *See, e.g.*, *Adidas Am., Inc. v. Skechers USA, Inc.*, 2017 WL 2604310, at *5 (D. Or. June 12, 2017) (finding that PTAB's conclusion in instituting IPR "demonstrates that there is at least a substantial question regarding the validity of the asserted patents"); *Murata Mach. USA, Inc. v. Daifuku Co.*, 2016 WL 4287040, at *2 (D. Utah Aug. 15, 2016) (similar); *TAS Energy, Inc. v. Stellar Energy Ams.*,

*Inc.*, 2015 WL 6156149, at *8 (M.D. Fla. Oct. 19, 2015) (similar). These decisions reflect the practical significance of IPR institution—in FY2023, over 77% of challenged claims in IPRs that were instituted went on to be cancelled in the final written decision. Ex. 1 at 4; *see* Ex. E at 13 (5,894 instituted claims found unpatentable in final decision, with 1,691 claims found patentable). And tellingly, Alexion cites no case to the contrary. There can be little dispute that institution decisions like the PTAB's here raise, at a minimum, substantial questions regarding a patent's validity.

### 2. Alexion's Estoppel Arguments Are Meritless

Alexion nonetheless insists that Samsung's invalidity defenses in its IPR "have no legal bearing on these preliminary injunction proceedings," Mot. 14, because Samsung may eventually be estopped from making these defenses "at trial," Mot. 12 (emphasis omitted). Indeed, Alexion's audacious position is that it is entitled to the extraordinary remedy of preliminary injunction, ***even if it is likely that the PTAB will invalidate the '189 patent***. Alexion offers no legal support for this position, which cannot withstand scrutiny.

Alexion admits that estoppel cannot attach at least until a final written decision is issued in the IPR, Mot. 14-15, and thus cannot dispute

that Samsung *may* rely on the invalidity arguments raised in the IPR for the purposes of establishing a "substantial question" of invalidity. *See United Therapeutics Corp. v. Liquidia Techs., Inc.*, 74 F.4th 1360, 1372 (Fed. Cir. 2023) ("[A]n IPR decision does not have collateral estoppel effect until that decision is affirmed or the parties waive their appeal rights."), *cert. denied*, 144 S. Ct. 873 (2024).[3] Whether trial will occur before a decision on appeal in the IPRs is inconsequential to the applicable legal standard here: Has Samsung established a substantial question of invalidity? As agreed by the PTAB after extensive, technical analysis, it has.

As the District Court recognized, Alexion's argument would compel a court to provide the extraordinary remedy of an injunction to a patent owner who likely has an invalid patent. Ex. 1 at 4. Alexion asks the Court to ignore invalidity of the PNH claim if the PTAB, rather than the District Court, is likely to invalidate it. This is improper.

---

[3] None of the cases Alexion cites (Mot. 15) are to the contrary: these cases stand for the unremarkable proposition that a PTAB finding of invalidity is not preclusive in parallel infringement litigation until it is *final* (through affirmance or waiver of appellate rights).

### 3. As the District Court Recognized, the PTAB Evaluated Extensive Evidence and Correctly Found a Reasonable Likelihood of Invalidity

While Alexion further complains that IPR should not have been instituted in the first place, *see* Mot. 7-12, the PTAB's 67-page decision thoroughly evaluated the same evidence Alexion presents here, and its "extensive" technical determinations are more than sufficient to raise substantial questions regarding the validity of the PNH claim. Ex. 1 at 4; *see* Ex. A.

***First***, the PTAB's institution decision endorsed not just one, but three separate "Grounds" of invalidity, each constituting a separate substantial question, and credited Samsung's arguments as "more plausible," "well-reasoned," and "compelling." Ex. A at 39, 41, 46, 63. While it is unnecessary to detail all of the PTAB's findings, the institution decision recognized, in particular, that the PNH claim is obvious over a group of several specific references, each of which was published by or in collaboration with Alexion. *See id.* at 12-20, 29-43. Among other things, these references teach that eculizumab antibody was a useful treatment for PNH "more than a year before the '189 patent was filed," *id.* at 27-28, and that the amino acid sequence of this antibody had been previously

disclosed in numerous ways, *see, e.g., id.* at 39-40.  And on top of that, the

PTAB provided a detailed analysis of two other Grounds supporting its

invalidity determination.  *See id.* at 45-46, 49-55.

***Second***, the PTAB already considered (and rejected) the *same*

arguments Alexion repeats here, Mot. 7-12, based on the same validity

declarations from the same experts.  By way of example only:

- Alexion argues that prior art references would have directed a person of ordinary skill in the art to Thomas's IgG4 antibody, Mot. 7, but the PTAB disagreed and found it "more plausible" that such a person would have been led to the claimed IgG2/G4 sequence based on Samsung's proposed obviousness combinations, Ex. A at 38-39.

- Alexion argues that a person of ordinary skill in the art would not have been motivated to combine Bowdish, Evans, Bell, Mueller, and Tacken, Mot. 7-8, but the PTAB credited as "compelling" Samsung's argument that a person would have been led to Evans, starting from Bell and Tacken, to produce the claimed sequence and that Mueller discloses the same sequence, Ex. A at 45-46.

- Alexion argues that Samsung failed to show that the prior art discloses the formulation, administration, and patient conditional limitations of the PNH claim, Mot. 11, but the PTAB found Samsung's support for the limitations "sufficient" for institution, Ex. A at 43, 46, 55.

By simply rehashing these arguments, Alexion provides no basis to

disturb the PTAB's findings—much less doubt that they raise

"substantial questions" regarding validity.

***Finally***, the PTAB identified specific material errors made by the Examiner during the prosecution of the '189 patent—including by crediting Alexion's *ex parte* arguments. Ex. A at 66. Alexion ignores this history and instead argues that the Examiners "apparently agree that Samsung's arguments are flawed" because a different party, Amgen, successfully petitioned for IPRs against the parent patents on different grounds before settling with Alexion in 2019. Mot. 10-11. That argument is irrelevant. *See Polaris PowerLED Techs., LLC v. Dell Techs. Inc.*, 2024 WL 1546973, at *3 (W.D. Tex. Mar. 5, 2024) (IPR institution suggested likelihood of success in showing invalidity, thus warranting a stay, even though same patent had been challenged in four previous IPRs that were not instituted).

**B.    The District Court Did Not Clearly Err in Finding Substantial Questions of Validity Regarding the aHUS Claim ('176 Patent)**

The District Court likewise committed no clear error in finding that there are substantial questions regarding the validity of the aHUS claim, *see* Ex. 1 at 5-7, and Alexion's arguments to the contrary fail, Mot. 15-20.

**1.    The aHUS Claim Is Obvious in View of Noris (2005) and the SOLIRIS® Label (2007)**

As the District Court recognized, there are substantial questions regarding whether the claimed dosing schedule for aHUS was obvious in view of two references: Noris (2005) and the 2007 SOLIRIS® label (2007). Ex. 1 at 5-7; *see* Ex. 24 ¶¶ 107-28.

Noris (2005) is a review article showing that, well before 2008, a person of ordinary skill in the art recognized that both PNH and aHUS were hemolytic disorders caused by hyperactivation of the complement system.   Ex. 24 ¶¶ 57-64, 108-11.   Noris described the underlying complement hyperactivation found in patients with aHUS, noting "[t]he discovery of mutations in three different complement regulatory genes provides enough evidence of the involvement of complement activation in the pathogenesis of [aHUS] and indicates that complement inhibition could represent a therapeutic target in these patients."  Ex. F at 1044;

Ex. 24 ¶¶ 58, 111, 113. Noris further noted that eculizumab is a monoclonal antibody that is "directed against C5 that inhibit[s] the activation of terminal complement components," and concluded: "It is hoped that the above complement inhibitors, once available to the market, will be useful in [aHUS] patients." Ex. F at 1044. Noris thus expressly suggested using eculizumab to treat aHUS. *Id.*; Ex. 24 ¶¶ 115, 122-23.

A person of ordinary skill in the art following Noris's suggestion would then look to the available FDA-approved SOLIRIS® label (2007) as a starting point for an eculizumab dosing schedule, as the FDA previously approved eculizumab as safe and effective in treating another complement hyperactivation disease, PNH. Ex. 24 ¶¶ 48-56, 125-26. The approved eculizumab dosing schedule for PNH fits squarely within the dosing schedule recited in the aHUS claim, as illustrated below:

| Claim 1 Dosing Limitation | FDA-Approved SOLIRIS® label (2007) Disclosure |
|---|---|
| "at least 600 mg of eculizumab once per week for four consecutive weeks; and beginning at week five, maintenance doses of at least 900 mg eculizumab every two weeks thereafter." | **2.1 Recommended Dosage Regimen**<br>Soliris therapy consists of:<br>• 600 mg every 7 days for the first 4 weeks, followed by<br>• 900 mg for the fifth dose 7 days later, then<br>• 900 mg every 14 days thereafter. |

Ex. 4, Claim 1; Ex. B § 2.1; Ex. 24 ¶¶ 47, 117, 127.  Thus, the District Court correctly found a reasonable expectation of success by following Noris's express suggestion to use eculizumab to treat aHUS and using the previously approved SOLIRIS® label (2007) dosing schedule.  Ex. 1 at 5-7.

Alexion identifies no clear error in that finding, and its counterarguments are unpersuasive for at least three reasons.  *See* Mot. 15-20.

***First***, Alexion repeatedly points to the declaration of its expert, Dr. Blasco, regarding the aHUS claim, *see* Mot. 17-20, but that declaration should be disregarded because it was introduced for the first time in Alexion's ***reply*** brief.  "An issue is waived unless a party raises it in its opening brief[.]"  *Laborers' Int'l Union of N. Am., AFL-CIO v. Foster Wheeler Energy Corp.*, 26 F.3d 375, 398 (3d Cir. 1994).  And to the extent this Court considers Dr. Blasco's declaration at all, it should also consider his subsequent deposition testimony (Ex. D), which he provided only after briefing was complete.  *See, e.g.*, *Cyntec Co. v. Chilisin Elecs. Corp.*, 84 F.4th 979, 989 n.6 (Fed. Cir. 2023) ("An appellate court may take judicial

notice of court filings and other matters of public record." (quotation marks omitted)).

**Second**, Alexion attempts to downplay Noris's teaching—suggesting that it offered no more than vague "hope" for expectation of success. But "case law is clear that obviousness cannot be avoided simply by a showing of some degree of unpredictability in the art so long as there was a reasonable probability of success," as "the expectation of success need only be reasonable, not absolute." *Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1364 (Fed. Cir. 2007). And here, the District Court correctly recognized that such a "reasonable probability" existed: well before 2008, a person of ordinary skill in the art recognized that (i) both PNH and aHUS were hemolytic disorders caused by hyperactivation of the complement system, (ii) the complement system was well characterized, and (iii) the defects in complement responsible for aHUS were known. *See* Ex. 24 ¶¶ 57-64, 108-11, 126.

**Finally**, Alexion ignores the other extensive knowledge a person of ordinary skill in the art would have had at the time. This knowledge included, for example, the mechanism of action that formed the basis for eculizumab's therapeutic effects and the fact that eculizumab acted

downstream of known defects in the complement system that resulted in hyperactivation consequently in aHUS—indeed, even Alexion's expert has acknowledged as much. *See* Ex. G at 10; Ex. 22 ¶¶ 49-50; *see also* Ex. G at 11 (quoting Blasco).

### 2. The aHUS Claim Is Anticipated by Chatelet (2008)

While the District Court had no need to reach the issue, *see* Ex. 1 at 7 n.2, there are substantial questions regarding the validity of the aHUS claim for a second reason: Chatelet (2008) disclosed every element of the claim prior to November 10, 2009, the earliest priority date that the aHUS claim is entitled to.

Chatelet is an abstract that discloses a study using eculizumab off-label to treat a patient with recurrent aHUS using the claimed dosing schedule. *See* Ex. H.[4] As illustrated below, Chatelet discloses each and every limitation of claim 1, and renders the aHUS claim invalid:

---

[4] While the date on the face of the abstract is November 16, 2008, an Alexion Press Release and the American Society of Hematology's website confirm that abstract was in fact available as of November 10, 2008. Ex. M at 6, 11.

| aHUS Claim (Claim 1 of the '176 Patent) | Chatelet (2008) Disclosure |
|---|---|
| 1. A method for treating atypical hemolytic uremic syndrome (aHUS), | "In this study, we report the first case of eculizumab treatment in a patient with recurrent aHUS . . . ." Ex. H at 1. |
| the method comprising administering to a patient in need thereof eculizumab | "The patient received 4 doses of eculizumab . . . ." *Id*. at 2. |
| in an amount effective to treat aHUS in the patient; | "In summary, the data suggest that chronic blockade of complement C5 with eculizumab maintained renal function and reduced platelet consumption and hemolysis without PT in a patient with aHUS previously dependent on frequent PT. Based on these results clinical trials are warranted to confirm the activity of eculizumab for the treatment of patients with recurrent aHUS that are dependent on PT." *Id*. |
| wherein the eculizumab is intravenously administered to the patient under the following schedule: | "The patient received 4 doses of eculizumab, 900 mg IV . . . ." *Id*. |
| at least 600 mg of eculizumab once per week for four consecutive weeks; and beginning at week five, maintenance doses of at least 900 mg eculizumab every two weeks thereafter. | "The patient received 4 doses of eculizumab, 900 mg IV approximately every 7 days, and then 1200 mg 7 days later, and is scheduled to receive chronic dosing at 1200 mg every 14 days." *Id*. |

Alexion offers two responses, Mot. 17-20, but neither is persuasive.

***First***, Alexion asserts that Chatelet is "not prior art" because Alexion is entitled to a priority date of November 10, 2008—the date the '803 provisional application was filed. Mot. 17-18 & n.6. "[W]hen a patent owner attempts to antedate an asserted prior art reference, the patent owner assumes a temporary burden of production." *Parus Holdings, Inc. v. Google LLC*, 70 F.4th 1365, 1371 (Fed. Cir. 2023). Here, Alexion cannot meet this burden because—as the table in its motion makes clear, *see* Mot. 18-19—none of the provisional applications provide written description support for the claimed maintenance dosing limitation of "***at least*** 900 mg." *See* Ex. 24 ¶¶ 75-90 (emphasis added) (citing'176 patent provisional applications). Instead, the '803 provisional application discloses "***about*** 900mg" or "***being*** 900 mg," Ex. I at 39:1-12, 47:18-25, which is simply not "interchangeable" with the claimed maintenance dose of "at least 900mg," Mot. 19 (emphasis added).[5] The

---

[5] Alexion's reliance on Dr. Blasco's declaration should be given no weight for several other reasons, including his limited understanding of the English language and his admission that he could identify only three paragraphs in his declaration that he had drafted, none of which were directed to the disclosure of the '803 provisional or the '176 patent. Ex. D at 13:1-14, 23:16-24:19.

earliest effective filing date of the aHUS claim is thus the filing date of the PCT application, November 10, 2009.

**Second**, Alexion argues that "*Alexion* invented the claimed method of treatment and provided it to Dr. Chatelet." Mot. 20 (emphasis added). Alexion's argument is unsupported speculation. The document Alexion cites (at p. 20) and alleges, without support, Dr. Chatelet allegedly received from Alexion in July 2008, refers to a "treatment schedule" in "the context of treatment of this particular patient and as a result of our discussions." Ex. 26 at 6. But even Alexion's purported expert admitted he had no basis to claim that anyone other than Dr. Chatelet invented the claimed dosing schedule. Ex. D at 134:17-136:11, 137:10-138:13. Therefore, Alexion has not provided a "strong showing" that the aHUS claim is not invalid based on anticipation by Chatelet (2008).

## II. ALEXION HAS FAILED TO DEMONSTRATE IRREPARABLE HARM ABSENT AN INJUNCTION

The Supreme Court has been clear that an injunction may not issue "based only on the possibility of irreparable harm." *Winter,* 555 U.S. at 22. Remarkably, however, Alexion attempts to establish irreparable harm in *less than one sentence* with no substantive analysis, Mot. 20-21—thereby waiving the issue. *See Rodriguez*, 8 F.4th at 1305. The

arguments Alexion raised below—if considered—are patently insufficient for at least three reasons.

**First**, Alexion's "delays in bringing suit against [Samsung] negate[] the idea of irreparability." *Pfizer, Inc. v. Teva Pharm., USA, Inc.*, 429 F.3d 1364, 1382 (Fed. Cir. 2005). Alexion waited **seven months**—until the very last day of the BPCIA's 180-day period after receiving Samsung's Notice of Commercial Marketing—to file this case, then waited another month to seek a preliminary injunction. *See* 42 U.S.C. § 262(*l*)(8)(B); Ex. 3 (filed Jan. 3, 2024). Alexion's lack of urgency in filing its motion, "particularly in light of relevant provisions under the BPCIA, should be sufficient by itself to deny the motion." *Genentech, Inc. v. Amgen Inc.*, 2019 WL 3290167, at *3 (D. Del. July 18, 2019), *aff'd*, 796 F. App'x 726 (Fed. Cir. 2020).

**Second**, any lost sales or price erosion may be redressed through "monetary damages," which "belies a claim of irreparable injury." *Takeda Pharms. U.S.A., Inc. v. Mylan Pharms. Inc.*, 967 F.3d 1339, 1349 (Fed. Cir. 2020) (citation omitted). Indeed, Alexion has *already determined* a royalty rate that compensates it for biosimilar competition before March 1, 2025, as demonstrated by its settlement and

license agreement with Amgen. Ex. J §§ 4(a)-(b); *see, e.g.*, *Nichia Corp. v. Everlight Americas, Inc.*, 855 F.3d 1328, 1343-44 (Fed. Cir. 2017) (affirming district court finding that prior grant of licenses to significant competitors undermined any claim of irreparable harm). Moreover, Alexion's own expert has agreed that the information necessary to calculate such damages with reasonable certainty will be available by the time of trial. *See* Ex. K at 25:2-12.

**Finally**, Alexion's alleged harms to goodwill and alleged impacts from workforce redeployment are speculative. Indeed, Alexion's expert conceded that his opinions on both of these issues are not substantiated by any Alexion document or witness interview. *Id.* at 90:10-25 ("Q. Did you speak with any employee of Alexion concerning the potential impacts to reputation and goodwill that would manifest from a launch of SB12? A. I did not."); *see also, e.g.*, Ex. 9 at 23 (quoting Thomas Dep. Tr.: "Q. Okay. Have you seen any Alexion document that projects workforce reduction, as opposed to redeployment, as a result of biosimilar entry? A. As I said, that there are certain line items on this chart - well, no, I don't.").

Accordingly, Alexion has fallen well short of demonstrating any immediate, irreparable harm that would warrant any injunctive relief.

## III. THE REMAINING FACTORS DO NOT SUPPORT AN INJUNCTION

As with irreparable harm, Alexion has failed to address the balance of hardships and public interest. Mot. 20-21. If considered, however, both factors tip in Samsung's favor.

Alexion has previously pointed to the "los[s] [of] the value of its hard-earned intellectual property reflecting decades of investment and innovation." Ex. 27 at 19. But Alexion's key patents covering the composition of eculizumab began expiring in 2021. Ex. L ¶ 62. Moreover, Alexion has already granted Amgen a free license to enter the market years before the expiration of these patents—suggesting little, if any, hardship absent an injunction now.

Any injunction preventing Samsung from selling SB12 is also against the public interest. The interest of a pharmaceutical company in maintaining its revenue and market share, on the facts here, should not

forestall access to more affordable, FDA-approved drugs for the public at large.

**CONCLUSION**

For the foregoing reasons, this Court should deny Alexion's motion for an injunction pending appeal.

Dated: July 1, 2024

COOLEY LLP

*/s/ Michelle S. Rhyu*
MICHELLE S. RHYU
DANIEL J. KNAUSS
3175 Hanover Street
Palo Alto, CA 94304
(650) 843-5000
rhyums@cooley.com
dknauss@cooley.com

ORION ARMON
1144 15th St., Suite 2300
Denver, CO 80202
(720) 566-4000
oarmon@cooley.com

JONATHAN DAVIES
1299 Pennsylvania Ave., NW
Suite 700
Washington, DC 20004
(202) 776-2049
jdavies@cooley.com

PATRICK J. HAYDEN
55 Hudson Yards
New York, NY 10001
(212) 479-6000

phayden@cooley.com

ALEXANDER ROBLEDO
500 Boylston Street
Boston, MA 02116
(617) 937-2300
arobledo@cooley.com

*Counsel for Appellee*

# EXHIBITS

TABLE OF CONTENTS

**EXHIBITS IN SUPPORT OF APPELLEE'S OPPOSITION TO
MOTION FOR INJUNCTION PENDING APPEAL**

| EXHIBIT | DOCUMENT DESCRIPTION |
|---------|----------------------|
|  | Order Granting Unopposed Motion to File Under Seal, dated June 3, 2024 |
| A | *Samsung Bioepis Co., Ltd. v. Alexion Pharmaceuticals, Inc.*, IPR2023-01069, Paper 9, Decision – Institution of *Inter Partes Review* (P.T.A.B Dec. 20, 2023) (D.I. 45-8) |
| B | SOLIRIS® March 2007 Label (D.I. 45-7) |
| C | July 7, 2023 Letter from Samsung Bioepis to Alexion Pharmaceuticals (D.I. 19-1, Ex. C) |
| D | Excerpted Deposition Transcript of Josep Miquel Blasco Pelicano, M.D., dated Apr. 29, 2024 (D.I. 70, Ex. A) |
| E | United States Patent and Trademark Office, PTAB Trial Statistics FY23 End of Year Outcome Roundup IPR, PGR Publication (D.I. 45-10) |
| F | Noris et al, *Hemolytic Uremic Syndrome*¸ 16 J. Am. Soc. Nephrology 1035 (2005) (D.I. 45-3) |
| G | Samsung Bioepis Co. Ltd.'s Opposition to Plaintiffs' Emergency Motion for Injunction Pending Appeal and Temporary Restraining Order Pending Resolution of This Motion, dated May 31, 2024 (Public Version) (D.I. 70) |
| H | Chatelet et al., *Efficacy of Eculizumab in a Plasmatherapy-Dependent Patient with Atypical Hemolytic Uremic Syndrome with C3 Mutation Following Plasmatherapy Withdrawal*, 112 Blood 4579 (2008) (D.I. 46-10) |

| Exhibit | Document Description |
|---------|----------------------|
| I | Provisional Application No. 61/198,803 filed on Nov. 10, 2008 (D.I. 45-20) |
| J | Confidential Settlement and License Agreement Between Alexion Pharmaceuticals, Inc. and Amgen Inc., dated May 28, 2020 (Public Version) (D.I. 45-9) |
| K | Deposition Transcript of Vincent A. Thomas, dated Mar. 5, 2024 (Public Version) (D.I. 46-16) |
| L | Declaration of Mohan Rao, Ph.D., dated Mar. 14, 2024 (Public Version) (D.I. 47) |
| M | Affidavit of Duncan Hall, Internet Archive Records Request Processor, dated June 14, 2021 attaching Alexion and American Society of Hematology's website pages, dated Nov. 10, 2008 (D.I. 46-13) |

**NOTICE REGARDING CONFIDENTIALITY**

Pursuant to Federal Circuit Rule 25.1, Appellee Samsung Bioepis Co. Ltd. has attached a public version of an exhibit in support of this opposition that omits certain of Appellants' confidential information. Specifically, Exhibit D contains testimony of Appellants' expert witness pertaining to Appellants' alleged prior invention history and related communications. The omitted information was designated as confidential by the parties under a sealing order entered by the District Court.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ALEXION PHARMACEUTICALS, INC. and ALEXION PHARMA INTERNATIONAL OPERATIONS LTD., | ) ) ) | |
| | ) | |
| Plaintiffs, | ) | C.A. 24-005-GBW |
| | ) | |
| v. | ) | |
| | ) | |
| SAMSUNG BIOEPIS CO. LTD., | ) | |
| | ) | |
| Defendant. | ) | |

## [PROPOSED] ORDER GRANTING *UNOPPOSED* MOTION TO FILE UNDER SEAL

The Court having considered Samsung's Unopposed Motion to File Under Seal,

IT IS HEREBY ORDERED THAT:

1. The Unopposed Motion to Seal is GRANTED.

2. Samsung may file its Answering Brief, and exhibits attached thereto under seal and subject to the requirements of D. Del. LR 5.1.3.

3. The parties will confer and file redacted versions of the Answering Brief and exhibits attached thereto in accordance with this Court's procedures.

SO ORDERED this ____3d____ day of ___June___, 2024.

_____
United States District Judge

# EXHIBIT A

Trials@uspto.gov                                                      Paper 9
571-272-7822                                      Entered: December 20, 2023

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

SAMSUNG BIOEPIS CO., LTD.,
Petitioner,

v.

ALEXION PHARMACEUTICALS, INC.,
Patent Owner.

_____

IPR2023-01069
Patent 10,590,189 B2

_____

Before TINA E. HULSE, ROBERT A. POLLOCK, and RYAN H. FLAX,
*Administrative Patent Judges*.

POLLOCK, *Administrative Patent Judge*.

DECISION
Institution of *Inter Partes* Review
35 U.S.C. § 314(a)

IPR2023-01069
Patent 10,590,189 B2

# I.    INTRODUCTION

Samsung Bioepis Co., Ltd. ("Petitioner" or "Samsung Bioepis") filed a Petition for an *inter partes* review of claims 1–8 (all claims) of U.S. patent No. 10,590,189 B2 ("the '189 patent," Ex. 1001). Paper 2 ("Pet."). Alexion Pharmaceuticals ("Patent Owner" or "Alexion") timely filed a Preliminary Response. Paper 6 ("Prelim. Resp."). The parties further submitted an authorized Reply and Sur-Reply to the Preliminary Response. Paper 7 ("Reply"); Paper 8 ("Sur-reply").

We reviewed the Petition, Preliminary Response, Reply, Sur-Reply, and accompanying evidence under 35 U.S.C. § 314. An *inter partes* review may not be instituted unless "the information presented in the petition . . . and any response . . . shows that there is a reasonable likelihood that the petitioner would prevail with respect to at least 1 of the claims challenged in the petition." 35 U.S.C. § 314(a). Further, a decision to institute may not do so on fewer than all claims challenged in the petition. *SAS Inst., Inc. v. Iancu*, 138 S. Ct. 1348, 1359–60 (2018).

After considering the evidence and arguments presented in the Petition, Preliminary Response, Reply, and Sur-Reply, we determine that Petitioner demonstrates a reasonable likelihood of prevailing in showing that at least one of the challenged claims of the '189 patent is unpatentable. Accordingly, we institute an *inter partes* review as to all the challenged claims of the '189 patent on all the grounds of unpatentability set forth in the Petition. We note that there are disputed issues in this proceeding under 35 U.S.C. § 325(d) and § 314(a) concerning discretionary denial; however,

IPR2023-01069
Patent 10,590,189 B2

we decline to exercise our discretion to deny institution. *See* Pet. 63–74
Prelim. Resp. 15–31; Reply; Sur-Reply.

A.     Real Parties-in-Interest

Petitioner identifies only itself as the real party-in-interest. Pet. 2.
Patent Owner identifies itself as the real party-in-interest, but also notes that
it is wholly owned by AstraZeneca PLC. Paper 3, 1.

B.     Related Proceedings

In February of 2019, Amgen, Inc. filed Petitions for *Inter Partes*
Review of U.S. Patent Nos. 9,718,880 (the '880 patent), 9,725,504 B2 ("the
'504 patent), and 9,732,149 B2 ("the '149 patent") in IPR2019-00740 ("the
00740 IPR"), IPR2019-00739 ("the 00739 IPR"), and IPR2019-00741 ("the
00741 IPR"), respectively (collectively "the Amgen IPRs"). *See* Pet. 2
(citing Ex. 1024), Paper 3, 1; Prelim. Resp. 1 n.2. We instituted *Inter Partes*
Review in each of the 00740 IPR, 00739 IPR, and 00741 IPR. *See, e.g.*,
Ex. 1024. In June of 2020, and following settlement between the parties, we
terminated each of the Amgen proceedings without issuing a final written
decision. Ex. 1026. Before the filing of the instant Petition for IPR, Patent
Owner submitted the records of the three terminated IPRs in the prosecution
of related applications, which issued as the '189 patent and U.S. Patent No.
10,703,809 B1 ("the '809 patent) (collectively, "the child patents"). *See*
Ex. 1001, code [56]; Ex. 3003, code [56].

According to Petitioner, "[t]he '189 patent has never been asserted in
any litigation." Pet. 63.

3

IPR2023-01069
Patent 10,590,189 B2

The '189 and '809 patents share essentially the same specification with the earlier-issued '880, '504, and '149 patents. Samsung Bioepis has filed Petitions for *Inter Partes* Review of the '880, '504, '149, '189, and '809 patents in IPR2023-00998, IPR2023-00999, IPR2023-00933, IPR2023-01069, and IPR2023-01070, respectively. Pet. 2; Paper 3, 1.

The '880, '504, '149, '189, and '809 patents are related as follows: The '809 patent issued from application No. 16/804,567, filed on February 28, 2020, which is a continuation of application No. 16/750,978, filed on January 23, 2020, which is a continuation of application No. 15/642,096 (now the '189 patent), filed on July 5, 2017, which is a continuation of application No. 15/284,015 (now the '149 patent), filed October 3, 2016, which is a continuation of application No. 15/260,888 (now the '504 patent), filed on September 9, 2016, which is a continuation of application No. 15/148,839 (now the '880 patent), filed on May 6, 2016, which is a continuation of application No. 13/426,973, filed on March 22, 2012, which is a continuation of application No. 12/225,040, filed as application No. PCT/US2007/006606 on March 15, 2007. The parties do not dispute that March 15, 2007, is the relevant priority date of the challenged patent. Pet. 18; Prelim. Resp. 2.

C.   The '189 patent and Relevant Background

The '189 patent, listing Leonard Bell, Russell P. Rother, and Mark J. Evans as inventors, relates to the use of a humanized anti-C5 antibody (eculizumab) for the treatment of paroxysmal nocturnal hemoglobinuria (PNH). *See* Ex. 1001, code (72), Abstract.

IPR2023-01069
Patent 10,590,189 B2

PNH is an acquired hemolytic disease resulting from loss of function
in certain cytoprotective proteins. Ex. 1001, 1:33–42. This loss of function
renders red blood cells, platelets and other blood cells highly sensitive to
attack via activated complement proteins (explained in detail below). *Id.* The
resultant complement-mediated lysis of blood cells results in several
symptoms, which impair a patient's quality of life to the extent that "[m]any
PNH patients depend on blood transfusions to maintain adequate erythrocyte
hemoglobin levels." Ex. 1001, 1:58–60. As further explained by Petitioner's
declarant, Dr. Ravetch, "[p]atients who suffer from PNH have sudden
attacks in the night ('paroxysmal nocturnal') and have hemoglobin in the
urine, causing dark coloring ('hemoglobinuria')" and "other known clinical
symptoms, such as anemia, fatigue, thrombosis and pain." Ex. 1003 ¶ 56.[1]

The complement system acts in conjunction with other immunological
systems of the body to defend against intrusion of cellular and viral
pathogens. *See generally* Ex. 1001, 7:17–8:62. As part of the immune
system, "[c]omplement components achieve their immune defensive
functions by interacting in a series of intricate but precise enzymatic
cleavage and membrane binding events. The resulting complement cascade
leads to the production of products with opsonic, immunoregulatory, and
lytic functions." *Id.* at 7:30–35. The complement cascade progresses through
the classical or alternative pathways, which "differ in their initial steps," yet
"converge and share the same 'terminal complement' components (C5

---

[1] Declaration of Jeffrey V. Ravetch, M.D., Ph.D. (Ex. 1003, "Ravetch
Declaration").

IPR2023-01069
Patent 10,590,189 B2

through C9) responsible for the activation and destruction of target cells." *Id.*
at 7:38–40. Before converging in terminal complement components,
complement component "C3 is . . . regarded as the central protein in the
complement reaction sequence since it is essential to both the alternative and
classical pathways." *Id.* at 7:66–8:2. All pathways lead to the cleavage of C3
convertase and the resultant cleavage of C5 convertase into C5a and C5b. *Id.*
at 7:64–66.

    Blocking the cleavage of C5 with specific antibodies, however, is
known to prevent complement activation. *See, e.*g., *id.* at 11:10–14 ("U.S.
Pat. No. 6,355,245 [Evans[2]] teaches an antibody which binds to C5 and
inhibits cleavage into C5a and C5b thereby decreasing the formation not
only of C5a but also the downstream complement components."); 12:22–26.
For reference, we reproduce figures from paragraphs 37 and 38 of the
Ravetch Declaration, illustrating the basic structure of an antibody such as
eculizumab:



Basic domain structure of antibody

---

[2] US 6,355,245 B1, issued Mar. 12, 2002 (Ex. 1005).

IPR2023-01069
Patent 10,590,189 B2



Basic domain structure of antibody

The figures above show a basic antibody structure having hinged heavy chains (colored blue) and accompanying light chains (colored green), with each chain having constant regions ($C_{H1}$, $C_{H2}$, $C_{H3}$, and $C_L$) and variable regions ($V_H$ and $V_L$), all arranged in a general "Y" shaped structure, as the variable regions and portions of the constant heavy chain regions are angled away from one another via a hinge region between CH1 and CH2. Ex. 1003 ¶¶ 37, 44. The above figures also illustrate that the variable regions of each chain also include three complementarity determining regions (CDR 1, CDR 2, and CDR 3—shown in darker green), which provide the antibody with antigen-binding specificity. *Id.* ¶ 38.

There are five classes of antibodies, with IgG being the most abundant class in humans and represented by the illustration above. *Id.* ¶¶ 43–44. IgG has been characterized as having subclass constant domains, for example, IgG1, IgG2, IgG3, and IgG4, defined by their amino acid sequences. *Id.* Each displays unique properties based on affinity for specific receptors. *Id.*

According to the '189 patent "[a] preferred method of inhibiting complement activity is to use a monoclonal antibody which binds to complement C5 and inhibits cleavage. . . . Such antibodies which are

IPR2023-01069
Patent 10,590,189 B2

specific to human complement are known . . . [and] include a preferred
whole antibody (now named eculizumab). *Id.* at 12:29–37 (citing Evans).
The Specification further discloses that eculizumab is a humanized
monoclonal antibody directed against the terminal complement protein C5
convertase and is, thus, intended to suppress the terminal activation cascade
and resultant complement activation. *Id.* at Abstract, 1:63–64 (citing as
endnote 11, Thomas C. Thomas et al., *Inhibition of Complement Activity by
Humanized Anti-C5 Antibody and Single-Chain Fv*, 33(17) Mol. Immunol.
1389–401 (1996) (Ex. 1010, "Thomas")). More specifically, "eculizumab"
refers to a specific humanized antibody derived from mouse antibody 5G1.1,
sometimes referred to as "murine 5G1.1" or "m5G1.1." *See* Prelim. Resp. 7–
8. The term "humanized" refers to an antibody having a human framework,
into which CDR regions from a non-human monoclonal antibody (*e.g.*,
mouse) are inserted. Ex. 1005, 5:57–67; Ex. 1003 ¶ 53. Accordingly,
humanized versions of non-human antibodies may be indicated by the prefix
"h" or "hu" as in "h5G1.1" and "hu5G1.1." *See, e.g.*, Pet. 9, 10, 11; Prelim.
Resp. 18, n.7; Ex. 1003 ¶ 61; *but see* Ex. 2022 ¶ 121 (Dr. Casadevall noting
that "'5G1.1' or 'h5G1.1' could potentially refer to multiple different
antibody structures (when not further limited or clarified by additional
context)"); Ex. 1003 ¶ 66 (Dr. Ravetch noting the use of "5G1.1 and h5G1.1
as 'synonyms'").

Claims 1 and 5 of the '189 patent recite the amino acid sequences of
SEQ ID NO: 2 and SEQ ID NO: 4, which together comprise the eculizumab
antibody. *See generally* Prelim. Resp. 14. The '189 patent identifies SEQ ID

8

IPR2023-01069
Patent 10,590,189 B2

NO: 2 and SEQ ID NO: 4 as the "Eculizumab Heavy Chain" and
"Eculizumab Light Chain," respectively. Ex. 1001, 30:37–54, 30:61–31:5.

It is undisputed that SEQ ID NO: 2 encodes a hybrid IgG2/IgG4
heavy chain (i.e., having a genetically engineered heavy chain constant
region derived from portions of IgG2 and IgG4 isotype antibodies). *See, e.g.*,
Pet. 10; Prelim. Resp. 9–10; Ex. 2100, 1258 (Figure 2). Eculizumab is the
non-proprietary name for Alexion's Soliris product, which was approved by
the FDA "to reduce hemolysis in patients with PNH." *See, e.g.*, Prelim.
Resp. 4 (citing Ex. 2100, 1256;[3] Ex. 2005, 1[4]); *see also* Prelim. Resp. 8
("SOLIRIS® has the amino acid sequence recited in the '189 patent's
claims, namely, 'a heavy chain consisting of SEQ ID NO: 2 and a light chain
consisting of SEQ ID NO: 4.'").[5]

The '189 patent also discusses the conduct and results of the
TRIUMPH trial in which 88 red blood cell transfusion-dependent PNH
patients were randomly assigned "to receive either placebo or eculizumab
(Soliris™, Alexion Pharmaceuticals, Inc.)." Ex. 1001, 19:61–28:45.

> Study medication was dosed in a blinded fashion as follows:
> 600 mg eculizumab for patients randomly assigned to active
> drug, or placebo for those patients randomly assigned to

---

[3] Rother et al., *Discovery and development of the complement inhibitor
eculizumab for the treatment of paroxysmal nocturnal hemoglobinuria*,
25(11) NATURE BIOTECHNOLOGY 1256–64 (2007).

[4] SOLIRIS Product Label (rev. 3/2007).

[5] It is undisputed that "eculizumab," marketed as Soliris, refers to a specific
antibody having the primary amino acid sequence of SEQ ID NO: 2 and
SEQ ID NO: 4. *See*, *e.g.*, Prelim. Resp. 9–11, 14, 37; Pet. 11–12; Ex. 2022
¶¶ 98–103, 133; Ex. 1003 ¶ 160.

9

IPR2023-01069
Patent 10,590,189 B2

> placebo, respectively via IV infusion every 7±1 days for 4
> doses; followed by 900 mg eculizumab, or placebo,
> respectively, via IV infusion 7±1 day later; followed by a
> maintenance dose of 900 mg eculizumab, or placebo,
> respectively, via IV infusion every 14±2 days for a total of 26
> weeks of treatment.

*Id.* at 20:52–60. The Specification concludes that "[t]he results of the
TRIUMPH study indicate that terminal complement inhibition with
eculizumab safely and effectively addresses an important consequence of the
underlying genetic defect in PNH hematopoietic stem cells by providing a
therapeutic replacement for the terminal complement inhibitor deficiency."
*Id.* at 28:40–45. "[E]culizumab stabilized hemoglobin levels, decreased the
need for transfusions, and improved quality of life in PNH patients via
reduced intravascular hemolysis." *Id.* at Abstract.

### D.    Challenged Claims

Petitioner challenges claims 1–8 of the '189 patent, of which claims 1
and 5 are independent. Claims 1 and 5 recite:

> 1. A method of treating a patient suffering from
> paroxysmal nocturnal hemoglobinuria (PNH) comprising
> administering to the patient a pharmaceutical composition
> comprising an antibody that binds C5, wherein the antibody
> comprises a heavy chain consisting of SEQ ID NO: 2 and a
> light chain consisting of SEQ ID NO: 4, and wherein the
> composition comprises a single-unit dosage form comprising
> 300 mg of the antibody in 30 mL of a sterile, preservative-free
> solution.

> 5. A method of treating a patient suffering from
> paroxysmal nocturnal hemoglobinuria (PNH) comprising
> administering to the patient a pharmaceutical composition

10

IPR2023-01069
Patent 10,590,189 B2

> comprising an antibody that binds C5, wherein the antibody comprises a heavy chain consisting of SEQ ID NO: 2 and a light chain consisting of SEQ ID NO: 4, wherein the composition comprises a single-unit dosage form comprising 300 mg of the antibody in 30 mL of a sterile, preservative- free solution, and wherein the patient exhibits decreased lactate dehydrogenase levels.

Ex. 1001, 39:16–24, 40:15–24.

E.    Asserted Grounds of Unpatentability

Petitioner asserts three grounds of unpatentability (Pet. 3–4, 25–28):

| Ground | Claim(s) | Basis | Asserted Reference(s) |
|--------|----------|-------|------------------------|
| 1 | 1–8 | 103(a) | Bell,[6] Bowdish,[7] Evans,[8] Wang,[9] Tacken,[10] and Mueller PCT[11] |
| 2 | 1–8 | 103(a) | Bell, Evans, Mueller PCT, Wang, and Tacken |
| 3 | 1–8 | 103(a) | Bell and Wang |

In support of its patentability challenges, Petitioner relies on, *inter alia*, the Declarations of Jeffrey V. Ravetch, M.D., Ph.D. (Ex. 1003) and Cindy Ippoliti, Pharm.D. (Ex. 1062). For the purpose of the Preliminary

---

[6] Bell et al., US 2005/0191298 A1, published Sept. 1, 2005 (Ex. 1007).

[7] Bowdish et al., US 2003/0232972 A1, published Dec. 18, 2003 (Ex. 1004).

[8] Evans et al., US 6,355,245 B1, issued March 12, 2002 (Ex. 1005).

[9] Wang, US 2005/0271660 Al, published Dec. 8, 2005 (Ex. 1044)

[10] Paul J. Tacken et al., *Effective induction of naive and recall T-Cell responses by targeting antigen to human dendritic cells via a humanized anti–DC-SIGN antibody*, 106 BLOOD 1278–85 (2005) (Ex. 1008).

[11] Mueller et al., WO 97/11971, published April 3, 1997 (Ex. 1009).

IPR2023-01069
Patent 10,590,189 B2

Response, Patent Owner relies on the Declarations of Drs. Arturo Casadevall (Ex. 2022), Bernhardt Trout (Ex. 2024), and Michel Nussenzweig (Ex. 2026), which it contends were previously submitted in the 00739 IPR. *See* Prelim. Resp. 3, n.5, 52 n.10, 58, n.11.[12]

F.    Overview of Asserted References

Petitioner asserts that "[e]ach reference in Grounds 1-3 . . . qualifies as prior art under 35 U.S.C. § 102(b)." Pet. 18. Patent Owner does not presently dispute that any of the asserted references qualifies as prior art. *See generally* Prelim. Resp.; *but see id.* at 54 (Patent Owner's argument that "Bowdish is non-analogous art," which we address below).

1.    Overview of Bowdish (Ex. 1004)

Bowdish is a U.S. Patent Application published on December 18, 2003,[13] and listing Alexion as the official correspondence address. Ex. 1004, code [76].

Bowdish discloses "[i]mmunoglobulins or fragments thereof hav[ing] a peptide of interest inserted into a complementarity determining region (CDR) of an antibody molecule," whereupon "[t]he antibody molecule serves as a scaffold for presentation of the peptide and confers upon the peptide enhanced stability." *Id.* ¶ 6. In certain "embodiments, the peptide

---

[12] Although Patent Owner purports to rely on Dr. Casadevall's and Dr. Nussenzweig's declarations from the 00739 IPR, Exhibit 2022 and Exhibit 2026, respectively, appear to be Dr. Casadevall's and Dr. Nussenzweig's declarations from the 00741 IPR.

[13] According to Office records, Bowdish eventually issued as U.S. Patent 7,396,917 B2.

12

IPR2023-01069
Patent 10,590,189 B2

replacing the amino acids of a CDR is an agonist TPO [thrombopoeitin]
peptide." *Id.* ¶17.

In Example 4, Bowdish describes a TPO mimetic peptide graft into
the heavy chain CDR3 of antibody framework 5G1.1, described in Evans,
which it incorporates by reference. *Id.* ¶¶ 191–193. According to Bowdish:

> Construction of 5G1.1 is described in U.S. Application. Ser.
> No. 08/487,283, incorporated herein by reference.[14] The
> sequence was cloned into 5G1.1 in such a fashion as to replace
> the native CDR3 . . . [wherein t]he peptide graft translated into
> amino acids is Leu Pro Ile Glu Gly Pro Thr Leu Arg Gln Trp
> Leu Ala Arg Ala Pro Val (SEQ. ID. NO: 66). The 5G1+peptide
> was produced as a whole IgG antibody (See FIGS. 13A and
> 13B).

*Id.* ¶ 191. "Purified 5G1.1+peptide antibody as well as the parental 5G1.1
were analyzed for their ability to bind to cMp1 receptor by FACS analysis."
*Id.* ¶ 192. "The FACS staining was performed essentially as described
previously herein, with the exception that the detection was done using PE
conjugated F(ab')2 fragment of goat anti-human IgG (H+L). *Id.*

In SEQ ID NOs: 69 and 70, respectively, Bowdish discloses the
amino acid and nucleotide sequences for the "5G1.1 Light Chain." *Id.* ¶ 50.
In SEQ ID NO: 67, Bowdish discloses the amino acid sequence of the
"5G1.1–TPO Heavy Chain," with the substituted TPO mimetic sequence
marked in bold. *Id.* ¶ 49. Bowdish discloses the corresponding nucleotide
sequence in SEQ ID NO: 68. *Id.*

---

[14] U.S. Application Ser. No. 08/487,283 matured into U.S. Patent No.
6,355,245 B1, referenced herein as Evans (Ex. 1005).

IPR2023-01069
Patent 10,590,189 B2

2.      Overview of Evans (Ex. 1005)

Evans is a U.S. patent, issued March 12, 2002, and assigned on its face to Alexion. Ex. 1005 code (73).[15] Among its listed inventors are Mark J. Evans, Russell P. Rother, and Thomas C. Thomas. *Id.* at code (75).

Evans is cited in the '189 patent, as well as by other evidence of record, as teaching a "[s]uitable anti-C5 antibod[y] known to those of skill in the art" and the "antibod[y] . . . specific to human complement[,] . . . whole antibody (now named eculizumab)," as well as "methods of engineering such antibodies." Ex. 1001, 11:6–7, 12:29–38, 12:58–62; *see also* Ex. 1004 ¶ 191 (Bowdish incorporating Evans by reference for teaching "[c]onstruction of 5G1.1); Ex. 1007 ¶ 52 (Bell incorporating Evans by reference for teaching "[p]articularly useful anti-C5 antibod[y] . . . h5G1.1-mAb [or] h5G1.1-scFv," and identifying that "[t]he antibody h5G1.1-Mab is currently undergoing clinical trials under the tradename eculizumab.").

Evans discloses anti-C5 antibodies useful in the treatment of glomerulonephritis (GN). Ex. 1005, Abstract. Evans's Example 7 describes the isolation of anti-C5 monoclonal antibodies from mouse hybridoma designated 5G1.1. *Id.* at 37:34–39:30. In Figures 18 and 19, respectively, Evans discloses the amino acid sequence of the light and heavy chain

---

[15] Patent Owner appears to contend that the Petition is deficient in citing to Evans rather than to its parent application (U.S. Application. Ser. No. 08/487,283) incorporated by reference in Bowdish. *See* Prelim. Resp. 50. On the present record this appears to be a distinction without a difference. Patent Owner is, nevertheless, welcome to address at trial any substantive and material differences between the Evans application and resulting Evans patent.

14

IPR2023-01069
Patent 10,590,189 B2

variable regions of mouse antibody 5G1.1, with "[t]he complementarity determining region (CDR) residues according to the sequence variability definition or according to the structural variability definition . . . [bolded] and [underlined], respectively." *Id.* at 9:65–10:20. A representation of an excerpt of the heavy chain sequence showing the amino acid sequence of CDR3 so marked reads:

DSAVYYCAR**<u>FFGSSPNWYFD</u>**VWGAGTTVTVSS.

*See id.* at Fig. 19 (amino acids 85–113).

Evans describes making a series of different humanized 5G1.1 scFv[16] and full-length antibodies containing the CDR regions from the murine 5G1.1 antibody. Ex. 1005, 37:35–39:30, 42:59–45:33. With respect to the former, Evans discloses that "[p]articularly preferred constant regions . . . are IgG constant regions, which may be unaltered, or constructed of a mixture of constant domains from IgGs of various subtypes, e.g., IgG1 and IgG4." *Id.* at 45:29–33.

In Example 11, Evans discloses eighteen constructs "encoding . . . recombinant mAbs comprising the 5G1.1 CDRs." *Id.* at 42:56–45:33. One of these constructs, designated 5G1.1 scFv CO12, "encodes a humanized (CDR grafted and frame work sequence altered) scFv" which, according to Petitioner's declarant, Dr. Ravetch, "includes all six CDR sequences and variable regions of SEQ ID NOS: 2 and 4 of claims 1–3." Ex. 1003 ¶ 88 (citing Ex. 1005, Example 11 (12)).

---

[16] As Dr. Ravetch notes, "[a]n scFv fragment corresponds to $V_L$ and $V_H$ domains of an antibody joined by a short peptide linker." Ex. 1003 ¶ 39.

IPR2023-01069
Patent 10,590,189 B2

Evans also teaches that its anti-C5 antibodies can be administered "in a variety of unit dosage forms," and that doses are generally between 1 to 100 mg per kg and preferably between about 5 to 50 mg per kg of patient weight. Ex. 1005, 17:60–18:11. Evans discloses that its antibodies will generally be administered intravenously in a formulation that "must be sterile" and which "may" contain preservatives. *Id.* at 18:29–43.

3.    Overview of Bell (Ex. 1007)

Bell is a published U.S. Patent Application listing Leonard Bell and Russell P. Rother as inventors. Ex. 1007, code 76. Both Bell and Rother are listed as inventors of the '189 patent; Russell P. Rother is also listed as an inventor on the face of Evans. *See* Ex. 1005, code (75).

Bell discloses the treatment of PNH "using a compound which binds to or otherwise blocks the generation and/or activity of one or more complement components . . . . In particularly useful embodiments, the compound is an anti-C5 antibody selected from the group consisting of h5G1.1-mAb (eculizumab), h5G1.1-scFv (pexelizumab) and other functional fragments of h5G1.1." *Id.* ¶ 12; *see also id.* ¶ 52 ("The antibody h5G1.1-mAb is currently undergoing clinical trials under the tradename eculizumab."). Bell further discloses: "Methods for the preparation of h5G1.1-mAb, h5G1.1-scFv and other functional fragments of h5G1.1 are described in [Evans] and [Thomas] . . . the disclosures of which are incorporated herein in their entirety." *Id.* ¶ 52. According to Bell, formulations of its anti-C5 antibodies "suitable for injection" "must be sterile" and may or may not contain preservatives. ¶ 62.

16

IPR2023-01069
Patent 10,590,189 B2

The data disclosed in Bell includes data on studies in which eleven transfusion-dependent PNH patients received weekly 600 mg doses of eculizumab by infusion for four weeks, followed by "900 mg of eculizumab 1 week later[,] then 900 mg on a bi-weekly basis." Ex. 1007 ¶¶ 81–82. Bell characterizes the first twelve weeks of treatment as a "pilot study." *Id.* ¶ 82. "Following completion of the initial acute phase twelve week study, all patients participated in an extension study conducted to a total of 64 weeks. Ten of the eleven patients participated in an extension study conducted to a total of two years." *Id.* Bell concludes that "[p]atients in the two year study experienced a reduction in adverse symptoms associated with PNH." *Id.* ¶¶ 82, 96.

4.    Overview of Tacken (Ex. 1008)

Tacken, an article published in 2005, notes the disclosed research was supported by "funding from Alexion Pharmaceuticals" to the lead author, and that three of the paper's other authors "are employed by Alexion Pharmaceuticals, whose potential product was studied in the present work." *Id.* at 1278. One of these authors, Russell P. Rother, is also an author of Thomas (Ex. 1010), a named inventor on Evans (Ex. 1005, code (75)), and cited as an inventor of the '189 patent (Ex. 1001, code 72).

Tacken describes "a humanized antibody, hD1V1G2/G4 (hD1), directed against the C-type lectin DC-specific intercellular adhesion molecule 3–grabbing nonintegrin (DC-SIGN)," and its use as a dendritic cell-based vaccine. Ex. 1008, Abstr. 1278. In the section describing "Recombinant antibodies," Tacken describes the DC-SIGN construct as comprising a humanized variable heavy chain region "genetically fused with

17

IPR2023-01069
Patent 10,590,189 B2

a human hybrid IgG2/IgG4 constant domain" previously shown to "prevent[] antibodies from binding to Fc receptors. [citing Mueller 1997[17]]." *Id.* at 1279. Tacken used mouse IgG1 and 5G1.1 antibodies as isotype controls in binding and internalization assays. *Id.* at 1280. With respect to the latter, Tacken states: "An isotype control antibody, h5G1.1-mAb (5G1.1, "eculizamab [*sic*]; Alexion Pharmaceuticals) containing the same IgG2/IgG4 constant region, is specific for the human terminal complement protein C5. [citing Thomas (Ex. 1010)]." *Id.* at 1279.

     5.     Overview of Mueller PCT (Ex. 1009)

     Mueller PCT is an international patent publication listing Alexion as applicant. Ex. 1009, code (71). Among the listed inventors of Mueller PCT are two of the listed inventors of the '189 patent: Mark J. Evans and Russell P. Rother. *Id.* at code (75).

     Mueller PCT discloses "[a]ntibodies to porcine P-selecting protein, porcine VCAM protein and porcine CD86 protein are useful for diagnosing human rejection of porcine xenotransplants and for improving xenotransplantation of porcine, [sic] cells, tissues and organs into human recipients." *Id.* at Abstract. According to Mueller PCT, one object of the invention is to provide antibody molecules that neither activate complement nor bind to the FC receptor. *Id.* at 7:28–31.

---

[17] John P. Mueller et al., *Humanized Porcine VCAM-specific Monoclonal Antibodies with Chimeric IgG2/G4 Constant Regions Block Human Leukocyte Binding to Porcine Endothelial Cells*, 34(6) MOL. IMMUNOL. 441–452 (1997). Ex. 1006.

18

IPR2023-01069
Patent 10,590,189 B2

To achieve these and other goals, Mueller PCT points to
"[r]ecombinant (chimeric and/or humanized) antibody molecules comprising
the C1 and hinge regions of human IgG2 and the C2 and C3 regions of
human IgG4, such antibodies being referred to hereinafter as 'HuG2/G4
mAb.'" *Id.* at 8:23–26. Mueller PCT discloses the development and testing
of "chimeric antibodies containing the C1 and hinge region of human IgG2
and the C2 and C3 regions of human IgG4 . . . (HuG2/G4 mAb)." *Id.* at
12:19–33. As controls for these experiments, Mueller PCT used "a
humanized antibody directed against human C5 (h5G1.1 CO12 HuG4
mAb)." *Id.* at 11:34–12:4. 12:34–13:2, Figures 11, 12, 15.

On pages 52–61 of the reference, Mueller PCT discloses the amino
acid sequence of the hybrid IgG2/G4 anti-VCAM antibody, 3F4. According
to Dr. Ravetch, "an alignment of the amino acid sequence of Mueller PCT's
hybrid IgG2/G4 heavy chain constant region of the 3F4 (chimeric) human
G2/G4 antibody with the heavy chain constant region of '189 patent's SEQ
ID NO:2 shows that Mueller PCT discloses the same IgG2/G4 heavy chain
constant region as described in SEQ ID NO:2" of the '189 patent, whereas
alignment of "the light chain in 3F4 is identical to the constant region of the
light chain disclosed in SEQ ID NO:4." Ex. 1003 ¶¶ 103–104.

6.    Overview of Wang (Ex. 1044)

Wang is a U.S. Patent Application Publication assigned on its face to
Alexion. Ex. 1044, code (73). Wang is directed to "an antibody that inhibits
activation of the complement system." *Id.* at Abstract. Wang discloses that
its invention "include[s] anti-C5 antibody or antibodies that inhibit
activation of the complement cascade, for example, the antibodies as

19

IPR2023-01069
Patent 10,590,189 B2

described in U.S. Pat. No. 6,355,245 [Evans]." *Id.* ¶ 4; *see also id.* ¶¶ 42, 115, 174 (identifying that Wang's SEQ ID NO:2 is "described in [Evans]," which was incorporated by reference in its entirety). Wang discloses formulations of eculizumab suitable for nebulization and pulmonary delivery. *See, e.g.*, *id.* ¶¶ 25, 60, 67. According to Wang, eculizumab formulations "may be stable in a formulation at a concentration ranging from 1 mg/ml to 200 mg/ml." *Id.* ¶ 67. Wang further discloses inhalable formulations comprising from 1 to 30 mg/ml eculizumab, and provides evidence that a formulation having 30 mg/ml eculizumab can be effectively and efficiently delivered using a conventional nebulizer. *Id.* ¶¶ 171–173, Fig. 10.

## II.   ANALYSIS

A.   Principles of Law

"In an [*inter partes* review], the petitioner has the burden from the onset to show with particularity why the patent it challenges is unpatentable." *Harmonic Inc. v. Avid Tech., Inc.*, 815 F.3d 1356, 1363 (Fed. Cir. 2016) (citing 35 U.S.C. § 312(a)(3) (requiring *inter partes* review petitions to identify "with particularity . . . the evidence that supports the grounds for the challenge to each claim")). This burden of persuasion never shifts to Patent Owner. *See Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.*, 800 F.3d 1375, 1378 (Fed. Cir. 2015) (discussing the burden of proof in *inter partes* review).

IPR2023-01069
Patent 10,590,189 B2

A claim is unpatentable under 35 U.S.C. § 103(a) if the differences
between the subject matter sought to be patented and the prior art are such
that the subject matter as a whole would have been obvious at the time the
invention was made to a person having ordinary skill in the art to which that
subject matter pertains. *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406
(2007). The question of obviousness is resolved on the basis of underlying
factual determinations including: (1) the scope and content of the prior art;
(2) any differences between the claimed subject matter and the prior art;
(3) the level of ordinary skill in the art; and (4) objective evidence of non-
obviousness. *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966).

In analyzing the obviousness of a combination of prior art elements, it
can be important to identify a reason that would have prompted one of skill
in the art "to combine . . . known elements in the fashion claimed by the
patent at issue." *KSR*, 550 U.S. at 418. A precise teaching directed to the
specific subject matter of a challenged claim is not necessary to establish
obviousness. *Id.* Rather, "any need or problem known in the field of
endeavor at the time of invention and addressed by the patent can provide a
reason for combining the elements in the manner claimed." *Id.* at 420.
Accordingly, a party that petitions the Board for a determination of
unpatentability based on obviousness must show that "a skilled artisan
would have been motivated to combine the teachings of the prior art
references to achieve the claimed invention, and that the skilled artisan
would have had a reasonable expectation of success in doing so." *In re
Magnum Oil Tools Int'l, Ltd.*, 829 F.3d 1364, 1381 (Fed. Cir. 2016) (internal
quotations and citations omitted).

IPR2023-01069
Patent 10,590,189 B2

B.   Person of Ordinary Skill in the Art

In determining the ordinary level of skill in the art, we consider the type of problems encountered in the art, the prior art solutions to those problems, the rapidity with which innovations are made, the sophistication of the technology, and the educational level of active workers in the field. *Custom Accessories, Inc. v. Jeffrey-Allan Indus. Inc.*, 807 F.2d 955, 962 (Fed. Cir. 1986); *Orthopedic Equip. Co. v. United States*, 702 F.2d 1005, 1011 (Fed. Cir. 1983).

Petitioner contends:

A person of ordinary skill in the art ("POSA") would have knowledge of the scientific literature and have skills relating to the design and generation of antibodies, the complement system, and the application of antibodies as therapeutics before March 15, 2007. (EX1003, ¶¶16-20; EX1062. ¶¶ 14–18.) A POSA also would have knowledge of laboratory techniques and strategies used in immunology research, including practical applications of the same. (EX1003, ¶19; EX1062, ¶17.) Typically, a POSA would have had an M.D. and/or a Ph.D. in immunology, biochemistry, cell biology, molecular biology, pharmaceutics, or a related discipline, with at least two years of experience in the discovery, development, and design of therapeutic antibodies for use as potential treatments in human disease. (*Id.*) Also, a POSA may have worked as part of a multidisciplinary team and drawn upon not only his or her own skills, but also taken advantage of certain specialized skills of others on the team, *e.g.*, to solve a given problem; for example, a clinician, a doctor of pharmacy, and a formulation chemist may have been part of a team. (*Id.*)

Pet. 15.

22

IPR2023-01069
Patent 10,590,189 B2

Patent Owner does not presently dispute this definition "except to clarify that the POSA would have at least two years of experience in engineering monoclonal antibodies for human therapeutic use, either in the laboratory or industry." Prelim. Resp. 44–48 (emphasis omitted); *see also id.* at 48–49 (arguing that Petitioner cannot prove unpatentability of the challenged claims under either party's definition).

At this stage in the proceeding, we accept and apply Petitioner's proposed definition of the skilled artisan, as being both unopposed by Patent Owner and inclusive of Patent Owner's additional qualification. In this respect, it appears that Petitioner's language "at least two years of experience in the discovery, development, and design of therapeutic antibodies for use as potential treatments in human disease" encompasses Patent Owner's proposed modification, and is consistent with the level of skill in the art reflected in the prior art of record. *See Okajima v. Bourdeau*, 261 F.3d 1350, 1355 (Fed. Cir. 2001) ("the prior art itself [may] reflect[] an appropriate level" as evidence of the ordinary level of skill in the art) (quoting *Litton Indus. Prods., Inc. v. Solid State Sys. Corp.*, 755 F.2d 158, 163 (Fed. Cir. 1985)).

Our decision whether to institute, however, does not turn on which party's definition of the skilled artisan is used, and our determinations would be unchanged if we applied Patent Owner's supplemented definition. Further, we note that evidence may be presented as the case progresses to support some other proposed definition of the skilled artisan, which may influence our determination of this issue.

IPR2023-01069
Patent 10,590,189 B2

C.    Claim Construction

The Board interprets claim terms in an *inter partes* review ("IPR") using the same claim construction standard that is used to construe claims in a civil action in federal district court. *See* 37 C.F.R. § 42.100(b)).

In construing claims, district courts give claims their ordinary and customary meaning, which is "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312–13 (Fed. Cir. 2005) (en banc). Sources for claim interpretation include "the words of the claims themselves, the remainder of the specification, the prosecution history [i.e., the intrinsic evidence], and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art." *Id.* at 1314 (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1116 (Fed. Cir. 2004)). "[T]he claims themselves [may] provide substantial guidance as to the meaning of particular claim terms." *Id.* However, the claims "do not stand alone," but are part of "'a fully integrated written instrument,' consisting principally of a specification that concludes with the claims," and, therefore, the claims are "read in view of the specification." *Id.* at 1315 (quoting *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 978–79 (Fed. Cir. 1995) (en banc).

Neither party requests the construction of any claim term. *See, e.g.*, Pet. 18. We need only construe the claims to the extent necessary to determine whether to institute *inter partes* review. *See Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017) ("[W]e need only construe terms 'that are in controversy, and only to the

24

IPR2023-01069
Patent 10,590,189 B2

extent necessary to resolve the controversy.'" (quoting *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999))). At this stage in the proceeding we find it unnecessary to construe the language of any challenged claim, and there is no dispute.

      With this understanding, as well as the legal principles and our understanding of the definition of the skilled artisan as set forth above in mind, we address the parties' positions below.

D.    Objective Evidence Indicating Non-Obviousness

      Before addressing the specifics of Petitioner's obviousness grounds, we address Petitioner's contention that there are no objective indicia of nonobviousness that would outweigh the strong case of obviousness. Pet. 60–63, 72–73. "Objective indicia of nonobviousness can serve as an important check against hindsight bias and 'must always when present be considered.'" *Merck & Cie v. Gnosis S.P.A.*, 808 F.3d 829, 837 (Fed. Cir. 2015) (internal quotation omitted). Factual considerations that underlie the obviousness inquiry include the scope and content of the prior art, the differences between the prior art and the claimed invention, the level of ordinary skill in the art, and any relevant secondary considerations, or objective indicia, evidencing non-obviousness. *See Graham*, 383 U.S. at 17–18. Relevant objective indicia of nonobviousness include commercial success, long-felt but unsolved needs, failure of others, and unexpected results. *KSR*, 550 U.S. at 406 (2007). Although evidence pertaining to objective indicia of nonobviousness must be taken into account whenever present, it does not necessarily control the obviousness conclusion. *See, e.g.*, *Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1372 (Fed. Cir. 2007).

25

IPR2023-01069
Patent 10,590,189 B2

Petitioner notes that any objective evidence of nonobviousness must have a nexus to the claimed invention. Pet. 60–61 (citing *In re Kao*, 639 F.3d 1057, 1068 (Fed. Cir. 2011)). Petitioner asserts that Patent Owner cannot argue commercial success of its drug Soliris, a long-felt and unrecognized need, or industry praise as objective evidence of nonobviousness, because the use of eculizumab as a treatment for PNH was expressly taught in the prior art and therefore not novel in the claim. *Id.* at 60–63 (citing Ex. 1003 ¶¶ 164–167). As for evidence of copying, Petitioner argues that its intent to develop a biosimilar of Soliris is inapposite, as biosimilar statutes and regulations require that any biosimilar of Soliris be "highly similar to the reference product." *Id.* at 63 (quoting 42 U.S.C. § 262(i)(2); Ex. 1003 ¶ 168.

In response, Patent Owner asserts that commercial success, long-felt but unmet need, and industry praise all support the patentability of the challenged patent claims. Specifically, Patent Owner relies on the commercial success of Soliris, which Patent Owner asserts has generated substantial sales in the relevant market. Prelim. Resp. 70–71 (citing Ex. 2018, 70). Patent Owner also asserts that Soliris fulfilled a long-felt, unmet need as the first FDA-approved treatment to reduce hemolysis in PNH patients and has received industry praise as the recipient of several awards. *Id.* at 71 (citing Ex. 2019, 1270; Ex. 2020; Ex. 2021). Moreover, Patent Owner dismisses Petitioner's copying argument, as Patent Owner contends Petitioner could have chosen to develop biosimilars of other biologic products, but instead chose to copy Soliris. *Id.* Patent Owner argues

IPR2023-01069
Patent 10,590,189 B2

that, contrary to Petitioner's assertions, the claimed sequences were novel and nonobvious at the time of the invention. *Id.* at 72.

At this stage of the proceeding, we find Petitioner has shown sufficiently that Patent Owner's objective evidence of nonobviousness carries little weight. "For objective indicia evidence to be accorded substantial weight, we require that a nexus must exist 'between the evidence and the merits of the claimed invention.'" *Novartis AG v. Torrent Pharms. Ltd.*, 853 F.3d 1316, 1330–31 (Fed. Cir. 2017) (quoting *Wyers v. Master Lock Co.*, 616 F.3d 1231, 1246 (Fed. Cir. 2010)). If the patentee relies on the commercial embodiment of the claimed invention and that embodiment is the invention disclosed and claimed, a presumption of nexus exists. *See Fox Factory, Inc. v. SRAM, LLC*, 944 F.3d 1366, 1373 (Fed. Cir. 2019). That presumption is rebuttable and the evidence is not pertinent, however, "if the feature that creates the commercial success [or other secondary considerations] was known in the prior art." *See Ormco Corp. v. Align Tech.*, 463 F.3d 1299, 1312 (Fed. Cir. 2006).

On this record, although there is a presumption of nexus between Soliris and the challenged claims, we find Petitioner has sufficiently rebutted that presumption. In its Preliminary Response, Patent Owner relies heavily on Soliris and its treatment of PNH as evidence of commercial success, long-felt need, and industry praise. Prelim. Resp. 70–72. At this stage of the proceeding, however, we are persuaded that Bell, Hillmen 2004,[18] and Hill

---

[18] Hillmen et al., *Effect of Eculizumab on Hemolysis and Transfusion Requirements in Patients with Paroxysmal Nocturnal Hemoglobinuria*, 350

IPR2023-01069
Patent 10,590,189 B2

2005[19] all disclosed that eculizumab was a useful treatment for PNH more than a year before the '189 patent was filed. *See* Pet. 7–8 (citing, e.g., Ex. 1007 ¶ 52; Ex. 1013, 9; Ex. 1011, 3; Ex. 1062 ¶ 58; Ex. 1003 ¶ 58). We also agree with Petitioner that the Federal Circuit's holding in *Adapt Pharma Operations Ltd. v. Teva Pharms. USA, Inc.*, 25 F.4th 1354 (Fed. Cir. 2022) is instructive with respect to Patent Owner's evidence of copying. *See* Pet. 63. The Court noted that it has held that "evidence of copying in the ANDA context is not probative of nonobviousness because a showing of bioequivalence is required for FDA approval." *Adapt Pharma* at 1374 (quoting *Bayer Healthcare Pharms., Inc. v. Watson Pharms., Inc.*, 713 F.3d 1369, 1377 (Fed. Cir. 2013)). Similarly, here, evidence of copying in the biosimilar context is not probative of nonobviousness because the "biological product [must be] highly similar to the reference product." *See* 42 U.S.C. § 262(k)(2)(A). That there may be "hundreds of other biologic products" that Petitioner could have developed, as Patent Owner asserts, does not outweigh the strong evidence of obviousness regarding the sequence, composition, and use of eculizumab.

In light of the foregoing, we are not persuaded that Patent Owner's objective indicia evidence is sufficiently probative of nonobviousness at this stage of the proceeding. *See Ormco*, 463 F.3d at 1313 (finding patentee's evidence did not show commercial success where allegedly novel features

---

N. ENG. J. MED. 552–59 (2004) (Ex. 1011).

[19] Hill et al., *Sustained response and long-term safety of eculizumab in paroxysmal nocturnal hemoglobinuria*, 106 BLOOD 2559–65 (2005) (Ex. 1013).

IPR2023-01069
Patent 10,590,189 B2

were taught by the prior art); *see also Novartis AG v. Torrent Pharms. Ltd.*, 853 F.3d 1316, 1331 (Fed. Cir. 2017) (finding objective indicia evidence not probative of nonobviousness where prior art suggested the allegedly successful feature of the claimed invention). We recognize, however, that consideration of objective indicia of nonobviousness is highly fact dependent. We note that our determination here is preliminary, and we will re-evaluate the evidence on a full trial record in our Final Written Decision.

E.    Obviousness in view of Bell, Bowdish, Evans, Wang, Tacken, and Mueller PCT (Ground 1)

In Ground 1, Petitioner challenges claims 1–8 as obvious over Bell, Bowdish, Evans, Wang, Tacken, and Mueller PCT. Pet. 25–26, 28–48. Patent Owner opposes. Prelim. Resp. 48–59. We focus first on the identity of the antibody recited in independent claims 1 and 5, and its use in treating PNH.

1.    "the antibody compris[ing] a heavy chain consisting of SEQ ID NO: 2 and a light chain consisting of SEQ ID NO: 4"

The parties agree that the antibody recited in the challenged independent claims is eculizumab. Prelim. Resp. 9–10; Pet. 25. According to Petitioner, one of ordinary skill in the art would have been motivated to obtain the sequence of the anti-C5 antibody eculizumab (also referred to as "h5G1.1") because Bell teaches that this molecule is "particularly useful" and effective in the treatment of PNH. *See* Pet. 21–22, 25, 28–29 (citing, e.g., Ex. 1007 ¶¶ 12, 52, 81–97, Figs. 1a, 1b, 3, 6a, 6b, 7–10; Ex. 1003 ¶¶ 109). With respect to the sequences of the claimed anti-C5 antibody, Petitioner concedes that "Bell's disclosure does not include the exact amino

IPR2023-01069
Patent 10,590,189 B2

sequence of eculizumab," but argues that the sequences are necessarily disclosed because "Bell teaches that the antibody h5G1.1 *is* eculizumab, and that 'methods for the preparation of' h5G1.1 'are described in' Evans (EX1005) and Thomas (EX1010), both of which are incorporated into Bell in their entirety." *Id.* at 28–29 (citing Ex. 1007 ¶ 52). Accordingly, Petitioner points to Bowdish, and its similar incorporation of Evans, as disclosing the entirety of eculizumab, including SEQ ID NO: 2 and SEQ ID NO: 4, as a starter-scaffold-antibody for making a 5G1.1 antibody with a TPO mimetic peptide. *See* Pet. 29–36 (citing, *inter alia*, Ex. 1003 ¶¶ 111–122; Ex. 1004, Figs. 13A, 13B, ¶ 191; Ex. 1005, page 1 (Title), Fig. 8, Figs. 18–19, 7:60–64, 9:44–45, 9:65–10:20, 42:56–45:33 (Example 11), 143:22–144:14, claim 19).

According to Petitioner, "Bowdish's SEQ ID NO:69 discloses the light chain sequence of SEQ ID NO:4 in claim 1 of the '189 patent, exactly." Pet. 29 (citing Ex. 1004, Fig 13B; Ex. 1003 ¶¶ 111–112). Petitioner contends that Bowdish, via its incorporation of Evans, also discloses SEQ ID NO:2, which is the sequence of eculizumab's heavy chain. *Id.* at 30–32. In particular, Petitioner points to Bowdish's SEQ ID NO:67 as disclosing eculizumab's heavy chain "with the exception of the 13 amino acid 'native CDR3' of '5G1.1' within SEQ ID NO:2." *Id.* at 30 (citing Ex. 1004, ¶ 191, Fig 13A; Ex. 1003 ¶ 113). Petitioner asserts that these remaining 13 amino acids of the SEQ ID NO: 2 are accounted for by Bowdish's replacing the native CDR3 portion of Evans's antibody with a TPO mimetic peptide where, Petitioner contends, Bowdish's incorporation of Evans by reference

IPR2023-01069
Patent 10,590,189 B2

discloses this native CDR3 sequence and, thus, the entirety of the antibody of challenged claim 1. *Id.* at 30–32.

Petitioner's argument is illustrated by the following illustration from the Petition, incorporated from Dr. Ravetch's Declaration:



*Id.* at 32; *see also* Ex. 1003 ¶ 114. The figure above illustrates reverse engineering the Bowdish antibody based on its disclosure that Evans disclosed the "[c]onstruction of 5G1.1" antibody, into which Bowdish's TPO mimetic peptide graft was inserted (shown in in red) "to replace the native CDR3 (represented by the middle image above ["Evans h5G1.1 scFv CO12"] with 5' ttg cca ATT GAA GGG CCG ACG CTG CGG CAA TGG CTG GCG GCG CGC GCG cct gtt 3' (SEQ. ID. NO: 65)." Ex. 1003 ¶ 114; Ex. 1004 ¶ 191. Bowdish states that "[t]he 5G1+peptide was produced as a whole IgG antibody (See **FIGS. 13A and 13B**)." Ex. 1004 ¶ 191; *see also* Ex. 1003 ¶¶ 116–117. Thus, the figure above shows, left-to-right, Bowdish's final antibody having a grafted TPO mimetic peptide colored red, then the substitution of that TPO mimetic peptide segment with the CDR3 segment from Evans that it replaced, and last, the starting full antibody having the amino acid sequence of Evans, which Petitioner asserts is eculizumab, i.e.,

31

IPR2023-01069
Patent 10,590,189 B2

the claimed C5-specific antibody consisting of SEQ ID NO: 2 and SEQ ID NO: 4, i.e., eculizumab. *See generally* Ex. 1003 ¶¶ 111–122.

According to Petitioner, "[a] POSA following Bowdish's incorporation of Evans would have no difficulty immediately identifying the sequence Bowdish refers to as 'the native CDR3.'" Pet. 32. In this respect, Petitioner points to Evans's Example 11, which describes eighteen constructs of "recombinant mAb-encoding DNAs." *Id.* at 32–33 (citing Ex. 1005, 42:56–45:33; Ex. 1003 ¶¶ 39, 115–118). According to Evans, "one each of the various L1, L2, and L3 CDRs" and "one each of the various H1, H2, and H3 CDRs" disclosed in its Example 11, assembled into "matched pairs of the variable regions (e.g. a VL and a VH region) . . . may be combined with constant region domains by recombinant DNA or other methods known in the art to form full length antibodies of the invention." Ex. 1005, 45:5–33. Of the eighteen constructs of Evans's Example 11, Petitioner focuses on nine "humanized single-chain variable domain structures ("scFvs") which correspond to the VH and VL domains of an antibody joined by a short peptide linker and starting with the "MA" leader sequence. Pet. 33 (citing Ex. 1005, 42:56-45:33; Ex. 1003, ¶¶ 39, 117–119). "Importantly," Petitioner argues,

> the *identical* HCDR3 sequence is used in *every one* of these examples. (EX1005, 9:65-10:20, 42:56-45:33, 143:22-144:14, Figs. 18-19, Claim 19; EX1003, ¶118, Appendix A.) This is not surprising, since the CDR regions determine binding to target (here, C5), and are a fundamental component of the uniqueness of a particular antibody such as 5G1.1. (EX1003, ¶118.)

*Id.*

32

IPR2023-01069
Patent 10,590,189 B2

Thus, Petitioner contends that, without specifically naming any of such antibodies "eculizumab," Evans taught artisans how to build each of these humanized 5G1.1 antibodies and, in light of Bell, such artisans would have been motivated to try all nine sequences to arrive at the sequence for eculizumab. *Id.* at 49–50 (citing, *inter alia*, Ex. 1003 ¶¶ 148–149; *Merck & Co. v. Biocraft Lab'ys, Inc.*, 874 F.2d 804, 807 (Fed. Cir. 1989); *KSR*, 550 U.S. at 421).

Petitioner also points to Tacken as further confirmation that Bowdish discloses the hybrid IgG2/IgG4 heavy chain of eculizumab, as recited in challenged claim 1. Pet. 25–26, 36–41. Petitioner contends that, like Bell, Tacken equates h5G1.1 with eculizumab and, moreover, teaches that eculizumab contains "the same" IgG2/IgG4 constant region disclosed in Mueller 1997 (Tacken's reference 17, submitted here as Exhibit 1006). *Id.* at 36–37 (citing Ex. 1008, 1279; Ex. 1003 ¶ 123). Noting that "Mueller PCT, the companion patent application for Mueller 1997, expressly discloses the full amino acid sequence for the IgG2/IgG4 constant domain heavy chain used in the 'h5G1.1 HuG2/G4' antibody," Petitioner contends that "[a] routine alignment of the IgG2/G4 constant domain heavy chain from Mueller PCT and Bowdish would have immediately confirmed that the antibody disclosed in Bowdish has *precisely* the sequence of eculizumab," recited in claim 1 *Id.* at 37–38 (citing Ex. 1009, 14, 58–59, 97; Ex. 1003 ¶¶ 124–125 (showing comparison of heavy chain constant regions)).

Patent Owner argues that "the claimed sequences were unknown as of Bell's publication," and that Petitioner uses impermissible hindsight and its present-day knowledge of the Soliris (eculizumab) antibody to reconstruct

33

IPR2023-01069
Patent 10,590,189 B2

the sequences of independent claim 1. *See generally* Prelim. Resp. 48–59
(citing, e.g., Ex. 2103, 1320–1327).[20] Patent Owner argues, for example, that
Bowdish is non-analogous art, and one of ordinary skill in the art "seeking to
develop an anti-C5 antibody composition for treating PNH would never
have started with Bowdish" because it has "nothing to do with blocking C5
cleavage or treating PNH." *See* Prelim. Resp. 32, 41, 54, 57.

Petitioner, supported by the testimony of Dr. Ravetch, contends that
Bowdish is analogous art in the field of the '189 patent. Pet. 34–35 (citing
Ex. 1003 ¶ 120). In this respect, Dr. Ravetch testifies:

> A POSA looking for the amino acid sequences encoding
> eculizumab would have easily found Bowdish, and considered
> it to be analogous art to Bell and Evans for at least three
> reasons: (1) it provides express disclosures about the structure
> of the antibody "5G1.1," (2) it identifies "Alexion
> Pharmaceuticals" as the inventors' addressee that is the same as
> the assignee for Evans, and (3) it cites to the same Evans patent
> as does Bell for the structure of 5G1.1. Thus, a POSA would
> have been motivated to combine the teachings of Bowdish and
> Evans in view of Bell to arrive at the claimed sequence.

Ex. 1003 ¶ 120.

> Two separate tests define the scope of analogous prior art:
> (1) whether the art is from the same field of endeavor,
> regardless of the problem addressed and, (2) if the reference is
> not within the field of the inventor's endeavor, whether the
> reference still is reasonably pertinent to the particular problem
> with which the inventor is involved.

---

[20] Declaration of Laural S. Boone, J.D., PhD., submitted during the
prosecution of the '504 patent.

IPR2023-01069
Patent 10,590,189 B2

*In re Bigio*, 381 F.3d 1320, 1325 (Fed. Cir. 2004) (internal citation omitted).
On the record before us, it appears that Bowdish is both reasonably pertinent
and within the same field of endeavor of the '189 patent for the reasons
identified by Dr. Ravetch, because it is directed to the construction of a
humanized monoclonal antibody comprising a TPO mimetic peptide graft
into the heavy chain CDR3 of antibody framework 5G1.1, and because it
uses "the parental 5G1.1" sequence as a control for FACs analysis of the
TPO mimetic antibody. *See* Ex. 1004 ¶¶ 191–193; Ex. 1003 ¶ 122.

Patent Owner further argues that one of ordinary skill in the art would
not have been motivated to combine Bowdish and Evans because, in citing
to Evans's application, "Bowdish refer[s] to a ***mouse*** antibody in its
reference to '[c]onstruction of 5G1.1,'" whereas "Evans disclos[es] only a
mouse antibody plus humanized recombinant 'fragments' that are unusable
as the 'scaffold' to make Bowdish's full-length TPO-mimetic compound."
Prelim. Resp. 50; *see also id.* at 55 (arguing that Bowdish's reference to
"5G1.1" as the parental scaffold for its TPO-mimetic antibody potentially
"encompass[es] a myriad of possible murine and humanized antibodies and
fragments not limited to 'eculizumab'"). We do not agree with Patent
Owner's assessment on the current record.

As Patent Owner correctly quotes from Bowdish's Example 4: "The
TPO mimetic peptide graft in Fab clone X4b has been transplanted into the
heavy chain CDR3 region of another antibody framework, 5G1.1 . . . .
***Construction of 5G1.1*** is described in U.S. Application Ser. No. 08/487,283,
incorporated herein by reference." Prelim. Resp. 51–52 (emphasis added)
(citing Ex. 1006 ¶ 191). It is not disputed here that U.S. Application

35

IPR2023-01069
Patent 10,590,189 B2

08/487,283 issued as Evans. *See* Ex. 1005, code (21); *see generally* Prelim.
Resp. The portion of Evans relating to "***Construction*** of 5G1.1" (Ex. 1004
¶ 191) appears to be (or at least includes) Example 11, which is titled
"***Construction*** and Expression of Recombinant mAb." Ex. 1005, 42:55–58
(emphasis added). According to Dr. Ravetch, "Evans' Example 11 expressly
teaches humanized 5G1.1 scFv **constructs** and is entitled '**Construction** and
Expression of Recombinant mAbs.'" Ex. 1003 ¶ 175 (citing Ex. 1005,
42:56-45:33). And, none of the other Evans Examples addressing an anti-C5
antibody or a 5G1.1 antibody designate their respective disclosure as relating
to "construction," as per the title of Example 11 and the sentence of
Bowdish expressly incorporating Evans. *See* Ex. 1005, 33:1–42:54
(Examples 1–10); Ex. 1003 ¶ 185.

Thus, on this record, we find that Petitioner's pointing to the
antibodies (or fragments) of Evans's Example 11 for use as a starting point
for Bowdish's invention to be more reasonable than Patent Owner's
arguments that antibodies would have been selected from some other
Example.

With respect to Tacken's description of eculizumab as having an
"IgG2/IgG4 constant region," Patent Owner contends that the prior art
"consistently directed a POSA to read Thomas (EX1010)," which disclosed
an IgG4 antibody. Prelim. Resp. 7–14. According to Patent Owner, "Tacken
is the ***only*** document before March 15, 2007 that purportedly associated
'eculizumab' with a hybrid IgG2/IgG4 constant region." *Id.* at 12. Further,
"nothing in Tacken contradicted the consistent teaching of the prior art ***as a***
***whole*** that 'eculizumab' had an IgG4 constant region." *Id.* at 12. And,

36

IPR2023-01069
Patent 10,590,189 B2

considering the art as a whole, "the **only** plausible conclusion a POSA could have reached in view of the entire content of the art was that 'eculizumab' was Thomas's IgG4 antibody." *Id.* at 14 (citing Ex. 2022 ¶¶ 146, 151).

Dr. Ravetch, however, testifies that "Thomas does not refer to the word 'eculizumab' anywhere, indeed it is simply not true that the 'pertinent literature' 'said' that eculizumab was Thomas'[s] IgG4-isotype antibody." Ex. 1003 ¶ 172. Moreover,

> none of the prior art references teach that "eculizumab" has the IgG4 isotype, indeed Thomas does not refer to "eculizumab" at all. Tacken instead is the only reference that discloses any information regarding the constant domain structure of 'eculizumab,' and it unambiguously teaches that "eculizumab" has the hybrid IgG2/G4 constant domain.

*Id.* at ¶ 160.

As noted in Section I.F.4, above, Tacken describes a lectin-specific antibody comprising a humanized variable heavy chain region "genetically fused with a human hybrid IgG2/IgG4 constant domain. [citing Mueller 1997]." Ex. 1008, 1279. Tacken used mouse IgG1 and human 5G1.1 antibodies as isotype controls in binding and internalization assays. *Id.* at 1280. With respect to the latter, Tacken states: "An isotype control antibody, h5G1.1-mAb (5G1.1, "eculizamab [*sic*]; Alexion Pharmaceuticals) containing the same IgG2/IgG4 constant region, is specific for the human terminal complement protein C5 [citing Thomas (Ex. 1010)]." *Id.* at 1279. On its face, we find it most plausible that Tacken suggests that eculizumab (h5G1.1) contained a "human hybrid IgG2/IgG4 constant domain," making it suitable for use as an IgG2/IgG4 isotype control for the IgG2/IgG4– containing antibody under development. *See* Ex. 1003 ¶ 70 (citing Ex. 1029,

37

IPR2023-01069
Patent 10,590,189 B2

10–11 (Alexion's statement in unrelated patent's prosecution that in light of Evans and Mueller 1997, it was well known as of 2002 "that eculizumab has a G2/G4 Fc portion")).

Patent Owner, in contrast, contends that one of ordinary skill reading Tacken would understand it to "identify[] 'eculizumab' and 'SOLIRIS®' as Thomas's *IgG4* antibody," in the same manner as the other prior art it cites. *See* Prelim. Resp. 12–13. Addressing the implication that Tacken instead teaches that eculizumab "contain[s] the same IgG2/IgG4 constant region" as Tacken's lectin-specific antibody (having "a human hybrid IgG2/IgG4 constant domain"), Patent Owner's declarant from the 00741 IPR downplays the disclosure as "a single sentence taken out of context from a single publication," and which the skilled artisan would have found "ambiguous," "confusing," and possibly a "mistake" to be disregarded in view of "the numerous clear statements in the key publications regarding 'eculizumab' that identify it as the IgG4 antibody of Thomas." *See* Ex. 2022 ¶¶ 141–148 (citing Ex. 1008, 1279).

We do not find this interpretation of Tacken persuasive on the present record, and particularly in view of what appears to be a close association between Alexion and the authors of Tacken. *See* Ex. 1008, 1278 (footnote). Specifically, Tacken discloses that the lectin-specific antibody research was supported by "funding from Alexion Pharmaceuticals" to the lead author, and that three of the paper's other authors were "employed by Alexion Pharmaceuticals, whose potential product was studied in the present work." *Id.* at 1278. Notably, one of the Tacken authors, Russell P. Rother, is also an author of Thomas, published some nine years earlier. *See* Ex. 1010, 1389.

38

IPR2023-01069
Patent 10,590,189 B2

On the present record, we find it unlikely that Mr. Rother (*a named inventor of the '189 patent*) and the other Tacken authors were mistaken in referring to eculizumab as having an IgG2/IgG4 constant region. We find more plausible that Tacken cites to Thomas as describing eculizumab's C5-specific CDRs, and refers to Mueller 1997 for the IgG2/IgG4 heavy chain sequence common to both eculizumab and the anti-lectin antibody under development. We also find it plausible that other documents Patent Owner points to as citing to Thomas also do so in reference to the C5-specific variable domain, rather than to the constant region or other non-antigen binding features of the molecule. *See*, *e.g.*, Prelim. Resp. 13 (timeline); Pet. 67–68. We invite the parties to further address this issue at trial.

We also note Patent Owner's argument that Petitioner ignores "the complexity and unpredictability of designing monoclonal antibodies for human clinical therapy," and, in particular, the "substantial risks and unpredictability associated with changing the constant region isotype of a known antibody." Prelim. Resp. 44–47 (capitalization normalized). While these factors may have relevance to the design of new monoclonal therapies, we do not find them relevant here. The thrust of Petitioner's argument appears not to entail creating a *new* antibody, but in how one of ordinary skill in the art would have been motivated to reconstruct the amino acid sequence of eculizumab, an *existing* antibody, which, as evidenced by Bell and others (*see*, *e.g.*, Section I.F.3, above), was already shown to be safe and effective for the treatment of PNH. As such, Patent Owner's arguments regarding the risks of modifying the 5G1.1 antibody constant region to arrive at eculizumab are not pertinent to our analysis.

IPR2023-01069
Patent 10,590,189 B2

In light of the above, and on the record before us, Petitioner has shown sufficiently that, under Ground 1, one of ordinary skill in the art would have been motivated with a reasonable expectation of success, to re-create eculizumab by replacing the CDR3 region of Bowdish's "5G1.1+peptide antibody" with Evans's CDR3 sequence to arrive at Bowdish's "parental 5G1.1," having the sequences set forth in claim 1. *See* Ex. 1004 ¶¶ 191–193. And, in light of Bell's disclosure that pharmaceutical formulations containing this antibody are particularly useful in reducing the symptoms of PNH (*see*, *e.g.*, Section I.F.3, above), Petitioner has shown sufficiently that one of ordinary skill in the art would have been motivated to administer a pharmaceutical composition of eculizumab for the treatment of PNH with a reasonable expectation of success.

2.    Formulation, Administration, and Patient Condition Limitations

The challenged claims recite additional limitations relating to the method of administration for treatment of PNH and the composition administered in independent claims 1 and 5. Petitioner relies on Bell, Bowdish, Evans, and Wang with respect to these limitations. *See*, *e.g.*, Pet. 41–48 (Ground 1), 54 (Ground 2), 58–60 (Ground 3). Of these, Patent Owner asserts that Petitioner "cannot show how the 'single-unit dosage form comprising 300 mg of the antibody in 30 mL of a sterile, preservative-free solution' element" recited in independent claims 1 and 5 would have been obvious without hindsight. Prelim. Resp. 58. In particular, Patent Owner briefly challenges Petitioner's support for what it casts as the "300 mg single-use dosage form" and "30 ml of a 10 mg/ml antibody solution" limitations. *Id.* at 58–59 (citing Ex. 1007 ¶¶ 82, 91; Ex. 2024 ¶¶ 76–91;

40

IPR2023-01069
Patent 10,590,189 B2

Ex. 1044 ¶ 67). Although Patent Owner is welcome to expand its arguments at trial, on the record before us we find Petitioner's well-reasoned explanations regarding these limitations sufficient for the purpose of institution.

We have noted more than once above that the asserted prior art discloses treating PNH with eculizumab, and with respect to the "300 mg single-use dosage form," element, Petitioner notes that Bell suggests the administration of its antibodies "in a variety of unit dosage forms," and discloses a dosage regime for the treatment of PNH involving the administration of 600 mg and 900 mg intravenous doses. Pet. 41–42 (citing Ex. 1007 ¶¶ 58, 82; Ex. 1003 ¶ 133–134; Ex. 1062 ¶¶ 25, 48–50; Exs. 1055–1060). According to Petitioner's declarant, Dr. Ippoliti, "[a] POSA would have known that single-use dosage units are preferred for use in organized health care settings such as hospitals, and especially in contexts such as intravenous infusion in which sterility must be maintained." Ex. 1062 ¶ 49 (citations omitted). Moreover, "[a] pharmacy also would not prefer to stock (nor, presumably, would a drug company prefer to make), two different vial amounts of 600 and 900 mg each" because, among other things, "[t]his would unnecessarily complicate antibody supply services, inventory tracking." *Id.* at 50. Thus, reasons Petitioner,

> [g]iven Bell's express disclosure of a dosage regimen having 600 and 900 mg phases, a 300 mg unit dosage form would have been obvious. 300 is the highest common factor of 600 and 900, and thus the most convenient unit dose to use without the need to manufacture vials of differing quantities, and without causing unnecessary waste of costly antibody treatments.

Pet. 41–42 (citing Ex. 1003 ¶ 134; Ex. 1062 ¶ 50).

41

IPR2023-01069
Patent 10,590,189 B2

Addressing the "300 mg of the antibody in 30 mL of . . . solution" element of claim 1, Petitioner contends that this element would have been obvious in view of Wang and the understanding of one of ordinary skill in the art. Pet. 42. Noting that this element "implies antibody in solution at a concentration of 10 mg/ml." Petitioner points out that Wang discloses that eculizumab formulations could be successfully and stably formulated in an aqueous solution at concentrations in the range of 1 to 30 mg/ml, which includes the concentration of 10 mg/ml, as implicitly required by claims 1 and 5. *Id*. (citing Ex. 1044 ¶¶ 25, 67, 170–173, Fig. 10; Ex. 1003 ¶ 135; Ex. 1061, 104; Ex. 1062 ¶¶ 51–52). Dr. Ippoliti further testifies that one of ordinary skill in the art "also would have known that 10 mg/ml [and, presumably, the equivalent ratio of 300 mg of antibody in 30 ml,] was well within the known range of concentrations of several FDA-approved antibodies." Ex. 1062 ¶ 52 (citations omitted). With this background, Dr Ippoliti concludes that,

> given the desirability of supplying eculizumab as a 300 mg single-use dose amount as discussed above, and based on simple arithmetic, it would have been obvious for a POSA to use 30 ml of 10 mg/ml solution to administer the desired single-use dose of 300 mg. A POSA would also consider it advantageous to have the total supplied volume of the antibody drug substance be 30 ml – neither such a small volume that there would be concern about successfully drawing all the drug substance into a syringe, nor such a large volume as to be impractical to draw using a standard syringe or impractical to dilute into an IV solution for infusion into the patient.

*Id.*

IPR2023-01069
Patent 10,590,189 B2

Patent Owner does not contest Petitioner's evidence regarding any other limitation of claims 1 and 5, nor address any limitation specific to dependent claims 2–4 or 6–8. *See* Prelim. Resp. 58—59. On the record before us, we find Petitioner's support for these "formulation, administration, and patient condition limitations" sufficient for the purpose of institution. *See* Pet. 28–48; Prelim. Resp. 61.

> 3.      Conclusion as to Ground 1

In consideration of the above, and on the record before us, Petitioner has shown sufficiently that it has a reasonable likelihood of showing at trial that claims 1–8 are unpatentable as obvious under Ground 1.

F.      Obviousness in view of Bell, Evans, Wang, Tacken, and Muller PCT (Ground 2)

> Under Ground 2, Petitioner challenges claims 1–8 as obvious over Bell, Evans, Wang, Tacken, and Muller PCT. Pet. 26–27, 48–54. Patent Owner opposes. Prelim. Resp. 60–62.

> 1.      The Parties' Contentions

Petitioner begins with Bell's disclosure, which it contends would have motivated an ordinarily skilled artisan to determine the amino acid sequence of its disclosed anti-C5 antibody eculizumab for use in the treatment of PNH as described in the challenged claims. Pet. 26–27. In this respect, Petitioner asserts that Bell points directly to Evans and Thomas, each being incorporated by reference. *Id.* at 48. According to Petitioner, such an artisan would have recognized in Evans the critical CDR sequences for the heavy and light chains of an original mouse antibody 5G1.1 that binds C5, as were variable domain sequences for humanized forms of 5G1.1. *Id.* at 48–49

IPR2023-01069
Patent 10,590,189 B2

(citing Ex. 1005, 1:1–3, 9:65–10:20, 42:56–45:23, 143:22–144:14, Figs. 18–19, Claim 19; Ex .1003 ¶¶ 146–148). Petitioner also points to Evans's Example 11, which provides nine humanized scFv structures corresponding to the $V_H$ and $V_L$ domains of an antibody joined by a short peptide linker. *Id.* at 49 (citing Ex. 1005, 42:56–45:33; Ex. 1003 ¶ 147). According to Petitioner,

> Evans then explains that "one each of the various L1, L2, and L3 CDRs" and "one each of the various H1, H2, and H3 CDRs" disclosed in Example 11, assembled into "matched pairs of the variable regions (e.g. a VL and a VH region) . . . may be combined with constant region domains by recombinant DNA or other methods known in the art to form full length antibodies *of the invention*."

*Id.* at 52 (citing Ex. 1005, 45:5–33; Ex. 1003 ¶¶ 147–148). Thus, Petitioner contends, without naming any of such antibodies "eculizumab," Evans taught artisans how to build each of these humanized 5G1.1 antibodies and, in light of Bell, would have been motivated to try all nine sequences to arrive at its sequence. *Id.* at 49–50; Ex. 1003 ¶¶ 148–149.

In particular, Petitioner points to Bell as support for Evans teaching the structure of 5G1.1 antibodies, and eculizumab, specifically. *Id.* at 49–50. Petitioner asserts that a limited (finite) number of antibodies are taught in this scenario and that the artisan would have had good reason to pursue them (Bell says to do so, for example), meaning each was obvious to try; hence, producing eculizumab was obvious to try. *Id.* (citing, *inter alia*, *KSR*, 550 U.S. at 421).

Petitioner further points to Mueller PCT as focusing such an ordinarily skilled artisan upon an antibody construct identified as CO12,

IPR2023-01069
Patent 10,590,189 B2

because Mueller PCT discusses an h5G1.1 *CO12* HuG2/G4 antibody, which would point to Evans's CO12 example, which would result in "a perfect match to SEQ ID NOS:2 and 4 recited in challenged claim 1." *Id.* at 50–52 (citing Ex. 1009, 14; Ex. 1003 ¶¶ 150–151).

Petitioner also points to Tacken (discussed with respect to Ground 1) as specifically teaching that eculizumab has an IgG2/IgG4 constant region (refers to Mueller 1997), and also would have motivated the ordinarily skilled artisan to create an antibody, as in Evans, with such a constant region (as discussed in both Mueller 1997 and Mueller PCT). *Id.* at 52 (citing Ex. 1003 ¶ 152).

Patent Owner argues that "Evans discloses only the 5G1.1 ***murine*** antibody," which is unrelated to the antibody of Mueller PCT. *See* Prelim. Resp. 60. Patent Owner argues there would have been no motivation for the skilled artisan to have combined sequences from Evans and Mueller PCT to arrive at the sequence of eculizumab and, even were one to attempt to make such an antibody, the prior art pointed toward Thomas's IgG4 sequence. *Id.* at 60–62. Patent Owner argues that only with hindsight would a person of ordinary skill in the art have reasonably expected to successfully produce an antibody by combining a variable region of Evans with an IgG2/G4 heavy chain constant region of Mueller PCT, or would have expected it to cleave C5 and safely and effectively treat PNH. *Id* at 61–62.

2.    Analysis

We find Petitioner has met its burden for institution and do not find Patent Owner's arguments persuasive on this record largely for the reasons discussed above over similar arguments relating to Ground 1.

IPR2023-01069
Patent 10,590,189 B2

On the present record, we find compelling Petitioner's assertion that Bell and Tacken provide a starting point for an ordinarily skilled artisan to develop eculizumab as an h5G1.1-mAb, anti-C5 antibody, and also as to what eculizumab's structure would be—an h5G1.1-mAb with an IgG2/IgG4 constant region. *See* Ex. 1007 ¶¶ 12, 52; Ex. 1008, 1279. We similarly find compelling Petitioner's assertion that an ordinarily skilled artisan would have looked to Evans for a humanized variable domain of 5G1.1 (Bell tells one to do so to produce eculizumab for treating PNH in humans), and that, upon focusing on an antibody like that identified by Tacken (also identified as eculizumab, specific for the human terminal complement protein C5), such a skilled artisan would have produced one having SEQ ID NOS: 2 and 4, as recited in challenged independent claim 1. Mueller PCT discloses the amino acid sequence of such a human G2/G4 constant region, thus, a skilled artisan would have also found that combined isotype sequence useful in such an endeavor.

Patent Owner's arguments regarding the "formulation, administration, and patient condition limitations of claims 1–8," are substantially the same as those addressed in Ground 1. *See* Prelim. Resp. 61–62. As above, we find Petitioner's support for these limitations sufficient for the purpose of institution. *See* Section II.E.2, above.

3.    Conclusion as to Ground 2

Based on the evidence presented at this stage in the proceeding, Petitioner has shown sufficiently that the challenged claims would have been unpatentable as obvious over the teachings of Evans, Bell, Tacken, and Mueller PCT as set forth in Ground 2.

46

IPR2023-01069
Patent 10,590,189 B2

G.    Obviousness in view of Bell and Wang (Ground 3)

In Ground 3, Petitioner challenges claims 1–8 as obvious over Bell and Wang. Pet. 27–28, 54–60. Patent Owner opposes. Prelim. Resp. 63–70. As we have already found Petitioner's positions under Grounds 1 and 2 sufficient to institute trial, we address Ground 3 for the sake of completeness.

1.    The Parties' Contentions

According to Petitioner, in disclosing successful clinical studies involving eculizumab for the treatment of PNH, Bell necessarily discloses the claimed SEQ ID NOS: 2 and 4. *See* Pet. 55–59. More specifically, Petitioner contends that Bell (which incorporates Evans (Ex. 1005) and Thomas (Ex. 1010) by reference) discloses the eculizumab antibody by name, unambiguously refers to the h5G1.1 IgG2/IgG4 molecule described by SEQ ID NOS: 2 and 4. Pet. 55–59; *see* Ex. 1003 ¶¶ 157–162.

Referencing its arguments with respect to Grounds 1 and 2, Petitioner further asserts that an ordinarily skilled artisan would have known that eculizumab has the same sequence as the claimed SEQ ID NOS: 2 and 4 (based on Bowdish, Evans, Muller PCT, and Tacken (which disclose eculizumab's IgG2/IgG4 structure)), and that Alexion itself stated to the Office that Bell's disclosed eculizumab contained the heavy and light chain sequences claimed. Pet. 56–57, 59 (citing; Ex. 1002, 13879–13886 (¶¶ 5–6);[21] Ex. 1066, 013; Ex. 1003 ¶¶ 158–162; Ex. 1025, 41). Accordingly,

---

[21] Declaration of Laural S. Boone, J.D., PhD., submitted during the prosecution of the '189 patent.

47

IPR2023-01069
Patent 10,590,189 B2

Petitioner asserts, "the mere use of the word "eculizumab" by Bell provides an anticipating disclosure [of the claimed antibody], because before 2007 a POSA had "the ability to make" eculizumab, and thus was in possession of the [the amino acid sequences of SEQ ID Nos. 2 and 4]." *Id.* at 59 (citing *In re Gleave*, 560 F.3d 1331, 1337 (Fed. Cir. 2009)).

With respect to the formulation, administration, and patient condition limitations of claims 1–8, Petitioner relies on Bell and/or Wang, substantially as discussed in section II.E.2, above. *Id.* at 58, 59–60 (citing Ex. 1003 ¶¶ 16, 163).

Patent Owner argues that Bell fails to expressly or inherently disclose the claim elements because it omits "the exact amino acid sequence of eculizumab." Prelim. Resp. 64. Patent Owner argues that "[w]hile Bell described administering 'eculizumab' for treating PNH, ***nothing*** in Bell taught the uniquely-engineered heavy chain reflected in 'SEQ ID NO: 2.'" *Id*. Patent Owner contends this is because Bell references Thomas's IgG4 antibody, which is not the amino sequence of SEQ ID NO: 2. *Id*.

Patent Owner contends that Bell's "mere naming of an investigational product (*e.g.*, 'eculizumab') . . . does ***not*** inherently anticipate later-filed patent claims detailing the specific structure or composition of that product" unless "a POSA could have ***necessarily*** determined that later claimed structure/composition from the information publicly available as of the priority date." *Id.* at 66 (citing *Endo Pharms. Sols., Inc. v. Custopharm Inc.*, 894 F.3d 1374, 1378-83 (Fed. Cir. 2018) ("*Endo Pharms.*")). Patent Owner argues that eculizumab was not available to the public and its sequence was

48

IPR2023-01069
Patent 10,590,189 B2

not disclosed as of Bell's publication date. *Id.* at 67–68 (citing Ex. 2103, 1320–1327).

2.    Analysis

On the present record we find Petitioner has met its burden of showing there is a reasonable likelihood that the challenged claims are obvious in view of Bell and Wang. We find the facts under Ground 3 largely in line with those under Grounds 1 and 2, discussed above.

Bell uses the word "eculizumab" at least 25 times throughout its disclosure, describing it as an anti-C5, h5G1.1-mAb, but without further expressly describing its structure. *See generally* Ex. 1007. The record suggests that one of ordinary skill in the art understood "eculizumab" to refer to a specific antibody. *See, e.g.*, Ex. 1008, 1279 ("An isotype control antibody, h5G1.1-mAb (5G1.1, eculiz[u]mab; Alexion Pharmaceuticals) containing the same IgG2/IgG4 constant region, is specific for the human terminal complement protein C5," as discussed in Mueller 1997 and Thomas); Ex. 2022 ¶¶ 101–103 (Patent Owner's declarant testifying that as of the critical date, one of ordinary skill in the art "would have understood that the term 'eculizumab' referred to a single, unique antibody with a single defined structure and primary amino acid sequence"), 120 (similar).

Consistent with the above, Bell states that eculizumab is *the* "particularly useful . . . anti-C5 antibody . . . h5G1.1-mAb," discussed throughout its disclosure as a therapy for PNH patients, including, in its Examples, as a successful treatment of 11 specific PNH patients. Ex. 1007 ¶¶ 12, 21, 25, 26, 28, 30–35, 37, 52, 61, 81–96, Figs. 1A, 1B, 2, 3, 4, 5, 6a, 6b, 7, 8, 9, 10, claims 1–3, 8, 20–21, 109, 114, 119. Bell also identifies that

IPR2023-01069
Patent 10,590,189 B2

Evans (and Thomas), which it incorporates by reference, discloses methods for eculizumab's preparation. Ex. 1007 ¶ 52.

On the present record, we find the facts here to be highly analogous to those of both *In re Crish*, 393 F.3d 1253 (Fed. Cir. 2004) ("*Crish*"), and *Nichols Institute Diagnostics, Inc. v. Scantibodies Clinical Laboratory, Inc.*, 195 F. App'x 947 (Fed. Cir. 2006) ("*Nichols*"), each of which suggests the sequence elements of the challenged claims are disclosed by Bell. Although *Crish* and *Nichols* focus on anticipation, we find their facts and rationale applicable to the issue of obviousness in the present proceeding.

In *Crish*, the claimed invention at issue was a "[a] purified oligonucleotide comprising at least . . . the nucleotide sequence from 521 to 2473 of SEQ ID NO:1, and wherein said portion . . . has promoter activity." *Crish*, 393 F.3d at 1254. So, similar to the presently claimed pair of amino acid sequences providing an antibody (eculizumab) that binds C5, the invention of *Crish* was a sequence of oligonucleotides that had promoter activity, namely "the hINV promoter."

Further, the issue in *Crish* was whether a publication by inventor Crish disclosing the complete structure of hINV as a plasmid, but not the express sequence of the promoter region as claimed, anticipated the claim. *Id.* at 1255 *et seq*. Crish argued that those working in the relevant field had used the disclosed plasmid and sequenced it to obtain a different promoter sequence from the claimed sequence. *Id.* at 1255. Crish argued that those of ordinary skill in the art would not have then recognized the claimed sequence in view of such results obtained by other workers. *Id.*

IPR2023-01069
Patent 10,590,189 B2

The similarities to this case are apparent. Here, we also have prior art disclosing eculizumab, which Bell discloses as useful in the treatment PNH. Also here, Patent Owner argues that no one could have known the claimed amino acid sequences for eculizumab and, in fact, would have looked to the wrong antibody therefor (i.e., to Thomas's disclosure of an IgG4 antibody rather than the claimed IgG2/IgG4 antibody). Crish's claimed SEQ ID NO: 1 was obtained by sequencing the same plasmid disclosed in the prior art reference. *Id.* at 1256. Here, the '189 patent itself states that Evans teaches an antibody that binds to C5 and that it discloses a preferred whole antibody, which was later named eculizumab.

The Federal Circuit held in *Crish* that "[t]he sequence is the identity of the structure of the gene, not merely one of its properties." *Id.* at 1258. The Court further recognized that "one cannot establish novelty by claiming a known material," i.e., the sequence of nucleotides in *Crish's* gene/promoter. *Id.* The Court held that hINV was known and its promoter region identified in the inventor's own prior art by size and location, if not by its sequence, and "[t]he only arguable contribution to the art that Crish's [claimed invention] makes is the identification of the nucleotide sequence of the promoter region of hINV." *Id.* The Court further held that "[t]he starting material plasmid necessarily contains the gene of interest including the promoter region," thus, "the claims necessarily encompass the gene incorporated in the starting material plasmid." *Id.* at 1259.

The Federal Circuit held that, in claiming SEQ ID NO: 1, "Crish [was] claiming what Crish earlier disclosed," and "Crish cannot rely upon the inability of another worker to correctly sequence the promoter region of

IPR2023-01069
Patent 10,590,189 B2

the hINV gene from [the plasmid] . . . when he has sequenced it accurately himself." *Id.* Thus, the Federal Circuit concluded that the Crish-published prior art and its disclosed starting materials anticipated the claim. *Id.*

Here, like *Crish*, the asserted prior art, i.e., Bell (with its incorporation of Evans and Thomas), is Alexion's, and at least to some degree, the '189 patent inventor's own work.[22] Further, here, like *Crish*, the prior art discloses the claimed antibody, eculizumab, and how to construct it, even if there may have been some confusion by those in the field over precisely the structure of the antibody's heavy chain (i.e., IgG4 or IgG2/IgG4). Therefore, it would appear that, here, the same conclusion as in *Crish* would be appropriate.

*Nichols* is very similar to *Crish*, and its facts are similar to those of the present record. In *Nichols*, the claimed invention was an antibody (or fragment) that selectively binds a peptide of hPTH that has one of six peptide sequences, i.e., SEQ ID Nos 1–6, which were hPTH 1–10, hPTH 1–9, hPTH 1–8, hPTH 1–7, hPTH 1–6, and hPTH 1–5. *Nichols*, 195 F. App'x at 949. The inventors, before their patent application, published an abstract

---

[22] We note that Bell, Evans, and Thomas are all associated with Alexion: Two of the named inventors of the '189 patent (Leonard Bell and Russell P. Rother) are also named inventors of Bell. *See* Ex. 1001, code (72); Ex. 1007, code (76)). Two of the named inventors of the '189 patent (Russell P. Rother and Mark J. Evans) are also named inventors of Evans *See* Ex. 1001, code (72); Ex. 1005, codes (73), (75); Ex. 1004, code (76) (correspondence address). And all of the named inventors of the '189 patent (Leonard Bell, Russell P. Rother, and Mark J. Evans) are also authors of Thomas. *See* Ex. 1001, code (72); Ex. 1010, 1389.

IPR2023-01069
Patent 10,590,189 B2

disclosing that they developed a mixture of ten antibodies that bound to specific peptides of hPTH (i.e., hPTH 1–37); however, the true significance of the antibody mixture was not recognized at the abstract's publication.

There was no dispute in *Nichols* that the claimed antibody was present in the serum disclosed in the abstract. *Id.* at 950–51. Here, there is no dispute that the antibody Bell used to treat PNH is eculizumab. And here, as noted above, the '189 patent itself states that Evans discloses "a preferred whole antibody (now named eculizumab)," and how to produce it. *See e.g.,* Ex. 1001, 12:29–63. Further, the inventor in *Nichols* testified that the claimed antibody was isolated from the serum disclosed in the abstract using known methods. *Nichols*, 195 F. App'x at 950–51. The *Nichols* patentee also argued that the abstract disclosed that the antibodies *predominantly* bound to the hPTH peptides, but that the claimed antibody required "selective" binding, and also that no one recognized the significance of the claimed antibody until after the abstract was published. *Id*.

The Federal Circuit in *Nichols* held that the abstract inherently anticipated the claimed antibody because, if it were isolated from the disclosed serum, using known methods, the isolated antibody would exhibit the claimed binding property, and recognition of the inherent disclosure by those of skill in the art was not needed. *Id.* Therefore, it would appear that, here, the same conclusion as in *Nichols* would be appropriate.

Thus, applying *Crish*, Bell's disclosure of eculizumab and its use in treating PNH is the disclosure of the identity of the antibody of SEQ ID NOS: 1 and 2, and its use in the recited method. Likewise, applying *Nichols*, disclosure of the existence of eculizumab, even as a generic reference to the

53

IPR2023-01069
Patent 10,590,189 B2

antibody (like disclosing the preparation of sera of a mixture of unidentified antibodies), is an inherent disclosure of the claimed antibody, even if its precise sequence was unappreciated at the time.

We are unpersuaded by Patent Owner's citation to *Endo Pharms.*, which, on this record, we find distinguishable on its facts. *See* Prelim. Resp. 66. In *Endo Pharms.*, the Federal Circuit found a claim to a formulation including (1) testosterone undecanoate in a certain mixture/ratio of (2) castor oil and (3) benzyl benzoate was not inherently disclosed by prior art articles reporting clinical studies—the prior art did not disclose the use of any co-solvent with castor oil—however, it was established that the actual formulation used in the reported studies had the claimed amounts of castor oil and benzyl benzoate. *Endo Pharms.*, 894 F.3d at 1377–78. In *Endo Pharms.*, the evidence asserted for the inherency of the unreported benzyl benzoate element was pharmacokinetic performance data, but such was not argued to be attributable only to the claimed vehicle formulation, and the "prior art was replete with potential co-solvents" that could have been used in place of benzyl benzoate. *Id.* at 1382. Thus, benzyl benzoate and the claimed ratio of it to castor oil was not necessarily disclosed. *Id.*

The Federal Circuit held that this uncertainty in mixture composition and the possible variability in mixtures that could achieve the same reported results fell short of the holding in *Crish*, where the claim was to a specific oligonucleotide, which, but for its claimed promoter sequence, was disclosed in the prior art. *Id.* at 1383. We find the facts here more like those of *Crish* and less like those of *Endo Pharms.,* because there appears to be no dispute here that eculizumab, as disclosed by Bell, *is* the claimed antibody.

IPR2023-01069
Patent 10,590,189 B2

As for whether eculizumab (the antibody of SEQ ID NOs: 1 and 2) was enabled by Bell, we find that the present record supports that it was. Bell is explicit that Evans described "[m]ethods for the preparation of h5G1.1, h5G1.1-scFv and other functional fragments of h5G1.1." Ex. 1007 ¶ 52. Furthermore, Petitioner asserts, in addition to Bell's explicit reference to Evans, the knowledge of those of ordinary skill in the art included that eculizumab had a human hybrid IgG2/IgG4 constant domain. *See, e.g.*, Ex. 1008, 1279. Moreover, the '189 patent, itself, refers to Thomas (incorporated by Bell) as disclosing that eculizumab "is a humanized monoclonal antibody directed against the terminal complement protein C5," and states that Evans (also a part of Bell), discloses "a preferred whole antibody (now named eculizumab)," and how to produce it. *See, e.g.*, Ex. 1001 1:63–64, 12:29–37. Therefore, on the present record, we are unpersuaded regarding Patent Owner's non-enablement argument.

3.    Conclusion as to Ground 3

Based on the evidence presented at this stage in the proceeding, and for the reasons discussed in section II.E.2, above, with respect to the dose form and formulations limitations, Petitioner has shown sufficiently that challenged claims would have been unpatentable as obvious over the teachings of Bell and Tacken as set forth in Ground 3.

H.    Discretionary Denial under 35 U.S.C. § 325(d)

Patent Owner contends that we should exercise our discretion to deny the Petition under 35 U.S.C § 325(d). Prelim. Resp. 1–2, 15–31; Sur-reply. According to Patent Owner, prior art asserted and arguments presented in

IPR2023-01069
Patent 10,590,189 B2

the Petition are the same as, or cumulative of, art and arguments previously presented the Office. Prelim. Resp. 17–24. Patent Owner also argues that Petitioner has not shown the Office erred in a manner material to patentability of challenged claims. *Id.* at 24–31. Petitioner disagrees as to both points. Pet. 64–74; Reply 1–6; Ex. 1003 ¶¶ 170–179.

> 1.      Principles of Law

Institution of an *inter partes* review is discretionary. *See Cuozzo Speed Techs., LLC v. Lee*, 579 U.S. 261, 273 (2016) (explaining that because § 314 includes no mandate to institute review, "the agency's decision to deny a petition is a matter committed to the Patent Office's discretion"); *see also Harmonic Inc. v. Avid Tech., Inc.*, 815 F.3d 1356, 1367 (Fed. Cir. 2016) (stating that under § 314(a), "the PTO is permitted, but never compelled, to institute an IPR proceeding").

Under § 325(d), in determining whether to institute an *inter partes* review, "the Director may take into account whether, and reject the petition or request because, the same or substantially the same prior art or arguments previously were presented to the Office." One of the guideposts for our discretion is 35 U.S.C. § 325(d), which provides, in relevant part:

> MULTIPLE PROCEEDINGS -- . . . In determining whether to institute or order a proceeding under this chapter, chapter 30, or chapter 31, the Director may take into account whether, and reject the petition or request because, the same or substantially the same prior art or arguments previously were presented to the Office.

Thus, 35 U.S.C. § 325(d) identifies two separate issues that the Director may consider in exercising discretion to deny institution of review: whether the

56

IPR2023-01069
Patent 10,590,189 B2

petition presents to the Office the same or substantially the same art previously presented to the Office; and whether the petition presents to the Office the same or substantially the same arguments previously presented to the Office. *Advanced Bionics, LLC v. MED-EL Elektromedizinische Geräte GmbH*, IPR2019-01469, Paper 6 at 8 (PTAB Feb. 13, 2020) (designated precedential March 24, 2020) ("*Advanced Bionics*"). We consider multiple factors when determining whether to exercise our discretion under § 325(d), including:

> (a) the similarities and material differences between the asserted art and the prior art involved during examination;

> (b) the cumulative nature of the asserted art and the prior art evaluated during examination;

> (c) the extent to which the asserted art was evaluated during examination, including whether the prior art was the basis for rejection;

> (d) the extent of the overlap between the arguments made during examination and the manner in which Petitioner relies on the prior art or Patent Owner distinguishes the prior art;

> (e) whether Petitioner has pointed out sufficiently how the Examiner erred in its evaluation of the asserted prior art; and

> (f) the extent to which additional evidence and facts presented in the Petition warrant reconsideration of the prior art or arguments.

*Becton, Dickinson & Co. v. B. Braun Melsungen AG*, IPR2017-01586, Paper 8 at 17–18 (PTAB Dec. 15, 2017) (informative; precedential as to § III.C.5, first paragraph) (paragraphing added). These factors are not dispositive, but are part of a balanced assessment of the relevant circumstances in a

57

IPR2023-01069
Patent 10,590,189 B2

particular case and we do not simply default to a tally of each factor to
determine whether or not an IPR should be instituted.

We integrate the above considerations into the *Advanced Bionics* two-
part framework in deciding discretionary denial under § 325(d), first
considering *Becton, Dickinson* factors (a), (b), and (d) to determine whether
the same or substantially the same art or arguments were previously
presented to the Office, and if so, evaluating *Becton, Dickinson* factors (c),
(e), and (f) to determine whether the petitioner has demonstrated that the
Office erred in a manner material to the patentability of challenged claims.
*Advanced Bionics*, 7–11.

    2.   *Advanced Bionics* Part One

With respect to the first part of the *Advanced Bionics* analysis, we
address "whether the same or substantially the same art . . . w[as] previously
presented to the Office." *Advanced Bionics*, 7–8 (stating that "[p]reviously
presented art includes . . . art provided to the Office, such as on an
Information Disclosure Statement (IDS)").[23] Patent Owner contends that
Bowdish, Evans, Wang, Tacken, and a counterpart reference to Bell were
disclosed in the prosecution leading to the issuance of the '189 patent.
Prelim. Resp. 15–16. Patent Owner further points to Mueller 1997
(Ex. 1006) as cumulative Mueller PCT. *Id.*

––––––––––––––––––––

[23] Although the parties also address the alternative question of whether the
same or substantially the same *arguments* were previously presented to the
Office, that analysis is not necessary here, but is subsumed, in relevant part,
in our discussion of the second prong of *Advanced Bionics*.

58

IPR2023-01069
Patent 10,590,189 B2

In response, Petitioner argues that Mueller PCT is not cumulative to Mueller 1997 because only the former "discloses the complete IgG2/G4 constant domain of eculizumab." Reply 5–6.[24] Petitioner further points out that Patent Owner identifies no citation to Tacken in the prosecution leading to the issuance of the '189 patent "despite Tacken's express teaching that eculizumab contains the IgG2/G4 constant region." *Id.* at 1.[25]

Patent Owner points to the prosecution history of the '189 and '809 child patents, wherein Patent Owner had

> submitted the entire history of each of Amgen's IPRs against the '880, '504, and '149 patents, including all the references cited in those IPRs including Bowdish, Evans, Bell, Tacken, and Mueller PCT/1997 as well as all expert reports and testimony, early in the prosecution to be considered by [the] Examiners.

Prelim. Resp. 21; *see also* Ex. 1002, 14885–14886 (IDS disclosing records of Amgen IPRs). Patent Owner argues that the Examiner "expressly stated in many of his Office Actions that he considered each IDS submitted and, when making his rejections, noted that the references used were listed on an IDS," and evidence of such appears on the face of the child patents. *See*

---

[24] Petitioner's contention is undercut somewhat by Dr. Ravetch's characterization of Mueller PCT as "a '***companion*** patent application describing the ***same work*** published in the Mueller 1997 article." *See* Sur-reply 5 (citing Ex. 1003 ¶¶ 62. 124) (emphasis added by Petitioner).

[25] Although Petitioner further argues that mere citation of references in an IDS may not be sufficient to satisfy the first element of Advanced Bionics, that line of inquiry is not necessary here. *See* Reply 1.

IPR2023-01069
Patent 10,590,189 B2

Prelim. Resp. 20–21 (citing Ex. 1002, 11284–85); *see also* Ex. 1001, code (56); Ex. 3003, code (56).

The claims of the child patents (including the '189 patent at issue here) recite, in relevant part, an antibody that "comprises a heavy chain consisting of SEQ ID NO: 2 and a light chain consisting of SEQ ID NO: 4." *See, e.g.*, Ex. 1001, 39:15–24; Ex. 3003, 39:14–20. Moreover, a major issue addressed by the Examiner in the child patents was whether the hybrid IgG4/IgG2 heavy chain described by SEQ ID NO: 2 was known or obvious over the prior art. *See*, *e.g.*, Ex. 1002, 14840–43 (Alexion's argument in the '189 patent's prosecution that the prior art "repeatedly and consistently described 'eculizumab' as having an IgG4 heavy chain constant region" (capitalization normalized)), 14854–55 (similar), 14873–14875 (Examiner's Reasons for Allowance for the '189 patent stating, e.g., that Evans, identified as the closest prior art, "does not teach an antibody that binds C5 which have a H and L chain with SEQ ID Nos: 2 and 4, respectively"). As such, and in light of the unique record before us, we agree with Patent Owner that all of the references relied on by Petitioner here "previously were presented to the Office" as required by § 325(d) and *Advanced Bionics*. Accordingly, we proceed to part two of the analysis.

    3.    *Advanced Bionics* Part Two

In the second phase of our inquiry, we consider whether the Office erred in a manner material to the patentability of challenged claims. *Advanced Bionics*, 7–11. Petitioner raises at least four non-trivial arguments for why the Examiner allegedly erred in the prosecution of '189 and related

IPR2023-01069
Patent 10,590,189 B2

patents. *See* Pet. 66–74; Reply 3–6. For the purpose of our analysis, we find it sufficient to address only two of those arguments.

> a)     Tacken

Petitioner argues that the Examiner overlooked or misapprehended the significance of Tacken's statement that eculizumab contains an IgG2/G4 constant region and, thus, did not appreciate the significance of the IgG2/G4 sequence disclosed in Mueller PCT. *See* Pet. 66–68; Reply 5–6; Ex. 1003 ¶¶ 170–174. In this respect, Petitioner points to Alexion's Response to an Office Action in the prosecution of the '189 patent, which avers that

> the literature as of March 15, 2007 . . . ***consistently*** identified eculizumab as the antibody described in the "Thomas" publication . . . which has a naturally-occurring "IgG4" heavy chain constant region. Accordingly, a person of ordinary skill in the art as of March 15, 2007 would have had ***no doubt*** that "eculizumab" was Thomas's IgG4-isotpe humanized antibody, because the pertinent literature ***consistently and unambiguously*** said so[.]

Pet. 67 (citing Ex. 1002, 14840). As noted by Petitioner, Alexion "went on to list several references that purportedly referred to eculizumab as an IgG4 antibody," via citation to Thomas. *Id.* at 67–68; see Ex. 1002, 14840–14842. Petitioner argues that Alexion's characterization of the art was incomplete and inaccurate for failing to account for Tacken. Pet. 68. We agree with Petitioner.

As noted in Section I.F.4, above, Tacken describes a lectin-specific antibody comprising a humanized variable heavy chain region "genetically fused with a human hybrid IgG2/IgG4 constant domain. [citing Mueller 1997]." Ex. 1008, 1279. Tacken used mouse IgG1 and 5G1.1

61

IPR2023-01069
Patent 10,590,189 B2

antibodies as isotype controls in binding and internalization assays. *Id.* at 1280. With respect to the latter, Tacken states: "An isotype control antibody, h5G1.1-mAb (5G1.1, "eculizamab [*sic*]; Alexion Pharmaceuticals) containing the same IgG2/IgG4 constant region, is specific for the human terminal complement protein C5 [citing Thomas (Ex. 1010)]." *Id.* at 1279. On its face, we find it plausible that Tacken believed that eculizumab (h5G1.1) contained a "human hybrid IgG2/IgG4 constant region," making is suitable for use an IgG2/IgG4 isotype control for the IgG2/IgG4–containing antibody under development. *See* Ex. 1003 ¶¶ 64, 69, 70 (citing Ex. 1029, 10–11 (Alexion's statement in unrelated patent prosecution that in light of Evans and Mueller 1997, it was well known as of 2002 "that eculizumab has a G2/G4 Fc portion").

Patent Owner, in contrast, contends that the above passage from Tacken merely "point[s] to Thomas's IgG4 antibody," in the same manner as the prior art it raised with the Examiner. Sur-reply 2. Addressing the implication that Tacken instead teaches that eculizumab "contain[s] the same IgG2/IgG4 constant region" as Tacken's lectin-specific antibody (having "a human hybrid IgG2/IgG4 constant domain"), Patent Owner's expert downplays the passage as "a single sentence taken out of context from a single publication," and which the skilled artisan would have found "ambiguous," "confusing," and possibly a "mistake" to be disregarded in view of "the numerous clear statements in the key publications regarding 'eculizumab' that identify it as the IgG4 antibody of Thomas." Ex. 2022 ¶¶ 140, 143; Ex. 1008, 1279.

62

IPR2023-01069
Patent 10,590,189 B2

We do not find this interpretation persuasive on the present record, and particularly in view of the close association between Alexion and the authors of Tacken. In this respect, Tacken discloses that the lectin-specific antibody research was supported by "funding from Alexion Pharmaceuticals" to the lead author, and that three of the paper's other authors were "employed by Alexion Pharmaceuticals, whose potential product was studied in the present work." *Id.* at 1278 (footnotes). Notably, one of these authors, Russell P. Rother, is also an author of Thomas, published some nine years earlier.

On the present record, we find it unlikely that the Mr. Rother and the other Tacken authors mistakenly referred to eculizumab as having an IgG2/IgG4 constant region. We find more plausible that Tacken cites to Thomas as describing eculizumab's C5-specific CDRs, and refers to Mueller 1997 for the IgG2/IgG4 heavy chain sequence common to both eculizumab and the anti-lectin antibody under development.

As such, we find it error for the Examiner to have not expressly considered Tacken in the context of the other references Alexion pointed to as allegedly demonstrating the "consistent teachings as of March 15, 2007 that 'eculizumab was the IgG4 antibody of Thomas." Ex. 1002, 14840–14843, 14854. But for this error, the Examiner would have better appreciated the disclosure of Mueller PCT. *See* Ex. 1003 ¶¶ 170–172.

b)    Bowdish and Evans

Petitioner further argues that, during the examination of the child patents, the Examiner erred in evaluating Bowdish and Evans by relying on Alexion's comparison between of Bowdish's *humanized* IgG2/G4 TPO-

63

IPR2023-01069
Patent 10,590,189 B2

mimetic antibody (5G1.1+peptide antibody), with sequences of Evans'
*mouse* 5G1.1 sequence, instead of using Evan's *humanized* 5G1.1 sequence
as the comparator, which would have shown "no mismatch beyond the
HCDR3 region of the TPO mimetic peptide insert." Pet. 68–72; Reply 4–6;
Ex. 1002, 14848–14850. "This, unsurprisingly revealed a mismatch in the
sequences." Pet. 69; *see* Ex. 1002, 14848 (showing alignment between
Bowdish SEQ ID NO: 67 (Ex. 1004 ¶ 49) and the "heavy chain variable
region of [mouse] antibody 5G1.1" (Evans Fig. 19 (Ex. 1005, 10:9–21, Fig.
19)). But, according to Petitioner and its technical expert, Dr. Ravetch, one
of ordinary skill in the art would have understood that the humanized nature
of Bowdish's 5G1.1+peptide antibody, and that a comparison using Evans'
humanized 5G1.1 sequence would have shown "no mismatch beyond the
HCDR3 region of the TPO mimetic peptide insert." Pet. 69–70; *see, also*,
Ex. 1003 ¶¶ 81 (citing Ex. 1004 ¶ 192 as disclosing that Bowdish used "anti-
human IgG" to detect 5G1.1), 84, 174–175.

According to Petitioner, the comparison presented during prosecution
was predicated on Alexion's representation to the examiner that Bowdish's
"[c]onstruction of 5G1.1" would have directed a POSA only to Evans'
mouse antibody in Examples 7–10. *Id.* Petitioner contends that Alexion's
argument to the Examiner ignored the express description of other, more
pertinent, examples in Evans. In particular,

Evans' Example 11 expressly teaches humanized 5G1.1 scFv
**constructs** and is entitled "**Construction** and Expression of
Recombinant mAbs." (EX1005, 42:56-45:33 (emphasis
added).) Example 11 also states: "Recombinant DNA
**constructions** encoding the recombinant mAbs comprising the

64

IPR2023-01069
Patent 10,590,189 B2

> 5G1.1 CDRs are prepared by conventional recombinant DNA methods[.]" (EX1005, 42:59-62 (emphasis added).) Evans also discloses "CDR sequences that are useful in the **construction** of the humanized antibodies of the invention[.]" (EX1005, 8:50-54 (emphasis added).)

Pet. 70–71. Instead, Petitioner argues, "Alexion focused the Examiner on [Evans'] Example 7, entitled 'Preparation of anti-C5 Monoclonal Antibodies,' which discloses preparing (not constructing) the parent 5G1.1 mouse antibody from the mouse hybridomas of the prior art." *Id.* at 71(citing Ex. 1005, 37:34–39:30).[26]

> We agree with Petitioner that, "[t]he Examiner was persuaded by Alexion's comparison, as evidenced by the Reason for Allowance:

> > Evan's [*sic*] scaffold 5G1.1 mouse antibody variable regions or the whole 5G1.1 mouse antibody with the sequences for Bowdish's TPO mimetic compound would still have revealed a mismatch in amino acids beyond those that Bowdish identified as the TPO mimetic peptide insert.

> Pet. 69 (citing Ex. 1002, 14874–75; Ex. 1003 ¶ 173.)

Patent Owner present no specific rebuttal, merely asserting that Petitioner's "purported errors are the same flawed arguments Samsung asserts in its Petition, which are fully accounted for in Alexion's POPR."

---

[26] Although not necessary to our finding of error sufficient to satisfy the second prong of *Advanced Bionics*, Petitioner plausibly argues that the Examiner was also misled by Alexion's incorrect characterization of Evans as disclosing "multiple options" for heavy chain CDR3—whereas, "all nine humanized scFv sequences of Evans have only one unique HCDR3 sequence (YFFGSSPNWYFDV), not 'multiple options.' (*See* EX1005, 42:56-45:33; *see also supra* VIII.C; EX1003, ¶176, Appendix A.)." Pet. 71–72.

65

IPR2023-01069
Patent 10,590,189 B2

Reply 5. We address the teachings of Bowdish and Evans in Section II.E, above.

Considering the record before us, we agree with Petitioner that the Examiner erred in crediting Alexion's comparison between Bowdish's humanized IgG2/G4 TPO-mimetic antibody and Evans's mouse 5G1.1 sequence, without considering the more pertinent comparison between Bowdish's sequence and Evan's humanized 5G1.1 sequence.

4.      Conclusion

Having considered the argument and evidence of record, and for the reasons above, we decline to exercise our discretion under section 325(d) to deny institution.

I.  Discretionary Denial under 35 U.S.C. § 314(a)

Patent Owner points to § 314(a)[27] as a basis for denying institution but provides no substantive argument or evidence on this point. *See* Prelim. Resp. 2 (citation), 4 (citation), 15 (section heading), 31 (citation in parenthetical). At best, Patent Owner asserts that if we find "that fewer than all three Grounds meet the standard for Section 325(d), institution of Samsung's petition should still be denied in full, because institution on all three Grounds 'would not be an efficient use of the Board's time and

---

[27] Under certain circumstances, the Board may apply its discretion under § 314(a) to deny institution in light of a parallel district court proceeding involving the same patent. *See*, *e.g.*, *Apple Inc. v. Fintiv, Inc.*, IPR2020-00019, Paper 11 (PTAB Mar. 20, 2020) (precedential). But as noted by Petitioner, the patent at issue here "has never been asserted in any litigation." Pet. 63.

66

IPR2023-01069
Patent 10,590,189 B2

resources.'" Prelim. Resp. 31 (citing *Deeper, UAB v. Vexilar, Inc.*, IPR2018-01310, Paper 7 at 41–43 (PTAB Jan. 24, 2019) (informative)). Because we decline to exercise our discretion with respect to any of the Grounds under § 325(d), the Board's *Deeper* decision is inapposite.

## III.   CONCLUSION

On the record before us at this stage in the proceeding, Petitioner has demonstrated a reasonable likelihood of showing that claims 1–8 of the '189 patent are unpatentable under at least one ground. Accordingly, we institute an *inter partes* review of the challenged claims of the '189 patent on all grounds alleged by Petitioner. This decision does not reflect a final determination on the patentability of the claim.

## III.   ORDER

Accordingly, it is hereby:

ORDERED that, pursuant to 35 U.S.C. § 314, an *inter partes* review of claims 1–8 of the '189 patent, in accordance with each ground on which the challenge to each claim is based in the Petition, is hereby *instituted*; and

FURTHER ORDERED that, pursuant to 35 U.S.C. § 314(c) and 37 C.F.R. § 42.4(b), *inter partes* review of the '189 patent will commence on the entry date of this Order, and notice is hereby given of the institution of a trial.

IPR2023-01069
Patent 10,590,189 B2


For PETITIONER:

Michelle Rhyu
Daniel Knauss
COOLEY LLP
rhyums@cooley.com
dknauss@cooley.com

For PATENT OWNER:

Gerald Flattmann
Andrew Cochran
CAHILL GORDON & REINDEL LLP
gflattmann@cahill.com
acochran@cahill.com

68

# EXHIBIT B

**HIGHLIGHTS OF PRESCRIBING INFORMATION**

**These highlights do not include all the information needed to use Soliris safely and effectively. See full prescribing information for Soliris.**

**Soliris™ (eculizumab)₁**

**Concentrated solution for intravenous infusion**
**Initial U.S. Approval: 2007**

---

**WARNING: SERIOUS MENINGOCOCCAL INFECTIONS**

*See full prescribing information for complete boxed warning*

**Soliris increases the risk of meningococcal infections (5.1)**
- **Vaccinate patients with a meningococcal vaccine at least 2 weeks prior to receiving the first dose of Soliris; revaccinate according to current medical guidelines for vaccine use**
- **Monitor patients for early signs of meningococcal infections, evaluate immediately if infection is suspected, and treat with antibiotics if necessary.**

---

**----------------------INDICATIONS AND USAGE--------------------------**

Soliris is a complement inhibitor indicated for the treatment of patients with paroxysmal nocturnal hemoglobinuria (PNH) to reduce hemolysis (1).

**--------------------DOSAGE AND ADMINISTRATION--------------------**

Dosage Regimen: (2.1)
- 600 mg via 35 minute intravenous infusion every 7 days for the first 4 weeks, followed by
- 900 mg for the fifth dose 7 days later, then
- 900 mg every 14 days thereafter

Administration: (2.2, 2.3)
- Do not administer as an intravenous push or bolus.
- Dilute to a final concentration of 5 mg/mL prior to administration.
- Administer by intravenous infusion over 35 minutes.

**--------------------DOSAGE FORMS AND STRENGTHS----------------------**

300 mg single-use vials each containing 30 mL of 10 mg/mL sterile, preservative-free solution (3).

**------------------------------CONTRAINDICATIONS-------------------------------**

Do not initiate Soliris therapy in patients:
- with unresolved serious *Neisseria meningitidis* infection (4).
- who are not currently vaccinated against *Neisseria meningitidis* (4).

**----------------------WARNINGS AND PRECAUTIONS-----------------------**

- Other Infections: Use caution when administering Soliris to patients with any systemic infection (5.2).
- Monitoring After Soliris Discontinuation: Soliris increases the number of PNH red blood cells (RBCs). All patients who discontinue Soliris therapy should be monitored for signs and symptoms of intravascular hemolysis, including evaluation of serum lactate dehydrogenase (LDH) levels (5.3).

**------------------------------ADVERSE REACTIONS----------------------------**

The most frequently reported adverse reactions (≥10% overall and greater than placebo) are: headache, nasopharyngitis, back pain and nausea (6).

**To report SUSPECTED ADVERSE REACTIONS, contact Alexion Pharmaceuticals, Inc. at 1-888-SOLIRIS (1-888-765-4747) or FDA at 1-800-FDA-1088 or www.fda.gov/medwatch.**

**See 17 PATIENT COUNSELING INFORMATION AND MEDICATION GUIDE**

**Revised: 3/2007**

---

**FULL PRESCRIBING INFORMATION: CONTENTS\***
**WARNING: SERIOUS MENINGOCOCCAL INFECTIONS**
**1    INDICATIONS AND USAGE**
**2    DOSAGE AND ADMINISTRATION**
    2.1    Recommended Dosage Regimen
    2.2    Preparation for Administration
    2.3    Administration
**3    DOSAGE FORMS AND STRENGTHS**
**4    CONTRAINDICATIONS**
**5    WARNINGS AND PRECAUTIONS**
    5.1    Serious Meningococcal Infections
    5.2    Other Infections
    5.3    Monitoring After Soliris Discontinuation
    5.4    Thrombosis Prevention and Management
    5.5    Laboratory Monitoring
    5.6    Infusion Reactions
**6    ADVERSE REACTIONS**
    6.1    Clinical Trial Experience
    6.2    Immunogenicity
**7    DRUG INTERACTIONS**

**8    USE IN SPECIFIC POPULATIONS**
    8.1    Pregnancy
    8.2    Labor and Delivery
    8.3    Nursing Mothers
    8.4    Pediatric Use
    8.5    Geriatric Use
**10    OVERDOSAGE**
**11    DESCRIPTION**
**12    CLINICAL PHARMACOLOGY**
    12.1    Mechanism of Action
    12.2    Pharmacodynamics
    12.3    Pharmacokinetics
**13    NONCLINICAL TOXICOLOGY**
    13.1    Carcinogenesis, Mutagenesis, Impairment of Fertility
**14    CLINICAL STUDIES**
**16    HOW SUPPLIED/STORAGE AND HANDLING**
**17    PATIENT COUNSELING INFORMATION**

\*Sections or subsections omitted from the full prescribing information are not listed.

## Soliris ™ (eculizumab)

1   **FULL PRESCRIBING INFORMATION**

```
┌─────────────────────────────────────────────────────────────────────────────┐
│           WARNING: SERIOUS MENINGOCOCCAL INFECTION                            │
│  Soliris increases the risk of meningococcal infections (5.1)                 │
│     • Vaccinate patients with a meningococcal vaccine at least 2 weeks prior  │
│       to receiving the first dose of Soliris; revaccinate according to        │
│       current medical guidelines for vaccine use                              │
│     • Monitor patients for early signs of meningococcal infections, evaluate  │
│       immediately if infection is suspected, and treat with antibiotics if    │
│       necessary.                                                              │
└─────────────────────────────────────────────────────────────────────────────┘
```

2   **1   INDICATIONS AND USAGE**

3   Soliris is indicated for the treatment of patients with paroxysmal nocturnal hemoglobinuria (PNH) to reduce
4   hemolysis.

5   **2   DOSAGE AND ADMINISTRATION**

6   Patients must be administered a meningococcal vaccine at least two weeks prior to initiation of Soliris therapy
7   and revaccinated according to current medical guidelines for vaccine use. [*see Warnings and Precautions*
8   *(5.1)*].

9   **2.1   Recommended Dosage Regimen**
10  Soliris therapy consists of:
11   • 600 mg every 7 days for the first 4 weeks, followed by
12   • 900 mg for the fifth dose 7 days later, then
13   • 900 mg every 14 days thereafter.
14

15  Soliris should be administered at the recommended dosage regimen time points, or within two days of these time
16  points. [*see Warnings and Precautions (5.5)*]
17

18  **2.2   Preparation for Administration**
19  Soliris must be diluted to a final admixture concentration of 5 mg/mL using the following steps:
20   • Withdraw the required amount of Soliris from the vial into a sterile syringe.
21   • Transfer the recommended dose to an infusion bag.
22   • Dilute Soliris to a final concentration of 5 mg/mL by adding  the appropriate amount (equal volume of diluent
23     to drug volume) of 0.9% Sodium Chloride Injection, USP; 0.45% Sodium Chloride Injection, USP; 5%
24     Dextrose in Water Injection, USP; or Ringer's Injection, USP to the infusion bag.
25

26  The final admixed Soliris 5 mg/mL infusion volume is 120 mL for 600 mg doses or 180 mL for 900 mg doses.
27  Gently invert the infusion bag containing the diluted Soliris solution to ensure thorough mixing of the product
28  and diluent. Discard any unused portion left in a vial, as the product contains no preservatives.
29

30  Prior to administration, the admixture should be allowed to adjust to room temperature [18°-25° C, 64-77° F].
31  The admixture must not be heated in a microwave or with any heat source other than ambient air temperature.
32  The Soliris admixture should be inspected visually for particulate matter and discoloration prior to
33  administration.

34  **2.3   Administration**
35  *Do Not Administer As An Intravenous Push Or Bolus Injection*

36  The Soliris admixture should be administered by intravenous infusion over 35 minutes via gravity feed, a
37  syringe-type pump, or an infusion pump. Admixed solutions of Soliris are stable for 24 hours at 2-8° C (36-46°
38  F) and at room temperature.
39

40  If an adverse reaction occurs during the administration of Soliris, the infusion may be slowed or stopped at the
41  discretion of the physician.  If the infusion is slowed, the total infusion time should not exceed two hours.
42  Monitor the patient for at least one hour following completion of the infusion for signs or symptoms of an
43  infusion reaction.
44

45  **3   DOSAGE FORMS AND STRENGTHS**
46  Soliris is supplied as 300 mg single-use vials each containing 30 mL of 10 mg/mL sterile, preservative-free
47  eculizumab solution.

48  **4   CONTRAINDICATIONS**
49  Do not initiate Soliris therapy in patients:

50   • with unresolved serious *Neisseria meningitidis* infection.
51   • who are not currently vaccinated against *Neisseria meningitidis*.

# Soliris ™ (eculizumab)

52    **5**        **WARNINGS AND PRECAUTIONS**

53    **5.1**   **Serious Meningococcal Infections**
54      The use of Soliris increases a patient's susceptibility to serious meningococcal infections (septicemia and/or
55      meningitis).  All patients without a history of prior meningococcal vaccination must receive the meningococcal
56      vaccine at least 2 weeks prior to receiving the first dose of Soliris and revaccinated according to current medical
57      guidelines for vaccine use. Quadravalent, conjugated meningococcal vaccines are strongly recommended.
58      Vaccination may not prevent meningococcal infections.

59      All patients must be monitored for early signs and symptoms of meningococcal infections and evaluated
60      immediately if an infection is suspected. Physicians should strongly consider discontinuation of Soliris during
61      the treatment of serious meningococcal infections.

62      In clinical studies, 2 out of 196 PNH patients developed serious meningococcal infections while receiving
63      treatment with Soliris; both had been vaccinated. [*see Adverse Reactions (6.1)*].

64    **5.2 Other Infections**

65      Soliris blocks terminal complement; therefore patients may have increased susceptibility to infections, especially
66      with encapsulated bacteria. Use caution when administering Soliris to patients with any systemic infection.

67    **5.3 Monitoring After Soliris Discontinuation**

68      Since Soliris therapy increases the number of PNH cells [in study 1, the proportion of PNH RBCs increased
69      among Soliris-treated patients by a median of 28% from baseline (range from -25% to 69%)], patients who
70      discontinue treatment with Soliris may be at increased risk for serious hemolysis. Serious hemolysis is identified
71      by serum LDH levels greater than the pre-treatment level, along with any of the following: greater than 25%
72      absolute decrease in PNH clone size (in the absence of dilution due to transfusion) in one week or less; a
73      hemoglobin level of <5 gm/dL or a decrease of >4 gm/dL in one week or less; angina; change in mental status; a
74      50% increase in serum creatinine level; or thrombosis. Monitor any patient who discontinues Soliris for at least 8
75      weeks to detect serious hemolysis and other reactions.

76      If serious hemolysis occurs after Soliris discontinuation, consider the following procedures/treatments: blood
77      transfusion (packed RBCs), or exchange transfusion if the PNH RBCs are >50% of the total RBCs by flow
78      cytometry; anticoagulation; corticosteroids; or reinstitution of Soliris.

79      In clinical studies, 16 of 196 PNH patients discontinued treatment with Soliris. Patients were followed for
80      evidence of worsening hemolysis and no serious hemolysis was observed.
81

82    **5.4 Thrombosis Prevention and Management**
83      The effect of withdrawal of anticoagulant therapy during Soliris treatment has not been established. Therefore,
84      treatment with Soliris should not alter anticoagulant management.
85

86    **5.5 Laboratory Monitoring**
87      Serum LDH levels increase during hemolysis and may assist in monitoring Soliris effects, including the response
88      to discontinuation of therapy. In clinical studies, six patients achieved a reduction in serum LDH levels only after
89      a decrease in the Soliris dosing interval from 14 to 12 days.  All other patients achieved a reduction in serum
90      LDH levels with the 14 day dosing interval [*see Clinical Pharmacology (12.2) and Clinical Studies (14)*].

91    **5.6 Infusion Reactions**
92      As with all protein products, administration of Soliris may result in infusion reactions, including anaphylaxis or
93      other hypersensitivity reactions.   In clinical trials, no PNH patients experienced an infusion reaction which
94      required discontinuation of Soliris.  Soliris administration should be interrupted in all patients experiencing
95      severe infusion reactions and appropriate medical therapy administered.
96

97    **6**        **ADVERSE REACTIONS**

98    **6.1 Clinical Trial Experience**

99      Meningococcal infections are the most important adverse reactions experienced by patients receiving Soliris
100      therapy.  In PNH clinical studies, two patients experienced meningococcal sepsis.  Both patients had previously
101      received a meningococcal vaccine.  In clinical studies among patients without PNH, meningococcal meningitis
102      occurred in an unvaccinated patient [*see Warnings and Precautions (5.1)*].

103      The data described below reflect exposure to Soliris in 196 adult patients with PNH, age 18-85, of whom 55%
104      were female.  All had signs or symptoms of intravascular hemolysis.  Soliris was studied in a placebo-controlled
105      clinical study (in which 43 patients received Soliris and 44, placebo); a single arm clinical study and a long term
106      extension study. 182 patients were exposed for greater than one year. All patients received the recommended
107      Soliris dose regimen.

108      Because clinical trials are conducted under widely varying conditions, adverse reaction rates observed in the
109      clinical trials of a drug cannot be directly compared to rates in the clinical trials of another drug and may not
110      reflect the rates observed in practice.  Table 1 summarizes the adverse reactions that occurred at a numerically

Soliris ™ (eculizumab)

111     higher rate in the Soliris group than the placebo group and at a rate of 5% or more among patients treated with
112     Soliris.

113                                 TABLE 1
114     ADVERSE REACTIONS REPORTED IN 5% OR MORE OF SOLIRIS TREATED PATIENTS AND GREATER
115               THAN PLACEBO IN THE CONTROLLED CLINICAL STUDY

| Reaction | Soliris<br>N = 43<br>N (%) | Placebo<br>N = 44<br>N (%) |
|---|---|---|
| Headache | 19 (44) | 12 (27) |
| Nasopharyngitis | 10 (23) | 8 (18) |
| Back pain | 8 (19) | 4 (9) |
| Nausea | 7 (16) | 5 (11) |
| Fatigue | 5 (12) | 1 (2) |
| Cough | 5 (12) | 4 (9) |
| Herpes simplex infections | 3 (7) | 0 |
| Sinusitis | 3 (7) | 0 |
| Respiratory tract infection | 3 (7) | 1 (2) |
| Constipation | 3 (7) | 2 (5) |
| Myalgia | 3 (7) | 1 (2) |
| Pain in extremity | 3 (7) | 1 (2) |
| Influenza-like illness | 2 (5) | 1 (2) |

116     In the placebo-controlled clinical study, serious adverse reactions occurred among 4 (9%) patients receiving
117     Soliris and 9 (21%) patients receiving placebo. The serious reactions included infections and progression of
118     PNH. No deaths occurred in the study and no patients receiving Soliris experienced a thrombotic event; one
119     thrombotic event occurred in a patient receiving placebo.

120     Among 193 patients with PNH treated with Soliris in the single arm, clinical study or the follow-up study, the
121     adverse reactions were similar to those reported in the placebo-controlled clinical study.  Serious adverse
122     reactions occurred among 16% of the patients in  these studies. The most common serious adverse reactions
123     were: viral infection (2%), headache (2%), anemia (2%), and pyrexia (2%).

124   **6.2**   **Immunogenicity**
125     As with all proteins there is a potential for immunogenicity. Low titers of antibodies to Soliris were detected in
126     3/196 (2%) of all PNH patients treated with Soliris. No apparent correlation of antibody development to
127     clinical response was observed.  The immunogenicity data reflect the percentage of patients whose test results
128     were considered positive for antibodies to Soliris in an enzyme linked immunosorbent assay (ELISA) and are
129     highly dependent on the sensitivity and specificity of the assay. Additionally, the observed incidence of
130     antibody positivity in the assay may be influenced by several factors including sample handling, timing of
131     sample collection, concomitant medications and underlying disease. For these reasons, comparison of the
132     incidence of antibodies to Soliris with the incidence of antibodies to other products may be misleading.

133   **7**    **DRUG INTERACTIONS**
134     Drug interaction studies have not been performed with Soliris.

Soliris ™ (eculizumab)

135  **8**  **USE IN SPECIFIC POPULATIONS**

136  **8.1**  **Pregnancy**

137  Pregnancy Category C:

138  PNH is a serious illness.  Pregnant women with PNH and their fetuses have high rates of morbidity and
139  mortality during pregnancy and the postpartum period.  There are no adequate and well-controlled studies of
140  Soliris in pregnant women. Soliris, a recombinant IgG molecule (humanized anti-C5 antibody), is expected to
141  cross the placenta.  Animal studies using a mouse analogue of the Soliris molecule (murine anti-C5 antibody)
142  showed increased rates of developmental abnormalities and an increased rate of dead and moribund offspring at
143  doses 2-8 times the human dose.  Soliris should be used during pregnancy only if the potential benefit justifies
144  the potential risk to the fetus.

145  Animal reproduction studies were conducted in mice using doses of a murine anti-C5 antibody that
146  approximated 2-4 times (low dose) and 4-8 times (high dose) the recommended human Soliris dose, based on a
147  body weight comparison.  When animal exposure to the antibody occurred in the time period from before
148  mating until early gestation, no decrease in fertility or reproductive performance was observed. When maternal
149  exposure to the antibody occurred during organogenesis, two cases of retinal dysplasia and one case of
150  umbilical hernia were observed among 230 offspring born to mothers exposed to the higher antibody dose;
151  however, the exposure did not increase fetal loss or neonatal death.  When maternal exposure to the antibody
152  occurred in the time period from implantation through weaning, a higher number of male offspring became
153  moribund or died (1/25 controls, 2/25 low dose group, 5/25 high dose group).   Surviving offspring had normal
154  development and reproductive performance.

155  **8.2**  **Labor and Delivery**
156  No information is available on the effects of Soliris during labor and delivery.

157  **8.3**  **Nursing Mothers**
158  It is not known whether Soliris is secreted into human milk.  IgG is excreted in human milk, so it is expected
159  that Soliris will be present in human milk.  However, published data suggest that breast milk antibodies do not
160  enter the neonatal and infant circulation in substantial amounts.  Caution should be exercised when Soliris is
161  administered to a nursing woman.  The unknown risks to the infant from gastrointestinal or limited systemic
162  exposure to Soliris should be weighed against the known benefits of breastfeeding.

163  **8.4**  **Pediatric Use**
164  The safety and effectiveness of Soliris therapy in pediatric patients below the age of 18 have not been
165  established.

166  **8.5**  **Geriatric Use**
167  In PNH studies, 15 patients 65 years of age or older were treated with Soliris. Although there were no apparent
168  age-related differences observed in these studies, the number of patients aged 65 and over is not sufficient to
169  determine whether they respond differently from younger patients.

170  **10**  **OVERDOSAGE**
171  No cases of Soliris overdose have been reported during clinical studies.

172  **11**  **DESCRIPTION**
173  Soliris is a formulation of eculizumab which is a recombinant humanized monoclonal $IgG_{2/4}\kappa$ antibody
174  produced by murine myeloma cell culture and purified by standard bioprocess technology.  Eculizumab
175  contains human constant regions from human IgG2 sequences and human IgG4 sequences and murine
176  complementarity-determining regions grafted onto the human framework light- and heavy-chain variable
177  regions.  Eculizumab is composed of two 448 amino acid heavy chains and two 214 amino acid light chains
178  and has a molecular weight of approximately 148 kDa.
179
180  Soliris is a sterile, clear, colorless, preservative-free 10 mg/mL solution for intravenous infusion and is
181  supplied in 30-mL single-use vials.  The product is formulated at pH 7 and each vial contains 300 mg of
182  eculizumab, 13.8 mg sodium phosphate monobasic, 53.4 mg sodium phosphate dibasic, 263.1 mg sodium
183  chloride, 6.6 mg polysorbate 80 (vegetable origin) and Water for Injection, USP.

184  **12**  **CLINICAL PHARMACOLOGY**

185  **12.1**  **Mechanism of Action**
186  Eculizumab, the active ingredient in Soliris, is a monoclonal antibody that specifically binds to the
187  complement protein C5 with high affinity, thereby inhibiting its cleavage to C5a and C5b and preventing the
188  generation of the terminal complement complex C5b-9. Soliris inhibits terminal complement mediated
189  intravascular hemolysis in PNH patients.

190  A genetic mutation in PNH patients leads to the generation of populations of abnormal RBCs (known as PNH
191  cells) that are deficient in terminal complement inhibitors, rendering PNH RBCs sensitive to persistent
192  terminal complement-mediated destruction. The destruction and loss of these PNH cells (intravascular
193  hemolysis) results in low RBC counts (anemia), and also fatigue, difficulty in functioning, pain, dark urine,
194  shortness of breath, and blood clots.

Soliris ™ (eculizumab)

**12.2  Pharmacodynamics**

In the placebo-controlled clinical study, Soliris when administered as recommended reduced hemolysis as shown by the reduction of serum LDH levels from 2200 ± 1034 U/L (mean ± SD) at baseline to 700 ± 388 U/L by week one and maintained the effect through the end of the study at week 26  (327 ± 433 U/L). In the single arm clinical study, Soliris maintained this effect through 52 weeks [*see Clinical Studies (14)*].

**12.3  Pharmacokinetics**

A population PK analysis with a standard 1-compartmental model was conducted on the multiple dose PK data from 40 PNH patients receiving the recommended Soliris regimen [*see Dosage and Administration (2.1)*].  In this model, the clearance of Soliris for a typical PNH patient weighing 70 kg was 22 mL/hr and the volume of distribution was 7.7 L.  The half-life was 272 ± 82 hrs (mean ± SD).  The mean observed peak and trough serum concentrations of Soliris by week 26 were 194 ± 76 mcg/mL and 97 ± 60 mcg/mL, respectively.

Studies have not been conducted to evaluate the PK of Soliris in special patient populations identified by gender, race, age (pediatric or geriatric), or the presence of renal or hepatic impairment.

**13    NONCLINICAL TOXICOLOGY**

**13.1  Carcinogenesis, Mutagenesis, Impairment of Fertility**

Long-term animal studies have not been conducted to evaluate the carcinogenic and genotoxic potential of Soliris.  Effects of Soliris upon fertility have not been studied in animals.  Intravenous injections of male and female mice with a murine anti-C5 antibody at up to 4-8 times the equivalent of the clinical dose of Soliris had no adverse effects on mating or fertility.

**14    CLINICAL STUDIES**

The safety and efficacy of Soliris in PNH patients with hemolysis were assessed in a randomized, double-blind, placebo-controlled 26 week study (Study 1); PNH patients were also treated with Soliris in a single arm  52 week study  (Study 2); and in a long term  extension study. Patients received meningococcal vaccination prior to receipt of Soliris.  In all studies, the dose of Soliris was 600 mg study drug every 7 ± 2 days for 4 weeks, followed by 900 mg 7 ± 2 days later, then 900 mg every 14 ± 2 days for the study duration.  Soliris was administered as an intravenous infusion over 25 - 45 minutes.

Study 1:

PNH patients with at least four transfusions in the prior 12 months, flow cytometric confirmation of at least 10% PNH cells and platelet counts of at least 100,000/microliter were randomized to either Soliris (n = 43) or placebo (n = 44). Prior to randomization, all patients underwent an initial observation period to confirm the need for RBC transfusion and to identify the hemoglobin concentration (the "set-point") which would define each patient's hemoglobin stabilization and transfusion outcomes.  The hemoglobin set-point was less than or equal to 9 g/dL in patients with symptoms and was less than or equal to 7 g/dL in patients without symptoms. Endpoints related to hemolysis included the numbers of patients achieving hemoglobin stabilization, the number of RBC units transfused, fatigue, and health-related quality of life.  To achieve a designation of hemoglobin stabilization, a patient had to maintain a hemoglobin concentration above the hemoglobin set-point and avoid any RBC transfusion for the entire 26 week period.  Hemolysis was monitored mainly by the measurement of serum LDH levels, and the proportion of PNH RBCs was monitored by flow cytometry.  Patients receiving anticoagulants and systemic corticosteroids at baseline continued these medications.

Major baseline characteristics were balanced (see table 2).

TABLE 2
STUDY 1 PATIENT BASELINE CHARACTERISTICS

| Parameter | Study 1 | |
|---|---|---|
| | Placebo<br>N = 44 | Soliris<br>N = 43 |
| Mean age (SD) | 38 (13) | 42 (16) |
| Gender - female (%) | 29 (66) | 23 (54) |
| History of aplastic anemia or myelodysplastic syndrome (%) | 12 (27) | 8 (19) |
| Patients with history of thrombosis (events) | 8 (11) | 9 (16) |
| Concomitant anticoagulants (%) | 20 (46) | 24 (56) |
| Concomitant steroids/immunosuppressant | 16 (36) | 14 (33) |

Soliris ™ (eculizumab)

|  | Study 1 | |
| Parameter | Placebo<br>N = 44 | Soliris<br>N = 43 |
| --- | --- | --- |
| treatments (%) | | |
| Packed RBC units transfused per patient in previous 12 months (median (Q1,Q3)) | 17 (14, 25) | 18 (12, 24) |
| Mean hgb level (g/dL) at setpoint (SD) | 8 (1) | 8 (1) |
| Pre-treatment LDH levels (median, U/L) | 2,234 | 2,032 |
| Free hemoglobin at baseline (median, mg/dL) | 46 | 41 |

237

238 Patients treated with Soliris had significantly reduced (p< 0.001) hemolysis resulting in improvements in anemia as
239 indicated by increased hemoglobin stabilization and reduced need for RBC transfusions compared to placebo treated
240 patients (see table 3).  These effects were seen among patients within each of the three pre-study RBC transfusion
241 strata (4 - 14 units; 15 - 25 units; > 25 units).  After 3 weeks of Soliris treatment, patients reported less fatigue and
242 improved health-related quality of life. Because of the study sample size and duration, the effects of Soliris on
243 thrombotic events could not be determined.

244

245 **TABLE 3**
246 **STUDY 1 RESULTS**

|  | Placebo<br>N = 44 | Soliris<br>N = 43 |
| --- | --- | --- |
| Percentage of patients with stabilized hemoglobin levels | 0 | 49 |
| Packed RBC units transfused per patient (median) | 10 | 0 |
| (range) | (2 - 21) | (0 - 16) |
| Transfusion avoidance (%) | 0 | 51 |
| LDH levels at end of study (median, U/L) | 2,167 | 239 |
| Free hemoglobin at end of study (median, mg/dL) | 62 | 5 |

247

248 Study 2 and Extension Study:
249 PNH patients with at least one transfusion in the prior 24 months and at least 30,000 platelets/microliter received
250 Soliris over a 52-week period.  Concomitant medications included anti-thrombotic agents in 63% of the patients
251 and systemic corticosteroids in 40% of the patients.  Overall, 96 of the 97 enrolled patients completed the study
252 (one patient died following a thrombotic event).   A reduction in intravascular hemolysis as measured by serum
253 LDH levels was sustained for the treatment period and resulted in a reduced need for RBC transfusion and less
254 fatigue. 187 Soliris-treated PNH patients were enrolled in a long term extension study. All patients sustained a
255 reduction in intravascular hemolysis over a total Soliris exposure time ranging from 10 to 54 months.  There
256 were fewer thrombotic events with Soliris treatment than during the same period of time prior to treatment.
257 However, the majority of patients received concomitant anticoagulants; the effects of anticoagulant withdrawal
258 during  Soliris therapy was not studied  [see Warnings and Precautions (5.4)].
259

260 **16    HOW SUPPLIED / STORAGE AND HANDLING**
261 Soliris (eculizumab) is supplied as 300 mg single-use vials containing 30 mL of 10 mg/mL sterile,
262 preservative-free Soliris solution per vial.

263 Soliris vials must be stored in the original carton until time of use under refrigerated conditions at 2-8º C (36-
264 46º F) and protected from light.  Do not use beyond the expiration date stamped on the carton.  Refer to
265 Dosage and Administration (2) for information on the stability and storage of diluted solutions of Soliris.

Soliris ™ (eculizumab)

| | | |
|---|---|---|
| 266 | | *DO NOT FREEZE.  DO NOT SHAKE.* |
| 267 | | NDC 25682-001-01 Single unit 300 mg carton: Contains one (1) 30 mL vial of Soliris (10 mg/mL). |
| 268 | **17** | **PATIENT COUNSELING INFORMATION** |
| 269 | | *See Medication Guide.* |

270

271 Prior to treatment, patients should fully understand the risks and benefits of Soliris, in particular the risk of
272 meningococcal infection. Ensure that patients receive the Medication Guide.

273

274 Patients should be informed that they are required to receive a meningococcal vaccination at least 2 weeks prior
275 to receiving the first dose of Soliris, if they have not previously been vaccinated. They are required to be
276 revaccinated according to current medical guidelines for meningococcal vaccine use while on Soliris therapy.
277 Patients should also be informed that vaccination may not prevent meningococcal infection. Patients should be
278 educated about any of the signs and symptoms of meningococcal infection, and strongly advised to seek
279 immediate medical attention if these signs or symptoms occur.  These signs and symptoms are as follows:

280

281 • moderate to severe headache with nausea or vomiting
282 • moderate to severe headache and a fever
283 • moderate to severe headache with a stiff neck or stiff back
284 • fever of 103° F (39.4° C) or higher
285 • fever and a rash
286 • confusion
287 • severe muscle aches with flu-like symptoms, and eyes sensitive to light

288 Patients should be informed that they would be provided with the Patient Safety Card that they should carry with
289 them at all times. This card describes symptoms which, if experienced, should prompt the patient to immediately seek
290 medical evaluation.

291

292 Patients should be informed that there is a potential for serious hemolysis when Soliris is discontinued and that they
293 will be monitored by their healthcare professional for at least 8 weeks following Soliris discontinuation.

294

Manufactured by:

Alexion Pharmaceuticals, Inc.

352 Knotter Drive

Cheshire, CT  06410 USA

US License Number 1743

# MEDICATION GUIDE
## Soliris (eculizumab)
## (so-leer-is)

Read the Medication Guide before you start Soliris and before each dose (infusion).  This Medication Guide does not take the place of talking with your doctor about your condition or your treatment.  Talk to your doctor if you have any questions about your treatment with Soliris.

**What Is The Most Important Information I Should Know About Soliris?**

**Soliris is a medicine that affects your immune system.  Soliris can lower the ability of your immune system to fight infections.**

- **Soliris increases your chance of getting serious and life-threatening meningococcal infections.**

  1. **You must receive a meningococcal vaccine at least 2 weeks before your first dose of Soliris unless you have already had this vaccine.**

  2. **If you had a meningococcal vaccine in the past, you might need a booster dose before starting Soliris.**  Your doctor will decide if you need another dose of a meningococcal vaccine.

  3. **A meningococcal vaccine does not prevent all meningococcal infections.  You must be aware of the following signs and symptoms of a meningococcal infection:**

     - **moderate to severe headache with nausea or vomiting**
     - **moderate to severe headache and a fever**
     - **moderate to severe headache with a stiff neck or stiff back**
     - **fever of 103° F (39.4° C) or higher**
     - **fever and a rash**
     - **confusion**
     - **severe muscle aches with flu-like symptoms, and eyes sensitive to light**

**Call your doctor or get emergency medical care right away if you have any of these symptoms.**

You will receive a Patient Safety Card that lists these symptoms and what to do if you have them.  Carry it with you at all times.  You will need to show the card to any healthcare provider that treats you.

**What Is Soliris?**

Soliris is a medicine called a monoclonal antibody.  Soliris is used for the treatment of patients with a disease that affects red blood cells called Paroxysmal Nocturnal Hemoglobinuria (PNH).

Soliris works by blocking part of your immune system.  This can help your PNH symptoms but it can also increase your chance for infection.  **It is important that you:**
- have all recommended immunizations and vaccines before you start Soliris
- stay up-to-date with all recommended immunizations and vaccines during treatment with Soliris

**Who Should Not Receive Soliris?**

**Do not receive Soliris if you:**

342     •   have a meningococcal infection

343     •   have not been vaccinated with, or you are not up-to-date with a meningococcal vaccine.

344         See "What is the most important information about Soliris?"

345 **Tell your doctor if you:**

346     •   have an infection or fever

347     •   are pregnant, become pregnant, or are breastfeeding.  Soliris has not been studied in

348         pregnant or nursing women.

349 **How Do I Receive Soliris?**

350     •   Soliris is given through a vein (I.V. infusion) over 35 minutes.

351     •   You will usually receive a Soliris infusion:

352         o   every 7 days for five weeks, then

353         o   every 14 days

354     •   Following each infusion, you may be monitored for one hour for allergic reactions.

355 **What If I Miss a Dose or Stop Soliris Treatment?**

356     •   If you forget or miss a Soliris infusion, call your doctor right away.

357     •   Stopping treatment with Soliris may cause a sudden and serious breakdown of your red

358         blood cells.  Symptoms or problems from red blood cell breakdown include:

359         o   a large drop in your red blood cell count causing anemia

360         o   confusion

361         o   chest pain

362         o   kidney problems

363         o   blood clots

364     •   Your doctor will need to monitor you closely for at least 8 weeks after stopping Soliris.

365 **What Are The Possible Side Effects With Soliris?**

366 **Serious side effects with Soliris include:**

367     •   **serious and life-threatening infections.**  See "What is the most imortant information I

368         should know about Soliris?"

369

370 **Common side effects with Soliris include:**

371     •   headaches

372     •   runny nose and colds

373     •   sore throat

374     •   back pain

375     •   nausea

376 Call your doctor if you have any of these side effects.  These are not all the side effects with

377 Soliris.  Ask your doctor for more information.

378 **General Information About Soliris**

379 Medicines are sometimes prescribed for conditions other than those listed in a Medication

380 Guide. If you have any concerns about Soliris, ask your doctor. Your doctor or pharmacist can

381 give you information about Soliris that was written for health care professionals.

382 Soliris contains eculizumab in a solution of water, polysorbate, sodium phosphate and sodium

383 chloride.

384 Manufactured by Alexion Pharmaceuticals, Inc., 352 Knotter Drive, Cheshire, CT 06410

385 USA.

386 Revised: March 2007

387 This Medication Guide has been approved by the U.S. Food and Drug Administration

# EXHIBIT C



Michelle S. Rhyu, Ph.D.
T: +1 650 843 5505
rhyums@cooley.com

By Overnight Courier and Email
(Todd.Spalding@alexion.com)

July 7, 2023

Todd Spalding
Alexion Pharmaceuticals
Senior V.P., Deputy General Counsel of Alexion,
AstraZeneca Rare Disease
121 Seaport Blvd.
Boston, MA  02210

Re:    Notice of Commercial Marketing for Samsung Bioepis's SB12
       Biosimilar Drug Product

Dear Mr. Spalding:

We represent Samsung Bioepis ("Samsung").  We write to provide Alexion notice of
commercial marketing of Samsung's SB12 drug candidate pursuant to 42 U.S.C. §
262(*l*)(8)(A).  The SB12 drug product is a biosimilar of Soliris®, which as you know is
covered by Biologics License Application No. 125166.  This notice is provided not later
than 180 days before the date of the first commercial marketing Samsung's SB12 drug
product.  Samsung's application to the FDA seeks approval for its SB12 drug product with
a label directed to indications for paroxysmal nocturnal hemoglobinuria (PNH) and
atypical hemolytic uremic syndrome (aHUS).

The BLA for the SB12 drug product has now been accepted for review by the FDA, and
Samsung expects to receive FDA approval in the first half of 2024.  Samsung does not
intend to provide Alexion the application and manufacturing information under 42 U.S.C.
§ 262(*l*)(2)(A).

Sincerely,

Michelle S. Rhyu

cc (via eMail):  Gerald Flattmann Jr. (gflattmann@cahill.com)
                 Cahill Gordon & Reindel LLP
                 32 Old Slip
                 New York, NY   10005

                 Tara Rahemba (Tara.Rahemba@alexion.com)
                 Head of Intellectual Property
                 Alexion, AstraZeneca Rare Disease

# EXHIBIT D

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ALEXION PHARMACEUTICALS, INC. and ALEXION PHARMA INTERNATIONAL OPERATIONS LTD., | ) ) ) ) | **REDACTED PUBLIC VERSION** |
| Plaintiffs, | ) ) | |
| v. | ) ) ) | C.A. 24-005-GBW |
| SAMSUNG BIOEPIS CO. LTD., | ) ) ) | |
| Defendant. | ) | |

**SAMSUNG BIOEPIS CO. LTD.'S OPPOSITION TO
PLAINTIFFS' EMERGENCY MOTION FOR INJUNCTION PENDING APPEAL AND
TEMPORARY RESTRAINING ORDER PENDING RESOLUTION OF THIS MOTION**

*Of Counsel:*

Michelle Rhyu
Daniel Knauss
COOLEY LLP
3175 Hanover Street
Palo Alto, CA 94304-1130
(650) 843-5000
rhyums@cooley.com
dknauss@cooley.com

Jonathan Davies
COOLEY LLP
1299 Pennsylvania Avenue, NW, Suite 700
Washington, DC 20004-2400
(202) 842-7800
jdavies@cooley.com

Orion Armon
COOLEY LLP
1144 15th St., Suite 2300
Denver, CO 80202
(720) 566-4000
oarmon@cooley.com

Andrew C. Mayo (#5207)
ASHBY & GEDDES
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE  19899
(302) 654-1888
amayo@ashbygeddes.com

*Attorneys for Defendant Samsung Bioepis Co. Ltd.*

{02020295;v1 }

# EXHIBIT A

# REDACTED IN ITS ENTIRETY

# EXHIBIT E



# PTAB Trial Statistics
# FY23 End of Year Outcome Roundup
# IPR, PGR

Patent Trial and Appeal Board
Fiscal Year 2023



# Petitions filed by trial type
## (FY23: Oct. 1, 2022 to Sept. 30, 2023)



Trial types include Inter Partes Review (IPR) and Post Grant Review (PGR).



3

# Petitions filed by technology
## (FY23: Oct. 1, 2022 to Sept. 30, 2023)



# Petitions filed by month
## (September 2023 and Prior 12 Months: Sept. 1, 2022 to Sept. 30, 2023)



# Institution rates by petition
## (FY19 to FY23: Oct. 1, 2018 to Sept. 30, 2023)



# Institution rates by patent
## (FY19 to FY23: Oct. 1, 2018 to Sept. 30, 2023)



by Patent

7

# Institution rates by technology
## (FY23: Oct. 1, 2022 to Sept. 30, 2023)



Bio/Pharma — 52% (43 of 82)
Chemical — 49% (23 of 47)
Design — 50% (4 of 8)
Electrical/Computer — 70% (492 of 701)
Mechanical & Business Method — 66% (190 of 289)

Institution rate for each technology is calculated by dividing petitions instituted by decisions on institution (i.e., petitions instituted plus petitions denied). The outcomes of decisions on institution responsive to requests for rehearing are excluded.



8

# Settlements
## (FY19 to FY23: Oct. 1, 2018 to Sept. 30, 2023)



Settlement rate is calculated by dividing total settlements by concluded proceedings in each fiscal year (i.e., denied institution, settled, dismissed, requested adverse judgment, and final written decision), excluding joined cases.

9

# Outcomes by petition
## (FY23: Oct. 1, 2022 to Sept. 30, 2023)



FWD patentability or unpatentability reported with respect to the claims at issue in the FWD. Joined cases are excluded.



10

# Outcomes by patent
## (FY23: Oct. 1, 2022 to Sept. 30, 2023)



FWD patentability or unpatentability reported with respect to the claims at issue in the FWD. "Mixed Outcome" is shown for patents receiving more than one type of outcome from the list of: denied, settled, dismissed, and/or req. adverse judgement only. A patent is listed in a FWD category if it ever received a FWD, regardless of other outcomes.



11

# Outcomes by claim challenged
## (FY23: Oct. 1, 2022 to Sept. 30, 2023)



# Claim outcomes
## (FY23: Oct. 1, 2022 to Sept. 30, 2023)



"No DI" and "No FWD" mean the claim was challenged but not addressed in a DI/FWD, e.g., due to settlement.

30% of challenged claims and 51% of instituted claims were found unpatentable by a preponderance of the evidence.

13

# All patents: Fiscal Year 2023
## (FY23: Oct. 1, 2022 to Sept. 30, 2023)



~3,800,000 live patents

1,117 patents with AIA proceedings that ended in FY23

392 patents at least partially invalidated by PTAB

133 patents fully invalidated by PTAB

- 12% of patents with proceedings ending in FY23 were fully invalidated by PTAB (133 out of 1,117).

- Less than 0.004% of all live patents in FY23 were fully invalidated (133 out of ~3,800,000).

Events that end an AIA proceeding include final written decisions (FWD), settlements, dismissals, requests for adverse judgment, and denials of institution. A patent is listed in an FWD category if it ever received an FWD.



14

# All patents: All time
## (All time: Sept. 16, 2012 to Sept. 30, 2023)



10,363 patents challenged

3,170 patents at least partially invalidated by PTAB

1,037 patents fully invalidated by PTAB

10% of challenged patents were fully invalidated by PTAB (1,037 out of 10,363).



15



# EXHIBIT F

Disease of the Month

# Hemolytic Uremic Syndrome

Marina Noris* and Giuseppe Remuzzi*†

*Transplant Research Center, "Chiara Cucchi de Alessandri e Gilberto Crespi," Mario Negri Institute for Pharmacological Research; and †Department of Medicine and Transplantation, Ospedali Riuniti di Bergamo, Bergamo, Italy

J Am Soc Nephrol 16: 1035-1050, 2005. doi: 10.1681/ASN.2004100861

Hemolytic uremic syndrome (HUS) is a disease of nonimmune (Coombs negative) hemolytic anemia, low platelet count, and renal impairment (1). Anemia is severe and microangiopathic in nature, with fragmented red blood cells (schistocytes) in the peripheral smear, high serum lactate dehydrogenase (LDH), circulating free hemoglobin, and reticulocytes. Platelet count is $<60,000/mm^3$ in most cases (1).

In children, the disease is most commonly triggered by Shiga-like toxin (Stx)-producing *Escherichia coli* (Stx-*E. coli*) and manifests with diarrhea (D$^+$HUS), often bloody. Cases of Stx-*E. coli* HUS—approximately 25% (2)—which, however do not present with diarrhea, have also been reported (3). Acute renal failure manifests in 55 to 70% of cases (4–6); however, renal function recovers in most of them (up to 70% in various series) (1,3,6,7).

Non–Shiga toxin-associated HUS (non–Stx-HUS) comprises a heterogeneous group of patients in whom an infection by Stx-producing bacteria could be excluded as cause of the disease. It can be sporadic or familial (*i.e.*, more than one member of a family affected by the disease and exposure to Stx-*E. coli* excluded). Collectively, non–Stx-HUS forms have a poor outcome. Up to 50% of cases progress to ESRD or have irreversible brain damage, and 25% may die during the acute phase of the disease (8–10). Genetic studies have recently documented that the familial form is associated with genetic abnormalities of complement regulatory proteins, and evidence is now emerging that similar genetic alterations can predispose to sporadic cases of non–Stx-HUS as well. Major recent advances in the field of Stx-HUS and non–Stx-HUS are summarized in Table 1.

Microvascular lesion of HUS consists of vessel wall thickening with endothelial swelling and accumulation of proteins and cell debris in the subendothelial layer, creating a space between endothelial cells and the underlying basement membrane of affected microvessels (1,3). In Stx-HUS, the lesion is mainly confined to the glomerular tuft and is noted in an early phase of the disease. Examination of biopsies taken several months after the disease onset showed that most glomeruli are normal, whereas 15 to 20% eventually became sclerotic (11,12). Arterial

thrombosis does occur but is uncommon and seems to be a proximal extension of the glomerular lesion (11,12).

## Stx-Associated HUS

### Epidemiology

In 70% of cases in North America and Western Europe, Stx-HUS is secondary to infection with the *E. coli* serotype O157:H7 (13–19). This serotype has a unique biochemical property (lack of sorbitol fermentation) as to render it readily distinguishable from other fecal *E. coli* (20). However, many other *E. coli* serotypes (O111:H8, O103:H2, O121, O145, O26, and O113 [13,16,21–23]) have been shown to cause Stx-HUS. Infection by Stx-producing *Shigella dysenteriae* serotype 1 has been commonly linked to Stx-HUS in developing countries of Asia (24) and Africa (25) but rarely in industrialized countries (26).

After exposure to Stx-*E. coli*, 38 to 61% of individuals develop hemorrhagic colitis and 3 to 9% (in sporadic infections) to 20% (in epidemic forms) progress to overt HUS (5,27). The overall incidence of Stx-HUS is estimated to be 2.1 cases per 100,000 persons/yr, with a peak incidence in children who are younger than 5 yr (6.1 per 100,000/yr), and the lowest rate in adults who are 50 to 59 yr of age (0.5 per 100,000/yr) (1). The incidence of the disease parallels the seasonal fluctuation of *E. coli* O157:H7 infections with a peak in warmer months, between June and September. In the United States, approximately 70,000 illnesses and 60 deaths have been attributed annually to Stx-HUS (28). In Argentina and Uruguay, *E. coli* infections are endemic and Stx-HUS is a common cause of acute renal failure in children (23,29,30), with an estimated incidence rate of 10.5 per 100,000/yr (31). An association between traditional extensive production of cattle with endemic HUS in Argentina has been proposed, as supported by detection of Stx-producing *E. coli* strains—mainly O8, O25, O103, O112, O113, O145, O171, and O174 serotypes—in stool samples from 39% of Argentine healthy young beef steers (31).

Stx-producing *E. coli* colonize healthy cattle intestine but also have been isolated from deer, sheep, goats, horses, dogs, birds, and flies (1,32). They are found in manure and water troughs in farms, which explains the increased risk for infection in people who live in rural areas. Humans become infected from contaminated milk, meat, and water—water-borne outbreaks have occurred as a result of drinking and swimming in unchlorinated water (21)—or from contact with infected animals, humans, or either's excreta (27,33,34) and occasionally through

*Published online ahead of print. Publication date available at www.jasn.org.*

Address correspondence to: Dr. Marina Noris, Transplant Research Center, "Chiara Cucchi de Alessandri e Gilberto Crespi," Villa Camozzi, Via Camozzi, 3 24020, Ranica (BG), Italy. Phone: +39-035-4535362; Fax: +39-035-4535377; E-mail: noris@marionegri.it

Copyright © 2005 by the American Society of Nephrology

ISSN: 1046-6673/1604-1035

*Table 1. HUS: Major advances in recent years[a]*

| | |
|---|---|
| **Stx-HUS** | |
| 1994–2004 | Description of the crystal structure of Stx-1 and Stx-2 (46,52) |
| 1993–2001 | Specific Stx surface receptors (globotriaosylceramide, Gb3) were identified on human endothelial cells, platelets, monocytes, erythrocytes, and polymorphonuclear cells (57–66) |
| 1995–2003 | Identification of the molecular mechanisms by which Stx promotes leukocyte adhesion to endothelial cells and induces thrombus formation (71–74) |
| 2004 | Description of the beneficial effect of angiotensin-converting enzyme inhibitors on long-term renal outcome in children with renal sequelae after severe Stx-HUS (83,84) |
| 2002–2003 | Reports on the good outcome of kidney transplantation in children with Stx-HUS (85–87) |
| **Non–Stx-HUS** | |
| 1999 | Description of high incidence of hypocomplementemia (low C3 levels) in familial forms of non-Stx-HUS (98) |
| 1998 | Linkage mapping of familial HUS on human chromosome 1q32 containing the regulator of complement activation gene cluster (110) |
| 1998–2004 | Identification of 50 mutations in factor H gene in familial and sporadic non–Stx-HUS (99–102,110,114,119–121) |
| 2002–2004 | Localization (in SCR19–20) of the domain responsible for inactivation of surface-bound C3b by factor H (115–118) |
| 2002–2004 | Demonstration that mutations found in patients with non–Stx-HUS cause loss of the capability of factor H to bind polyanions on endothelial cells and extracellular matrix and to bind C3b (117,118,123) |
| 2003 | Mutations in another complement regulatory gene, MCP, in non–Stx-HUS (126,127) |
| 1997–2003 | Description of high incidence of recurrence on the kidney graft in patients with non–Stx-HUS (1,85,86,99–101,153,154) |
| 2003–2004 | Complement inhibitors are being clinically available (163–167) |

[a]HUS, hemolytic uremic syndrome; Stx, Shiga toxin; MCP, monocyte chemoattractant protein.

environmental contamination (17). Meat is contaminated at slaughter. Internalization of the microorganism during grinding renders it capable of surviving cooking (27). Fruits and vegetables may also be contaminated, including radish sprouts, lettuce, and apple cider. Unpasteurized apple juice has been implicated in several outbreaks (35). Person-to-person transmission has been reported in child care and long-term care facilities (27).

### Clinical Phenotype

The disease is characterized by prodromal diarrhea followed by acute renal failure. The average interval between *E. coli* exposure and illness is 3 d (range, 1 to 8). Illness typically begins with abdominal cramps and nonbloody diarrhea; diarrhea may become hemorrhagic in 70% of cases usually within 1 or 2 d (36). Vomiting occurs in 30 to 60% of cases, and fever occurs in 30%. Leukocyte count is usually elevated, and a barium enema may demonstrate "thumb-printing," suggestive of edema and submucosal hemorrhage, especially in the region of the ascending and transverse colon. HUS is usually diagnosed 6 d after the onset of diarrhea (1). After infection, Stx-*E. coli* may be shed in the stools for several weeks after the symptoms are resolved, particularly in children <5 yr of age (1). Diagnosis rests on detection of Stx-*E. coli* in stool cultures. Serologic tests for antibodies to Stx and O157 LPS can be done in research laboratories, and tests are being developed

for rapid detection of *E. coli* O157:H7 and Stx in stools. Bloody diarrhea, fever, vomiting, elevated leukocyte count, extremes of age, and female gender as well as the use of antimotility agents (37) have been associated with an increased risk of HUS after *E. coli* infection (27).

Stx-HUS is not a benign disease. Seventy-percent of patients who develop HUS require red blood cell transfusions, 50% need dialysis, and 25% have neurologic involvement, including stroke, seizure, and coma (6,27,38). Although mortality for infants and young children in industrialized countries decreased when dialysis became available, as well as after the introduction of intensive care facilities, still 3 to 5% of patients die during the acute phase of Stx-HUS (6). A recent meta-analysis of 49 published studies (3476 patients, mean follow-up of 4.4 yr) describing long-term prognosis of patients who survived an episode of Stx-HUS reported death or permanent ESRD in 12% of patients and GFR <80 ml/min per 1.73 m² in 25% (38). The severity of acute illness, particularly central nervous system symptoms, and the need for initial dialysis were strongly associated with a worse long-term prognosis (4,38). Stx-HUS that is precipitated by *S. dysenteriae* infection is almost invariably complicated by bacteremia and septic shock, systemic intravascular coagulation, and acute cortical necrosis and renal death and has a high mortality rate (approximately 30%) (39).

J Am Soc Nephrol 16: 1035–1050, 2005

Hemolytic Uremic Syndrome    1037

## History of a Discovery

*E. coli* has been associated with hemorrhagic colitis and organ failure, including kidney failure. In 1927, Albert Adam first reported an epidemia of bloody diarrhea of infants caused by a special type of Bacterium *coli*. Such bacterium was biochemically unique in that fermentation properties were different from known *E. coli* strains (40). In 1947, the *E. coli* O111:B4 was found in the stools of >90% of infants with epidemic diarrhea but never in their blood (41). A filterable agent—we now know that this was likely Stx—that caused diarrhea in calves and was lethal to mice was isolated from the stools of these children. A few years later, it was found that most severe cases of O111:B4-induced epidemic diarrhea were associated with purpura, anuria, and neurologic signs. Autopsy material revealed thrombosis of capillary and precapillary arterioles in lungs, liver, brain, and kidneys, as well as glomerular tuft occlusion by fibrin thrombi (42). These early findings were taken to indicate that a toxin, possibly released by the *E. coli*, induced hemorrhagic necrosis of the gastrointestinal mucosa and—once absorbed into the blood stream—caused microvascular thrombosis of kidneys and the other organs. Several years later, in 1977, Konowalciuck *et al.* (43) noted that *E. coli* that was isolated from patients with diarrhea produced a toxin similar to the one of *S. dysenteriae type 1* (Stx) found cytopathic to Vero cells (African green monkey kidney cells). Karmali *et al.* (14) found an increased Stx activity in fecal filtrates and increased Stx-neutralizing antibody titer in sera from children who had *E-coli* O157:H7 infection an had received a diagnosis of HUS.

## Shiga Toxin or Shiga Toxins?

The Stx associated with *E. coli* are designated by a number. Stx-1 is almost identical to Stx from *S. dysenteriae type 1*, differing by a single amino acid, and is 50% homologous with Stx-2 (44–46). Despite their similar sequences, Stx-1 and Stx-2 cause different degrees and types of tissue damage as documented by the higher pathogenicity of strains of *E. coli* that produce only Stx-2 than of those that produce Stx-1 alone (47–49). In a recent study in children who become infected by Stx-*E. coli*, *E. coli* strains that produced Stx-2 were most commonly associated with HUS, whereas most strains that were isolated from children who had diarrhea alone or remained asymptomatic produced only Stx-1 (50). This is also true in mice and baboons (45,51).

Both Stx-1 and Stx-2 are 70-kD AB5 holotoxins that are composed of a single A subunit of 32-kD and five 7.7-kD B subunits (52) (Figure 1). It is interesting that a new AB5 toxin that comprises a single 35-kD A subunit and a pentamer of 13-kD B subunits has been recently isolated from a highly virulent *E. coli* strain (0113:H21) that was responsible for an outbreak of HUS (53), which may represent the prototype of a new class of toxins, accounting for HUS associated with strains of *E. coli* that do not produce Stx.

After oral ingestion, Stx-*E. coli* reaches the gut and closely adheres to the epithelial cells of the gastrointestinal mucosa through a 97-kD outer membrane protein, intimin (54). Stx then are picked up by polarized gastrointestinal cells via transcellular pathways (55) and translocate into the circulation, probably



*Figure 1.* Binding and mechanism of action of Shiga-like toxin. The B subunits of Shiga toxin (Stx) molecules attach to galactose (gal) disaccharides of globotriaosylceramide (Gb3) receptors on the membrane of monocytes, polymorphonuclear cells, platelets, glomerular endothelial cells, and tubular epithelial cells. The toxin is internalized via retrograde transport through the Golgi complex. Then the A and B subunits dissociate, and the A subunit is translocated to the cytosol. The A subunit blocks peptide chain elongation by eliminating one adenine from the 28S ribosomal RNA.

facilitated by the transmigration of neutrophils (PMN) (56), which increase paracellular permeability. The route of transport of Stx from the intestine to the kidney has been greatly debated. *In vitro* experiments have shown that Stx can bind to human erythrocytes (57), platelets (58), and activated monocytes (59). However, more recent studies have underpinned a role for PMN in Stx transfer in the blood because Stx rapidly and completely bind to PMN when incubated with human blood (60). Consistently, Stx bound to circulating PMN have been detected in the blood of patients with Stx-HUS (61). The Stx receptor on PMN has a 100-fold lower affinity than the high-affinity receptor expressed on glomerular endothelial cells. *In vitro*, in co-cultures, PMN loaded with Stx transfer the ligand to glomerular endothelial cells so that at the end of the incubation, Stx molecules were found on glomerular endothelial cells but no more on PMN (60).

Binding of Stx to target cells is dependent on B subunits and occurs via the terminal digalactose moiety of the glycolipid cell surface receptor globotriaosylceramide Gb3 (Figure 1). Stx-1 and Stx-2 bind to different epitopes on the Gb3 molecule, and they also differ in binding affinity and kinetics (62). Surface plasmon resonance analysis showed that Stx-1 easily binds to and detaches from Gb3, in contrast to Stx-2, which binds slowly but also dissociates very slowly, thus staying on the cells long

J Am Soc Nephrol 16: 1035-1050, 2005

enough to be incorporated (62). The latter could explain why Stx-2 is 1000-fold more toxic than Stx-1 on human endothelial cells *in vitro* (63).

Cultured human microvascular endothelial cells are more susceptible to the toxic effects of Stx than large-vessel endothelium (64). This is consistent with data that the number of Gb3 receptors expressed on human microvascular endothelial cells is 50-fold higher than in endothelial cells from human umbilical veins (65). In human glomerular endothelial cells, Gb3 expression and Stx toxicity are further increased upon exposure to TNF-$\alpha$ (66), in turn released by monocytes in response to Stx binding (59). Altogether these data provide the biochemical basis for the preferential localization of microangiopathic lesions to renal vasculature in HUS in humans.

After internalization by receptor-mediated endocytosis, Stx are carried by retrograde transport through the Golgi complex to the endoplasmic reticulum, where the A and B subunits likely dissociate (Figure 1). Then the A subunit is translocated to the cytosol and nuclear envelope, where it enzymatically blocks protein synthesis (67) (Figure 1). Stx-1 and Stx-2 also induce endothelial apoptosis (68,69) possibly by inhibiting the expression of the antiapoptotic Bcl-2 family member, Mcl-1 (70).

For many years, it was assumed that the only relevant biologic activity of Stx was the block of protein synthesis and destruction of endothelial cells. Recently, however, it has been shown that treatment of endothelial cells with sublethal doses of Stx, exerting minimal influence on protein synthesis, leads to increased mRNA levels and protein expression of chemokines, such as IL-8 and monocyte chemoattractant protein-1 (MCP-1) and cell adhesion molecules, a process preceded by NF-$\kappa$B activation (71). Analysis of genome-wide expression pattern of human endothelial cells stimulated with sublethal doses of Stx evidenced 25 and 24 genes upregulated by Stx-1 and Stx-2, respectively, mostly encoding for chemokines and cytokines, cell adhesion molecules, including P-selectin and ICAM-1, and transcription factors (EGR-1, NF-$\kappa$B2, and NF-$\kappa$BIA) (72). Che-

mokines and cytokines are likely involved in the chemoattraction and activation of neutrophils. Adhesion molecules seem to play a critical role in mediating binding of inflammatory cells to the endothelium. This is supported by adhesion experiments under flow showing that Stx-2 treatment enhanced the number of leukocytes that adhere and migrate across a monolayer of human endothelial cells (73). Preventing IL-8 and MCP-1 overexpression by adenovirus-mediated blocking of NF-$\kappa$B inhibited the adhesion and transmigration of leukocytes (71).

Taken together, these findings indicate that Stx, by altering endothelial cell adhesion properties and metabolism, favor leukocyte-dependent inflammation. The latter activates endothelial cells that lose thromboresistance, which ultimately leads to microvascular thrombosis. Evidence for such sequence of events has been obtained in experiments of whole blood flowing on human microvascular endothelial cells, pre-exposed to Stx-1, at high shear stress (74). Finding that in such circumstances early platelet activation and adhesion takes place, followed by the formation of organized thrombi dependent on endothelial P-selectin and PECAM-1, offers a plausible pathophysiologic pathway for microvascular thrombosis in HUS. The above report could also be taken as a demonstration of a link between bacteria and their products and arterial thrombosis, as suggested in the accompanying commentary (75).

*In vivo* evidence of coagulation disturbances, *i.e.*, increase in prothrombin fragment 1 + 2, has been found (36) in children who developed HUS upon *E. coli* O157:H7 infection. Although early studies suggested that fibrinolysis is augmented in Stx-HUS (76), more recent work revealed the presence of higher-than-normal levels of plasminogen-activator inhibitor type 1, indicating that fibrinolysis is substantially inhibited (36).

### Is There Any Effective Treatment for Stx-HUS?

There is no treatment of proven value, and care during the acute phase of the illness is still merely supportive with no substantial changes as compared with the past (Table 2). There is no clear consensus on whether antibiotics should be admin-

*Table 2.* Classification and treatment of different forms of HUS[a]

| Disease | Causes | Treatment |
| --- | --- | --- |
| Stx-HUS | Stx-producing *Escherichia coli* | Supportive |
| | *Shigella dysenteriae type 1* | Supportive, antibiotics |
| Non–Stx-HUS | Bacteria (*Streptococcus pneumoniae*) | Antibiotics, no plasma |
| sporadic | Viruses (HIV) | Plasma |
| | Drugs (antineoplastic, antiplatelet, immunosuppressive) | Drug withdrawal, plasma |
| | Pregnancy associated | Delivery, plasma |
| | Postpartum | Plasma |
| | Systemic diseases | |
| | lupus | Steroids, plasma |
| | scleroderma | BP control |
| | antiphospholipid syndrome | Oral anticoagulants |
| | Idiopathic | Plasma |
| | Genetic (factor H, MCP, factor I) | Plasma |
| familial | Genetic (factor H, MCP, factor I), plasma | Plasma |

istered to treat Stx-*E. coli* infection. Wong *et al.* (77) showed that antibiotic therapy at the stage of gastrointestinal infection with Stx-*E. coli* increases—by approximately 17-fold—the risk for full-blown HUS. It was postulated that antibiotic-induced injury to the bacterial membrane might favor the acute release of large amounts of toxins. However, a recent meta-analysis on 26 reports failed to show a higher risk for HUS associated with antibiotic administration (78). Of note, in the study by Wong *et al.*, none of the patients had bacteremia. Although bacteremia is very common in Stx-HUS precipitated by *S. dysenteriae type 1* and these patients eventually progress to death unless antibiotics are started early enough (79,80), such complication is only exceptionally found in Stx-HUS sustained by *E. coli* O157:H7 infection. However, a recent report of an adult patient with *E. coli* O157:H7–induced HUS with bacteremia and urinary tract infection showed that early antibiotic therapy rapidly resolved hematologic and renal abnormalities (81). On the basis of available data, we suggest that in patients with Stx-*E. coli* gastrointestinal infection, antibiotics should be avoided unless in cases with sepsis.

A study with an Stx-binding agent, SYNSORB Pk, composed of particles of silicon linked to the globotriaosylceramide, given orally (82), failed to find any effect of SYNSORB over placebo. Most treatments, including plasma therapy, intravenous IgG, fibrinolytic agents, antiplatelet drugs, corticosteroids, and antioxidants (38), have been shown to be ineffective in controlled clinical trials in the acute phase of the disease (38). Careful BP control and renin-angiotensin system blockade may be particularly beneficial on the long term for patients who experience chronic renal disease after an episode of Stx-HUS. A recent study in 45 children who had renal sequelae of HUS and were followed for 9 to 11 yr documented that early restriction of proteins and use of angiotensin-converting enzyme inhibitors may have a beneficial effect on long-term renal outcome, as documented by a positive slope of 1/Cr values over time in treated patients (83). In another study, 8 to 15 yr of treatment with angiotensin-converting enzyme inhibitors after severe Stx-HUS normalized BP, reduced proteinuria, and improved GFR (84).

Finally, kidney transplant should be considered as an effective and safe treatment for children who progress to ESRD. Indeed, the outcome of renal transplantation is good in children with Stx-HUS: Recurrence rates range from 0 to 10% (85,86), and graft survival at 10 yr is even better than in control children who had other diseases and received a transplant (87).

## Non–Stx-HUS

### Epidemiology and Clinical Features

Non–Stx-HUS is less common than Stx-HUS and accounts for only 5 to 10% of all cases of the disease (1,88). It may manifest at all ages but is more frequent in adults. According to a recent U.S. study, the incidence of non–Stx-HUS in children is approximately one tenth that of Stx-HUS (10), corresponding to approximately 2 cases/yr per 1000,000 total population. At variance with Stx-HUS, there is no clear causative agent or seasonal pattern. The onset may be preceded by features of the nephrotic

syndrome. A diarrhea prodrome is rarely observed (D−HUS) (1,3,10,89). Non–Stx-HUS can occur sporadically or in families.

**Sporadic Non–Stx-HUS.**    A wide variety of triggers for sporadic non–Stx-HUS have been identified, including various nonenteric infections, viruses, drugs, malignancies, transplantation, pregnancy, and other underlying medical conditions (scleroderma, antiphospholipid syndrome, lupus; Table 2). Infection caused by *Streptococcus pneumoniae* accounts for 40% of non–Stx-HUS and 4.7% of all causes of HUS in children in the United States (10). Neuroaminidase produced by *S. pneumoniae*, by removing sialic acids from the cell membranes, exposes Thomsen-Friedenreich antigen to preformed circulating IgM antibodies, which bind to this neoantigen on platelet and endothelial cells and cause platelet aggregation and endothelial damage (90,91). The clinical picture is usually severe, with respiratory distress, neurologic involvement, and coma and a mortality rate of 50% (91).

Categories of drugs that have been most frequently reported to induce non–Stx-HUS include anticancer molecules (mitomycin, cisplatin, bleomycin, and gemcitabine), immunotherapeutic (cyclosporine, tacrolimus, OKT3, IFN, and quinidine), and antiplatelet (ticlopidine and clopidogrel) agents (92). The risk for developing HUS after mitomycin is 2 to 10%. The onset is delayed, occurring almost 1 yr after starting treatment. The prognosis is poor, with up to 75% mortality at 4 mo (92).

Posttransplantation HUS is being reported with increasing frequency (1,93). It may ensue for the first time in patients who never experienced the disease (*de novo* posttransplantation HUS) or may affect patients whose primary cause of ESRD was HUS (recurrent posttransplantation HUS, discussed later in this review). *De novo* posttransplantation HUS might occur in patients who receive renal transplants and other organs, as a consequence of the use of calcineurin inhibitors or of humoral (C4b positive) rejection. It occurs in 5 to 15% of renal transplant patients who receive cyclosporine and in approximately 1% of those who are given tacrolimus (94).

Pregnancy-associated HUS may occasionally develop as a complication of preeclampsia. Some patients progress to a life-threatening variant of preeclampsia with severe thrombocytopenia, microangiopathic hemolytic anemia, renal failure, and liver involvement (HELLP syndrome). These forms are always an indication for prompt delivery that is usually followed by complete remission (95). Postpartum HUS manifests within 3 mo of delivery in most cases. The outcome is usually poor, with 50 to 60% mortality; residual renal dysfunction and hypertension are the rule in surviving patients (96). Of note, in approximately 50% of cases of sporadic non–Stx-HUS, no clear triggering conditions could be found (idiopathic HUS) (1).

**Familial Non–Stx-HUS.**    Familial forms account for fewer than 3% of all cases of HUS. Both autosomal dominant and autosomal recessive forms of inheritance have been noted (97). In autosomal recessive HUS, the onset is usually early in childhood. The prognosis is poor, with a mortality rate of 60 to 70%. Recurrences are very frequent. Autosomal dominant HUS has an adult onset in most cases; the prognosis is poor, with a cumulative incidence of death or ESRD of 50 (98) to 90% (97). Recent studies have documented that familial HUS may be

caused by genetic abnormalities of proteins involved in the regulation of the complement system. Similar genetic abnormalities have been found in sporadic non–Stx-HUS, mainly in idiopathic forms (99,100) but also in rare cases of pregnancy-associated (99) and postpartum HUS (three patients) (101,102), ticlopidine-induced HUS (one patient) (99), and postinfectious HUS (*Neisseria meningitidis*; one patient) (103).

### Genetic Studies

Reduced serum levels of the third component (C3) of complement have been reported since 1974 in both familial and sporadic forms of non–Stx-HUS (98,104,105). Low C3 levels likely reflect C3 consumption in the microvasculature rather than defective synthesis, as documented by granular C3 deposits in glomeruli and arterioles of HUS patients (106,107) and by increased C3 breakdown products in sera. By contrast, levels of the fourth fraction of complement, C4, are usually normal (98). Persistent and remarkably depressed C3 levels found in patients with familial HUS, even in the unaffected relatives (98), suggested an inherited defect causing hyperactivation of the complement cascade.

The complement system consists of several plasma- and membrane-associated proteins that are organized in three activation pathways: The classical, the lectin, and the alternative pathway (108,109) (Figure 2). Upon activation by molecules on the surface of microorganisms, these pathways result in the formation of protease complexes, the C3 convertases, which cleave C3 generating C3b. The classic/lectin convertases are formed by C2 and C4 fragments, whereas the generation of the alternative pathway convertase requires the cleavage of C3 but not of C4. Thus, low C3 levels in patients with HUS in the presence of normal C4 indicate a selective activation of the alternative pathway (98).

Upon generation, C3b deposits on bacterial surfaces, which leads to opsonization for phagocytosis by PMN and macrophages. C3b also participates to the formation of the C5 convertases that cleaves C5 and initiates assembly of the membrane attack complex that causes cell lysis. The human complement system is highly regulated as to prevent nonspecific damage to host cells and limit deposition of C3b to the surface of pathogens. This fine regulation is based on a number of membrane-anchored (CR1, DAF, MCP, and CD59) and fluid-phase (factor H) regulators that protect host tissues. Foreign surfaces that either lack membrane-bound regulators or cannot bind soluble regulators are attacked by complement.

In 1998, Warwicker *et al.* (110) studied three families with HUS and established linkage in the affected individuals to the regulator of complement activation gene cluster on human chromosome 1q32, which encodes for several complement regulatory proteins. The first examined candidate gene in this region was factor H (HF1), because an association between familial HUS and HF1 abnormalities had been reported previously (103,111,112). HF1 is a 150-kD multifunctional single-chain plasma glycoprotein that plays an important role in the regulation of the alternative pathway of complement (113). It serves as a co-factor for the C3b-cleaving enzyme factor I in the degradation of newly formed C3b molecules and controls decay, formation, and stability of the C3b convertase C3bBb. HF1 consists of 20 homologous units, named short consensus repeats (SCR). The complement regulatory domains that are needed to prevent fluid-phase alternative pathway amplification have been localized within the N-terminal SCR1–4 (114). The inactivation of surface-bound C3b is dependent on the binding of the C-terminal domain of HF1 to polyanionic molecules that increases HF1 affinity for C3b and exposes its complement regulatory N-terminal domain. The C-terminal domains contain two C3b binding sites, located in SCR12–14 and SCR19–20, and three polyanion-binding sites, located in SCR 7, SCR 13, and SCR19–20 (Figure 3) (115–117). However, the C3b and the polyanion-binding sites located in SCR19–20 are the only indispensable sites for HF1 to inactivate surface-bound C3b, because deletion of this portion of the molecule causes loss of HF1 capability to prevent complement activation on sheep erythrocytes (115,116). Human glomerular endothelial cells and kidney glomerular basement membrane are rich in polyanionic molecules, so HF1 deposited on their surface would provide an efficient shield against complement attack (Figure 4A) (117,118).

Since the first report by Warwicker, a number of studies have been performed by four independent groups, who altogether so far have identified up to 50 different HF1 mutations (Figure 3) in 80 patients who had familial (36 patients) and sporadic (44 patients) forms of non–Stx-HUS (99–102,114,119–121). In sporadic forms, the mutation was either inherited from a healthy parent or, more rarely—only four cases reported—ensued *de novo* in the proband (100,102). The mutation frequency is up to 40% in familial forms, whereas only 13 to 17% of sporadic forms had HF1 mutations (100,119). Alterations in other genes encoding for complement regulatory proteins could theoretically be involved in determining predisposition to sporadic non–Stx-HUS. Alternatively, these forms could be caused by an acquired autoimmune HF1 defect, similar to that observed in some patients with thrombotic thrombocytopenic purpura, in whom the acute episode is triggered by antibodies against the von



*Figure 2.* Activation pathways of the complement system and their regulators (in red).

J Am Soc Nephrol 16: 1035–1050, 2005



*Figure 3.* Factor H mutations associated with hemolytic uremic syndrome (HUS). The figure shows the structure of human factor H with the 20 short consensus repeats. The locations of the N-terminal regulatory domain responsible for co-factor activity and the binding sites for C3b and polyanions (heparin) are indicated. The majority of the mutations found in patients with HUS clusters in the C-terminus of factor H that is important for binding to polyanions and to surface-bound C3b and for the control of C3b deposition on cell membranes and extracellular matrix.

Willebrand factor cleaving metalloprotease ADAMTS-13 (122). This possibility is supported by a recently published paper (123) documenting the presence of anti-factor H antibodies in the plasma of three children with recurrent HUS.

The vast majority (48 of 50) of HF1 mutations in HUS patients are heterozygous and cause either single amino acid changes or premature translation interruption, mainly clustering in the C-terminus domains and are commonly associated with normal HF1 plasma levels. This is at variance with patients with type II membranoproliferative glomerulonephritis, who carry homozygous HF1 mutations that cause severely reduced HF1 levels (101). Expression and functional studies demonstrated that HF1 proteins that carry HUS-associated mutations have a severely reduced capability to interact with polyanions and with surface-bound C3b (117,118,124), which results in a lower density of mutant HF1 molecules bound to endothelial cells surface and a diminished complement regulatory activity on the cell membrane (117,118). In contrast, these mutants have a normal capacity to control activation of the complement in plasma, as indicated by data that they retain a normal co-factor activity in the proteolysis of fluid-phase C3b (124). The latter finding explains the case of patients who have HUS and HF1 mutations and normal serum complement levels (100,101). Sánchez-Corral *et al.* (125) proposed that HF1-related complement regulatory defects could be detected in patients' serum with an *ex vivo* hemolytic assay, in which serum from patients with HF1 mutations caused a more severe lysis of sheep erythrocytes than serum from patients without mutations. This, if confirmed, could represent a useful tool to select patients who

have HUS and deserve studies of HF1 and other complement regulatory proteins.

Patients who carry HF1 mutations have a partial HF1 deficiency, as a result of one intact and one defective allele, which more likely predispose to rather than directly cause the disease. The observation that these patients occasionally have long remissions from HUS or do not present until late in life supports this hypothesis (125). In addition, conditions that trigger complement activation, either directly (bacterial and viral infections) or indirectly, by causing endothelial insult (drugs, systemic diseases, or pregnancy), precipitate the acute event in approximately 60% of patients with HF1 mutations (99,119). All of the above observations can be reconciled by reasoning that in these patients, the suboptimal HF1 activity is enough to protect the host from complement activation in physiologic conditions. However, upon exposure to an agent that activates complement, C3b is formed in higher-than-normal amounts, and its deposition on vascular endothelial cells cannot be fully prevented as a result of loss of polyanion binding capability of mutated HF1 (Figure 4B). This results in the formation of membrane attack complex and the recruitment of inflammatory cells, all events that cause damage and retraction of endothelial cells, adhesion and aggregation of platelets, increased local tissue factor with factor VII binding and activation, and the formation of thrombin and of fibrin polymers (Figure 4D). Such a scenario particularly applies to glomerular capillary bed, which is a fenestrated endothelium, and the exposed basement membrane supplies a surface that is rich in polyanions for HF1 binding, which could explain the renal localization of microvascular injury of HUS.

Two thirds of patients with non–Stx-HUS have no HF1 mutations, despite that up to 50% of them exhibit evidence of overactivity of the alternative pathway of complement (99). The possibility that uncommon polymorphic variants of HF1 gene may confer susceptibility to HUS in patients without HF1 mutations has been recently raised. Indeed, the T allele of the C-257T, the G allele of the A2089G, and the T allele of the G2881T polymorphisms were found to be more frequent in HUS patients without HF1 mutations than in healthy subjects (99), and analysis of the overall study population revealed that individuals who carry two or three of the above variants had a fourfold increased risk for developing HUS (99). The −257T, 2089G, and 2881T alleles might also have a role in determining the penetrance (which is approximately 50%) (99) of the disease in HF1 mutation carriers. In five of nine families, individuals who developed HUS had inherited an allele carrying the HF1 mutation from one parent together with an allele carrying at least one disease-associated HF1 polymorphism from the other parent. Instead, all of the healthy HF1 mutation carriers inherited only the mutation but no polymorphism (99).

Abnormalities in two additional genes encoding for complement modulatory proteins have also been involved recently in predisposition to non–Stx-HUS. Two reports from independent groups, published a few days apart, described mutations in MCP gene, encoding for membrane co-factor protein, a cell-bound complement regulator, in affected individuals of four families (127,128). MCP is a widely expressed transmembrane



*Figure 4.* Proposed model for the pathologic consequences of factor H and monocyte chemoattractant protein (MCP) mutations. (A) After viral or bacterial infection or endothelial insult, complement is activated and C3b is formed. In the presence of normal factor H (HF1), C3b is rapidly inactivated to inactive C3b (iC3b). Factor H in the circulation binds fluid-phase C3b and favors its degradation by factor I (FI; co-factor activity, yellow domain). In addition, it binds (green domain) to polyanionic proteoglycans that are present on endothelial cell surface and in the subendothelial matrix, where, because of its high affinity for C3b, it entraps fluid-phase C3b, thus preventing its deposition on host surfaces and its binding with factor B (FB) to form the C3 convertase complex (C3bBb). The subendothelial matrix lacks endogenous complement regulators and is completely dependent on factor H to control complement activation. MCP also inactivates C3b deposited on endothelial cells by favoring its cleavage to iC3b by FI. (B) Proposed consequences of factor H mutations found in patients with HUS. Mutant factor H has a normal co-factor activity in fluid phase. However, the mutations affect the polyanion interaction site at the C-terminus of factor H so that it shows reduced bind to proteoglycans on endothelial cell surface and in subendothelial matrix. This results in more C3b reaching the endothelia cell surface so that MCP is not enough to control adequately complement activation on the cell membrane. In addition, C3b deposited on exposed extracellular matrix is not degraded and forms the C3 convertase of the alternative pathway of complement that further cleaves C3 to C3b. (C) MCP deficiency also predisposes to HUS. MCP mutations found in patients with HUS result in a reduced surface expression of the protein or in a reduced capability of MCP to bind C3b. In both cases, membrane-bound C3b is not efficiently inactivated, which leads to undesirable amplification of C3b formation and deposition on damaged endothelial cells through the formation of C3 convertase. (D) The sequence of events leading to microvascular thrombosis. The proteolysis of C3 and C5 by convertases causes the release of the chemotactic anaphylatoxins C3a and C5a that bind to receptors on inflammatory cells and attract them toward the endothelial layer. The deposition of C3b on endothelial cells is followed by the formation of the membrane attack complex (C5b9), which leads to cells' injury and detachment and to sublytic membrane perturbation, leading to endothelial activation and expression of adhesion molecules (*e.g.*, P-selectin). The latter favor leukocyte attachment and activation with the release of oxygen radicals and proteinases that further damage the endothelium. After endothelial damage, cell detachment ensues and exposes basement membranes. In these conditions, platelets from the microcirculation adhere and aggregate to the exposed matrix.

glycoprotein that serves as a co-factor for factor I to cleave C3b and C4b deposited on host cell surface (129–131). MCP has four extracellular complement control-protein modules (CCP) that are important for its inhibitory activity, followed by a serine-threonine–proline–rich domain, a transmembrane domain, and a cytoplasmic tail (132). Richards *et al.* (128) reported a heterozygous deletion of the D237/S238 amino acids in one family and a S206P substitution in two families. Evaluations of protein expression and function on PBMC showed that the mutants had a reduced C3b binding capability and a reduced ability to prevent complement activation. Another heterozygous mutation, causing two amino acid changes and a premature inter-ruption of MCP protein in CCP4, was identified (127) in two siblings, which caused 50% reduction in MCP expression levels on PBMC of heterozygous individuals. Additional studies from our group on 112 patients with non–Stx-HUS have revealed five additional MCP mutations in familial (seven cases) and in sporadic (five cases) HUS with a mutation frequency of 11% (25% in familial and 6% in sporadic forms) (133).

MCP is highly expressed in the kidney and could be found on glomerular endothelial cells by immunohistochemical analysis (134–136). It likely exerts a main role in protecting glomerular endothelial cells against C3 activation as indicated by data that co-factor activity in the extracts of these cells was com-

J Am Soc Nephrol 16: 1035-1050, 2005    Hemolytic Uremic Syndrome   1043

pletely blocked by anti-MCP antibody (136). Factor H and MCP likely integrate each other in controlling complement activation on host cells. Polyanion-attached HF1 extends from the cell membrane by approximately 120 nm and could represent an outer barrier of cells against complement attack. However, because MCP is a small-sized membrane-integrated complement regulator that extends for approximately 20 nm, one can hypothesize that MCP protein is involved in the control of complement in the close vicinity of the cell membrane (117). As hypothesized for HF1, mutations in MCP likely predispose rather than directly cause HUS. Upon exposure to conditions that cause activation of the complement cascade, reduced levels or defective C3b binding capability and co-factor activity of mutated MCP on glomerular endothelial cells would result in an insufficient protection of these cells from complement activation (Figure 4C). That mutations either in factor H or in MCP result in complement activation and HUS indicates that these complement regulators do not have overlapping functions and that they both are necessary to control complement adequately.

Finally, three mutations in the gene encoding for factor I have been reported in three patients with sporadic non–Stx-HUS (137), which further support the concept that HUS is a disease of complement dysregulation. Other candidate genes are under investigation, including DAF, CR1, CD59, C3, and factor B.

Patients who present with non–Stx-HUS should be tested first for serum C3 concentrations; however, normal C3 levels do not necessarily exclude a complement dysfunction. More sensitive assays could be a higher-than-normal C3d/C3 ratio in plasma (unpublished data) or the presence of C3 deposits in renal biopsy (106,107). Measurement of HF1 in serum would be helpful to find out those few patients who carry HF1 mutations that cause reduced HF1 levels. Decreased CH50 values and factor B concentrations could be found in some but not all patients with HF1 or MCP mutations. A second step should be the search for mutations in candidate genes HF1 and MCP. Search for factor I mutations should be performed in patients with lower-than-normal factor I serum levels.

### Which Treatment for Non–Stx-HUS?

Despite that non–Stx-HUS has a poor prognosis, after plasma manipulation was introduced, the mortality rate has dropped from 50 to 25% (138–140). However, debate still exists on whether plasma is or is not effective in the treatment of acute episodes (141–144). Published observations (139,145–147) and our own experience indicate that a consistent number of patients with non–Stx-HUS respond to plasma treatment. It has been proposed that plasma exchange might be relatively more effective than plasma infusion because it might remove potentially toxic substances from the patient's circulation. That this may not be the case is documented by data that in a patient with relapsing thrombotic microangiopathy (148), normalization of the platelet count was invariably obtained by plasma exchange or infusion, whereas plasma removal and substitution with albumin and saline never raised the platelet count. However, in situations such as renal insufficiency or heart failure, which limit the amount of plasma that can be provided with infusion alone, plasma exchange should be considered as

first-choice therapy (1). Plasma treatment should be started within 24 h of presentation as delay in treatment initiation may increase treatment failure. Usually one plasma volume (40 ml/kg) is exchanged per session (1,149). Treatment can be intensified by increasing the volume of plasma replaced. The twice-daily exchanges of one plasma volume is probably the treatment of choice for refractory patients to minimize the recycling of infused plasma (1). As for plasma infusion, the recommended dose is 30 to 40 ml/kg on day 1, then 10 to 20 ml/kg per d. Daily plasma therapy should continue for a minimum of 2 d after complete remission is obtained (1,149).

Plasma infusion or exchange has been used in patients with HUS and HF1 mutations, with the rationale to provide the patients with normal HF1 to correct the genetic deficiency. Some patients did not respond at all and died or developed ESRD (107). Others remained chronically ill (121,150) or required infusion of plasma at weekly intervals to raise HF1 plasma levels enough to maintain remission (151). Stratton *et al.* (152) were able to induce sustained remission in a patient who had HF1 mutation and developed an acute episode of HUS and required hemodialysis. After 3 mo of weekly plasma exchange in conjunction with intravenous immunoglobulins, the patient regained renal function, dialysis was withdrawn, and plasma therapy was stopped. At 1 yr after stopping plasma therapy, the patient remained disease-free and dialysis independent. Plasma therapy is instead contraindicated in patients with HUS induced by *S. pneumoniae*, because adult plasma contains antibodies against the Thomsen-Friedenreich antigen, which may exacerbate the disease.

In those few patients with extensive microvascular thrombosis at renal biopsy, refractory hypertension, and signs of hypertensive encephalopathy, when conventional therapies including plasma manipulation are not enough to control the disease (*i.e.*, persistent severe thrombocytopenia and hemolytic anemia), bilateral nephrectomy has been performed with excellent follow-up in some patients (153). Other treatments, including antiplatelet agents, prostacyclin, heparin or fibrinolytic agents, steroids, and intravenous immunoglobulins, have been attempted, with no consistent benefit (1).

Patients who develop HUS upon challenge with cyclosporine or tacrolimus have to stop the medication. Sirolimus has been used as an alternative in occasional patients with encouraging results (154).

Of patients with non–Stx-HUS, 50% (in sporadic forms) to 60% (in familial forms) progress to ESRD (1,99). Renal transplantation is not necessarily an option for non–Stx-HUS, at variance with Stx-HUS. Actually, approximately 50% of the patients who had a renal transplant had a recurrence of the disease in the grafted organ (86,155). Recurrences occur at a median time of 30 d after transplant (range, 0 d to 16 yr). There is no effective treatment of recurrences. Graft failure occurs in >90% of patients who experience recurrence, despite plasma infusion or plasma exchange, high-dose prednisone, and withdrawal of cyclosporine (1,86). Patients who lost the first kidney graft for recurrence should not receive another transplant. Live-related renal transplant should also be avoided in that it carries the additional risk to precipitate the disease onset in the healthy

donor relative as recently reported in two families (156). New knowledge from genetic studies will predict more accurately the risk for recurrence. In patients with HF1 mutations, the recurrence rate ranges from 30 to 100%, according to different surveys (99–101), and is significantly higher than in patients without HF1 mutations (99). In view of the fact that HF1 is a plasma protein mainly of liver origin, a kidney transplant does not correct the HF1 genetic defect (110,119).

Simultaneous kidney and liver transplant was performed in two young children with non–Stx-HUS and HF1 mutations, with the objective of correcting the genetic defect and preventing disease recurrences (157,158). However, for reasons that are currently under evaluation and that possibly involve an increased liver susceptibility to immune or ischemic injury related to uncontrolled complement activation, both cases that were treated with this procedure were complicated by premature irreversible liver failure. In the first published case (157), a humoral rejection of the liver graft manifested by the 26th day after transplantation; the patient had actually a high titer of antibodies to donor class I HLA. In a few days, the child developed hepatic encephalopathy and coma that recovered with a second, uneventful liver transplant (157). The second case was complicated by a fatal, primary nonfunction of the liver graft. Graft hypoperfusion, as a result of a sudden drop of arterial BP occurring soon after reperfusion, triggered severe ischemia/reperfusion damage and complement deposition in the liver, conceivably as the result of defective HF1 complement regulatory potential. Multiorgan failure was the final event resulting in the patient's death (158). Thus, despite its capacity of correcting the genetic defect, combined kidney and liver transplant for non–Stx-HUS associated with HF1 mutations should not be performed unless a patient is at imminent risk for life-threatening complications.

Kidney graft outcome is favorable in patients with MCP mutations as found in four patients who received a successful transplant and experienced no disease recurrence (128; unpublished data). In view of the fact MCP is a membrane-bound protein that is highly expressed in the kidney, a kidney graft would reasonably correct local MCP dysfunction. The graft, bearing wild-type MCP expressed on renal endothelial cell surface, should conceivably be protected from disease recurrence.

## The Future

Research efforts are aimed at identifying more specific approaches that may interfere with the primary cause of microangiopathy in the different forms of HUS. In Stx-HUS, new agents that are targeted at preventing organ exposure to Stx are currently under evaluation (159). In mice, molecular decoys such as orally administered harmless recombinant bacteria that display an Stx receptor on the surface that in turn binds the toxin in the gut (160–162) have been used successfully. Another approach is to use Stx inhibitors, among them is STARFISH, an oligobivalent, water-soluble carbohydrate ligand that can simultaneously engage all five B subunits of the toxin, which might help to prevent toxin that already has entered the circulation from destroying kidney microvessels (163). Others have

ameliorated disease in pigs by injection of toxin-neutralizing antibodies (164). Some investigators have focused on downstream events in the pathogenetic cascade. Thrombin blockade with lepirudin in a model of Stx-HUS in greyhound dogs had some beneficial effect on mortality (165), indicating that thrombin may be a critical factor in the pathogenesis of Stx-HUS. At present, prevention remains the main approach to decreasing the morbidity and mortality associated with Stx-*E. coli* infection. A multifaceted approach that includes novel ways of decreasing Stx-*E. coli* carrier rate in livestock and implementing a zero-tolerance policy for contaminated foods and beverages is required.

The discovery of mutations in three different complement regulatory genes provides enough evidence of the involvement of complement activation in the pathogenesis of non–Stx-HUS and indicates that complement inhibition could represent a therapeutic target in these patients. There are currently a number of companies with complement inhibitors in clinical or preclinical development (166). Pexelizumab and eculizumab, two humanized monoclonal antibodies directed against C5 that inhibit the activation of terminal complement components, have been developed recently. Administration of eculizumab to patients with paroxysmal nocturnal hemoglobinuria, a disease characterized by a genetic deficiency of surface proteins that protect hematopoietic cells against the attack by the complement system, reduced intravascular hemolysis, hemoglobinuria, and the need for transfusions (167). In a phase II clinical trial, administration of pexelizumab as adjunctive therapy in patients who had myocardial infarction and underwent primary percutaneous coronary intervention inhibited complement activation and significantly reduced mortality as compared with the placebo group, although the infarct size was not modified by the drug (168). Another complement-blocking approach under investigation in clinical studies is based on the use of soluble forms of the C3/C5 convertase inhibitor complement receptor 1 (CR1). Phase I and phase II clinical trials have shown that the soluble CR1 TP10, administered intravenously both before and during surgery, decreased complement activation and protected vascular function in infants who underwent cardiopulmonary bypass (169). In a randomized, multicenter, prospective study in 564 high-risk patients who underwent cardiac surgery on cardiopulmonary bypass, a bolus of TP10 given immediately before cardiopulmonary bypass significantly inhibited complement activity within 10 min, and this inhibition persisted for 3 d postoperatively (170).

It is hoped that the above complement inhibitors, once available to the market, will be useful in patients with non–Stx-HUS, to block complement-mediated kidney damage during the acute episode or to prevent recurrence after kidney transplantation. Complement inhibitors also theoretically could be of benefit to prevent complications, such primary liver nonfunction, in combined kidney and liver transplantation in patients with HF1 genetic defects.

For HUS associated with HF1 mutations, specific replacement therapies with recombinant HF1 could become a viable alternative to plasma treatment. Efforts are also ongoing to isolate plasma fractions enriched in HF1, which could allow

providing the patient with enough active molecules while minimizing the risk for allergy and fluid overload. It is hoped that advances in vector safety and transfection efficiency will soon render gene therapy a realistic option for these patients. Undergoing studies on other complement regulatory genes would help to clarify fully the molecular determinants underlying the pathogenesis of non–Stx-HUS and hopefully translate into an improvement in the management and therapy.

## Acknowledgments

This work was partially supported by grants from Comitato 30 ore per la vita, from Telethon (grants GPP02161 and GPP02162), and from the Foundation for Children with Atypical HUS along with The Nando Peretti Foundation.

## References

1. Ruggenenti P, Noris M, Remuzzi G: Thrombotic microangiopathy, hemolytic uremic syndrome, and thrombotic thrombocytopenic purpura. *Kidney Int* 60: 831–846, 2001
2. Gianviti A, Rosmini F, Caprioli A, Corona R, Matteucci MC, Principato F, Luzzi I, Rizzoni G: Haemolytic-uraemic syndrome in childhood: Surveillance and case-control studies in Italy. Italian HUS Study Group. *Pediatr Nephrol* 8: 705–709, 1994
3. Kaplan BS, Meyers KE, Schulman SL: The pathogenesis and treatment of hemolytic uremic syndrome. *J Am Soc Nephrol* 9: 1126–1133, 1998
4. Tonshoff B, Sammet A, Sanden I, Mehls O, Waldherr R, Scharer K: Outcome and prognostic determinants in the hemolytic uremic syndrome of children. *Nephron* 68: 63–70, 1994
5. Banatvala N, Griffin PM, Greene KD, Barrett TJ, Bibb WF, Green JH, Wells JG: The United States National Prospective Hemolytic Uremic Syndrome Study: Microbiologic, serologic, clinical, and epidemiologic findings. *J Infect Dis* 183: 1063–1070, 2001
6. Milford D: The hemolytic uremic syndromes in the United Kingdom. In: *Hemolytic Uremic Syndrome and Thrombotic Thrombocytopenic Purpura*, edited by Kaplan BS, Trompeter RS, Moake JL, New York, Marcel Dekker, 1992, pp 39–59
7. Van Dyck M, Proesmans W, Depraetere M: Hemolytic uremic syndrome in childhood: Renal function ten years later. *Clin Nephrol* 29: 109–112, 1988
8. Schieppati A, Ruggenenti P, Cornejo RP, Ferrario F, Gregorini G, Zucchelli P, Rossi E, Remuzzi G: Renal function at hospital admission as a prognostic factor in adult hemolytic uremic syndrome. The Italian Registry of Haemolytic Uremic Syndrome. *J Am Soc Nephrol* 2: 1640–1644, 1992
9. Taylor CM, Chua C, Howie AJ, Risdon RA: Clinico-pathological findings in diarrhoea-negative haemolytic uraemic syndrome. *Pediatr Nephrol* 19: 419–425, 2004
10. Constantinescu AR, Bitzan M, Weiss LS, Christen E, Kaplan BS, Cnaan A, Trachtman H: Non-enteropathic hemolytic uremic syndrome: Causes and short-term course. *Am J Kidney Dis* 43: 976–982, 2004
11. Taylor CM, Howie AJ, Williams JM: No common final pathogenetic pathway in haemolytic uraemic syndromes. *Nephrol Dial Transplant* 14: 1100–1102, 1999
12. Remuzzi G, Ruggenenti P: Thrombotic microangiopathies.
In: *Renal Pathology*, 2nd Ed., edited by Tisher C, Brenner B, Philadelphia, J.B. Lippincott, 1994, pp 1154–1184
13. Thorpe CM: Shiga toxin-producing *Escherichia coli* infection. *Clin Infect Dis* 38: 1298–1303, 2004
14. Karmali MA, Steele BT, Petric M, Lim C: Sporadic cases of haemolytic-uraemic syndrome associated with faecal cytotoxin and cytotoxin-producing *Escherichia coli* in stools. *Lancet* 1: 619–620, 1983
15. Riley LW, Remis RS, Helgerson SD, McGee HB, Wells JG, Davis BR, Hebert RJ, Olcott ES, Johnson LM, Hargrett NT, Blake PA, Cohen ML: Hemorrhagic colitis associated with a rare *Escherichia coli* serotype. *N Engl J Med* 308: 681–685, 1983
16. Brooks JT, Bergmire-Sweat D, Kennedy M, Hendricks K, Garcia M, Marengo L, Wells J, Ying M, Bibb W, Griffin PM, Hoekstra RM, Friedman CR: Outbreak of Shiga toxin-producing *Escherichia coli* O111:H8 infections among attendees of a high school cheerleading camp. *Clin Infect Dis* 38: 190–198, 2004
17. Varma JK, Greene KD, Reller ME, DeLong SM, Trottier J, Nowicki SF, DiOrio M, Koch EM, Bannerman TL, York ST, Lambert-Fair MA, Wells JG, Mead PS: An outbreak of *Escherichia coli* O157 infection following exposure to a contaminated building. *JAMA* 290: 2709–2712, 2003
18. Caprioli A, Luzzi I, Rosmini F, Pasquini P, Cirrincione R, Gianviti A, Matteucci MC, Rizzoni G: Hemolytic-uremic syndrome and Vero cytotoxin-producing *Escherichia coli* infection in Italy. The HUS Italian Study Group. *J Infect Dis* 166: 154–158, 1992
19. Ludwig K, Bitzan M, Zimmermann S, Kloth M, Ruder H, Muller-Wiefel DE: Immune response to non-O157 Vero toxin-producing *Escherichia coli* in patients with hemolytic uremic syndrome. *J Infect Dis* 174: 1028–1039, 1996
20. Farmer JJ 3rd, Davis BR: H7 antiserum-sorbitol fermentation medium: A single tube screening medium for detecting *Escherichia coli* O157:H7 associated with hemorrhagic colitis. *J Clin Microbiol* 22: 620–625, 1985
21. McCarthy TA, Barrett NL, Hadler JL, Salsbury B, Howard RT, Dingman DW, Brinkman CD, Bibb WF, Cartter ML: Hemolytic-uremic syndrome and *Escherichia coli* O121 at a lake in Connecticut, 1999. *Pediatrics* 108: E59, 2001
22. Sonntag AK, Prager R, Bielaszewska M, Zhang W, Fruth A, Tschape H, Karch H: Phenotypic and genotypic analyses of enterohemorrhagic *Escherichia coli* O145 strains from patients in Germany. *J Clin Microbiol* 42: 954–962, 2004
23. Lopez EL, Diaz M, Grinstein S, Devoto S, Mendilaharzu F, Murray BE, Ashkenazi S, Rubeglio E, Woloj M, Vasquez M, *et al.*: Hemolytic uremic syndrome and diarrhea in Argentine children: The role of Shiga-like toxins. *J Infect Dis* 160: 469–475, 1989
24. Srivastava RN, Moudgil A, Bagga A, Vasudev AS: Hemolytic uremic syndrome in children in northern India. *Pediatr Nephrol* 5: 284–288, 1991
25. Guerin PJ, Brasher C, Baron E, Mic D, Grimont F, Ryan M, Aavitsland P, Legros D: *Shigella dysenteriae* serotype 1 in west Africa: Intervention strategy for an outbreak in Sierra Leone. *Lancet* 362: 705–706, 2003
26. Houdouin V, Doit C, Mariani P, Brahimi N, Loirat C, Bourrillon A, Bingen E: A pediatric cluster of *Shigella dysenteriae* serotype 1 diarrhea with hemolytic uremic syndrome in 2 families from France. *Clin Infect Dis* 38: e96–99, 2004

27. Mead PS, Griffin PM: *Escherichia coli* O157:H7. *Lancet* 352: 1207–1212, 1998

28. Mead PS, Slutsker L, Dietz V, McCaig LF, Bresee JS, Shapiro C, Griffin PM, Tauxe RV: Food-related illness and death in the United States. *Emerg Infect Dis* 5: 607–625, 1999

29. Cleary TG: Cytotoxin-producing *Escherichia coli* and the hemolytic uremic syndrome. *Pediatr Clin North Am* 35: 485–501, 1988

30. Lopez EL, Prado-Jimenez V, O'Ryan-Gallardo M, Contrini MM: Shigella and Shiga toxin-producing *Escherichia coli* causing bloody diarrhea in Latin America. *Infect Dis Clin North Am* 14: 41–65, viii, 2000

31. Meichtri L, Miliwebsky E, Gioffre A, Chinen I, Baschkier A, Chillemi G, Guth BE, Masana MO, Cataldi A, Rodriguez HR, Rivas M: Shiga toxin-producing *Escherichia coli* in healthy young beef steers from Argentina: Prevalence and virulence properties. *Int J Food Microbiol* 96: 189–198, 2004

32. Griffin PM, Tauxe RV: The epidemiology of infections caused by *Escherichia coli* O157:H7, other enterohemorrhagic *E. coli*, and the associated hemolytic uremic syndrome. *Epidemiol Rev* 13: 60–98, 1991

33. Locking ME, O'Brien SJ, Reilly WJ, Wright EM, Campbell DM, Coia JE, Browning LM, Ramsay CN: Risk factors for sporadic cases of *Escherichia coli* O157 infection: The importance of contact with animal excreta. *Epidemiol Infect* 127: 215–220, 2001

34. Mead PS, Finelli L, Lambert-Fair MA, Champ D, Townes J, Hutwagner L, Barrett T, Spitalny K, Mintz E: Risk factors for sporadic infection with *Escherichia coli* O157:H7. *Arch Intern Med* 157: 204–208, 1997

35. Cody SH, Glynn MK, Farrar JA, Cairns KL, Griffin PM, Kobayashi J, Fyfe M, Hoffman R, King AS, Lewis JH, Swaminathan B, Bryant RG, Vugia DJ: An outbreak of *Escherichia coli* O157:H7 infection from unpasteurized commercial apple juice. *Ann Intern Med* 130: 202–209, 1999

36. Chandler WL, Jelacic S, Boster DR, Ciol MA, Williams GD, Watkins SL, Igarashi T, Tarr PI: Prothrombotic coagulation abnormalities preceding the hemolytic-uremic syndrome. *N Engl J Med* 346: 23–32, 2002

37. Beatty ME, Griffin PM, Tulu AN, Olsen SJ: Culturing practices and antibiotic use in children with diarrhea. *Pediatrics* 113: 628–629, 2004

38. Garg AX, Suri RS, Barrowman N, Rehman F, Matsell D, Rosas-Arellano MP, Salvadori M, Haynes RB, Clark WF: Long-term renal prognosis of diarrhea-associated hemolytic uremic syndrome: A systematic review, meta-analysis, and meta-regression. *JAMA* 290: 1360–1370, 2003

39. Date A, Raghupathy P, Jadhav M, Pereira SM, Shastry JC: Outcome of the haemolytic-uraemic syndrome complicating bacillary dysentery. *Ann Trop Paediatr* 2: 1–6, 1982

40. Adam A: *Jahrb F Kinderh* 116, 1927

41. Giles G, Sangster G, Smith J: Epidemic gastroenteritis of infants in Aberdeen in 1947. *Arch Intern Med* 24: 45–51, 1949

42. Belnap W, O'Donnell J: Epidemic gastroenteritis due to *Escherichia coli* O-111. *J Pediatr* 47: 178–183, 1955

43. Konowalchuk J, Speirs JI, Stavric S: Vero response to a cytotoxin of *Escherichia coli*. *Infect Immun* 18: 775–779, 1977

44. Jackson MP, Newland JW, Holmes RK, O'Brien AD: Nucleotide sequence analysis of the structural genes for Shigalike toxin I encoded by bacteriophage 933J from *Escherichia coli*. *Microb Pathog* 2: 147–153, 1987

45. Tesh VL, Burris JA, Owens JW, Gordon VM, Wadolkowski EA, O'Brien AD, Samuel JE: Comparison of the relative toxicities of Shiga-like toxins type I and type II for mice. *Infect Immun* 61: 3392–3402, 1993

46. Fraser ME, Fujinaga M, Cherney MM, Melton-Celsa AR, Twiddy EM, O'Brien AD, James MN: Structure of Shiga toxin type 2 (Stx2) from *Escherichia coli* O157:H7. *J Biol Chem* 279: 27511–27517, 2004

47. Scotland SM, Willshaw GA, Smith HR, Rowe B: Properties of strains of *Escherichia coli* belonging to serogroup O157 with special reference to production of Vero cytotoxins VT1 and VT2. *Epidemiol Infect* 99: 613–624, 1987

48. Ostroff SM, Kobayashi JM, Lewis JH: Infections with *Escherichia coli* O157:H7 in Washington State. The first year of statewide disease surveillance. *JAMA* 262: 355–359, 1989

49. Cimolai N, Carter JE, Morrison BJ, Anderson JD: Risk factors for the progression of *Escherichia coli* O157:H7 enteritis to hemolytic-uremic syndrome. *J Pediatr* 116: 589–592, 1990

50. Jenkins C, Willshaw GA, Evans J, Cheasty T, Chart H, Shaw DJ, Dougan G, Frankel G, Smith HR: Subtyping of virulence genes in verocytotoxin-producing *Escherichia coli* (VTEC) other than serogroup O157 associated with disease in the United Kingdom. *J Med Microbiol* 52: 941–947, 2003

51. Siegler RL, Obrig TG, Pysher TJ, Tesh VL, Denkers ND, Taylor FB: Response to Shiga toxin 1 and 2 in a baboon model of hemolytic uremic syndrome. *Pediatr Nephrol* 18: 92–96, 2003

52. Fraser ME, Chernaia MM, Kozlov YV, James MN: Crystal structure of the holotoxin from *Shigella dysenteriae* at 2.5: A resolution. *Nat Struct Biol* 1: 59–64, 1994

53. Paton AW, Srimanote P, Talbot UM, Wang H, Paton JC: A new family of potent AB5 cytotoxins produced by Shiga toxigenic *Escherichia coli*. *J Exp Med* 200: 35–46, 2004

54. Donnenberg MS, Tacket CO, James SP, Losonsky G, Nataro JP, Wasserman SS, Kaper JB, Levine MM: Role of the eaeA gene in experimental enteropathogenic *Escherichia coli* infection. *J Clin Invest* 92: 1412–1417, 1993

55. Acheson DW, Moore R, De Breucker S, Lincicome L, Jacewicz M, Skutelsky E, Keusch GT: Translocation of Shiga toxin across polarized intestinal cells in tissue culture. *Infect Immun* 64: 3294–3300, 1996

56. Hurley BP, Thorpe CM, Acheson DW: Shiga toxin translocation across intestinal epithelial cells is enhanced by neutrophil transmigration. *Infect Immun* 69: 6148–6155, 2001

57. Bitzan M, Richardson S, Huang C, Boyd B, Petric M, Karmali MA: Evidence that verotoxins (Shiga-like toxins) from *Escherichia coli* bind to P blood group antigens of human erythrocytes in vitro. *Infect Immun* 62: 3337–3347, 1994

58. Cooling LL, Walker KE, Gille T, Koerner TA: Shiga toxin binds human platelets via globotriaosylceramide (Pk antigen) and a novel platelet glycosphingolipid. *Infect Immun* 66: 4355–4366, 1998

59. van Setten PA, Monnens LA, Verstraten RG, van den Heuvel LP, van Hinsbergh VW: Effects of verocytotoxin-1 on nonadherent human monocytes: Binding characteristics, protein synthesis, and induction of cytokine release. *Blood* 88: 174–183, 1996

60. te Loo DM, Monnens LA, van Der Velden TJ, Vermeer MA, Preyers F, Demacker PN, van Den Heuvel LP, van Hinsbergh VW: Binding and transfer of verocytotoxin by polymorphonuclear leukocytes in hemolytic uremic syndrome. *Blood* 95: 3396–3402, 2000

61. te Loo DM, van Hinsbergh VW, van den Heuvel LP, Monnens LA: Detection of verocytotoxin bound to circulating polymorphonuclear leukocytes of patients with hemolytic uremic syndrome. *J Am Soc Nephrol* 12: 800–806, 2001

62. Nakajima H, Kiyokawa N, Katagiri YU, Taguchi T, Suzuki T, Sekino T, Mimori K, Ebata T, Saito M, Nakao H, Takeda T, Fujimoto J: Kinetic analysis of binding between Shiga toxin and receptor glycolipid Gb3Cer by surface plasmon resonance. *J Biol Chem* 276: 42915–42922, 2001

63. Louise CB, Obrig TG: Specific interaction of *Escherichia coli* O157:H7-derived Shiga-like toxin II with human renal endothelial cells. *J Infect Dis* 172: 1397–1401, 1995

64. Ohmi K, Kiyokawa N, Takeda T, Fujimoto J: Human microvascular endothelial cells are strongly sensitive to Shiga toxins. *Biochem Biophys Res Commun* 251: 137–141, 1998

65. Obrig TG, Louise CB, Lingwood CA, Boyd B, Barley-Maloney L, Daniel TO: Endothelial heterogeneity in Shiga toxin receptors and responses. *J Biol Chem* 268: 15484–15488, 1993

66. van Setten PA, van Hinsbergh VW, van der Velden TJ, van de Kar NC, Vermeer M, Mahan JD, Assmann KJ, van den Heuvel LP, Monnens LA: Effects of TNF alpha on verocytotoxin cytotoxicity in purified human glomerular microvascular endothelial cells. *Kidney Int* 51: 1245–1256, 1997

67. Obrig TG, Moran TP, Brown JE: The mode of action of Shiga toxin on peptide elongation of eukaryotic protein synthesis. *Biochem J* 244: 287–294, 1987

68. Pijpers AH, van Setten PA, van den Heuvel LP, Assmann KJ, Dijkman HB, Pennings AH, Monnens LA, van Hinsbergh VW: Verocytotoxin-induced apoptosis of human microvascular endothelial cells. *J Am Soc Nephrol* 12: 767–778, 2001

69. Brigotti M, Alfieri R, Sestili P, Bonelli M, Petronini PG, Guidarelli A, Barbieri L, Stirpe F, Sperti S: Damage to nuclear DNA induced by Shiga toxin 1 and ricin in human endothelial cells. *FASEB J* 16: 365–372, 2002

70. Erwert RD, Eiting KT, Tupper JC, Winn RK, Harlan JM, Bannerman DD: Shiga toxin induces decreased expression of the anti-apoptotic protein Mcl-1 concomitant with the onset of endothelial apoptosis. *Microb Pathog* 35: 87–93, 2003

71. Zoja C, Angioletti S, Donadelli R, Zanchi C, Tomasoni S, Binda E, Imberti B, te Loo M, Monnens L, Remuzzi G, Morigi M: Shiga toxin-2 triggers endothelial leukocyte adhesion and transmigration via NF-κB dependent up-regulation of IL-8 and MCP-1. *Kidney Int* 62: 846–856, 2002

72. Matussek A, Lauber J, Bergau A, Hansen W, Rohde M, Dittmar KE, Gunzer M, Mengel M, Gatzlaff P, Hartmann M, Buer J, Gunzer F: Molecular and functional analysis of Shiga toxin-induced response patterns in human vascular endothelial cells. *Blood* 102: 1323–1332, 2003

73. Morigi M, Micheletti G, Figliuzzi M, Imberti B, Karmali MA, Remuzzi A, Remuzzi G, Zoja C: Verotoxin-1 promotes leukocyte adhesion to cultured endothelial cells under physiologic flow conditions. *Blood* 86: 4553–4558, 1995

74. Morigi M, Galbusera M, Binda E, Imberti B, Gastoldi S, Remuzzi A, Zoja C, Remuzzi G: Verotoxin-1-induced up-regulation of adhesive molecules renders microvascular endothelial cells thrombogenic at high shear stress. *Blood* 98: 1828–1835, 2001

75. Ruggeri Z: Endothelial cells: They only look all alike. *Blood* 98: 1644, 2001

76. Bergstein JM, Riley M, Bang NU: Role of plasminogen-activator inhibitor type 1 in the pathogenesis and outcome of the hemolytic uremic syndrome. *N Engl J Med* 327: 755–759, 1992

77. Wong CS, Jelacic S, Habeeb RL, Watkins SL, Tarr PI: The risk of the hemolytic-uremic syndrome after antibiotic treatment of *Escherichia coli* O157:H7 infections. *N Engl J Med* 342: 1930–1936, 2000

78. Safdar N, Said A, Gangnon RE, Maki DG: Risk of hemolytic uremic syndrome after antibiotic treatment of *Escherichia coli* O157:H7 enteritis: A meta-analysis. *JAMA* 288: 996–1001, 2002

79. Bhimma R, Rollins NC, Coovadia HM, Adhikari M: Post-dysenteric hemolytic uremic syndrome in children during an epidemic of Shigella dysentery in Kwazulu/Natal. *Pediatr Nephrol* 11: 560–564, 1997

80. Oneko M, Nyathi MN, Doehring E: Post-dysenteric hemolytic uremic syndrome in Bulawayo, Zimbabwe. *Pediatr Nephrol* 16: 1142–1145, 2001

81. Chiurchiu C, Firrincieli A, Santostefano M, Fusaroli M, Remuzzi G, Ruggenenti P: Adult nondiarrhea hemolytic uremic syndrome associated with Shiga toxin *Escherichia coli* O157:H7 bacteremia and urinary tract infection. *Am J Kidney Dis* 41: E4, 2003

82. Trachtman H, Cnaan A, Christen E, Gibbs K, Zhao S, Acheson DW, Weiss R, Kaskel FJ, Spitzer A, Hirschman GH: Effect of an oral Shiga toxin-binding agent on diarrhea-associated hemolytic uremic syndrome in children: A randomized controlled trial. *JAMA* 290: 1337–1344, 2003

83. Caletti MG, Lejarraga H, Kelmansky D, Missoni M: Two different therapeutic regimes in patients with sequelae of hemolytic-uremic syndrome. *Pediatr Nephrol* 19: 1148–1152, 2004

84. Van Dyck M, Proesmans W: Renoprotection by ACE inhibitors after severe hemolytic uremic syndrome. *Pediatr Nephrol* 19: 688–690, 2004

85. Loirat C, Niaudet P: The risk of recurrence of hemolytic uremic syndrome after renal transplantation in children. *Pediatr Nephrol* 18: 1095–1101, 2003

86. Artz MA, Steenbergen EJ, Hoitsma AJ, Monnens LA, Wetzels JF: Renal transplantation in patients with hemolytic uremic syndrome: High rate of recurrence and increased incidence of acute rejections. *Transplantation* 76: 821–826, 2003

87. Ferraris JR, Ramirez JA, Ruiz S, Caletti MG, Vallejo G, Piantanida JJ, Araujo JL, Sojo ET: Shiga toxin-associated hemolytic uremic syndrome: Absence of recurrence after renal transplantation. *Pediatr Nephrol* 17: 809–814, 2002

88. Hall SM, Glickman M: The British Paediatric Surveillance Unit. *Arch Intern Med* 63: 344–346, 1988

89. Renaud C, Niaudet P, Gagnadoux MF, Broyer M, Habib R: Haemolytic uraemic syndrome: Prognostic factors in children over 3 years of age. *Pediatr Nephrol* 9: 24–29, 1995

90. Erickson LC, Smith WS, Biswas AK, Camarca MA, Waecker NJ Jr: *Streptococcus pneumoniae*-induced hemolytic uremic syndrome: A case for early diagnosis. *Pediatr Nephrol* 8: 211–213, 1994

91. Novak RW, Martin CR, Orsini EN: Hemolytic-uremic syndrome and T-cryptantigen exposure by neuraminidase-producing pneumococci: An emerging problem? *Pediatr Pathol* 1: 409–413, 1983

92. Dlott JS, Danielson CF, Blue-Hnidy DE, McCarthy LJ:

Drug-induced thrombotic thrombocytopenic purpura/hemolytic uremic syndrome: A concise review. *Ther Apher Dial* 8: 102–111, 2004

93. Reynolds JC, Agodoa LY, Yuan CM, Abbott KC: Thrombotic microangiopathy after renal transplantation in the United States. *Am J Kidney Dis* 42: 1058–1068, 2003

94. Ruggenenti P: Post-transplant hemolytic-uremic syndrome. *Kidney Int* 62: 1093–1104, 2002

95. Remuzzi G, Ruggenenti P: The hemolytic uremic syndrome. *Kidney Int* 48: 2–19, 1995

96. George JN: The association of pregnancy with thrombotic thrombocytopenic purpura-hemolytic uremic syndrome. *Curr Opin Hematol* 10: 339–344, 2003

97. Berns JS, Kaplan BS, Mackow RC, Hefter LG: Inherited hemolytic uremic syndrome in adults. *Am J Kidney Dis* 19: 331–334, 1992

98. Noris M, Ruggenenti P, Perna A, Orisio S, Caprioli J, Skerka C, Vasile B, Zipfel PF, Remuzzi G: Hypocomplementemia discloses genetic predisposition to hemolytic uremic syndrome and thrombotic thrombocytopenic purpura: Role of factor H abnormalities. Italian Registry of Familial and Recurrent Hemolytic Uremic Syndrome/Thrombotic Thrombocytopenic Purpura. *J Am Soc Nephrol* 10: 281–293, 1999

99. Caprioli J, Castelletti F, Bucchioni S, Bettinaglio P, Bresin E, Pianetti G, Gamba S, Brioschi S, Daina E, Remuzzi G, Noris M: Complement factor H mutations and gene polymorphisms in haemolytic uraemic syndrome: The C-257T, the A2089G and the G2881T polymorphisms are strongly associated with the disease. *Hum Mol Genet* 12: 3385–3395, 2003

100. Neumann HP, Salzmann M, Bohnert-Iwan B, Mannuelian T, Skerka C, Lenk D, Bender BU, Cybulla M, Riegler P, Konigsrainer A, Neyer U, Bock A, Widmer U, Male DA, Franke G, Zipfel PF: Haemolytic uraemic syndrome and mutations of the factor H gene: A registry-based study of German speaking countries. *J Med Genet* 40: 676–681, 2003

101. Dragon-Durey MA, Fremeaux-Bacchi V, Loirat C, Blouin J, Niaudet P, Deschenes G, Coppo P, Herman Fridman W, Weiss L: Heterozygous and homozygous factor H deficiencies associated with hemolytic uremic syndrome or membranoproliferative glomerulonephritis: Report and genetic analysis of 16 cases. *J Am Soc Nephrol* 15: 787–795, 2004

102. Perez-Caballero D, Gonzalez-Rubio C, Gallardo ME, Vera M, Lopez-Trascasa M, Rodriguez de Cordoba S, Sanchez-Corral P: Clustering of missense mutations in the C-terminal region of factor H in atypical hemolytic uremic syndrome. *Am J Hum Genet* 68: 478–484, 2001

103. Rougier N, Kazatchkine MD, Rougier JP, Fremeaux-Bacchi V, Blouin J, Deschenes G, Soto B, Baudouin V, Pautard B, Proesmans W, Weiss E, Weiss L: Human complement factor H deficiency associated with hemolytic uremic syndrome. *J Am Soc Nephrol* 9: 2318–2326, 1998

104. Stuhlinger W, Kourilsky O, Kanfer A, Sraer JD: Haemolytic-uraemic syndrome: Evidence for intravascular C3 activation [Letter]. *Lancet* 2: 788–789, 1974

105. Carreras L, Romero R, Requesens C, Oliver AJ, Carrera M, Clavo M, Alsina J: Familial hypocomplementemic hemolytic uremic syndrome with HLA-A3,B7 haplotype. *JAMA* 245: 602–604, 1981

106. Hammar SP, Bloomer HA, McCloskey D: Adult hemolytic uremic syndrome with renal arteriolar deposition of IgM and C3. *Am J Clin Pathol* 70: 434–439, 1978

107. Landau D, Shalev H, Levy-Finer G, Polonsky A, Segev Y, Katchko L: Familial hemolytic uremic syndrome associated with complement factor H deficiency. *J Pediatr* 138: 412–417, 2001

108. Walport MJ: Complement. Second of two parts. *N Engl J Med* 344: 1140–1144, 2001

109. Walport MJ: Complement. First of two parts. *N Engl J Med* 344: 1058–1066, 2001

110. Warwicker P, Goodship TH, Donne RL, Pirson Y, Nicholls A, Ward RM, Turnpenny P, Goodship JA: Genetic studies into inherited and sporadic hemolytic uremic syndrome. *Kidney Int* 53: 836–844, 1998

111. Pichette V, Querin S, Schurch W, Brun G, Lehner-Netsch G, Delage JM: Familial hemolytic-uremic syndrome and homozygous factor H deficiency. *Am J Kidney Dis* 24: 936–941, 1994

112. Thompson RA, Winterborn MH: Hypocomplementaemia due to a genetic deficiency of beta 1H globulin. *Clin Exp Immunol* 46: 110–119, 1981

113. Zipfel PF, Skerka C: Complement factor H and related proteins: An expanding family of complement-regulatory proteins? *Immunol Today* 15: 121–126, 1994

114. Rodriguez de Cordoba S, Esparza-Gordillo J, Goicoechea de Jorge E, Lopez-Trascasa M, Sanchez-Corral P: The human complement factor H: Functional roles, genetic variations and disease associations. *Mol Immunol* 41: 355–367, 2004

115. Pangburn MK: Cutting edge: Localization of the host recognition functions of complement factor H at the carboxyl-terminal: Implications for hemolytic uremic syndrome. *J Immunol* 169: 4702–4706, 2002

116. Hellwage J, Jokiranta TS, Friese MA, Wolk TU, Kampen E, Zipfel PF, Meri S: Complement C3b/C3d and cell surface polyanions are recognized by overlapping binding sites on the most carboxyl-terminal domain of complement factor H. *J Immunol* 169: 6935–6944, 2002

117. Jozsi M, Manuelian T, Heinen S, Oppermann M, Zipfel PF: Attachment of the soluble complement regulator factor H to cell and tissue surfaces: Relevance for pathology. *Histol Histopathol* 19: 251–258, 2004

118. Manuelian T, Hellwage J, Meri S, Caprioli J, Noris M, Heinen S, Jozsi M, Neumann HP, Remuzzi G, Zipfel PF: Mutations in factor H reduce binding affinity to C3b and heparin and surface attachment to endothelial cells in hemolytic uremic syndrome. *J Clin Invest* 111: 1181–1190, 2003

119. Caprioli J, Bettinaglio P, Zipfel PF, Amadei B, Daina E, Gamba S, Skerka C, Marziliano N, Remuzzi G, Noris M: The molecular basis of familial hemolytic uremic syndrome: Mutation analysis of factor H gene reveals a hot spot in short consensus repeat 20. *J Am Soc Nephrol* 12: 297–307, 2001

120. Buddles MR, Donne RL, Richards A, Goodship J, Goodship TH: Complement factor H gene mutation associated with autosomal recessive atypical hemolytic uremic syndrome. *Am J Hum Genet* 66: 1721–1722, 2000

121. Filler G, Radhakrishnan S, Strain L, Hill A, Knoll G, Goodship TH: Challenges in the management of infantile factor H associated hemolytic uremic syndrome. *Pediatr Nephrol* 19: 908–911, 2004

122. Tsai HM, Lian EC: Antibodies to von Willebrand factor-cleaving protease in acute thrombotic thrombocytopenic purpura. *N Engl J Med* 339: 1585–1594, 1998

123. Brioschi S, Porrati F, Bresin E, Todeschini M, Bucchioni S, Pianetti G, Castelletti F, Caprioli J, Remuzzi G, Noris M: Mutations in membrane cofactor protein in atypical hemolytic uremic syndrome [Abstract]. Presented at the 7th Congress of the Italian Society of Human Genomics, October 13–15, 2004

124. Sanchez-Corral P, Perez-Caballero D, Huarte O, Simckes AM, Goicoechea E, Lopez-Trascasa M, de Cordoba SR: Structural and functional characterization of factor H mutations associated with atypical hemolytic uremic syndrome. *Am J Hum Genet* 71: 1285–1295, 2002

125. Sanchez-Corral P, Gonzalez-Rubio C, Rodriguez de Cordoba S, Lopez-Trascasa M: Functional analysis in serum from atypical hemolytic uremic syndrome patients reveals impaired protection of host cells associated with mutations in factor H. *Mol Immunol* 41: 81–84, 2004

126. Taylor CM: Complement factor H and the haemolytic uraemic syndrome. *Lancet* 358: 1200–1202, 2001

127. Noris M, Brioschi S, Caprioli J, Todeschini M, Bresin E, Porrati F, Gamba S, Remuzzi G: Familial haemolytic uraemic syndrome and an MCP mutation. *Lancet* 362: 1542–1547, 2003

128. Richards A, Kemp EJ, Liszewski MK, Goodship JA, Lampe AK, Decorte R, Muslumanoglu MH, Kavukcu S, Filler G, Pirson Y, Wen LS, Atkinson JP, Goodship TH: Mutations in human complement regulator, membrane cofactor protein (CD46), predispose to development of familial hemolytic uremic syndrome. *Proc Natl Acad Sci U S A* 100: 12966–12971, 2003

129. Johnstone RW, Loveland BE, McKenzie IF: Identification and quantification of complement regulator CD46 on normal human tissues. *Immunology* 79: 341–347, 1993

130. Goodship TH, Liszewski MK, Kemp EJ, Richards A, Atkinson JP: Mutations in CD46, a complement regulatory protein, predispose to atypical HUS. *Trends Mol Med* 10: 226–231, 2004

131. Barilla-LaBarca ML, Liszewski MK, Lambris JD, Hourcade D, Atkinson JP: Role of membrane cofactor protein (CD46) in regulation of C4b and C3b deposited on cells. *J Immunol* 168: 6298–6304, 2002

132. Liszewski MK, Leung M, Cui W, Subramanian VB, Parkinson J, Barlow PN, Manchester M, Atkinson JP: Dissecting sites important for complement regulatory activity in membrane cofactor protein (MCP; CD46). *J Biol Chem* 275: 37692–37701, 2000

133. Dragon-Durey M-A, Loirat C, Cloarec S, Macher M-A, Blouin J, Nivet H, Weiss L, Fridman WH, Fremeaux-Bacchi V: Anti–factor H antibodies associated with atypical hemolytic uremic syndrome. *J Am Soc Nephrol* 16: 555–563, 2005

134. Endoh M, Yamashina M, Ohi H, Funahashi K, Ikuno T, Yasugi T, Atkinson JP, Okada H: Immunohistochemical demonstration of membrane cofactor protein (MCP) of complement in normal and diseased kidney tissues. *Clin Exp Immunol* 94: 182–188, 1993

135. Ichida S, Yuzawa Y, Okada H, Yoshioka K, Matsuo S: Localization of the complement regulatory proteins in the normal human kidney. *Kidney Int* 46: 89–96, 1994

136. Nakanishi I, Moutabarrik A, Hara T, Hatanaka M, Hayashi T, Syouji T, Okada N, Kitamura E, Tsubakihara Y, Matsu-moto M, *et al.*: Identification and characterization of membrane cofactor protein (CD46) in the human kidneys. *Eur J Immunol* 24: 1529–1535, 1994

137. Fremeaux-Bacchi V, Dragon-Durey MA, Blouin J, Vigneau C, Kuypers D, Boudailliez B, Loirat C, Rondeau E, Fridman WH: Complement factor I: A susceptibility gene for atypical haemolytic uraemic syndrome. *J Med Genet* 41: e84, 2004

138. Hollenbeck M, Kutkuhn B, Aul C, Leschke M, Willers R, Grabensee B: Haemolytic-uraemic syndrome and thrombotic-thrombocytopenic purpura in adults: Clinical findings and prognostic factors for death and end-stage renal disease. *Nephrol Dial Transplant* 13: 76–81, 1998

139. Lara PN Jr, Coe TL, Zhou H, Fernando L, Holland PV, Wun T: Improved survival with plasma exchange in patients with thrombotic thrombocytopenic purpura-hemolytic uremic syndrome. *Am J Med* 107: 573–579, 1999

140. Morel-Maroger L, Kanfer A, Solez K, Sraer JD, Richet G: Prognostic importance of vascular lesions in acute renal failure with microangiopathic hemolytic anemia (hemolytic-uremic syndrome): Clinicopathologic study in 20 adults. *Kidney Int* 15: 548–558, 1979

141. Dundas S, Murphy J, Soutar RL, Jones GA, Hutchinson SJ, Todd WT: Effectiveness of therapeutic plasma exchange in the 1996 Lanarkshire *Escherichia coli* O157:H7 outbreak. *Lancet* 354: 1327–1330, 1999

142. Tsai HM: Is severe deficiency of ADAMTS-13 specific for thrombotic thrombocytopenic purpura? Yes. *J Thromb Haemost* 1: 625–631, 2003

143. Tsai HM: Deficiency of ADAMTS-13 in thrombotic and thrombocytopenic purpura. *J Thromb Haemost* 1: 2038–2040; discussion 2040–2035, 2003

144. Remuzzi G: Is ADAMTS-13 deficiency specific for thrombotic thrombocytopenic purpura? No. *J Thromb Haemost* 1: 632–634, 2003

145. Clark WF, Rock GA, Buskard N, Shumak KH, LeBlond P, Anderson D, Sutton DM: Therapeutic plasma exchange: An update from the Canadian Apheresis Group. *Ann Intern Med* 131: 453–462, 1999

146. Vesely SK, George JN, Lammle B, Studt JD, Alberio L, El-Harake MA, Raskob GE: ADAMTS13 activity in thrombotic thrombocytopenic purpura-hemolytic uremic syndrome: Relation to presenting features and clinical outcomes in a prospective cohort of 142 patients. *Blood* 102: 60–68, 2003

147. Tostivint I, Mougenot B, Flahault A, Vigneau C, Costa MA, Haymann JP, Sraer JD, Rondeau E: Adult haemolytic and uraemic syndrome: Causes and prognostic factors in the last decade. *Nephrol Dial Transplant* 17: 1228–1234, 2002

148. Ruggenenti P, Galbusera M, Cornejo RP, Bellavita P, Remuzzi G: Thrombotic thrombocytopenic purpura: Evidence that infusion rather than removal of plasma induces remission of the disease. *Am J Kidney Dis* 21: 314–318, 1993

149. Allford SL, Hunt BJ, Rose P, Machin SJ: Guidelines on the diagnosis and management of the thrombotic microangiopathic haemolytic anaemias. *Br J Haematol* 120: 556–573, 2003

150. Gerber A, Kirchhoff-Moradpour AH, Obieglo S, Brandis M, Kirschfink M, Zipfel PF, Goodship JA, Zimmerhackl LB: Successful (?) therapy of hemolytic-uremic syndrome

with factor H abnormality. *Pediatr Nephrol* 18: 952–955, 2003

151. Nathanson S, Fremeaux-Bacchi V, Deschenes G: Successful plasma therapy in hemolytic uremic syndrome with factor H deficiency. *Pediatr Nephrol* 16: 554–556, 2001

152. Stratton JD, Warwicker P: Successful treatment of factor H-related haemolytic uraemic syndrome. *Nephrol Dial Transplant* 17: 684–685, 2002

153. Remuzzi G, Galbusera M, Salvadori M, Rizzoni G, Paris S, Ruggenenti P: Bilateral nephrectomy stopped disease progression in plasma-resistant hemolytic uremic syndrome with neurological signs and coma. *Kidney Int* 49: 282–286, 1996

154. Franco A, Hernandez D, Capdevila L, Errasti P, Gonzalez M, Ruiz JC, Sanchez J: De novo hemolytic-uremic syndrome/thrombotic microangiopathy in renal transplant patients receiving calcineurin inhibitors: Role of sirolimus. *Transplant Proc* 35: 1764–1766, 2003

155. Miller RB, Burke BA, Schmidt WJ, Gillingham KJ, Matas AJ, Mauer M, Kashtan CE: Recurrence of haemolytic-uraemic syndrome in renal transplants: A single-centre report. *Nephrol Dial Transplant* 12: 1425–1430, 1997

156. Donne RL, Abbs I, Barany P, Elinder CG, Little M, Conlon P, Goodship TH: Recurrence of hemolytic uremic syndrome after live related renal transplantation associated with subsequent de novo disease in the donor. *Am J Kidney Dis* 40: E22, 2002

157. Remuzzi G, Ruggenenti P, Codazzi D, Noris M, Caprioli J, Locatelli G, Gridelli B: Combined kidney and liver transplantation for familial haemolytic uraemic syndrome. *Lancet* 359: 1671–1672, 2002

158. Remuzzi G, Ruggenenti P, Gridelli B, Bertani A, Bettinaglio P, Bucchioni S, Sonzogni A, Bonanomi E, Sonzogni V, Platt J, Perico N, Noris M: Hemolytic uremic syndrome: A fatal outcome after kidney and liver transplantation performed to correct factor H gene mutation. *Am J Transpl* 2005, in press

159. MacConnachie AA, Todd WA: Potential therapeutic agents for the prevention and treatment of haemolytic uraemic syndrome in shiga toxin producing *Escherichia coli* infection. *Curr Opin Infect Dis* 17: 479–482, 2004

160. Pinyon RA, Paton JC, Paton AW, Botten JA, Morona R: Refinement of a therapeutic Shiga toxin-binding probiotic for human trials. *J Infect Dis* 189: 1547–1555, 2004

161. Paton AW, Morona R, Paton JC: A new biological agent for treatment of Shiga toxigenic *Escherichia coli* infections and dysentery in humans. *Nat Med* 6: 265–270, 2000

162. Takahashi M, Taguchi H, Yamaguchi H, Osaki T, Komatsu A, Kamiya S: The effect of probiotic treatment with Clostridium butyricum on enterohemorrhagic *Escherichia coli* O157:H7 infection in mice. *FEMS Immunol Med Microbiol* 41: 219–226, 2004

163. Mulvey GL, Marcato P, Kitov PI, Sadowska J, Bundle DR, Armstrong GD: Assessment in mice of the therapeutic potential of tailored, multivalent Shiga toxin carbohydrate ligands. *J Infect Dis* 187: 640–649, 2003

164. Matise I, Cornick NA, Booher SL, Samuel JE, Bosworth BT, Moon HW: Intervention with Shiga toxin (Stx) antibody after infection by Stx-producing *Escherichia coli*. *J Infect Dis* 183: 347–350, 2001

165. Raife T, Friedman KD, Fenwick B: Lepirudin prevents lethal effects of Shiga toxin in a canine model. *Thromb Haemost* 92: 387–393, 2004

166. Kirschfink M: Targeting complement in therapy. *Immunol Rev* 180: 177–189, 2001

167. Hillmen P, Hall C, Marsh JC, Elebute M, Bombara MP, Petro BE, Cullen MJ, Richards SJ, Rollins SA, Mojcik CF, Rother RP: Effect of eculizumab on hemolysis and transfusion requirements in patients with paroxysmal nocturnal hemoglobinuria. *N Engl J Med* 350: 552–559, 2004

168. Granger CB, Mahaffey KW, Weaver WD, Theroux P, Hochman JS, Filloon TG, Rollins S, Todaro TG, Nicolau JC, Ruzyllo W, Armstrong PW: Pexelizumab, an anti-C5 complement antibody, as adjunctive therapy to primary percutaneous coronary intervention in acute myocardial infarction: The Complement Inhibition in Myocardial Infarction Treated with Angioplasty (COMMA) trial. *Circulation* 108: 1184–1190, 2003

169. Li JS, Sanders SP, Perry AE, Stinnett SS, Jaggers J, Bokesch P, Reynolds L, Nassar R, Anderson PA: Pharmacokinetics and safety of TP10, soluble complement receptor 1, in infants undergoing cardiopulmonary bypass. *Am Heart J* 147: 173–180, 2004

170. Lazar HL, Bokesch PM, van Lenta F, Fitzgerald C, Emmett C, Marsh HC Jr, Ryan U: Soluble human complement receptor 1 limits ischemic damage in cardiac surgery patients at high risk requiring cardiopulmonary bypass. *Circulation* 110[Suppl 1]: II274–II279, 2004

**Access to UpToDate on-line is available for additional clinical information at http://www.jasn.org/**

# EXHIBIT G

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ALEXION PHARMACEUTICALS, INC. and ALEXION PHARMA INTERNATIONAL OPERATIONS LTD., | ) ) ) ) | **REDACTED PUBLIC VERSION** |
| Plaintiffs, | ) ) | |
| v. | ) ) ) | C.A. 24-005-GBW |
| SAMSUNG BIOEPIS CO. LTD., | ) ) ) | |
| Defendant. | ) | |

**SAMSUNG BIOEPIS CO. LTD.'S OPPOSITION TO
PLAINTIFFS' EMERGENCY MOTION FOR INJUNCTION PENDING APPEAL AND
TEMPORARY RESTRAINING ORDER PENDING RESOLUTION OF THIS MOTION**

*Of Counsel:*

Michelle Rhyu
Daniel Knauss
COOLEY LLP
3175 Hanover Street
Palo Alto, CA 94304-1130
(650) 843-5000
rhyums@cooley.com
dknauss@cooley.com

Jonathan Davies
COOLEY LLP
1299 Pennsylvania Avenue, NW, Suite 700
Washington, DC 20004-2400
(202) 842-7800
jdavies@cooley.com

Orion Armon
COOLEY LLP
1144 15th St., Suite 2300
Denver, CO 80202
(720) 566-4000
oarmon@cooley.com

Andrew C. Mayo (#5207)
ASHBY & GEDDES
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE  19899
(302) 654-1888
amayo@ashbygeddes.com

*Attorneys for Defendant Samsung Bioepis Co. Ltd.*

Brianna Patterson
COOLEY LLP
30 South 9th Street 7th Floor
Minneapolis, MN 55402
(312) 881-6381
bchamberlin@cooley.com

Dated:  May 31, 2024

**TABLE OF CONTENTS**

Page

I.   NATURE AND STAGE OF PROCEEDINGS ................................................................ 1

II.  SUMMARY OF ARGUMENT .................................................................................... 1

III. LEGAL STANDARD ................................................................................................. 3

IV.  ARGUMENT ............................................................................................................. 4

    A.   Alexion Has Not Provided a "Strong Showing" of Likelihood of Success on the Merits on Appeal ........................................................................................ 4

        1.   The Court Correctly Concluded That The '189 IPR Institution Decision Raises a Substantial Question of Validity of the PNH Claim ............................................................................................................ 5

        2.   The Court Could Also Conclude That Samsung's Other Arguments Raise a Substantial Question of Validity and Enforceability Regarding the PNH Claim ........................................................................ 7

        3.   The Court Correctly Found a Substantial Question of Validity Regarding the aHUS Claim ........................................................................ 7

            a.   The aHUS Claim Is Obvious in View of Noris (2005) and the SOLIRIS® Label (2007) ...................................................... 8

            b.   The Court Should Revisit Samsung's Argument That Chatelet (2008) Presents a Substantial Question of Invalidity ................................................................................ 11

    B.   The Currently Scheduled Launch of SB12 Will Not Cause Alexion Any Imminent and Irreparable Harm ...................................................................... 13

        1.   Alexion's Lengthy, Unexplained Delay in Filing Suit and Seeking a Preliminary Injunction Contradicts Its Allegations of Irreparable Harm ............................................................................................. 15

        2.   Alleged Lost Sales and Price Erosion Will Be Quantifiable ................... 16

        3.   Alexion's Alleged Harms to Goodwill and Alleged Impacts from Workforce Redeployment Are Speculative ............................................ 17

        4.   Alexion Failed to Carry Its Burden of Showing a Nexus Between Its Alleged Irreparable Harms and the PI Claims .................................... 18

    C.   The Balance of Equities Favors Denying Alexion's Motion ............................... 19

    D.   Denying Alexion's Preliminary Injunction Would Promote the Public Interest ........................................................................................................... 20

V.   CONCLUSION ........................................................................................................ 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott Cardiovascular Sys., Inc. v. Edwards Lifesciences Corp.*,
    No. 19-149 (MN), 2019 WL 3855015 (D. Del. Mar. 5, 2019)................................................3

*Abbott Cardiovascular Sys., Inc. v. Edwards Lifesciences Corp.*,
    No. 19-149-MN, 2019 WL 2521305 (D. Del. June 6, 2019)....................................................3

*Altana Pharma AG v. Teva Pharms. USA, Inc.*,
    566 F.3d 999 (Fed. Cir. 2009)................................................................................................4

*Amgen Inc. v. Apotex Inc.*,
    827 F.3d 1052 (Fed. Cir. 2016)............................................................................................15

*Apple Inc. v. Samsung Elecs. Co.*,
    695 F.3d 1370 (Fed. Cir. 2012)......................................................................................14, 18

*Biogen Inc. v. Sandoz Inc.*,
    No. 22-1190-GBW, 2023 WL 7130655 (D. Del. June 29, 2023)................................... *passim*

*Cipla Ltd. v. Amgen Inc.*,
    No. 19-44-LPS, 2019 WL 2053055 (D. Del. May 9, 2019) ................................................1, 3

*FTC v. Equitable Res., Inc.*,
    No. 07CV0490, 2007 WL 1500046 (W.D. Pa. May 21, 2007) ................................................3

*Genentech, Inc. v. Amgen Inc.*,
    No. 18-924-CFC, 2019 WL 3290167 (D. Del. July 18, 2019), *aff'd*, 796 F.
    App'x 726 (Fed. Cir. 2020) ................................................................................................16

*Genentech, Inc. v. Immunex Rhode Island Corp.*,
    395 F. Supp. 3d 357 (D. Del. 2019), *aff'd*, 964 F.3d 1109 (Fed. Cir. 2020) .........................20

*Genentech, Inc. v. Novo Nordisk A/S*,
    108 F.3d 1361 (Fed. Cir. 1997)..............................................................................................4

*Genuine Enabling Tech., LLC v. Sony Corp.*,
    No. 17-135, 2020 WL 1140910 (D. Del. Mar. 9, 2020) ........................................................6

*Kenexa Brassring, Inc. v. Taleo Corp.*,
    751 F. Supp. 2d 735 (D. Del. 2010)......................................................................................13

*Liqwd, Inc. v. L'Oreal USA, Inc.*,
    No. 17-14, 2018 WL 11189633 (D. Del. Dec. 12, 2018) ....................................................5, 6

## TABLE OF AUTHORITIES
(continued)

Page(s)

*Medichem, S.A. v. Rolabo, S.L.,*
    437 F.3d 1157 (Fed. Cir. 2006)................................................................8

*Pfizer, Inc. v. Apotex, Inc.,*
    480 F.3d 1348 (Fed. Cir. 2007)................................................................8

*Pfizer, Inc. v. Teva Pharms., USA, Inc.,*
    429 F.3d 1364 (Fed. Cir. 2005)........................................................15, 20

*Reebok Int'l Ltd. v. J. Baker, Inc.,*
    32 F.3d 1552 (Fed. Cir. 1994)..................................................................4

*Sanofi-Aventis U.S. LLC v. Sandoz, Inc.,*
    No. 07-2762 (JAP), 2009 WL 1968900 (D.N.J. July 1, 2009) ..................3

*Sanofi-Aventis U.S. LLC v. Sandoz, Inc.,*
    No. 20-804-RGA, 2023 WL 4175334 (D. Del. June 26, 2023)................9

*Takeda Pharms. USA, Inc. v. West–Ward Pharm. Corp.,*
    No. 14-1268-SLR, 2014 WL 5088690 (D. Del. Oct. 9, 2014) ..........3, 16

*Tinnus Enterprises, LLC v. Telebrands Corp.,*
    846 F.3d 1190, 1201-02 (Fed. Cir. 2017) ...............................................5

*Titan Tire Corp. v. Case New Holland, Inc.,*
    566 F.3d 1372 (Fed. Cir. 2009)................................................................3

*Winter v. Nat. Res. Def. Council, Inc.,*
    555 U.S. 7 (2008)...................................................................................14

**Statutes**

42 U.S.C. § 262(*l*)(8)(B) ...........................................................................15

**Other Authorities**

Fed. R. Civ. P. 62(d) ...................................................................................3

## I.    NATURE AND STAGE OF PROCEEDINGS

Alexion Pharmaceuticals, Inc. and Alexion Pharma International Operations Ltd. (collectively, "Alexion") filed this suit on January 3, 2024 (D.I. 1), and Samsung Bioepis ("Samsung") filed its Answer and Counterclaims on February 8, 2024 (D.I. 8). Alexion filed its Answer to Samsung's Counterclaims on March 14, 2024. D.I. 36. Separately, Alexion filed a Motion for a Preliminary Injunction ("PI Motion") on February 12, 2024. D.I. 16. Samsung opposed Alexion's PI Motion on March 15, 2024 (D.I. 38 ("Samsung's Opp. Br.")), and Alexion filed its Reply in Support of its PI Motion on April 11, 2024 (D.I. 49 (Alexion's Reply Brief ISO PI Motion)). The Court denied Alexion's PI Motion on May 6, 2024 (D.I. 57 ("PI Order")), finding a substantial question of validity with regard to claim 1 of U.S. Patent No. 10,590,189 ("the '189 patent") ("the PNH claim") and claim 1 of U.S. Patent No. 9,447,176 ("the '176 patent") ("the aHUS claim") (collectively, "PI claims"). Alexion filed a Notice of Appeal to the United States Court of Appeals for the Federal Circuit on May 14, 2024, and filed an Emergency Motion for Injunction Pending Appeal and Temporary Restraining Order Pending Resolution of This Motion ("Emergency Motion") on May 17, 2024.

## II.    SUMMARY OF ARGUMENT

Alexion has failed to meet its heavy burden to obtain the extraordinary relief of an injunction pending appeal. For the same reasons this Court denied Alexion's PI Motion, Alexion cannot establish the required "strong showing" that it is likely to succeed on the merits in its appeal. *Cipla Ltd. v. Amgen Inc.*, No. 19-44-LPS, 2019 WL 2053055, at *1 (D. Del. May 9, 2019). This Court properly concluded that Samsung established a substantial question of validity as to the PNH claim in view of the United States Patent Trial and Appeal Board's ("PTAB's") institution decision for *Inter Partes* Review ("IPR") of the '189 patent. This Court correctly reasoned that IPR estoppel does not prevent Samsung from relying on the PTAB's institution decision to establish a

substantial question of validity.  For the aHUS claim, this Court also properly concluded that Samsung established a substantial question of validity based on obviousness in light of Noris (2005) and the SOLIRIS® label (2007), further strengthened by Samsung's argument based on anticipation by Chatelet (2008).  Alexion offers the same substantive discussion of the validity of the aHUS claim that the Court previously considered and properly rejected.  In addition, the testimony of Alexion's expert Dr. Josep Miquel Blasco Pelicano, whose deposition was taken after Alexion filed its Reply in Support of Its PI Motion, further undermines Alexion's arguments, and Samsung now incorporates that testimony into the record.  Ex. A ("Blasco Dep. Tr.").

This Court properly found that Samsung established a substantial question of validity as to each of the PI claims, and thus held that Alexion failed to establish a likelihood of success on the merits of its claims.  PI Order at 7.  In so finding, this Court did not need to address the remaining factors considered as part of a motion for preliminary injunction.  *Id.* at 2-3, 7.  In any event, Alexion failed to make a clear showing of irreparable harm that is not compensable with money damages.  Alexion's expert admitted that any alleged harms are quantifiable.  Not only are they quantifiable, but Alexion has ███████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████ Alexion also failed to provide the requisite nexus between the alleged harms and the asserted claims.  Lastly, both the balance of hardships and public interest tip in favor of Samsung providing its SOLIRIS® (eculizumab) biosimilar product, SB12, to the market, given Alexion's well-laid plans anticipating biosimilar competition.

Finally, there is no emergency to justify Alexion's Emergency Motion; ████████ ███████████████████████████████████████ Therefore, Alexion's request for

a temporary restraining order ("TRO") pending resolution of this Emergency Motion is unwarranted.  Moreover, for all the reasons summarized above, Alexion is not entitled to a TRO. Alexion's Emergency Motion should be denied.

## III.   LEGAL STANDARD

To prevail on a motion for injunction pending appeal under Rule 62(d), Alexion must demonstrate "(1) a 'strong showing' that it is likely to succeed on the merits in its appeal; (2) absent an injunction it will be irreparably harmed; (3) an injunction or stay will not substantially injure [patentee]; and (4) an injunction will not harm the interests of the public." *Cipla*, 2019 WL 2053055, at *1 (denying Amgen's motion for injunction under Rule 62(d) despite finding irreparable harm and balance of hardship in favor of granting the injunction, because Amgen failed to establish likelihood of success on appeal); *Sanofi-Aventis U.S. LLC v. Sandoz, Inc.*, No. 07-2762 (JAP), 2009 WL 1968900, at *2 (D.N.J. July 1, 2009) (a party seeking injunction pending appeal "bear[s] a very heavy burden of persuasion" (quoting *FTC v. Equitable Res., Inc.*, No. 07CV0490, 2007 WL 1500046 (W.D. Pa. May 21, 2007))); *see also Abbott Cardiovascular Sys., Inc. v. Edwards Lifesciences Corp.*, No. 19-149 (MN), 2019 WL 3855015, at *1 (D. Del. Mar. 5, 2019) (TRO "is governed by the same general standards that govern the issuance of a preliminary injunction" (quoting *Takeda Pharms. USA, Inc. v. West–Ward Pharm. Corp.*, No. 14-1268-SLR, 2014 WL 5088690, at *1 (D. Del. Oct. 9, 2014))).

At the preliminary injunction stage, if the alleged infringer presents an invalidity defense, "it is the patentee, the movant, who must persuade the court that, despite the challenge presented to validity, the patentee nevertheless is likely to succeed at trial on the validity issue." *Titan Tire Corp. v. Case New Holland, Inc.*, 566 F.3d 1372, 1377 (Fed. Cir. 2009).  Such persuasion requires the patentee to establish that the invalidity arguments lack substantial merit.  *Abbott Cardiovascular Sys., Inc. v. Edwards Lifesciences Corp.*, No. 19-149-MN, 2019 WL 2521305, at

*4 (D. Del. June 6, 2019) (denying plaintiff's motion for a preliminary injunction when plaintiff failed to show that defendant's obviousness challenge lacked substantial merit). The alleged infringer need only raise a "substantial question" concerning validity, enforceability, or infringement of the asserted patents to defeat preliminary injunction. *Genentech, Inc. v. Novo Nordisk A/S*, 108 F.3d 1361, 1364 (Fed. Cir. 1997) (vacating the grant of a preliminary injunction when defendant raised a substantial question of validity of the asserted patent). The "substantial question" standard is "lower than what is required to prove invalidity at trial." *Altana Pharma AG v. Teva Pharms. USA, Inc.*, 566 F.3d 999, 1005–06, 1010 (Fed. Cir. 2009) (affirming the district court's denial of a preliminary injunction when defendants "made out a sufficient case of obviousness").

## IV.   ARGUMENT

Alexion has fallen far short of its heightened burden to make a "strong showing" of a likelihood of success on its appeal to obtain the drastic remedy of injunction pending appeal. Alexion essentially repeats the same arguments presented in its PI Motion. For the same reasons this Court denied the PI Motion, an injunction pending appeal should also be denied.

### A.   Alexion Has Not Provided a "Strong Showing" of Likelihood of Success on the Merits on Appeal

Alexion has not demonstrated a likelihood of success on the merits on appeal. "[T]o obtain reversal [of the denial of a preliminary injunction], the movant must show not only that one or more of the findings relied on by the district court was clearly erroneous, but also that denial of the injunction amounts to an abuse of the court's discretion upon reversal of erroneous findings." *Reebok Int'l Ltd. v. J. Baker, Inc.*, 32 F.3d 1552, 1555 (Fed. Cir. 1994) (affirming the district court's denial of preliminary injunction because there was no clear error in finding no irreparable harm). Alexion has failed to show an abuse of discretion, let alone any legal or factual error in the

Court's denial of the PI Motion.  Therefore, Alexion failed to carry its burden to show a likelihood of success in reversing the Court's PI Order.

       1.        **The Court Correctly Concluded That The '189 IPR Institution Decision Raises a Substantial Question of Validity of the PNH Claim**

Neither of Alexion's two challenges to the Court's PI Order relating to the PNH claim is likely to succeed on appeal.  First, Alexion argues that the Court attributed undue weight to the '189 PTAB institution decision, because institution decisions are preliminary and do not require a clear and convincing evidence burden of proof.  D.I. 61 ("Op. Br.") at 4.  Alexion's argument ignores the Court's well-reasoned PI Order and the law establishing the correctness of relying on IPR institution decisions to establish a substantial question of validity in the preliminary injunction context.  *See* PI Order at 2-5.  The Court's reliance on the PTAB institution decision is particularly justifiable here, where the PTAB: (1) provided a thorough, highly technical analysis of the arguments in a 67-page decision; (2) concluded that Samsung had demonstrated a reasonable likelihood of showing unpatentability at trial on three separate Grounds; and (3) identified specific errors made by the patent Examiner during prosecution of the '189 patent.  *See* Samsung's Opp. Br. at 3-4, 9-12.  The Court recognized the "extensive analysis of the validity of the PNH claim" by the PTAB and pointed out that "Alexion has not presented compelling evidence that the PTAB instituted that IPR in error . . . ."  PI Order at 4.  Contrary to Alexion's suggestion, the Court did not consider the PTAB's institution decision as "binding on the court" but instead assessed the PTAB's embrace of Samsung's arguments for invalidity and concluded that Alexion had not presented compelling evidence challenging the PTAB's analysis.[1]

---

[1] The cases Alexion cites are inapposite.  *See* Op. Br. at 4.  In *Tinnus Enterprises, LLC v. Telebrands Corp.*, the PTAB instituted post-grant review ("PGR") *after* the district court granted an injunction, and the Federal Circuit recognized that the parties could ask the district court to reconsider its preliminary injunction in light of the PTAB'S Decision.  846 F.3d 1190, 1201-02 (Fed. Cir. 2017).  *Liqwd, Inc. v. L'Oreal USA, Inc.* relates to issues of trade secret misappropriation

The Court also properly recognized that Samsung is statistically very likely to prevail in its IPR.  As the Court acknowledged, "[i]n FY2023, over 77% of instituted claims were cancelled in a final written decision."  PI Order at 4 (citing D.I. 38, Ex. 10).  Alexion does not dispute this statistic in its Emergency Motion.

Alexion's second challenge to the Court's PI Order is also likely to fail on appeal, because it improperly dismisses the equitable nature of the injunction remedy.  Alexion argues that Samsung's invalidity defenses in its IPR "have no legal bearing on these preliminary injunction proceedings," because such arguments would not be available during a trial in district court.  Op. Br. at 4-6.  Alexion's audacious position is that it is entitled to the extraordinary remedy of preliminary injunction, ***even if it is likely that the PTAB will invalidate the '189 patent***.  Alexion argues, without any legal support, that "[t]he IPR estoppel statute supersedes judge-made law regarding the equities at the preliminary injunction stage."  *Id.* at 4.  This Court recognized the illogical consequences of Alexion's argument, observing that "[t]his argument oddly suggests that the Court should grant an injunction against nearly every party that achieves success at instituting an IPR if that party intends to present only an invalidity defense at trial, as that party would be unable to raise those defenses at trial."  PI Order at 4.  Implicit in the Court's statement is that Alexion's argument compels a court to provide the extraordinary remedy of an injunction to a patent owner who likely has an invalid patent.  Alexion asks the Court to ignore invalidity of the '189 patent, if the PTAB, rather than the district court, is likely to invalidate it.  This is improper. Granting an injunction under these circumstances would contravene justice rather than deliver

---

and breach of contract that the PTAB could not resolve and is not a preliminary injunction case. No. 17-14, 2018 WL 11189633, at *3 (D. Del. Dec. 12, 2018); *Genuine Enabling Tech., LLC v. Sony Corp.*, No. 17-135, 2020 WL 1140910, at *7 (D. Del. Mar. 9, 2020) relates to adopting the PTAB's claim construction and is not related to whether substantial questions of validity have been established.

justice, as equitable remedies are intended to do.

### 2.   The Court Could Also Conclude That Samsung's Other Arguments Raise a Substantial Question of Validity and Enforceability Regarding the PNH Claim

Separate from the IPR institution decision, Samsung presented additional arguments challenging the PNH Claim, based on obviousness and inequitable conduct, in opposition to Alexion's PI Motion.  Samsung's Opp. Br. at 9-13.  These arguments raise substantial questions of validity and enforceability that may be decided independent of the PTAB's IPR institution decision.  Should the Court revisit these arguments here, Samsung respectfully submits the Court will find further support for its prior finding that Alexion has not met its heavy burden to show likelihood of success on the merits of its PI claims.

### 3.   The Court Correctly Found a Substantial Question of Validity Regarding the aHUS Claim

This Court correctly found that Samsung raised a substantial question of validity of claim 1 of the '176 patent ("the aHUS claim") based on obviousness, relying on the combination of Noris (2005) and the SOLIRIS® label (2007).  PI Order at 5-7.  While the Court did not reach Samsung's theory of anticipation by Chatelet (2008), it noted that "the existence of a second invalidity theory strengthens the Court's conclusion that there is a substantial question of validity."  PI Order at 7 n.2.  Alexion has raised no clear error or abuse of discretion by the Court.  Nor does Alexion's Emergency Motion otherwise establish a "strong showing" of likelihood of success on appeal.  The aHUS claim is both obvious and anticipated for all the reasons presented in Samsung's Response to Alexion's PI Motion and accompanying declaration of Dr. John Bissler.  Samsung's Opp. Br.

at 13-19; D.I. 41 ("Bissler Decl."), ¶¶ 16-19, 75-128.  In addition, testimony provided by Dr. Josep

Miquel Blasco Pelicano ("Dr. Blasco") undercuts Alexion's arguments.[2]

<strong>a.      The aHUS Claim Is Obvious in View of Noris (2005) and the SOLIRIS® Label (2007)</strong>

Alexion does not dispute that both Noris (2005) and the SOLIRIS® label (2007) are prior

art to the '176 patent.  Alexion also does not dispute that a POSA would have been motivated to

combine Noris (2005) with the SOLIRIS® label (2007).  Rather, Alexion's sole argument is that

Noris (2005) merely expresses "hope," which Alexion asserts is not sufficient to establish a

reasonable expectation of success.  As the Court recognized, Alexion applies the wrong standard.

Applying the correct standard, the Court concluded that "a person of ordinary skill in the

art would have known that SOLIRIS was clinically safe and possessed a reasonable likelihood of

successfully treating aHUS by inhibiting the C5 pathway."  PI Order at 6.  Dr. Blasco's opinions

regarding a reasonable expectation of success should be disregarded because he applied the wrong

standard.  When asked during his deposition what would be required for a reasonable expectation

of success, Dr. Blasco responded that a POSA would need clinical evidence of efficacy and safety

of eculizumab in treating aHUS.  Blasco Dep. Tr. at 109:3-14.  Requiring such clinical evidence

is the standard for anticipation, not the standard for a reasonable expectation of success.  *See Pfizer,*

*Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1364 (Fed. Cir. 2007) (concluding that the district "clearly

erred" in finding non-obviousness because the district court's reasoning would require

"verifi[cation] through testing" to show reasonable expectation of success when "expectation of

success need only be reasonable, not absolute"); *Medichem, S.A. v. Rolabo, S.L.*, 437 F.3d 1157,

---

[2] Alexion submitted new arguments regarding validity of the aHUS claim and a declaration from Dr. Blasco in its Reply Briefing, contradicting earlier representations.  *See* Samsung's Opp. Br. at 13 n.6.  Although the briefing and hearing schedule did not allow for a sur-reply brief, Dr. Blasco was deposed on April 29, 2024.  Samsung provides excerpts from the transcript of that deposition in support of this brief.

1165 (Fed. Cir. 2006) (affirming the district court's finding of obviousness reasoning that "our case law makes clear that [reasonable expectation of success] does not require a *certainty* of success"). Moreover, Alexion's reliance in its brief on *Sanofi-Aventis U.S. LLC v. Sandoz, Inc.* is misplaced because the information forming a reasonable expectation of success here is different and more extensive than in *Sanofi-Aventis.* No. 20-804-RGA, 2023 WL 4175334, at *13-14 (D. Del. June 26, 2023). In *Sanofi-Aventis*, prior art Phase I and II clinical studies suggested some treatment effect for the claimed investigational drug in an unclaimed cancer. *Id.* In contrast, eculizumab was no longer an investigational drug as of the priority date of the '176 patent. Rather, it was an FDA approved marketed drug indicated for the treatment of another complement hyperactivation disease, PNH (at an approved dosing regimen that is the same as the base claimed dosing regimen), and the mechanism by which eculizumab achieved its therapeutic effects was known. *See, e.g.*, D.I. 39, Ex. 7 ("Soliris label (2007)"); Samsung's Opp. Br. at 14; Bissler Decl., ¶¶ 48-56, 125-126; D.I. 51 ("Blasco Decl."), ¶¶ 49-51; Blasco Dep. Tr. at 146:17-147:1, 148:9-149:4. Additionally, well before 2008, and as acknowledged by Alexion and its expert, Dr. Blasco, a POSA recognized that both PNH and aHUS were hemolytic disorders caused by hyperactivation of the complement system, the complement system was well characterized, and the defects in complement responsible for aHUS were known. *See* Samsung's Opp. Br. at 14; Bissler Decl., ¶¶ 57-64, 108-111; D.I. 39, Ex. 3 ("Noris (2005)"). Thus, Noris (2005) and the SOLIRIS® label (2007) provide more than mere "hope" for expectation of success, as this Court concluded. PI Order at 6-7.

Alexion incorrectly argues that Samsung offers only attorney argument in support of a reasonable expectation of success. Alexion ignores Dr. Bissler's declaration testimony, which this Court properly relied on—testimony that in Dr. Bissler's opinion a POSA would have had a

reasonable expectation of success of applying the approved dosing regimen for eculizumab for

PNH in the SOLIRIS® label (2007) to successfully treat aHUS.  PI Order at 6.  In his deposition,

Dr. Bissler also confirmed that the Noris (2005) authors believed eculizumab would be effective

in treating aHUS.  *See* Ex. B (Bissler Dep. Tr.) at 81:10-22.

Alexion also misstates Dr. Bissler's opinion on reasonable expectation of success.  His

opinion is not, as Alexion contends, simply based on a reference to "hope" in Noris (2005).

Instead, Dr. Bissler articulates the basis for a reasonable expectation of success as follows:

> In my opinion, one would first start with the FDA-approved dosing regimen of eculizumab for PNH, even to treat aHUS because the dosing regimen has already been found to be safe and effective in PNH patients and because of the similarities in the underlying cause of disease (complement system upstream hyperactivation and reduction of down-regulation). ***The fact that a POSA would have been aware that (1)*** eculizumab was known to block the pivotal cleavage step of C5 and the subsequent activation of the MAC complex of the complement system; ***(2)*** complement hyperactivation (or the reduction of down-regulation) was the underlying cause of the manifestation of both PNH and aHUS; ***(3)*** genetic mutations in complement components responsible for aHUS were upstream of eculizumab's site of action; ***(4)*** Noris (2005)'s express suggestion that eculizumab would be successful in treating aHUS; and ***(5)*** eculizumab was proven safe and effective for the treatment of PNH as of 2007 at the approved dosing regimen. ***This would have provided a POSA with a reasonable expectation of success that applying the approved dosing regimen for PNH would successfully treat aHUS***.

Bissler Decl., ¶ 126 (emphasis added).

Alexion ignores the extensive additional knowledge a POSA would have had beyond the

expression of hope from Noris (2005).  This knowledge included, for example, the mechanism of

action that formed the basis for eculizumab's therapeutic effects and the fact that eculizumab acted

downstream of known defects in the complement system that resulted in hyperactivation

consequently in aHUS.  Even Alexion's expert acknowledges these facts.  *See* Blasco Dep. Tr. at

146:17-148:1, 152:20-153:4, 149:5-9; Blasco Decl., ¶¶ 49-50.  Dr. Blasco also admits that a POSA

would have had at least a suspicion that eculizumab would treat aHUS.  Blasco Decl., ¶ 77; Blasco

Dep. Tr. at 103:18-104:14 (*see, e.g.*, "Q. Why would [a POSA] have made the hypothetical assumption that eculizumab could help treat aHUS in 2008?  A. Eculizumab blocks the terminal phase of the complement . . . ."). Alexion has not established that the Court clearly erred in finding that a POSA would have had a reasonable expectation of success, and the combination of Noris (2005) and SOLIRIS® label (2007) raise a substantial question of obviousness of the aHUS claim.

> **b.    The Court Should Revisit Samsung's Argument That Chatelet (2008) Presents a Substantial Question of Invalidity**

As presented in Samsung's Response to Alexion's PI Motion and declaration of Dr. Bissler, the aHUS claim is also invalid because it is not entitled to a priority date before November 10, 2009, and Chatelet (2008) discloses every element of the claim.  Samsung's Opp. Br. at 16-19; Bissler Decl., ¶¶ 65-67, 75-90, 96-105.  While the Court did not reach this issue in its PI Order, Samsung respectfully submits this invalidity argument raises additional substantial questions of validity, particularly in view of the new sworn testimony of Alexion's expert, Dr. Blasco.

As explained in Samsung's responsive brief, claim 1 is not entitled to a priority date earlier than the PCT filing date of the '176 patent on November 10, 2009.  Samsung's Opp. Br. at 16. None of the earlier priority applications supports the claimed maintenance dose of "at least 900 mg."  *Id*. at 17.  Alexion relies on its expert to argue that a POSA reading the "about 900 mg" in the '803 provisional (D.I. 39, Ex. 20) would understand the limitation to be interchangeable with the "at least 900 mg" claimed in the '176 patent.  D.I. 49 (Alexion's Reply Brief ISO PI Motion) at 7; Blasco Decl., ¶¶ 57-58.  But when Dr. Blasco was asked whether he believed "about" in the provisional to be the same as "at least" in the patent, he responded "I don't have an opinion in this regard because I did not write the documents."  Blasco Dep. Tr. at 52:3-17.  Moreover, Dr. Blasco's opinions regarding a POSA's understanding of the disclosures of the English language provisional and '176 patent should be given no weight because (1) Dr. Blasco is not a native English speaker;

(2) he communicates in either Spanish or Catalon at work and at home; (3) his deposition was conducted in Spanish; and (4) Dr. Blasco could only identify three paragraphs in his declaration that he had drafted, none of which were directed to the disclosure of the '803 provisional or the '176 patent. *Id.* at 13:1-14, 23:16-24:19. Therefore, Alexion cannot establish that the '176 patent is entitled to an earlier priority date than November 10, 2009, and Chatelet (2008) is prior art to the '176 patent.

Alexion does not dispute that Chatelet discloses every element of claim 1 of the '176 patent. And during his deposition Dr. Blasco confirmed that he never offers the opinion that Chatelet (2008) does not describe the method of treatment of claim 1. *Id.* at 58:2-9.

For the first time in its reply in support of its PI Motion, Alexion argued that



In fact, as confirmed by Dr. Blasco, Alexion's argument is pure speculation that should not be credited.

Alexion bears the burden of proving that it invented claim 1 of the '176 patent before Chatelet (2008), and mere speculation and conjecture cannot meet that burden. *Kenexa Brassring, Inc. v. Taleo Corp.*, 751 F. Supp. 2d 735, 753 (D. Del. 2010) (finding that the patent did not enjoy an earlier priority date because plaintiff failed to establish prior invention by clear and convincing evidence).

Therefore, Alexion has not provided a "strong showing" that the aHUS claim is not invalid based on anticipation by Chalet (2008).

### B. The Currently Scheduled Launch of SB12 Will Not Cause Alexion Any Imminent and Irreparable Harm

Although the Court did not need to reach the question of Irreparable Harm, Samsung reiterates its arguments here to emphasize that the Court's denial of the PI Motion is further justified by Alexion's failure to show irreparable harm if Samsung launches its biosimilar product, SB12. A party seeking a preliminary injunction must "make a 'clear showing' that it will suffer

irreparable harm and it is entitled to such relief." *Biogen Inc. v. Sandoz Inc.*, No. 22-1190-GBW, 2023 WL 7130655, at *2 (D. Del. June 29, 2023) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)).   The harm must be "immediate irreparable injury" that cannot be adequately compensated through monetary damages.  *Biogen*, 2023 WL 7130655, at *2 (quoting *Apple Inc. v. Samsung Elecs. Co.*, 695 F.3d 1370, 1374 (Fed. Cir. 2012)).  Lastly, there must be a causal nexus between the alleged infringement and the alleged harm.  *Biogen*, 2023 WL 7130655, at *2.

   ***First***, as a threshold matter, Alexion's composition of matter patents covering eculizumab began expiring in 2021 (D.I. 40, Ex. 35 (Alexion 2019 10-K) at 10), and its rush to settle Amgen's IPRs—and the PTAB's decisions to institute Samsung's IPRs—underscore that Alexion has no *valid* patent rights remaining that justify excluding Samsung's SB12 biosimilar from the market.

   ***Second***, Alexion's willingness to grant Amgen a royalty-free license to market its eculizumab biosimilar on March 1, 2025—two years before the expiration of the earliest-to-expire patents-in-suit—is completely inconsistent with its allegations of irreparable harm. The Amgen license *allows* the very same biosimilar competition that Alexion contends this Court should enjoin.  D.I. 39, Ex. 9 (Amgen License), §§ 4(a)-(b) (granting Amgen a royalty-free license to commercialize Amgen Eculizumab Products beginning March 1, 2025; D.I. 18 (Thomas Decl.), ¶ 13 n.35 (noting patent expiration dates).

   ***Third***, and as explained in more detail below, Alexion's actions undermine its claims of irreparable harm for these additional reasons: (i) Alexion delayed filing its PI motion for seven months without any justification; (ii) Alexion █████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████; and

(iii) Alexion's allegations of non-financial reputational harm from SB12's launch are speculative and unsupported by any evidence, and its allegations of harm to its workforce are refuted by the company's own documents.

Whether they are considered on a standalone basis or together, each of these reasons provides an ample basis to find that Alexion has not shown irreparable harm.

> **1.    Alexion's Lengthy, Unexplained Delay in Filing Suit and Seeking a Preliminary Injunction Contradicts Its Allegations of Irreparable Harm**

Alexion's seven-month delay in filing a PI motion weighs heavily against its claim of irreparable harm. *See Pfizer, Inc. v. Teva Pharms., USA, Inc.*, 429 F.3d 1364, 1382 (Fed. Cir. 2005) ("[E]vidence that a patent owner unduly delays in bringing suit against an alleged infringer negates the idea of irreparability."). Once Alexion received Samsung's notice of commercial marketing on July 7, 2023, notifying Alexion that it would not launch SB12 before the end of 180 days (January 3, 2024), it should have filed a PI motion as soon as possible, as contemplated by the BPCIA statute.[3] *See* 42 U.S.C. § 262(*l*)(8)(B) ("After receiving the [notice of commercial marketing] and *before such date of the first commercial marketing of such* biological product, the reference product sponsor may seek a preliminary injunction . . . ." (emphasis added)). The Federal Circuit has explained that the 180-day period triggered by the BPCIA's notice of commercial marketing "gives the parties and the district court the time for adjudicating such matters without the reliability-reducing rush that would attend requests for relief against immediate market entry that could cause irreparable injury." *Amgen Inc. v. Apotex Inc.*, 827 F.3d 1052, 1063 (Fed. Cir. 2016) (holding that defendant is required to give notice of commercial marketing under § 262(*l*)(8)(A) to allow the patent owner 180 days to seek a preliminary injunction). Here, Alexion

---

[3] Notwithstanding Alexion's unexplained delay in presenting this Motion, ███████████████ ███████████████████████████████████████████████████████

delayed filing its complaint until the very last day of the 180-day period (D.I. 1 (filed Jan. 3, 2024))

and waited another month to file its PI motion.  Alexion's lack of urgency in filing this motion,

"particularly in light of relevant provisions under the BPCIA, should be sufficient by itself to deny

the motion." *Genentech, Inc. v. Amgen Inc.*, No. 18-924-CFC, 2019 WL 3290167, at *3 (D. Del.

July 18, 2019), *aff'd*, 796 F. App'x 726 (Fed. Cir. 2020) (denying defendant's motion for a

preliminary injunction because plaintiff's delay in seeking a preliminary injunction disproved

existence of irreparable harm).

2.    <strong>Alleged Lost Sales and Price Erosion Will Be Quantifiable</strong>

Alexion's alleged lost sales and price erosion attributable to SB12 will be quantifiable (and

therefore not irreparable) for two reasons:  ***First***, Alexion's settlement and license agreement with

Amgen ████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████  "The

availability of adequate monetary damages belies a claim of irreparable injury."  *Biogen*, 2023 WL

7130655, at *4 (quoting *Takeda*, 967 F.3d at 1349).

***Second***, the experts for both parties agree that the information necessary to calculate lost

profit and price erosion damages with reasonable certainty would be available by the time of trial.

D.I. 40, Ex. 36 (Thomas Dep. Tr.) at 25:2-12 (Alexion's damages expert Vincent Thomas admitting that "I would be able to calculate" Alexion's lost profits and price erosion damages by the time of trial); D.I. 42 ("Rao Decl."), ¶¶ 40-57 (explaining that damages could be calculated with reasonable certainty by the time of trial); *see* Rao Decl., ¶ 46 ███████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

█████████████

### 3.     Alexion's Alleged Harms to Goodwill and Alleged Impacts from Workforce Redeployment Are Speculative

Alexion's assertion that its reputation as an innovator would be irreparably harmed by SB12's launch is contradicted by its willingness to license Amgen to sell its eculizumab biosimilar at least two years before the expiration of its eculizumab patents. *See* D.I. 18 (Thomas Decl.), ¶ 13 n.35 (noting patent expiration dates).  Mr. Thomas, Alexion's expert, conceded that his opinions on harm to goodwill are not substantiated by any Alexion document or witness interview.  D.I. 40, Ex. 36 (Thomas Dep. Tr.) at 90:10-13 ("Q. Did you speak with any employee of Alexion concerning the potential impacts to reputation and goodwill that would manifest from a launch of SB12?  A. I did not.").  And Alexion's claim that SB12's launch would cause Alexion irreparable harm by preventing it from redeploying its workforce is unsupported by any evidence.  D.I. 40, Ex. 36 (Thomas Dep. Tr.) at 90:14-25 ("Q. Did you speak with any employee of Alexion regarding redeployment of Alexion's workforce that might be necessitated by the launch of SB12? A. I did not. Q. Did you look at any Alexion or third-party business advisor document that addresses whether Alexion will need to redeploy workforce as a result of Eculizumab biosimilar launching? A. There's no document that is based on the assumption of SB12 launching, so the documents

would not reflect that scenario. So I can't say that such documents exist."). 

D.I. 40, Ex. 36 (Thomas Dep. Tr.) at 102:18-22 ("Q. Okay. Have you seen any Alexion document that projects workforce reduction, as opposed to redeployment, as a result of biosimilar entry?  A. As I said, that there are certain line items on this chart -- well, no, I don't."); *see also* Rao Decl., ¶¶ 58-60.

### 4. Alexion Failed to Carry Its Burden of Showing a Nexus Between Its Alleged Irreparable Harms and the PI Claims

Alexion has also failed to carry its burden of showing a nexus between its alleged harms and the alleged inventions in its PNH and aHUS claims.  "Causal nexus requires some connection between the alleged infringement and harm such 'that the infringing feature drives consumer demand for the accused product.'"  *Biogen*, 2023 WL 7130655, at *4 (quoting *Apple Inc.*, 695 F.3d at 1375).  Harm cannot be presumed.

Internally, Alexion has identified branded competition—not biosimilars—as the primary threat to its SOLIRIS® and ULTOMIRIS® products.

---

[4] Fabhalta® was FDA approved and launched in December 2023.  *See* D.I. 40, Ex. 41.

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████ Alexion's motion ignores the

reality that nearly all of the lost sales it forecast will be lost to branded drugs, not biosimilars.  As

a result of that oversight, Alexion failed to carry its burden of showing any nexus between its

alleged irreparable harms and the alleged infringement of the patents asserted in its motion.  D.I.

40, Ex. 36 (Thomas Dep. Tr.) 35:12-25 (admitting failure to parse out competitive impacts from

branded competition).  Alexion also failed to prove that the patents asserted in its motion are the

basis of customer demand for SB12, versus its composition of matter patent covering the

eculizumab, which began expiring in 2021 (D.I. 40, Ex. 35 at 10), or the other patents it owns.

D.I. 40, Ex. 36 (Thomas Dep. Tr.) at 84:16-86:13 (admitting failure to tie alleged harms to

infringement of asserted patents); *see also* Rao Decl., ¶¶ 61-62; *see Biogen*, 2023 WL 7130655, at

*4 ("Causal nexus requires some connection between the alleged infringement and harm such 'that

the infringing feature drives consumer demand for the accused product.'").

### C.     The Balance of Equities Favors Denying Alexion's Motion

The balance of the equities and hardships tips strongly in Samsung's favor.  Alexion's only

alleged hardship is the "los[s] [of] the value of its hard-earned intellectual property reflecting

decades of investment and innovation."  Op. Br. at 12.  But Alexion's key patents covering the

composition of eculizumab began expiring in 2021.  Rao Decl., ¶ 62 (citing D.I. 40, Ex. 35

---

[5] Alexion's arguments regarding irreparable harm to ULTOMIRIS® are speculative. ████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████ D.I. 40, Ex. 36
(Thomas Dep. Tr.) at 98:16-99:3, 100:1-23 (admitting ULTOMIRIS®' benefits.)

(Alexion 10K (2019)).  And Alexion has already granted Amgen a royalty-free license to enter the market years before the expiration of these patents, which undermines its arguments about the balance of equities.

      **D.**    **Denying Alexion's Preliminary Injunction Would Promote the Public Interest**

Any injunction preventing Samsung from selling SB12 is against the public interest. Alexion's composition of matter patents began expiring in 2021.  *Id.*  The PI Claims cover using the antibodies for only two of the four FDA-approved uses.  As this Court has recently recognized "[f]or pharmaceutical drugs that prolong and save lives, there is a critical public interest in affordable access to those drugs."  *Biogen*, 2023 WL 7130655, at *10 (quoting *Genentech, Inc. v. Immunex Rhode Island Corp.*, 395 F. Supp. 3d 357, 366 (D. Del. 2019), *aff'd*, 964 F.3d 1109 (Fed. Cir. 2020)).[6]  Samsung is committed to providing affordable biosimilars, such as SB12, to patients. The interest of a pharmaceutical company in maintaining its revenue and market share, on facts such as here, should not forestall access to FDA-approved, less expensive drugs for the public at large.

**V.**    **CONCLUSION**

Based on the foregoing, Plaintiffs' motion for injunction pending appeal and temporary restraining order pending resolution of this motion should be denied.

---

[6] *Pfizer Inc. v. Teva Pharmaceuticals*, 429 F.3d 1364 (Fed. Cir. 2005) does not hold otherwise; rather, *Pfizer* stands for the proposition that, where the movant can show irreparable harm and a likelihood of success on the merits, a preliminary injunction may be appropriate in a pharmaceutical setting.  That is not the case here.

ASHBY & GEDDES

*/s/ Andrew C. Mayo*

Of Counsel:

_____

Andrew C. Mayo (#5207)

Michelle Rhyu
500 Delaware Avenue, 8th Floor

Daniel Knauss
P.O. Box 1150

COOLEY LLP
Wilmington, DE  19899

3175 Hanover Street
(302) 654-1888

Palo Alto, CA 94304-1130
amayo@ashbygeddes.com

(650) 843-5000

rhyums@cooley.com
*Attorneys for Defendant Samsung Bioepis Co. Ltd.*

dknauss@cooley.com

Jonathan Davies
COOLEY LLP
1299 Pennsylvania Avenue, NW, Suite 700
Washington, DC 20004-2400
(202) 842-7800
jdavies@cooley.com

Orion Armon
COOLEY LLP
1144 15th St., Suite 2300
Denver, CO 80202
(720) 566-4000
oarmon@cooley.com

Brianna Patterson
COOLEY LLP
30 South 9th Street 7th Floor
Minneapolis, MN 55402
(312) 881-6381
bchamberlin@cooley.com

Dated:  May 31, 2024

## CERTIFICATE OF SERVICE

I hereby certify that on the 31st day of May, 2024, the attached **SAMSUNG BIOEPIS**

**CO. LTD.'S OPPOSITION TO PLAINTIFFS' EMERGENCY MOTION FOR**

**INJUNCTION PENDING APPEAL AND TEMPORARY RESTRAINING ORDER**

**PENDING RESOLUTION OF THIS MOTION** was served upon the below-named counsel of

record at the address and in the manner indicated:

Daniel M. Silver, Esquire                          <u>VIA ELECTRONIC MAIL</u>
MCCARTER &ENGLISH, LLP
Renaissance Centre
405 N. King St, 8th Floor
Wilmington, DE 19801

Gerald J. Flattmann, Jr., Esquire                  <u>VIA ELECTRONIC MAIL</u>
CAHILL GORDON & REINDEL LLP
32 Old Slip
New York, NY 10005


                                                   */s/ Andrew C. Mayo*
                                                   _____
                                                   Andrew C. Mayo

# EXHIBIT A

# REDACTED IN ITS ENTIRETY

# EXHIBIT B

# REDACTED IN ITS ENTIRETY

# EXHIBIT H



DISORDERS OF RED CELL REGULATION AND PRODUCTION  |    NOVEMBER 16, 2008

# Efficacy of Eculizumab in a Plasmatherapy-Dependent Patient with Atypical Hemolytic Uremic Syndrome with C3 Mutation Following Plasmatherapy Withdrawal

Valerie Chatelet, MD,[1,*]   Veronique Fremeaux-Bacchi, MD, PhD,[2,*]
Maxence Ficheux, MD,[1,*]   Thierry Lobbedez, MD,[1,*]   Bruno Hurault-Deligny, MD[1,*]

[1]Nephrology Department, CHU Clemenceau, Caen, France

[2]Immunology Department, HEGP, Paris, France

*Blood* (2008) 112 (11) : 4579.

http://doi.org/10.1182/blood.V112.11.4579.4579

## Abstract

Atypical hemolytic uremic syndrome (aHUS) is a rare microangiopathic hemolytic anemia characterized by chronic intravascular hemolysis, consumptive thrombocytopenia, microvascular glomerular thrombosis and acute renal failure. Atypical HUS develops as the result of unregulated complement activation either through genetic abnormalities in one or more complement proteins or more rarely the development of autoantibodies to complement factor H. Complement dysregulation has been shown to cause cause subendothelium exposure and activation of platelets resulting in a chronic proinflammatory and prothrombotic state. The prognosis for aHUS is poor as 25% of patients die during acute phases of the disease and 50% progress to end-stage-renal disease. In addition, the majority of renal transplants result in loss of the graft. Plasmatherapy (PT), either plasmapheresis, plasma infusion, or both, is currently used in an attempt to control complement activation and thereby reduce the thrombotic microangiopathy (TMA) and declining renal function, but this therapy is cumbersome and not effective in all patients. Eculizumab, an antibody targeting complement C5, blocks activation of terminal complement and generation of the proinflammatory and prothrombotic molecules C5a and C5b-9. In previous studies eculizumab significantly blocked complement-mediated hemolysis in patients with paroxysmal nocturnal hemoglobinuria, subsequently reducing thrombotic events and improving renal function. In this study, we report the first case of eculizumab treatment in a patient with recurrent aHUS after renal transplantation who refused further PT. The patient is a 42-year-old female diagnosed with a familial form of aHUS with a C3 mutation leading to a binding defect between C3b and the complement control molecules

factor H and membrane cofactor protein. The patient showed reduced serum levels of C3c (670 mg/L) suggesting C3 consumption. The patient had received 2 previous renal transplants, the last of which was performed in 2004; aHUS recurred after each transplant and required PT. In March 2007 the patient experienced an acute episode of aHUS and received 2 intensive PT sessions (60 treatments over 9 mos) to resolve the recurrence. In April 2008, the patient presented with septicemia and acute renal failure and was hospitalized for 10 days. In May 2008 her platelet count dropped to $170 \times 10^9$/L, haptoglobin became undetectable (< 0.15 g/L), and schistocytes increased to 3.7% suggesting an acute TMA exacerbation, confirmed by renal biopsy. Plasmatherapy was initiated with a course of high dose steroids and IV immunoglobulins. The administration of frequent PT treatments (16 treatments over 5 weeks) resulted in an improvement in the ongoing TMA. However, despite intensive PT, the patient continued to suffer from severe fatigue and daily episodes of diarrhea and chose to discontinue this therapy. As a result, disease deterioration was observed (see 10 Days of No PT in Table). The clinical deterioration established the need for an alternative treatment to reduce TMA and stabilize renal function. PT (3 treatments) was performed as a bridging treatment to eculizumab. Treatment with eculizumab was initiated 4 days following the last PT. The patient received a meningococcal vaccine 4 days prior to treatment with eculizumab and then prophylactic antibiotics (ciprofloxacin) after the vaccination. The patient received 4 doses of eculizumab, 900 mg IV approximately every 7 days, and then 1200 mg 7 days later, and is scheduled to receive chronic dosing at 1200 mg every 14 days. Platelet count, hemolysis and renal function were monitored. After one month of eculizumab treatment, and without concomitant PT, platelet count increased (range from 227 to $284 \times 10^9$/L), schistocytes decreased to 0.8% and haptoglobin increased to within normal limits (1.5 g/L; see "Ecu Dose 5"). Levels of C3c fluctuated between 420 and 690 mg/L, creatinine levels were stable and no further episodes of diarrhea were reported. In summary, the data suggest that chronic blockade of complement C5 with eculizumab maintained renal function and reduced platelet consumption and hemolysis without PT in a patient with aHUS previously dependent on frequent PT. Based on these results clinical trials are warranted to confirm the activity of eculizumab for the treatment of patients with recurrent aHUS that are dependent on PT.

Table.

| Parameter (normal ranges) | March 18th | April 14th | April 25th | May 19th | June 22nd | June 30th | July 4th | July 8th | July 23rd | July 31st | August 17th |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Admitted to Hospital | Hospital Discharge | PT initiation 3 times/week | PT Discontinuation | without PT 15 days | PT 3 times/ 6 days | Ecu Dose 1 900mg 4 Days w/out PT | Ecu Dose 3 900mg 21 Days w/out PT | Ecu Dose 4 900mg 27 Days w/out PT | Ecu Dose 5 1200mg 34 Days w/out PT |
| Platelets (145-450x10^9/L) | 257 | 289 | 347 | 170 | 242 | 178 | 158 | 201 | 273 | 284 | 227 |
| Creatinine (40-100 µmol/L) | 183 | 441 | 388 | 362 | 296 | 312 | 318 | 303 | 339 | - | 317 |
| Haptoglobin (0.5-1.5 g/L) | 0.97 | 2.94 | 0.27 | < 0.15 | 0.91 | 0.69 | 0.75 | 0.84 | 0.97 | 0.92 | 1.5 |
| Schistocytes (%) | 0.3 | 0.5 | 1.8 | 3.7 | 0.5 | 1.1 | 1.4 | 1.0 | 0.6 | 0.8 | 0.8 |
| C3c (760-1460 mg/l) | 670* | - | - | 680 | - | - | 610 | 690 | | 480 | 630 |

PT – plasmatherapy; Ecu – eculizumab

**Disclosures:** No relevant conflicts of interest to declare.

# Author notes

Corresponding author

© 2008 by the American Society of Hematology

# EXHIBIT I

# Document made available under the Patent Cooperation Treaty (PCT)

International application number:   PCT/US2009/063929

International filing date:          10 November 2009 (10.11.2009)

Document type:        Certified copy of priority document

Document details:     Country/Office:   US
                      Number:           61/198,803
                      Filing date:      10 November 2008 (10.11.2008)

Date of receipt at the International Bureau:   20 November 2009 (20.11.2009)

Remark:     Priority document submitted or transmitted to the International Bureau in
            compliance with Rule 17.1(a) or (b)



World Intellectual Property Organization (WIPO) - Geneva, Switzerland
Organisation Mondiale de la Propriété Intellectuelle (OMPI) - Genève, Suisse



213730

# THE UNITED STATES OF AMERICA

## TO ALL TO WHOM THESE PRESENTS SHALL COME:

UNITED STATES DEPARTMENT OF COMMERCE

United States Patent and Trademark Office

*November 19, 2009*

**THIS IS TO CERTIFY THAT ANNEXED HERETO IS A TRUE COPY FROM THE RECORDS OF THE UNITED STATES PATENT AND TRADEMARK OFFICE OF THOSE PAPERS OF THE BELOW IDENTIFIED PATENT APPLICATION THAT MET THE REQUIREMENTS TO BE GRANTED A FILING DATE.**

**APPLICATION NUMBER:** *61/198,803*
**FILING DATE:** *November 10, 2008*
**RELATED PCT APPLICATION NUMBER:** *PCT/US09/63929*

**THE COUNTRY CODE AND NUMBER OF YOUR PRIORITY APPLICATION, TO BE USED FOR FILING ABROAD UNDER THE PARIS CONVENTION, IS *US61/198,803***

Certified by

**Under Secretary of Commerce
for Intellectual Property
and Director of the United States
Patent and Trademark Office**


04772  U.S. PTO
·111008

**U.S. PTO**
**61/198803**
**11/10/2008**

PTO/SB/16 (10-08)
Approved for use through 06/30/2010. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

## PROVISIONAL APPLICATION FOR PATENT COVER SHEET – Page 1 of 2
This is a request for filing a PROVISIONAL APPLICATION FOR PATENT under 37 CFR 1.53(c).

Express Mail Label No. _____ EV521708867US _____

| INVENTOR(S) | | |
|---|---|---|
| Given Name (first and middle [if any] ) | Family Name or Surname | Residence (City and either State or Foreign Country) |
| Russell P. | Rother | Prospect, Connecticut |
| | | |
| | | |
| | | |

*Additional inventors are being named on the _____ separately numbered sheets attached hereto*

### TITLE OF THE INVENTION (500 characters max):
METHODS AND COMPOSITIONS FOR TREATING ATYPICAL HEMOLYTIC UREMIC SYNDROME

*Direct all correspondence to:*     **CORRESPONDENCE ADDRESS**

[X] The address corresponding to Customer Number:    28120
*OR*

[ ] Firm or Individual Name

Address

| City | State | Zip |
|---|---|---|
| Country | Telephone | Email |

### ENCLOSED APPLICATION PARTS (check all that apply)

[ ] Application Data Sheet. See 37 CFR 1.76     [ ] CD(s), Number of CDs
[ ] Drawing(s) *Number of Sheets*     [X] Other (specify) Sequence Listing (28 pages)
[X] Specification (e.g. description of the invention) *Number of Pages* 53

**Fees Due:** Filing Fee of $220 ($110 for small entity). If the specification and drawings exceed 100 sheets of paper, an application size fee is also due, which is $270 ($135 for small entity) for each additional 50 sheets or fraction thereof. See 35 U.S.C. 41(a)(1)(G) and 37 CFR 1.16(s).

### METHOD OF PAYMENT OF THE FILING FEE AND APPLICATION SIZE FEE FOR THIS PROVISIONAL APPLICATION FOR PATENT

[X] Applicant claims small entity status. See 37 CFR 1.27.

[ ] A check or money order is enclosed to cover the filing fee and application size fee (if applicable).    110.00

[ ] Payment by credit card. Form PTO-2038 is attached.    **TOTAL FEE AMOUNT ($)**

[X] The Director is hereby authorized to charge the filing fee and application size fee (if applicable) or credit any overpayment to Deposit Account Number: 18-1945 .

*USE ONLY FOR FILING A PROVISIONAL APPLICATION FOR PATENT*

I hereby certify that this paper (along with any paper referred to as being attached or enclosed) is being deposited with the U.S. Postal Service as Express Mail, Airbill No. EV521708867US, on the date shown below in an envelope addressed to:
Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.

Dated: 11/10/08     Signature: *Andrea Borden* (Andrea Borden)

11399299_1.DOC

*PROVISIONAL APPLICATION COVER SHEET*
*Page 2 of 2*

PTO/SB/16 (10-08)
Approved for use through 06/30/2010.  OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

The invention was made by an agency of the United States Government or under a contract with an agency of the United States Government.

[x] No.

[ ] Yes, the name of the U.S. Government agency and the Government contract number are:

_____

### WARNING:

Petitioner/applicant is cautioned to avoid submitting personal information in documents filed in a patent application that may contribute to identity theft.  Personal information such as social security numbers, bank account numbers, or credit card numbers (other than a check or credit card authorization form PTO-2038 submitted for payment purposes) is never required by the USPTO to support a petition or an application. If this type of personal information is included in documents submitted to the USPTO, petitioners/applicants should consider redacting such personal information from the documents before submitting them to the USPTO.  Petitioner/applicant is advised that the record of a patent application is available to the public after publication of the application (unless a non-publication request in compliance with 37 CFR 1.213(a) is made in the application) or issuance of a patent.  Furthermore, the record from an abandoned application may also be available to the public if the application is referenced in a published application or an issued patent (see 37 CFR 1.14).  Checks and credit card authorization forms PTO-2038 submitted for payment purposes are not retained in the application file and therefore are not publicly available.

| | | | |
|---|---|---|---|
| SIGNATURE | *Jennifer K Holmes* | Date | November 10, 2008 |
| TYPED or PRINTED NAME | Jennifer K. Holmes, Ph.D., J.D. | REGISTRATION NO. *(if appropriate)* | 46,778 |
| TELEPHONE | (617) 951-7933 | Docket Number: | ALXN-136-001 |

11399299_1.DOC

PTO/SB/17 (10-08)
Approved for use through 06/30/2010.  OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no person are required to respond to a collection of information unless it displays a valid OMB control number

| **FEE TRANSMITTAL**<br>**For FY 2009**<br><br>*Effective on 12/08/2004.*<br>*Fees pursuant to the Consolidated Appropriations Act, 2005 (H.R. 4818).* | **Complete if Known** | |
|---|---|---|
| | Application Number | Not Yet Assigned |
| | Filing Date | Herewith |
| | First Named Inventor | Russell P. Rother |
| | Examiner Name | Not Yet Assigned |
| [x] Applicant claims small entity status. See 37 CFR 1.27 | Art Unit | N/A |
| **TOTAL AMOUNT OF PAYMENT**       **($)** 110.00 | Attorney Docket No. | ALXN-136-001 |

**METHOD OF PAYMENT** (check all that apply)

[ ] Check   [ ] Credit Card   [ ] Money Order   [ ] None   [ ] Other (please identify): _____

[x] Deposit Account   Deposit Account Number: 18-1945        Deposit Account Name: Ropes & Gray LLP

For the above-identified deposit account, the Director is hereby authorized to: (check all that apply)

[x] Charge fee(s) indicated below                              [ ] Charge fee(s) indicated below, except for the filing fee

[x] Charge any additional fee(s) or underpayments of     [x] Credit any overpayments
fee(s) under 37 CFR 1.16 and 1.17

**FEE CALCULATION**

**1. BASIC FILING, SEARCH, AND EXAMINATION FEES**

| Application Type | FILING FEES Fee ($) | FILING FEES Small Entity Fee ($) | SEARCH FEES Fee ($) | SEARCH FEES Small Entity Fee ($) | EXAMINATION FEES Fee ($) | EXAMINATION FEES Small Entity Fee ($) | Fees Paid ($) |
|---|---|---|---|---|---|---|---|
| Utility | 330 | 165 | 540 | 270 | 220 | 110 | _____ |
| Design | 220 | 110 | 100 | 50 | 140 | 70 | _____ |
| Plant | 220 | 110 | 330 | 165 | 170 | 85 | _____ |
| Reissue | 330 | 165 | 540 | 270 | 650 | 325 | _____ |
| Provisional | 220 | 110 | 0 | 0 | 0 | 0 | 110.00 |

**2. EXCESS CLAIM FEES**

| Fee Description | | Fee ($) | Small Entity Fee ($) |
|---|---|---|---|
| Each claim over 20 (including Reissues) | | 52 | 26 |
| Each independent claim over 3 (including Reissues) | | 220 | 110 |
| Multiple dependent claims | | 390 | 195 |

| Total Claims | Extra Claims | Fee ($) | Fee Paid ($) | Multiple Dependent Claims | |
|---|---|---|---|---|---|
| _____ - or HP = _____ x _____ = _____ | | | | Fee ($) | Fee Paid ($) |
| HP = highest number of total claims paid for, if greater than 20. | | | | _____ | _____ |

| Indep. Claims | Extra Claims | Fee ($) | Fee Paid ($) |
|---|---|---|---|
| _____ - or HP = _____ x _____ = _____ | | | |
| HP = highest number of independent claims paid for, if greater than 3. | | | |

**3. APPLICATION SIZE FEE**

If the specification and drawings exceed 100 sheets of paper (excluding electronically filed sequence or computer listings under 37 CFR 1.52(e)), the application size fee due is $270 ($135 for small entity) for each additional 50 sheets or fraction thereof.  See 35 U.S.C. 41(a)(1)(G) and 37 CFR 1.16(s).

| Total Sheets | Extra Sheets | Number of each additional 50 or fraction thereof | Fee ($) | Fee Paid ($) |
|---|---|---|---|---|
| 81 - 100 = _____ | /50 = _____ | (round up to a whole number) x | _____ = | _____ |

**4. OTHER FEE(S)**

Non-English Specification,  $130 fee (no small entity discount)                          Fees Paid ($)

Other (e.g., late filing surcharge): _____          _____

**SUBMITTED BY**

| Signature | *[signature]* | Registration No. (Attorney/Agent) | 46,778 | Telephone | (617) 951-7933 |
|---|---|---|---|---|---|
| Name (Print/Type) | Jennifer K. Holmes, Ph.D., J.D. | | | Date | November 10, 2008 |

---

I hereby certify that this paper (along with any paper referred to as being attached or enclosed) is being deposited with the U.S. Postal Service as Express Mail, Airbill No. EV521708867US, on the date shown below in an envelope addressed to:
Commissioner for Patents, P.O. Box 1450, Alexandria, VA  22313-1450.

Dated: 11/10/08       Signature: *Andrea Borden* (Andrea Borden)

11399302_1.DOC

Express Mail Label No. EV521708867US                              ALXN-136-001

# METHODS AND COMPOSITIONS FOR TREATING ATYPICAL HEMOLYTIC UREMIC SYNDROME

5                                    Technical Field

The field of the invention is medicine, immunology, molecular biology, and protein chemistry.

## Background

The hemolytic uremic syndrome (HUS) is characterized by thrombocytopenia,
10    microangiopathic hemolytic anemia, and acute renal failure.  HUS is classified as one of two types: diarrheal-associated (D+ HUS) and non-diarrheal or atypical HUS (aHUS). D+ HUS is the most common form, accounting for greater than 90% of cases and is caused by a preceding illness with a shiga-like toxin-producing bacterium, e.g., *E. coli* O157:H7.  aHUS is rare and has a mortality rate of up to 25%.  Many patients with this
15    disease will sustain permanent neurological or renal impairment, e.g., at least 50% of aHUS patients progress to end-stage renal failure (ESRF) (see, e.g., Kavanagh et al. (2006) *British Medical Bulletin* 77 and 78:5-22).

aHUS can be genetic, acquired, or idiopathic.  Hereditable forms of aHUS can be associated with mutations in a number of human complement components including, e.g.,
20    complement factor H (CFH), membrane cofactor protein (MCP), complement factor I (CFI), C4b-binding protein (C4BP), complement factor B (CFB), and complement component 3 (C3).  See, e.g., Caprioli et al. (2006) *Blood* 108:1267-1279.  Certain mutations in the gene encoding CD55, though not yet implicated in aHUS, are associated with the severity of aHUS (see, e.g., Esparza-Gordillo et al. (2005) *Hum. Mol. Genet.*
25    14:703-712).

Treatment options for patients with aHUS are limited and generally involve plasma infusion or plasma exchange.  Other treatments include, e.g., use of anti-platelet agents, prostacyclin, heparin, fibrinolytic agents, and/or steroids.  (See, e.g., Ruggenenti et al. (2001) *Kidney Int.* 60:831-46).  In some cases, aHUS patients undergo uni- or
30    bilateral nephrectomy or renal transplantation (see Artz et al. (2003) *Transplantation* 76:821-826).  However, recurrence of the disease in treated patients is common.

Express Mail Label No. EV521708867US                                    ALXN-136-001

Accordingly, there has thus been a long felt need for new approaches and better methods
to treat patients with aHUS.

## Summary

5        The present disclosure relates to compositions containing an inhibitor of human
complement component C5 and use of the compositions in methods for treating or
preventing atypical hemolytic uremic syndrome (aHUS).  In some embodiments, the
compositions contain an antibody, or antigen-binding fragment thereof, that binds to a
human complement component C5 protein.

10        In one aspect, the disclosure provides a method for treating atypical hemolytic
uremic syndrome (aHUS) in a human.  The method includes administering to a human in
need thereof a therapeutically effective amount of a composition comprising an inhibitor
of human complement component C5.

        In another aspect, the disclosure features a method for treating atypical hemolytic
15      uremic syndrome (aHUS) in a human, which method includes administering to a human
in need thereof a composition comprising a therapeutically effective amount of an
inhibitor of human complement component C5.

        In some embodiments of any of the methods described herein, the inhibitor can
inhibit the expression of a human complement component C5 protein.  The inhibitor can
20      inhibit the protein expression of a human complement component C5 protein or inhibit
the expression of an mRNA encoding the protein.  In some embodiments of any of the
methods described herein, the inhibitor can inhibit the cleavage of human complement
component C5 to form C5a and C5b.

        In some embodiments of any of the methods described herein, the inhibitor can be
25      selected from the group consisting of a polypeptide, a polypeptide analog, a nucleic acid,
a nucleic acid analog, and a small molecule.  The polypeptide can be, or consist of, an
antibody, or antigen-binding fragment thereof, that binds to a human complement
component C5 protein such as any of those described herein.  In some embodiments, the
antibody can bind to the alpha chain of the complement component C5 protein.  In some
30      embodiments, the antibody can bind to the beta chain of the complement component C5
protein.  In some embodiments, the antibody can bind to the alpha chain of human

complement component C5, and the antibody can (i) inhibit complement activation in a human body fluid, (ii) inhibit the binding of purified human complement component C5 to either human complement component C3 or human complement component C4, and/or (iii) not bind to the human complement activation product free C5a (or a combination of

5      any of the foregoing properties).  The antibody can bind to the human complement component C5 protein having, or consisting of, the amino acid sequence depicted in any one of SEQ ID NOs:1-11.  The antibody can bind to an isolated oligopeptide comprising an amino acid sequence corresponding to amino acid position 8 through amino acid position 12 of SEQ ID NO:5.  In some embodiments, the antibody can be a monoclonal

10     antibody, a single-chain antibody, a humanized antibody, a fully human antibody, a polyclonal antibody, a recombinant antibody, a diabody, a chimerized or chimeric antibody, a deimmunized human antibody, a fully human antibody, a single chain antibody, an Fv fragment, an Fd fragment, an Fab fragment, an Fab' fragment, or an F(ab')$_2$ fragment.  In some embodiments, the antibody can be eculizumab or

15     pexelizumab.

        In some embodiments of any of the methods described herein, the composition can be intravenously administered to the subject.

        In some embodiments of any of the methods described herein, the aHUS is genetic, acquired, or idiopathic.  In some embodiments, the aHUS can be complement

20     factor H (CFH)-associated aHUS, membrane cofactor protein (MCP)-associated aHUS, complement factor I (CFI)-associated aHUS, C4b-binding protein (C4BP)-associated aHUS, or complement factor B-(CFB)-associated aHUS.

        In some embodiments, any of the methods described herein can further include identifying the subject as one having, suspected of having, or at risk for developing,

25     aHUS.

        In some embodiments, any of the methods described herein can further include, after the administering, monitoring the subject for an improvement in one or more symptoms of aHUS.

        In some embodiments of any of the methods described herein, the composition

30     can be administered to the subject prior to, during, or following a plasma exchange or plasma infusion.  In some embodiments, any of the methods described herein can include

administering to the subject one or more additional active agents.  The one or more additional active agents can be, e.g., selected from the group consisting of anti-hypertensives, anti-platelet agents, prostacyclin, fibrinolytic agents, and anti-oxidants.

In some embodiments, the human is an infant.  The infant can be, e.g., 0.5 (e.g., 1, 1.5, 2, 2.5, 3, 3.5, 4, 4.5, 6, 6.5, 7, 7.5, 8, 8.5, 9, or 9.5) years old.  The infant can be less than 10 (e.g., less than 9.5, 9, 8.5, 8, 7.5, 7, 6.5, 6, 5.5, 5, 4.5, 4, 3.5, 3, 2.5, 2, 1.5, 1, or less than 1) year(s) old.

In yet another aspect, the disclosure features a method for treating atypical hemolytic uremic syndrome (aHUS) in a human, which includes identifying a human as having, suspected of having, or at risk for developing, aHUS; and administering to the human a composition comprising a therapeutically effective amount of an antibody, or antigen-binding fragment thereof, that binds to a human complement component C5 protein, wherein the antibody is eculizumab.

In some embodiments of any of the methods or kits described herein, the compositions can contain two or more (e.g., three, four, five, six, seven, eight, nine, or 10 or more) different inhibitors of human complement component C5.  For example, a composition can contain an antibody that binds to a human complement component C5 protein and an siRNA that binds to, and promotes the degradation of, an mRNA encoding a human C5 protein.  The two or more inhibitors can each be present at a therapeutically effective amount in the composition or the inhibitors can each be present at a sub-therapeutic amount such that the combined amount of the inhibitors in total is therapeutic.

In another aspect, the disclosure features a composition comprising a therapeutically effective amount of an inhibitor of human complement component C5.  The inhibitor can be any of the C5 inhibitors described herein, e.g., an antibody, or antigen-binding fragment thereof, that binds to a human complement component C5 protein.  The composition can include, e.g., a pharmaceutically acceptable carrier, excipient, or diluent.

In yet another aspect, the disclosure features an article of manufacture (or kit).  The kit can include, e.g., a container having a label; and a composition comprising an inhibitor of human complement component C5.  The label can indicate that the composition is to be administered to a human having, suspected of having, or at risk for

developing, aHUS.  The inhibitor can be any of the C5 inhibitors described herein, e.g.,
an antibody, or antigen-binding fragment thereof, that binds to a human complement
component C5 protein (e.g., eculizumab).  The kit can also include, e.g one or more
additional active agents such as any of those described herein or that are known in the art
5    for treating aHUS in a human.

          "Polypeptide," "peptide," and "protein" are used interchangeably and mean any
peptide-linked chain of amino acids, regardless of length or post-translational
modification.  The complement component C5 proteins described herein can contain or
be wild-type proteins or can be variants that have not more than 50 (e.g., not more than
10   one, two, three, four, five, six, seven, eight, nine, ten, 12, 15, 20, 25, 30, 35, 40, or 50)
conservative amino acid substitutions.  Conservative substitutions typically include
substitutions within the following groups: glycine and alanine; valine, isoleucine, and
leucine; aspartic acid and glutamic acid; asparagine, glutamine, serine and threonine;
lysine, histidine and arginine; and phenylalanine and tyrosine.

15        The human complement component C5 proteins described herein also include
"antigenic peptide fragments" of the proteins, which are shorter than full-length,
immature (pre-pro) C5 proteins, but retain at least 10% (e.g., at least 10%, at least 15%,
at least 20%, at least 25%, at least 30%, at least 35%, at least 40%, at least 50%, at least
55%, at least 60%, at least 70%, at least 80%, at least 90%, at least 95%, at least 98%, at
20   least 99%, at least 99.5%, or 100% or more) of the ability of the full-length protein to
induce an antigenic response in a mammal (see below under "Methods for Producing an
Anti-C5 Antibody").  Antigenic peptide fragments of a C5 protein include terminal as
well internal deletion variants of the protein.  Deletion variants can lack one, two, three,
four, five, six, seven, eight, nine, ten, 11, 12, 13, 14, 15, 16, 17, 18, 19, or 20 amino acid
25   segments (of two or more amino acids) or non-contiguous single amino acids.  Antigenic
peptide fragments can be at least 6 (e.g., at least 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18,
19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31, 32, 33, 34, 35, 36, 37, 38, 39, 40, 41, 42,
43, 44, 45, 46, 47, 48, 49, 50, 55, 60, 65, 70, 75, 80, 85, 90, 95, 100, 110, 120, 130, 140,
150, 160, 170, 180, 190, 200, 250, 300, 350, 400, 450, 500, or 600 or more) amino acid
30   residues in length (e.g., at least 6 contiguous amino acid residues in any one of SEQ ID
NOS:1-11).  In some embodiments, an antigenic peptide fragment of a human C5 protein

is less than 500 (e.g., less than 450, 400, 350, 325, 300, 275, 250, 225, 200, 190, 180, 170, 160, 150, 140, 130, 120, 110, 100, 95, 90, 85, 80, 75, 60, 50, 49, 48, 47, 46, 45, 44, 43, 42, 41, 40, 39, 38, 37, 36, 35, 34, 33, 32, 31, 30, 29, 28, 27, 26, 25, 24, 23, 22, 21, 20, 19, 18, 17, 16, 15, 14, 13, 12, 11, 10, 9, 8, 7, or 6) amino acid residues in length (e.g., less

5    than 500 contiguous amino acid residues in any one of SEQ ID NOS:1-11). In some embodiments, an antigenic peptide fragment of a full-length, immature human C5 protein (prepro-C5 protein) is at least 6, but less than 500, amino acid residues in length.

In some embodiments, the human complement component C5 protein can have an amino acid sequence that is, or is greater than, 70 (e.g., 71, 72, 73, 74, 75, 76, 77, 78, 79,

10   80, 81, 82, 83, 84, 85, 86, 87, 88, 89, 90, 91, 92, 93, 94, 95, 96, 97, 98, 99, or 100) % identical to the human C5 protein having the amino acid sequence depicted in SEQ ID NO:1 (see below).

Percent (%) amino acid sequence identity is defined as the percentage of amino acids in a candidate sequence that are identical to the amino acids in a reference

15   sequence, after aligning the sequences and introducing gaps, if necessary, to achieve the maximum percent sequence identity. Alignment for purposes of determining percent sequence identity can be achieved in various ways that are within the skill in the art, for instance, using publicly available computer software such as BLAST, BLAST-2, ALIGN, ALIGN-2 or Megalign (DNASTAR) software. Appropriate parameters for measuring

20   alignment, including any algorithms needed to achieve maximal alignment over the full-length of the sequences being compared can be determined by known methods.

Amino acid sequences for exemplary human C5 proteins as well as antigenic peptide fragments thereof are known in the art and are set forth below.

As used throughout the present disclosure, the term "antibody" refers to a whole

25   or intact antibody (e.g., IgM, IgG, IgA, IgD, or IgE) molecule that is generated by any one of a variety of methods that are known in the art and described herein. The term "antibody" includes a polyclonal antibody, a monoclonal antibody, a chimerized or chimeric antibody, a humanized antibody, a deimmunized human antibody, and a fully human antibody. The antibody can be made in or derived from any of a variety of

30   species, e.g., mammals such as humans, non-human primates (e.g., monkeys, baboons, or

chimpanzees), horses, cattle, pigs, sheep, goats, dogs, cats, rabbits, guinea pigs, gerbils, hamsters, rats, and mice.  The antibody can be a purified or a recombinant antibody.

As used herein, the term "antibody fragment," "antigen-binding fragment," or similar terms refer to fragment of an antibody that retains the ability to bind to an antigen

5    (e.g., a complement component C5 protein), e.g., a single chain antibody, a single chain Fv fragment (scFv), an Fd fragment, an Fab fragment, an Fab' fragment, or an $F(ab')_2$ fragment.  An scFv fragment is a single polypeptide chain that includes both the heavy and light chain variable regions of the antibody from which the scFv is derived.  In addition, diabodies (Poljak (1994) *Structure* 2(12):1121-1123; Hudson et al. (1999) *J.*

10   *Immunol. Methods* 23(1-2):177-189, the disclosures of both of which are incorporated herein by reference in their entirety) and intrabodies (Huston et al. (2001) *Hum. Antibodies* 10(3-4):127-142; Wheeler et al. (2003) *Mol. Ther.* 8(3):355-366; Stocks (2004) *Drug Discov. Today* 9(22): 960-966, the disclosures of each of which are incorporated herein by reference in their entirety) that bind to a complement component

15   C5 protein can be incorporated into the compositions, and used in the methods, described herein.

Unless otherwise defined, all technical and scientific terms used herein have the same meaning as commonly understood by one of ordinary skill in the art to which this disclosure pertains.  In case of conflict, the present document, including definitions, will

20   control.  Preferred methods and materials are described below, although methods and materials similar or equivalent to those described herein can also be used in the practice or testing of the presently disclosed methods and compositions.  All publications, patent applications, patents, and other references mentioned herein are incorporated by reference in their entirety.

25

Other features and advantages of the present disclosure, e.g., methods for treating or preventing aHUS, will be apparent from the following description, the examples, and from the claims.

30

Express Mail Label No. EV521708867US                    ALXN-136-001

Detailed Description

The present disclosure provides compositions containing an inhibitor of human complement component C5 (e.g., an antibody, or antigen-binding fragment thereof, that binds to a human complement component C5 protein) and methods for using the

5    compositions to treat or prevent aHUS. While in no way intended to be limiting, exemplary compositions (e.g., pharmaceutical compositions and formulations) and methods for using the compositions are elaborated on below.

Complement Component C5 and the Complement Pathway

10   The complement system acts in conjunction with other immunological systems of the body to defend against intrusion of cellular and viral pathogens. There are at least 25 complement proteins, which are found as a complex collection of plasma proteins and membrane cofactors. The plasma proteins make up about 10% of the globulins in vertebrate serum. Complement components achieve their immune defensive functions by

15   interacting in a series of intricate but precise enzymatic cleavage and membrane binding events. The resulting complement cascade leads to the production of products with opsonic, immunoregulatory, and lytic functions. A concise summary of the biologic activities associated with complement activation is provided, for example, in The Merck Manual, 16th Edition.

20   The complement cascade progresses via the classical pathway or the alternative pathway. These pathways share many components, and while they differ in their initial steps, they converge and share the same "terminal complement" components (C5 through C9) responsible for the activation and destruction of target cells.

The classical complement pathway is typically initiated by antibody recognition

25   of, and binding to, an antigenic site on a target cell. The alternative pathway can be antibody independent, and can be initiated by certain molecules on pathogen surfaces. Additionally, the lectin pathway is typically initiated with binding of mannose-binding lectin (MBL) to high mannose substrates. These pathways converge at the point where complement component C3 is cleaved by an active protease (which is different in each

30   pathway) to yield C3a and C3b. Other pathways activating complement attack can act later in the sequence of events leading to various aspects of complement function.

C3a is an anaphylatoxin.  C3b binds to bacterial and other cells, as well as to certain viruses and immune complexes, and tags them for removal from the circulation. (C3b in this role is known as opsonin.)  The opsonic function of C3b is generally considered to be the most important anti-infective action of the complement system.

5       Patients with genetic lesions that block C3b function are prone to infection by a broad variety of pathogenic organisms, while patients with lesions later in the complement cascade sequence, i.e., patients with lesions that block C5 functions, are found to be more prone only to *Neisseria* infection, and then only somewhat more prone.

C3b also forms a complex with other components unique to each pathway to form
10     classical or alternative C5 convertase, which cleaves C5 into C5a and C5b.  C3 is thus regarded as the central protein in the complement reaction sequence since it is essential to both the alternative and classical pathways.  This property of C3b is regulated by the serum protease Factor I, which acts on C3b to produce iC3b.  While still functional as opsonin, iC3b cannot form an active C5 convertase.

15     C5 is a 190 kDa beta globulin found in normal serum at approximately 75 $\mu$g/ml (0.4 $\mu$M).  C5 is glycosylated, with about 1.5-3 percent of its mass attributed to carbohydrate.  Mature C5 is a heterodimer of a 999 amino acid 115 kDa alpha chain that is disulfide linked to a 655 amino acid 75 kDa beta chain.  C5 is synthesized as a single chain precursor protein product of a single copy gene (Haviland et al. (1991) *J. Immunol.*
20     <u>146</u>:362-368).  The cDNA sequence of the transcript of this gene predicts a secreted pro-C5 precursor of 1659 amino acids along with an 18 amino acid leader sequence (see, e.g., U.S. Patent No. 6,355,245).

The pro-C5 precursor is cleaved after amino acid 655 and 659, to yield the beta chain as an amino terminal fragment (amino acid residues +1 to 655 of the above
25     sequence) and the alpha chain as a carboxyl terminal fragment (amino acid residues 660 to 1658 of the above sequence), with four amino acids (amino acid residues 656-659 of the above sequence) deleted between the two.

C5a is cleaved from the alpha chain of C5 by either alternative or classical C5 convertase as an amino terminal fragment comprising the first 74 amino acids of the
30     alpha chain (i.e., amino acid residues 660-733 of the above sequence).  Approximately 20 percent of the 11 kDa mass of C5a is attributed to carbohydrate.  The cleavage site for

convertase action is at, or immediately adjacent to, amino acid residue 733 of the above sequence. A compound that would bind at, or adjacent, to this cleavage site would have the potential to block access of the C5 convertase enzymes to the cleavage site and thereby act as a complement inhibitor.

5      C5 can also be activated by means other than C5 convertase activity. Limited trypsin digestion (see, e.g., Minta and Man (1997) *J. Immunol.* 119:1597-1602 and Wetsel and Kolb (1982) *J. Immunol.* 128:2209-2216) and acid treatment (Yamamoto and Gewurz (1978) *J. Immunol.* 120:2008 and Damerau et al. (1989) *Molec. Immunol.* 26:1133-1142) can also cleave C5 and produce active C5b.

10     Cleavage of C5 releases C5a, a potent anaphylatoxin and chemotactic factor, and leads to the formation of the lytic terminal complement complex, C5b-9. C5a and C5b-9 also have pleiotropic cell activating properties, by amplifying the release of downstream inflammatory factors, such as hydrolytic enzymes, reactive oxygen species, arachidonic acid metabolites and various cytokines.

15     C5b combines with C6, C7, and C8 to form the C5b-8 complex at the surface of the target cell. Upon binding of several C9 molecules, the membrane attack complex (MAC, C5b-9, terminal complement complex--TCC) is formed. When sufficient numbers of MACs insert into target cell membranes the openings they create (MAC pores) mediate rapid osmotic lysis of the target cells. Lower, non-lytic concentrations of
20     MACs can produce other effects. In particular, membrane insertion of small numbers of the C5b-9 complexes into endothelial cells and platelets can cause deleterious cell activation. In some cases activation may precede cell lysis.

       As mentioned above, C3a and C5a are anaphylatoxins. These activated complement components can trigger mast cell degranulation, which releases histamine from basophils and mast cells, and other mediators of inflammation, resulting in smooth
25     muscle contraction, increased vascular permeability, leukocyte activation, and other inflammatory phenomena including cellular proliferation resulting in hypercellularity. C5a also functions as a chemotactic peptide that serves to attract pro-inflammatory granulocytes to the site of complement activation.

C5a receptors are found on the surfaces of bronchial and alveolar epithelial cells and bronchial smooth muscle cells.  C5a receptors have also been found on eosinophils, mast cells, monocytes, neutrophils, and activated lymphocytes.

5    Compositions

The compositions described herein contain an inhibitor of human complement component C5 (e.g., an antibody, or antigen-binding fragment thereof, that binds to a human complement component C5 protein).  As used herein, an "inhibitor of complement component C5" is any agent that inhibits: (i) the expression, or proper intracellular

10    trafficking or secretion by a cell, of a complement component C5 protein; (ii) the activity of C5 cleavage fragments C5a or C5b (e.g., the binding of C5a or C5b to their cognate cellular receptors; see above); (iii) the cleavage of a human C5 protein to forms C5a and C5b; or (iv) the proper intracellular trafficking of, or secretion by a cell, of a complement component C5 protein.  Inhibition of complement component C5 protein expression

15    includes: inhibition of transcription of a gene encoding a human C5 protein; increased degradation of an mRNA encoding a human C5 protein; inhibition of translation of an mRNA encoding a human C5 protein; increased degradation of a human C5 protein; inhibition of proper processing of a pre-pro human C5 protein; or inhibition of proper trafficking or secretion by a cell of a human C5 protein.  Methods for determining

20    whether a candidate agent is an inhibitor of human complement component C5 are known in the art and described herein.

An inhibitor of human complement component C5 can be, e.g., a small molecule, a polypeptide, a polypeptide analog, a nucleic acid, or a nucleic acid analog.

"Small molecule" as used herein, is meant to refer to an agent, which has a

25    molecular weight of less than about 6 kDa and most preferably less than about 2.5 kDa.  Many pharmaceutical companies have extensive libraries of chemical and/or biological mixtures comprising arrays of small molecules, often fungal, bacterial, or algal extracts, which can be screened with any of the assays of the application.  This application contemplates using, among other things, small chemical libraries, peptide libraries, or

30    collections of natural products.  Tan et al. described a library with over two million synthetic compounds that is compatible with miniaturized cell-based assays (*J. Am.*

*Chem. Soc.* (1998) <u>120</u>:8565-8566).  It is within the scope of this application that such a
library may be used to screen for inhibitors of human complement component C5.  There
are numerous commercially available compound libraries, such as the Chembridge
DIVERSet.  Libraries are also available from academic investigators, such as the

5    Diversity set from the NCI developmental therapeutics program.  Rational drug design
may also be employed.  For example, rational drug design can employ the use of crystal
or solution structural information on the human complement component C5 protein.  See,
e.g., the structures described in Hagemann et al. (2008) J. Biol. Chem. 283(12):7763-75
and Zuiderweg et al. (1989) *Biochemistry* <u>28(1)</u>:172–85.  Rational drug design can also

10   be achieved based on known compounds, e.g., a known inhibitor of C5 (e.g., an antibody,
or antigen-binding fragment thereof, that binds to a human complement component C5
protein).

      Peptidomimetics can be compounds in which at least a portion of a subject
polypeptide is modified, and the three dimensional structure of the peptidomimetic

15   remains substantially the same as that of the subject polypeptide.  Peptidomimetics may
be analogues of a subject polypeptide of the disclosure that are, themselves, polypeptides
containing one or more substitutions or other modifications within the subject
polypeptide sequence.  Alternatively, at least a portion of the subject polypeptide
sequence may be replaced with a nonpeptide structure, such that the three-dimensional

20   structure of the subject polypeptide is substantially retained.  In other words, one, two or
three amino acid residues within the subject polypeptide sequence may be replaced by a
non-peptide structure.  In addition, other peptide portions of the subject polypeptide may,
but need not, be replaced with a non-peptide structure.  Peptidomimetics (both peptide
and non-peptidyl analogues) may have improved properties (e.g., decreased proteolysis,

25   increased retention or increased bioavailability).  Peptidomimetics generally have
improved oral availability, which makes them especially suited to treatment of disorders
in a human or animal.  It should be noted that peptidomimetics may or may not have
similar two-dimensional chemical structures, but share common three-dimensional
structural features and geometry.  Each peptidomimetic may further have one or more

30   unique additional binding elements.

Nucleic acid inhibitors can be used to decrease expression of an endogenous gene encoding human complement component C5.  The nucleic acid antagonist can be, e.g., an siRNA, a dsRNA, a ribozyme, a triple-helix former, an aptamer, or an antisense nucleic acid.  siRNAs are small double stranded RNAs (dsRNAs) that optionally include

5   overhangs.  For example, the duplex region of an siRNA is about 18 to 25 nucleotides in length, e.g., about 19, 20, 21, 22, 23, or 24 nucleotides in length.  The siRNA sequences can be, in some embodiments, exactly complementary to the target mRNA.  dsRNAs and siRNAs in particular can be used to silence gene expression in mammalian cells (e.g., human cells).  See, e.g., Clemens et al. (2000) *Proc. Natl. Acad. Sci. USA* 97:6499- 6503;

10   Billy et al. (2001) *Proc. Natl. Sci. USA* 98:14428-14433; Elbashir et al. (2001) *Nature* 411 :494-8; Yang et al. (2002) *Proc. Natl. Acad. Sci. USA* 99:9942-9947, and U.S. Patent Application Publication Nos. 20030166282, 20030143204, 20040038278, and 20030224432.  Anti-sense agents can include, for example, from about 8 to about 80 nucleobases (i.e. from about 8 to about 80 nucleotides), e.g., about 8 to about 50

15   nucleobases, or about 12 to about 30 nucleobases.  Anti-sense compounds include ribozymes, external guide sequence (EGS) oligonucleotides (oligozymes), and other short catalytic RNAs or catalytic oligonucleotides which hybridize to the target nucleic acid and modulate its expression.  Anti-sense compounds can include a stretch of at least eight consecutive nucleobases that are complementary to a sequence in the target gene.  An

20   oligonucleotide need not be 100% complementary to its target nucleic acid sequence to be specifically hybridizable.  An oligonucleotide is specifically hybridizable when binding of the oligonucleotide to the target interferes with the normal function of the target molecule to cause a loss of utility, and there is a sufficient degree of complementarity to avoid non-specific binding of the oligonucleotide to non-target

25   sequences under conditions in which specific binding is desired, i.e., under physiological conditions in the case of *in vivo* assays or therapeutic treatment or, in the case of *in vitro* assays, under conditions in which the assays are conducted.  Hybridization of antisense oligonucleotides with mRNA (e.g., an mRNA encoding a human C5 protein) can interfere with one or more of the normal functions of mRNA.  The functions of mRNA to

30   be interfered with include all key functions such as, for example, translocation of the RNA to the site of protein translation, translation of protein from the RNA, splicing of

the RNA to yield one or more mRNA species, and catalytic activity which may be engaged in by the RNA.  Binding of specific protein(s) to the RNA may also be interfered with by antisense oligonucleotide hybridization to the RNA.  Exemplary antisense compounds include DNA or RNA sequences that specifically hybridize to the

5   target nucleic acid, e.g., the mRNA encoding a human complement component C5 protein.  The complementary region can extend for between about 8 to about 80 nucleobases.  The compounds can include one or more modified nucleobases.

Modified nucleobases may include, e.g., 5-substituted pyrimidines such as 5-iodouracil, 5-iodocytosine, and $C_5$- propynyl pyrimidines such as $C_5$-propynylcytosine

10   and $C_5$-propynyluracil.  Other suitable modified nucleobases include, e.g., 7-substituted-8-aza-7-deazapurines and 7-substituted-7-deazapurines such as, for example, 7-iodo-7-deazapurines, 7-cyano-7-deazapurines, 7-aminocarbonyl-7-deazapurines. Examples of these include 6-amino-7-iodo-7-deazapurines, 6-amino-7-cyano-7-deazapurines, 6-amino-7-aminocarbonyl-7-deazapurines, 2-amino-6-hydroxy-7-iodo-7-deazapurines, 2-

15   amino-6-hydroxy-7-cyano-7-deazapurines, and 2-amino-6-hydroxy-7-aminocarbonyl- 7-deazapurines. See, e.g., U.S. Patent Nos. 4,987,071; 5,116,742; and 5,093,246; "Antisense RNA and DNA," D.A. Melton, Ed., Cold Spring Harbor Laboratory, Cold Spring Harbor, N.Y. (1988); Haselhoff and Gerlach (1988) *Nature* 334:585-59; Helene, C. (1991) *Anticancer Drug D* 6:569-84; Helene (1992) *Ann. NY. Acad. Sci.* 660:27-36;

20   and Maher (1992) *Bioassays* 14:807-15.

Aptamers are short oligonucleotide sequences that can be used to recognize and specifically bind almost any molecule, including cell surface proteins.  The systematic evolution of ligands by exponential enrichment (SELEX) process is powerful and can be used to readily identify such aptamers.  Aptamers can be made for a wide range of

25   proteins of importance for therapy and diagnostics, such as growth factors and cell surface antigens.  These oligonucleotides bind their targets with similar affinities and specificities as antibodies do (see, e.g., Ulrich (2006) *Handb Exp Pharmacol.* 173:305-326).

In some embodiments, the inhibitor of human C5 is an antibody, or antigen-

30   binding fragment thereof, which binds to a human complement component C5 protein. (Hereinafter, the antibody may sometimes be referred to as an "anti-C5 antibody.")

In some embodiments, the anti-C5 antibody binds to an epitope in the human pro-C5 precursor protein. For example, the anti-C5 antibody can bind to an epitope in the human complement component C5 protein comprising, or consisting of, the amino acid sequence depicted in SEQ ID NO:1 (NCBI Accession No. AAA51925 and Haviland et
5    al., *supra*).

An "epitope" refers to the site on a protein (e.g., a human complement component C5 protein) that is bound by an antibody. "Overlapping epitopes" include at least one (e.g., two, three, four, five, or six) common amino acid residue(s).

In some embodiments, the anti-C5 antibody binds to an epitope in the human pro-
10   C5 precursor protein lacking the leader sequence. For example, the anti-C5 antibody can bind to an epitope in the human complement component C5 protein comprising, or consisting of, the amino acid sequence depicted in SEQ ID NO:2, which is a human C5 protein lacking the amino terminal leader sequence.

In some embodiments, the anti-C5 antibody can bind to an epitope in the alpha
15   chain of the human complement component C5 protein. For example, the anti-C5 antibody can bind to an epitope within, or overlapping with, a protein having the amino acid sequence depicted in SEQ ID NO:3, which is the human complement component C5 alpha chain protein. Antibodies that bind to the alpha chain of C5 are described in, for example, Ames et al. (1994) *J. Immunol.* 152:4572-4581, U.S. Patent No. 4,686,100, and
20   European patent Publication No. 0 411 306.

In some embodiments, the anti-C5 antibody can bind to an epitope in the beta chain of the human complement component C5 protein. For example, the anti-C5 antibody can bind to an epitope within, or overlapping with, a protein having the amino acid sequence depicted in SEQ ID NO:4, which is the human complement component C5
25   beta chain protein. Antibodies that bind to the C5 beta chain are described in, e.g., Moongkarndi et al. (1982) *Immunobiol.* 162:397 and Moongkarndi et al. (1983) *Immunobiol.* 165:323; Mollnes et al. (1988) *Scand. J. Immunol.* 28:307-312.

In some embodiments, the anti-C5 antibody can bind to an epitope within, or overlapping with, an antigenic peptide fragment of a human complement component C5
30   protein. For example, the anti-C5 antibody can bind to an epitope within, or overlapping with, an antigen peptide fragment of a human complement component C5 protein, the

fragment containing, or consisting of, the following amino acid sequence:

VIDHQGTKSSKCVRQKVEGSS (SEQ ID NO:5) or KSSKC (SEQ ID NO:6).

In some embodiments, the anti-C5 antibody can bind to an epitope within, or
overlapping with, a fragment of a human complement component C5 protein, the

5   fragment containing, or consisting of, any one of the following amino acid sequences
(which are exemplary antigenic fragments of SEQ ID NO:1):

NFSLETWFGKEILVKTLRVVPEGVKRESYSGVTLDPRGIYGTISRRKEFPYRIPLD
LVPKTEIKRILSVKGLLVGEILSAVLSQEGINILTHLPKGSAEAELMSVVPVFYVFH
YLETGNHWNIFHSD (SEQ ID NO:7);

10  SESPVIDHQGTKSSKCVRQKVEGSSSHLVTFTVLPLEIGLHNINFSLETWFGKEILV
KTLRVVPEGVKRESYSGVTLDPRGIYGTISRRKEFPYRIPLDLVPKTEIKRILSVKG
LLVGEILSAVLSQEGINILTHLPKGSAEAELMSVVPVFYVFHYLETGNHWNIFHSD
PLIEKQKLKKKLKEGMLSIMSYRNADYSYS (SEQ ID NO:8);

SHKDMQLGRLHMKTLLPVSKPEIRSYFPES (SEQ ID NO:9);

15  SHKDMQLGRLHMKTLLPVSKPEIRSYFPESWLWEVHLVPRRKQLQFALPDSLTT
WEIQGIGISNTGICVADTVKAKVFKDVFLEMNIPYSVVRGEQIQLKGTVYNYRTS
GMQFCVKMSAVEGICTSESPVIDHQGTKSSKCVRQKVEGSSSHLVTFTVLPLEIG
LHNINFSLETWFGKEILVKTLRVVPEGVKRESYSGVTLDPRGIYGTISRRKEFPYRI
PLDLVPKTEIKRILSVKGLLVGEILSAVLSQEGINILTHLPKGSAEAELMSVVPVFY

20  VFHYLETGNHWNIFHSDPLIEKQKLKKKLKEGMLSIMSYRNADYSYS (SEQ ID
NO:10); and

DHQGTKSSKCVRQKVEG (SEQ ID NO:11).

Additional exemplary antigenic fragments of human complement component C5
are disclosed in, e.g., U.S. Patent No. 6,355,245, the disclosure of which is incorporated

25  herein by reference.

In some embodiments, the anti-C5 antibody specifically binds to a human
complement component C5 protein (e.g., the human C5 protein having the amino acid
sequence depicted in SEQ ID NO:1). The terms "specific binding" or "specifically
binds" refer to two molecules forming a complex (e.g., a complex between an antibody

30  and a complement component C5 protein) that is relatively stable under physiologic
conditions. Typically, binding is considered specific when the association constant ($K_a$)

Express Mail Label No. EV521708867US                    ALXN-136-001

is higher than $10^6$ $\dot{M}^{-1}$.  Thus, an antibody can specifically bind to a C5 protein with a $K_a$ of at least (or greater than) $10^6$ (e.g., at least or greater than $10^7$, $10^8$, $10^9$, $10^{10}$, $10^{11}$ $10^{12}$, $10^{13}$, $10^{14}$, or $10^{15}$ or higher) $M^{-1}$.  Examples of antibodies that specifically bind to a human complement component C5 protein are described in, e.g., U.S. Patent No.

5    6,355,245, the disclosure of which is incorporated herein by reference in its entirety.

Methods for determining whether an antibody binds to a protein antigen and/or the affinity for an antibody to a protein antigen are known in the art.  For example, the binding of an antibody to a protein antigen can be detected and/or quantified using a variety of techniques such as, but not limited to, Western blot, dot blot, plasmon surface

10   resonance method (e.g., BIAcore system; Pharmacia Biosensor AB, Uppsala, Sweden and Piscataway, N.J.), or enzyme-linked immunosorbent assay (ELISA) assays.  See, e.g., Harlow and Lane (1988) "Antibodies: A Laboratory Manual" Cold Spring Harbor Laboratory Press, Cold Spring Harbor, N.Y.; Benny K. C. Lo (2004) "Antibody Engineering: Methods and Protocols," Humana Press (ISBN: 1588290921); Borrebaek

15   (1992) "Antibody Engineering, A Practical Guide," W.H. Freeman and Co., NY; Borrebaek (1995) "Antibody Engineering," 2nd Edition, Oxford University Press, NY, Oxford; Johne et al. (1993) *J. Immunol. Meth.* <u>160</u>:191-198; Jonsson et al. (1993) *Ann. Biol. Clin.* <u>51</u>:19-26; and Jonsson et al. (1991) *Biotechniques* <u>11</u>:620-627.  See also, U.S. Patent No. 6,355,245.

20   In some embodiments, the anti-C5 antibody can crossblock binding of another antibody that binds to an epitope within, or overlapping with, a human complement component C5 protein.  In some embodiments, the anti-C5 antibody can crossblock binding of an antibody that binds to an epitope within, or overlapping with, a peptide fragment of a human complement component C5 protein.  The peptide fragment can be a

25   fragment of a human complement component C5 protein having the amino acid sequence depicted in any one of SEQ ID NOS:1-11.  For example, the peptide fragment can contain, or consist of, the following amino acid sequence: VIDHQGTKSSKCVRQKVEGSS (SEQ ID NO:5).

As used herein, the term "crossblocking antibody" refers to an antibody that

30   lowers the amount of binding of anti-C5 antibody to an epitope on a complement component C5 protein relative to the amount of binding of the anti-C5 antibody to the

epitope in the absence of the antibody.  Suitable methods for determining whether a first antibody crossblocks binding of a second antibody to an epitope are known in the art. For example, crossblocking antibodies can be identified by comparing the binding of the 5G1.1 anti-C5 monoclonal antibody (ATCC designation HB-11625; see U.S. Patent No.

5      6,355,245) in the presence and absence of a test antibody.  Decreased binding of the 5G1.1 antibody in the presence of the test antibody as compared to binding of the 5G1.1 antibody in the absence of the test antibody indicates the test antibody is a crossblocking antibody.

         Methods for identifying the epitope to which a particular anti-C5 antibody binds

10    are also known in the art.  For example, the binding epitope of an anti-C5 antibody can be identified by measuring the binding of the antibody to several (e.g., three, four, five, six, seven, eight, nine, 10, 15, 20, or 30 or more) overlapping peptide fragments of a complement component C5 protein (e.g., several overlapping fragments of a protein having the amino acid sequence depicted in any one of SEQ ID NOS:1-11).  Each of the

15    different overlapping peptides is then bound to a unique address on a solid support, e.g., separate wells of a multi-well assay plate.  Next, the anti-C5 antibody is interrogated by contacting it to each of the peptides in the assay plate for an amount of time and under conditions that allow for the antibody to bind to its epitope.  Unbound anti-C5 antibody is removed by washing each of the wells.  Next, a detectably-labeled secondary antibody

20    that binds to the anti-C5 antibody, if present in a well of the plate, is contacted to each of the wells, and unbound secondary antibody is removed by washing steps.  The presence or amount of the detectable signal produced by the detectably-labeled secondary antibody in a well is an indication that the antibody binds to the particular peptide fragment associated with the well.  See, e.g., Harlow and Lane (*supra*), Benny K. C. Lo (*supra*),

25    and U.S. Patent Application Publication No. 20060153836, the disclosure of which is incorporated by reference in its entirety.  A particular epitope to which an antibody binds can also be identified using BIAcore chromatographic techniques (see, e.g., Pharmacia BIAtechnology Handbook, "Epitope Mapping," Section 6.3.2, (May 1994); and Johne et al. (1993) *J. Immunol. Methods* 160:20191-8).

30           The anti-C5 antibodies described herein can have activity in blocking the generation or activity of the C5a and/or C5b active fragments of a complement

Express Mail Label No. EV521708867US                          ALXN-136-001

component C5 protein (e.g., a human C5 protein).  Through this blocking effect, the anti-
C5 antibodies inhibit, e.g., the proinflammatory effects of C5a and the generation of the
C5b-9 membrane attack complex (MAC) at the surface of a cell.  Anti-C5 antibodies that
have the ability to block the generation of C5a are described in, e.g., Moongkarndi et al.
5   (1982) *Immunobiol.* 162:397 and Moongkarndi et al. (1983) *Immunobiol.* 165:323.

In some embodiments, an anti-C5 antibody, or antigen-binding fragment thereof,
can reduce the ability of a C5 protein to bind to human complement component C3 by
greater than 50 (e.g., greater than 55, 60, 65, 70, 75, 80, 85, 90, or 95 or more) %.  In
some embodiments, upon binding to a C5 protein, the anti-C5 antibody or antigen-
10   binding fragment thereof can reduce the ability of the C5 protein to bind to complement
component C4 by greater than 50 (e.g., greater than 55, 60, 65, 70, 75, 80, 85, 90, or 95
or more) %.  Methods for determining whether an antibody can block the generation or
activity of the C5a and/or C5b active fragments of a complement component C5 protein,
or binding to complement component C4 or C3, are known in the art and described in,
15   e.g., U.S. Patent No. 6,355,245 and Wurzner et al. (1991) *Complement Inflamm* 8:328-
340.

In some embodiments, an anti-C5 antibody binds to an amino-terminal region of
the alpha chain of a complement component C5 protein, but does not bind to free C5a.
Epitopes for an anti-C5 antibody within the amino-terminal region of the alpha chain
20   include, e.g., epitopes within the human sequence VIDHQGTKSSKCVRQKVEGSS
(SEQ ID NO:5).

In some embodiments, the composition comprises, and/or the antibody is,
eculizumab (Soliris®; Alexion Pharmaceuticals, Inc., Cheshire, CT).  (See, e.g., Kaplan
(2002) *Curr Opin Investig Drugs* 3(7):1017-23; Hill (2005) *Clin Adv Hematol Oncol*
25   3(11):849-50; and Rother et al. (2007) *Nature Biotechnology* 25(11):1256-1488.)

In some embodiments, the composition comprises, and/or the antibody is,
pexelizumab (Alexion Pharmaceuticals, Inc., Cheshire, CT).  (See, e.g., Whiss (2002)
*Curr Opin Investig Drugs* 3(6):870-7; Patel et al. (2005) *Drugs Today (Barc)* 41(3):165-
70; and Thomas et al. (1996) *Mol Immunol.* 33(17-18):1389-401.)

30   Methods for determining whether a particular agent is an inhibitor of human
complement component C5 as described herein are known in the art.  For example, the

concentration and/or physiologic activity of C5a and C5b in a body fluid can be measured by methods well known in the art.  Methods for measuring C5a concentration or activity include, e.g., chemotaxis assays, RIAs, or ELISAs (see, e.g., Ward and Zvaifler (1971) *J Clin Invest.* 50(3):606-16 and Wurzner et al. (1991) *Complement Inflamm.* 8:328-340).

5   For C5b, hemolytic assays or assays for soluble C5b-9 as discussed herein can be used. Other assays known in the art can also be used.  Using assays of these or other suitable types, candidate agents capable of inhibiting human complement component C5 such as an anti-C5 antibody, can be screened in order to, e.g., identify compounds that are useful in the methods described herein and determine the appropriate dosage levels of such

10   compounds.

Methods for detecting inhibition of expression of mRNA or protein (e.g., inhibition of human C5 protein expression or expression of an mRNA encoding human C5 protein) are well known in the art of molecular biology and include, e.g., Northern blot and RT-PCR (or quantitative RT-PCR) techniques for mRNA and for protein

15   detection, Western blot, dot blot, or ELISA techniques.  (See, e.g., Sambrook et al. (1989) "Molecular Cloning: A Laboratory Manual, 2nd Edition," Cold Spring Harbor Laboratory Press, Cold Spring Harbor, N.Y.)

Methods for determining whether a candidate compound inhibits the cleavage of human C5 into forms C5a and C5b are known in the art and described in, e.g.,

20   Moongkarndi et al. (1982) *Immunobiol.* 162:397; Moongkarndi et al. (1983) *Immunobiol.* 165:323; Isenman et al. (1980) *J Immunol.* 124(1):326-31; Thomas et al. (1996) *Mol. Immunol.* 33(17-18):1389-401; and Evans et al. (1995) *Mol. Immunol.* 32(16):1183-95.

Inhibition of human complement component C5 can also reduce the cell-lysing ability of complement in a subject's body fluids.  Such reductions of the cell-lysing

25   ability of complement present can be measured by methods well known in the art such as, for example, by a conventional hemolytic assay such as the hemolysis assay described by Kabat and Mayer (eds), "Experimental Immunochemistry, 2nd Edition," 135-240, Springfield, IL, CC Thomas (1961), pages 135-139, or a conventional variation of that assay such as the chicken erythrocyte hemolysis method as described in, e.g., Hillmen et

30   al. (2004) *N Engl J Med* 350(6):552.

Express Mail Label No. EV521708867US                    ALXN-136-001

**Pharmaceutical Compositions and Formulations**.  The compositions
containing an inhibitor of human complement component C5 (e.g., an anti-C5 antibody,
or antigen-binding fragment thereof) can be formulated as a pharmaceutical composition,
e.g., for administration to a subject to treat aHUS.  The pharmaceutical compositions will
5      generally include a pharmaceutically acceptable carrier.  As used herein, a
"pharmaceutically acceptable carrier" refers to, and includes, any and all solvents,
dispersion media, coatings, antibacterial and antifungal agents, isotonic and absorption
delaying agents, and the like that are physiologically compatible.  The compositions can
include a pharmaceutically acceptable salt, e.g., an acid addition salt or a base addition
10     salt (see e.g., Berge et al. (1977) *J. Pharm. Sci.* 66:1-19).

         The compositions can be formulated according to standard methods.
Pharmaceutical formulation is a well-established art, and is further described in, e.g.,
Gennaro (2000) "Remington: The Science and Practice of Pharmacy," 20th Edition,
Lippincott, Williams & Wilkins (ISBN: 0683306472); Ansel et al. (1999)
15     "Pharmaceutical Dosage Forms and Drug Delivery Systems," 7th Edition, Lippincott
Williams & Wilkins Publishers (ISBN: 0683305727); and Kibbe (2000) "Handbook of
Pharmaceutical Excipients American Pharmaceutical Association," 3rd Edition (ISBN:
091733096X).  In some embodiments, a composition can be formulated, for example, as
a buffered solution at a suitable concentration and suitable for storage at 2-8°C.  In some
20     embodiments, a composition can be formulated for storage at a temperature below 0°C
(e.g., -20°C or -80°C).

         The pharmaceutical compositions can be in a variety of forms.  These forms
include, e.g., liquid, semi-solid and solid dosage forms, such as liquid solutions (e.g.,
injectable and infusible solutions), dispersions or suspensions, tablets, pills, powders,
25     liposomes and suppositories.  The preferred form depends, in part, on the intended mode
of administration and therapeutic application.  For example, compositions containing an
anti-C5 antibody intended for systemic or local delivery can be in the form of injectable
or infusible solutions.  Accordingly, the compositions can be formulated for
administration by a parenteral mode (e.g., intravenous, subcutaneous, intraperitoneal, or
30     intramuscular injection).  "Parenteral administration," "administered parenterally," and
other grammatically equivalent phrases, as used herein, refer to modes of administration

other than enteral and topical administration, usually by injection, and include, without limitation, intravenous, intramuscular, intraarterial, intrathecal, intracapsular, intraorbital, intracardiac, intradermal, intraperitoneal, transtracheal, subcutaneous, subcuticular, intraarticular, subcapsular, subarachnoid, intraspinal, epidural, intracerebral, intracranial, intracarotid and intrasternal injection and infusion (see below).

5

The compositions can be formulated as a solution, microemulsion, dispersion, liposome, or other ordered structure suitable for stable storage at high concentration. Sterile injectable solutions can be prepared by incorporating an antibody described herein in the required amount in an appropriate solvent with one or a combination of ingredients enumerated above, as required, followed by filtered sterilization. Generally, dispersions are prepared by incorporating an inhibitor of human complement component C5 (e.g., an anti-C5 antibody) described herein into a sterile vehicle that contains a basic dispersion medium and the required other ingredients from those enumerated above. In the case of sterile powders for the preparation of sterile injectable solutions, methods for preparation include vacuum drying and freeze-drying that yield a powder of the antibody described herein plus any additional desired ingredient from a previously sterile-filtered solution thereof. The proper fluidity of a solution can be maintained, for example, by the use of a coating such as lecithin, by the maintenance of the required particle size in the case of dispersion and by the use of surfactants. Prolonged absorption of injectable compositions can be brought about by including in the composition a reagent that delays absorption, for example, monostearate salts and gelatin.

In certain embodiments, the C5 inhibitor (e.g., an anti-C5 antibody or antigen-binding fragment thereof) can be prepared with a carrier that will protect the compound against rapid release, such as a controlled release formulation, including implants and microencapsulated delivery systems. Biodegradable, biocompatible polymers can be used, such as ethylene vinyl acetate, polyanhydrides, polyglycolic acid, collagen, polyorthoesters, and polylactic acid. Many methods for the preparation of such formulations are known in the art. (See, e.g., J.R. Robinson (1978) "Sustained and Controlled Release Drug Delivery Systems," Marcel Dekker, Inc., New York.)

In some embodiments, an inhibitor of human C5 (e.g., an anti-C5 antibody or antigen-binding fragment thereof) described herein can be modified, e.g., with a moiety

10

15

20

25

30

that improves its stabilization and/or retention in circulation, e.g., in blood, serum, or other tissues. The stabilization moiety can improve the stability, or retention of, the antibody by at least 1.5 (e.g., at least 2, 5, 10, 15, 20, 25, 30, 40, or 50 or more) fold.

5      The nucleic acid inhibitors of human complement component C5 described herein (e.g., an anti-sense nucleic acid or siRNA) can be incorporated into a gene construct to be used as a part of a gene therapy protocol to deliver nucleic acids that can be used to express and produce agents within cells. Expression constructs of such components may be administered in any biologically effective carrier, e.g. any formulation or composition capable of effectively delivering the component gene to cells *in vivo*. Approaches

10     include insertion of the subject gene in viral vectors including recombinant retroviruses, adenovirus, adeno-associated virus, lentivirus, and herpes simplex virus-1 (HSV-1), or recombinant bacterial or eukaryotic plasmids. Viral vectors can transfect cells directly; plasmid DNA can be delivered with the help of, for example, cationic liposomes (lipofectin) or derivatized (e.g., antibody conjugated), polylysine conjugates, gramacidin

15     S, artificial viral envelopes or other such intracellular carriers, as well as direct injection of the gene construct or $CaPO_4$ precipitation carried out *in vivo*. (See also, "*Ex vivo* Approaches," below.) Examples of suitable retroviruses include pLJ, pZIP, pWE and pEM which are known to those skilled in the art (see, e.g., Eglitis et al. (1985) *Science* 230:1395-1398; Danos and Mulligan (1988) *Proc. Natl. Acad. Sci. USA* 85:6460-6464;

20     Wilson et al. (1988) *Proc. Natl. Acad. Sci. USA* 85:3014-3018; Armentano et al. (1990) *Proc. Natl. Acad. Sci. USA* 87:6141-6145; Huber et al. (1991) *Proc. Natl. Acad. Sci. USA* 88:8039-8043; Ferry et al. (1991) *Proc. Natl. Acad. Sci. USA* 88:8377-8381; Chowdhury et al. (1991) *Science* 254:1802-1805; van Beusechem et al. (1992) *Proc. Natl. Acad. Sci. USA* 89:7640-7644; Kay et al. (1992) *Human Gene Therapy* 3:641-647; Dai et al. (1992)

25     *Proc. Natl. Acad. Sci. USA* 89:10892-10895; Hwu et al. (1993) *J. Immunol.* 150:4104-4115; U.S. Patent Nos. 4,868,116 and 4,980,286; PCT Publication Nos. WO89/07136, WO89/02468, WO89/05345, and WO92/07573). Another viral gene delivery system utilizes adenovirus-derived vectors (see, e.g., Berkner et al. (1988) *BioTechniques* 6:616; Rosenfeld et al. (1991) *Science* 252:431-434; and Rosenfeld et al. (1992) *Cell* 68:143-

30     155). Suitable adenoviral vectors derived from the adenovirus strain Ad type 5 dl324 or other strains of adenovirus (e.g., Ad2, Ad3, Ad7, etc.) are known to those skilled in the

art. Yet another viral vector system useful for delivery of the subject gene is the adeno-associated virus (AAV). See, e.g., Flotte et al. (1992) *Am. J. Respir. Cell. Mol. Biol.* <u>7</u>:349-356; Samulski et al. (1989) *J. Virol.* <u>63</u>:3822-3828; and McLaughlin et al. (1989) *J. Virol* <u>62</u>: 1963-1973.

5          In some embodiments, more than one (e.g., two, three, four, five, six, seven, eight, nine, or 10 or more) inhibitor(s) of human C5 can be co-formulated. For example, a C5-specific siRNA and an anti-C5 antibody can be formulated together.

          In some embodiments, an inhibitor of human C5 (e.g., an anti-C5 antibody or antigen-binding fragment thereof) described herein can be formulated with one or more

10      additional active agents useful for treating aHUS or ameliorating a symptom thereof. For example, an anti-C5 antibody can be formulated with an anti-hypertensive such as, but not limited to, a diuretic, an adrenergic receptor antagonist, an adrenergic receptor agonist, a calcium channel blocker, an angiotensin-converting enzyme (ACE) inhibitor, or a vasodilator. An anti-C5 antibody can also be formulated with one or more of a

15      steroid, heparin, an anti-platelet agent, prostacyclin, a fibrinolytic agent, and/or an anti-oxidant (e.g., vitamin E, A, C, or beta-carotene) for the treatment of aHUS.

          When the inhibitor of human C5 is to be used in combination with a second active agent, or when two or more inhibitors of human C5 are to be used, the agents can be formulated separately or together. For example, the respective pharmaceutical

20      compositions can be mixed, e.g., just prior to administration, and administered together or can be administered separately, e.g., at the same or different times (see below).

          As described above, a composition can be formulated such that it includes a therapeutically effective amount of an inhibitor of human C5 (e.g., an anti-C5 antibody or antigen-binding fragment thereof) or the composition can be formulated to include a sub-

25      therapeutic amount of the inhibitor and a sub-therapeutic amount of one or more additional active agents such that the components in total are therapeutically effective for treating aHUS. In some embodiments, a composition can be formulated to include two or more inhibitors of human C5, each at sub-therapeutic doses, such that the inhibitors in total are at a concentration that is therapeutically effective for treating aHUS. Methods

30      for determining a therapeutically effective dose (e.g., a therapeutically effective dose of an anti-C5 antibody) are known in the art and described herein.

Express Mail Label No. EV521708867US                     ALXN-136-001

Methods for Producing an Anti-C5 Antibody

      Suitable methods for producing an anti-C5 antibody, or antigen-binding fragments thereof, in accordance with the disclosure are known in the art (see, e.g., U.S. Patent No.

5  6,355,245) and described herein. For example, monoclonal anti-C5 antibodies may be generated using complement component C5-expressing cells, a C5 polypeptide, or an antigenic fragment of C5 polypeptide, as an immunogen, thus raising an immune response in animals from which antibody-producing cells and in turn monoclonal antibodies may be isolated. The sequence of such antibodies may be determined and the

10  antibodies or variants thereof produced by recombinant techniques. Recombinant techniques may be used to produce chimeric, CDR-grafted, humanized and fully human antibodies based on the sequence of the monoclonal antibodies as well as polypeptides capable of binding to human complement component C5.

      Moreover, antibodies derived from recombinant libraries ("phage antibodies")

15  may be selected using C5-expressing cells, or polypeptides derived therefrom, as bait to isolate the antibodies or polypeptides on the basis of target specificity. The production and isolation of non-human and chimeric anti-C5 antibodies are well within the purview of the skilled artisan.

      Recombinant DNA technology can be used to modify one or more characteristics

20  of the antibodies produced in non-human cells. Thus, chimeric antibodies can be constructed in order to decrease the immunogenicity thereof in diagnostic or therapeutic applications. Moreover, immunogenicity can be minimized by humanizing the antibodies by CDR grafting and, optionally, framework modification. See, U.S. Patent Nos. 5,225,539 and 7,393,648, the contents of each of which are incorporated herein by

25  reference.

      Antibodies can be obtained from animal serum or, in the case of monoclonal antibodies or fragments thereof, produced in cell culture. Recombinant DNA technology can be used to produce the antibodies according to established procedure, including procedures in bacterial or preferably mammalian cell culture. The selected cell culture

30  system preferably secretes the antibody product.

In another embodiment, a process for the production of an antibody disclosed herein includes culturing a host, e.g. *E. coli* or a mammalian cell, which has been transformed with a hybrid vector. The vector includes one or more expression cassettes containing a promoter operably linked to a first DNA sequence encoding a signal peptide
5   linked in the proper reading frame to a second DNA sequence encoding the antibody protein. The antibody protein is then collected and isolated. Optionally, the expression cassette may include a promoter operably linked to polycistronic (e.g., bicistronic) DNA sequences encoding antibody proteins each individually operably linked to a signal peptide in the proper reading frame.

10   Multiplication of hybridoma cells or mammalian host cells *in vitro* is carried out in suitable culture media, which include the customary standard culture media (such as, for example Dulbecco's Modified Eagle Medium (DMEM) or RPMI 1640 medium), optionally replenished by a mammalian serum (e.g. fetal calf serum), or trace elements and growth sustaining supplements (e.g. feeder cells such as normal mouse peritoneal
15   exudate cells, spleen cells, bone marrow macrophages, 2-aminoethanol, insulin, transferrin, low density lipoprotein, oleic acid, or the like). Multiplication of host cells which are bacterial cells or yeast cells is likewise carried out in suitable culture media known in the art. For example, for bacteria suitable culture media include medium LE, NZCYM, NZYM, NZM, Terrific Broth, SOB, SOC, 2 xYT, or M9 Minimal Medium.
20   For yeast, suitable culture media include medium YPD, YEPD, Minimal Medium, or Complete Minimal Dropout Medium.

*In vitro* production provides relatively pure antibody preparations and allows scale-up production to give large amounts of the desired antibodies. Techniques for bacterial cell, yeast, plant, or mammalian cell cultivation are known in the art and include
25   homogeneous suspension culture (e.g. in an airlift reactor or in a continuous stirrer reactor), and immobilized or entrapped cell culture (e.g. in hollow fibers, microcapsules, on agarose microbeads or ceramic cartridges).

Large quantities of the desired antibodies can also be obtained by multiplying mammalian cells *in vivo*. For this purpose, hybridoma cells producing the desired antibodies are injected into histocompatible mammals to cause growth of antibody-
30   producing tumors. Optionally, the animals are primed with a hydrocarbon, especially

mineral oils such as pristane (tetramethyl-pentadecane), prior to the injection. After one to three weeks, the antibodies are isolated from the body fluids of those mammals. For example, hybridoma cells obtained by fusion of suitable myeloma cells with antibody-producing spleen cells from Balb/c mice, or transfected cells derived from hybridoma cell

5   line Sp2/0 that produce the desired antibodies are injected intraperitoneally into Balb/c mice optionally pre-treated with pristane. After one to two weeks, ascitic fluid is taken from the animals.

The foregoing, and other, techniques are discussed in, for example, Kohler and Milstein, (1975) *Nature* 256:495-497; U.S. Patent No. 4,376,110; Harlow and Lane,

10  Antibodies: a Laboratory Manual, (1988) Cold Spring Harbor, the disclosures of which are all incorporated herein by reference. Techniques for the preparation of recombinant antibody molecules are described in the above references and also in, e.g.:WO97/08320; U.S. Patent No. 5,427,908; U.S. Patent No. 5,508,717; Smith (1985) *Science* 225:1315-1317; Parmley and Smith (1988) *Gene* 73:305-318; De La Cruz et al. (1988) *Journal of*

15  *Biological Chemistry* 263:4318-4322; U.S. Patent No. 5,403,484; U.S. Patent No. 5,223,409; WO88/06630; WO92/15679; U.S. Patent No. 5,780,279; U.S. Patent No. 5,571,698; U.S. Patent No. 6,040,136; Davis et al. (1999) *Cancer Metastasis Rev.* 18(4):421-5; and Taylor et al. (1992) *Nucleic Acids Research* 20: 6287-6295; Tomizuka et al. (2000) *Proc. Natl. Acad. Sci. USA* 97(2): 722-727, the contents of each of which are

20  incorporated herein by reference in their entirety.

The cell culture supernatants are screened for the desired antibodies, preferentially by immunofluorescent staining of complement component C5-expressing cells, by immunoblotting, by an enzyme immunoassay, e.g. a sandwich assay or a dot-assay, or a radioimmunoassay.

25  For isolation of the antibodies, the immunoglobulins in the culture supernatants or in the ascitic fluid may be concentrated, e.g. by precipitation with ammonium sulfate, dialysis against hygroscopic material such as polyethylene glycol, filtration through selective membranes, or the like. If necessary and/or desired, the antibodies are purified by the customary chromatography methods, for example gel filtration, ion-exchange

30  chromatography, chromatography over DEAE-cellulose and/or (immuno-) affinity

chromatography, e.g. affinity chromatography with one or more surface polypeptides derived from a complement component C5-expressing cell line, or with Protein-A or -G.

　　　　Another embodiment provides a process for the preparation of a bacterial cell line secreting antibodies directed against a C5 protein in a suitable mammal. For example a

5    rabbit is immunized with pooled samples from C5-expressing tissue or cells or C5 polypeptide or fragments thereof. A phage display library produced from the immunized rabbit is constructed and panned for the desired antibodies in accordance with methods well known in the art (such as, e.g., the methods disclosed in the various references incorporated herein by reference).

10   　　　　Hybridoma cells secreting the monoclonal antibodies are also disclosed. The preferred hybridoma cells are genetically stable, secrete monoclonal antibodies described herein of the desired specificity, and can be expanded from deep-frozen cultures by thawing and propagation *in vitro* or as ascites *in vivo*.

　　　　In another embodiment, a process is provided for the preparation of a hybridoma

15   cell line secreting monoclonal antibodies against a complement component C5 protein. In that process, a suitable mammal, for example a Balb/c mouse, is immunized with one or more polypeptides or antigenic fragments of C5 or with one or more polypeptides or antigenic fragments derived from a C5-expressing cell, the C5-expressing cell itself, or an antigenic carrier containing a purified polypeptide as described. Antibody-producing

20   cells of the immunized mammal are grown briefly in culture or fused with cells of a suitable myeloma cell line. The hybrid cells obtained in the fusion are cloned, and cell clones secreting the desired antibodies are selected. For example, spleen cells of Balb/c mice immunized with a C5-expressing Chronic Lymphocytic Leukemia (CLL) cell line are fused with cells of the myeloma cell line PAI or the myeloma cell line Sp2/0-Ag 14.

25   The obtained hybrid cells are then screened for secretion of the desired antibodies and positive hybridoma cells are cloned.

　　　　Methods for preparing a hybridoma cell line include immunizing Balb/c mice by injecting subcutaneously and/or intraperitoneally between $10^6$ and $10^7$ cells of a complement component C5-expressing cell line several times, e.g., four to six times, over

30   several months, e.g., between two and four months. Spleen cells from the immunized mice are taken two to four days after the last injection and fused with cells of the

myeloma cell line PAI in the presence of a fusion promoter, preferably polyethylene glycol. Preferably, the myeloma cells are fused with a three- to twenty-fold excess of spleen cells from the immunized mice in a solution containing about 30% to about 50% polyethylene glycol of a molecular weight around 4000. After the fusion, the cells are

5    expanded in suitable culture media as described *supra*, supplemented with a selection medium, for example HAT medium, at regular intervals in order to prevent normal myeloma cells from overgrowing the desired hybridoma cells.

The antibodies and fragments thereof can be "chimeric." Chimeric antibodies and antigen-binding fragments thereof comprise portions from two or more different species

10   (e.g., mouse and human). Chimeric antibodies can be produced with mouse variable regions of desired specificity spliced into human constant domain gene segments (for example, U.S. Patent No. 4,816,567). In this manner, non-human antibodies can be modified to make them more suitable for human clinical application (e.g., methods for treating or preventing aHUS in a human subject).

15   The monoclonal antibodies of the present disclosure include "humanized" forms of the non-human (e.g., mouse) antibodies. Humanized or CDR-grafted mAbs are particularly useful as therapeutic agents for humans because they are not cleared from the circulation as rapidly as mouse antibodies and do not typically provoke an adverse immune reaction. Generally, a humanized antibody has one or more amino acid residues

20   introduced into it from a non-human source. These non-human amino acid residues are often referred to as "import" residues, which are typically taken from an "import" variable domain. Methods of preparing humanized antibodies are generally well known in the art. For example, humanization can be essentially performed following the method of Winter and co-workers (see, e.g., Jones et al.(1986) *Nature* 321:522-525; Riechmann

25   et al. (1988) *Nature* 332:323-327; and Verhoeyen et al. (1988) *Science* 239:1534-1536), by substituting rodent CDRs or CDR sequences for the corresponding sequences of a human antibody. Also see, e.g., Staelens et al. (2006) *Mol Immunol* 43:1243-1257. In some embodiments, humanized forms of non-human (e.g., mouse) antibodies are human antibodies (recipient antibody) in which hypervariable (CDR) region residues of the

30   recipient antibody are replaced by hypervariable region residues from a non-human species (donor antibody) such as a mouse, rat, rabbit, or non-human primate having the

desired specificity, affinity, and binding capacity.  In some instances, framework region residues of the human immunoglobulin are also replaced by corresponding non-human residues (so called "back mutations").  In addition, phage display libraries can be used to vary amino acids at chosen positions within the antibody sequence.  The properties of a

5    humanized antibody are also affected by the choice of the human framework. Furthermore, humanized and chimerized antibodies can be modified to comprise residues that are not found in the recipient antibody or in the donor antibody in order to further improve antibody properties, such as, for example, affinity or effector function.

Fully human antibodies are also provided in the disclosure.  The term "human

10   antibody" includes antibodies having variable and constant regions (if present) derived from human germline immunoglobulin sequences.  Human antibodies can include amino acid residues not encoded by human germline immunoglobulin sequences (e.g., mutations introduced by random or site-specific mutagenesis *in vitro* or by somatic mutation *in vivo*).  However, the term "human antibody" does not include antibodies in

15   which CDR sequences derived from the germline of another mammalian species, such as a mouse, have been grafted onto human framework sequences (i.e., humanized antibodies).  Fully human or human antibodies may be derived from transgenic mice carrying human antibody genes (carrying the variable (V), diversity (D), joining (J), and constant (C) exons) or from human cells.  For example, it is now possible to produce

20   transgenic animals (e.g., mice) that are capable, upon immunization, of producing a full repertoire of human antibodies in the absence of endogenous immunoglobulin production. (See, e.g., Jakobovits et al. (1993) *Proc. Natl. Acad. Sci. USA* 90:2551; Jakobovits et al. (1993) *Nature* 362:255-258; Bruggemann et al. (1993) *Year in Immunol.* 7:33; and Duchosal et al. (1992) *Nature* 355:258.)  Transgenic mice strains can be

25   engineered to contain gene sequences from unrearranged human immunoglobulin genes. The human sequences may code for both the heavy and light chains of human antibodies and would function correctly in the mice, undergoing rearrangement to provide a wide antibody repertoire similar to that in humans.  The transgenic mice can be immunized with the target protein (e.g., a complement component C5 protein, fragments thereof, or

30   cells expressing C5 protein) to create a diverse array of specific antibodies and their encoding RNA.   Nucleic acids encoding the antibody chain components of such

antibodies may then be cloned from the animal into a display vector. Typically, separate populations of nucleic acids encoding heavy and light chain sequences are cloned, and the separate populations then recombined on insertion into the vector, such that any given copy of the vector receives a random combination of a heavy and a light chain. The

5   vector is designed to express antibody chains so that they can be assembled and displayed on the outer surface of a display package containing the vector. For example, antibody chains can be expressed as fusion proteins with a phage coat protein from the outer surface of the phage. Thereafter, display packages can be screened for display of antibodies binding to a target.

10      In addition, human antibodies can be derived from phage-display libraries (Hoogenboom et al. (1991) *J. Mol. Biol.* 227:381; Marks et al. (1991) *J. Mol. Biol.*, 222:581-597; and Vaughan et al. (1996) *Nature Biotech* 14:309 (1996)). Synthetic phage libraries can be created which use randomized combinations of synthetic human antibody V-regions. By selection on antigen fully human antibodies can be made in which the V-

15   regions are very human-like in nature. See, e.g., U.S. Patent Nos. 6,794,132, 6,680,209, 4,634,666, and Ostberg et al. (1983), *Hybridoma* 2:361-367, the contents of each of which are incorporated herein by reference in their entirety.

    For the generation of human antibodies, also see Mendez et al. (1998) *Nature Genetics* 15:146-156, Green and Jakobovits (1998) *J. Exp. Med.* 188:483-495, the

20   disclosures of which are hereby incorporated by reference in their entirety. Human antibodies are further discussed and delineated in U.S. Patent Nos.: 5,939,598; 6,673,986; 6,114,598; 6,075,181; 6,162,963; 6,150,584; 6,713,610; and 6,657,103 as well as U.S. Patent Publication Nos. 2003-0229905 A1, 2004-0010810 A1, US 2004-0093622 A1, 2006-0040363 A1, 2005-0054055 A1, 2005-0076395 A1, 2005-0287630 A1. See also

25   International Publication Nos. WO 94/002602, WO 94/02602, WO 96/34096, and WO 98/24893, and European Patent No. EP 0 463 151 B1. The disclosures of each of the above-cited patents, applications, and references are hereby incorporated by reference in their entirety.

    In an alternative approach, others, including GenPharm International, Inc., have

30   utilized a "minilocus" approach. In the minilocus approach, an exogenous Ig locus is mimicked through the inclusion of pieces (individual genes) from the Ig locus. Thus, one

or more $V_H$ genes, one or more $D_H$ genes, one or more $J_H$ genes, a mu constant region, and a second constant region (preferably a gamma constant region) are formed into a construct for insertion into an animal. This approach is described in, e.g., U.S. Patent Nos.: 5,545,807; 5,545,806; 5,625,825; 5,625,126; 5,633,425; 5,661,016; 5,770,429;

5     5,789,650; and 5,814,318; 5,591,669; 5,612,205; 5,721,367; 5,789,215; 5,643,763; 5,569,825; 5,877,397; 6,300,129; 5,874,299; 6,255,458; and 7,041,871, the disclosures of which are hereby incorporated by reference. See also European Patent No. 0 546 073 B1, International Patent Publication Nos. WO 92/03918, WO 92/22645, WO 92/22647, WO 92/22670, WO 93/12227, WO 94/00569, WO 94/25585, WO 96/14436, WO 97/13852,

10    and WO 98/24884, the disclosures of each of which are hereby incorporated by reference in their entirety.  See further Taylor et al. (1992) *Nucleic Acids Res.* 20: 6287; Chen et al. (1993) *Int. Immunol.* 5: 647; Tuaillon et al. (1993) *Proc. Natl. Acad. Sci. USA* 90: 3720-4; Choi et al. (1993) *Nature Genetics* 4: 117; Lonberg et al. (1994) *Nature* 368: 856-859; Taylor et al. (1994) *International Immunology* 6: 579-591; Tuaillon et al. (1995) *J.*

15    *Immunol.* 154: 6453-65; Fishwild et al. (1996) *Nature Biotechnology* 14: 845; and Tuaillon et al. (2000) *Eur. J. Immunol.* 10: 2998-3005, the disclosures of each of which are hereby incorporated by reference in their entirety.

In certain embodiments, de-immunized anti-C5 antibodies or antigen-binding fragments thereof are provided.  De-immunized antibodies or antigen-binding fragments

20    thereof may be modified so as to render the antibody or antigen-binding fragment thereof non-immunogenic, or less immunogenic, to a given species.  De-immunization can be achieved by modifying the antibody or antigen-binding fragment thereof utilizing any of a variety of techniques known to those skilled in the art (see, e.g., PCT Publication Nos. WO 04/108158 and WO 00/34317).  For example, an antibody or antigen-binding

25    fragment thereof may be de-immunized by identifying potential T cell epitopes and/or B cell epitopes within the amino acid sequence of the antibody or antigen-binding fragment thereof and removing one or more of the potential T cell epitopes and/or B cell epitopes from the antibody or antigen-binding fragment thereof, for example, using recombinant techniques.  The modified antibody or antigen-binding fragment thereof may then

30    optionally be produced and tested to identify antibodies or antigen-binding fragments thereof that have retained one or more desired biological activities, such as, for example,

Express Mail Label No. EV521708867US   .                          ALXN-136-001

binding affinity, but have reduced immunogenicity.  Methods for identifying potential T
cell epitopes and/or B cell epitopes may be carried out using techniques known in the art,
such as, for example, computational methods (see e.g., PCT Publication No. WO
02/069232), *in vitro* or *in silico* techniques, and biological assays or physical methods

5      (such as, for example, determination of the binding of peptides to MHC molecules,
determination of the binding of peptide:MHC complexes to the T cell receptors from the
species to receive the antibody or antigen-binding fragment thereof, testing of the protein
or peptide parts thereof using transgenic animals with the MHC molecules of the species
to receive the antibody or antigen-binding fragment thereof, or testing with transgenic

10     animals reconstituted with immune system cells from the species to receive the antibody
or antigen-binding fragment thereof, etc.).  In various embodiments, the de-immunized
anti-C5 antibodies described herein include de-immunized antigen-binding fragments,
Fab, Fv, scFv, Fab' and F(ab')$_2$, monoclonal antibodies, murine antibodies, engineered
antibodies (such as, for example, chimeric, single chain, CDR-grafted, humanized, fully

15     human antibodies, and artificially selected antibodies), synthetic antibodies and semi-
synthetic antibodies.

        In some embodiments, a recombinant DNA comprising an insert coding for a
heavy chain variable domain and/or for a light chain variable domain of an anti-C5
antibody or a C5 protein-expressing cell line is produced.  The term DNA includes

20     coding single stranded DNAs, double stranded DNAs consisting of said coding DNAs
and of complementary DNAs thereto, or these complementary (single stranded) DNAs
themselves.

        Furthermore, a DNA encoding a heavy chain variable domain and/or a light chain
variable domain of anti-C5 antibodies, or the C5-expressing cell line, can be

25     enzymatically or chemically synthesized to contain the authentic DNA sequence coding
for a heavy chain variable domain and/or for the light chain variable domain, or a mutant
thereof.  A mutant of the authentic DNA is a DNA encoding a heavy chain variable
domain and/or a light chain variable domain of the above-mentioned antibodies in which
one or more amino acids are deleted, inserted, or exchanged with one or more other

30     amino acids.  Preferably said modification(s) are outside the CDRs of the heavy chain
variable domain and/or of the light chain variable domain of the antibody in

Express Mail Label No. EV521708867US                                  ALXN-136-001

humanization and expression optimization applications. The term mutant DNA also
embraces silent mutants wherein one or more nucleotides are replaced by other
nucleotides with the new codons coding for the same amino acid(s). The term mutant
sequence also includes a degenerate sequence. Degenerate sequences are degenerate
5    within the meaning of the genetic code in that an unlimited number of nucleotides are
replaced by other nucleotides without resulting in a change of the amino acid sequence
originally encoded. Such degenerate sequences may be useful due to their different
restriction sites and/or frequency of particular codons which are preferred by the specific
host, particularly *E. coli*, to obtain an optimal expression of the heavy chain murine
10   variable domain and/or a light chain murine variable domain.

The term mutant is intended to include a DNA mutant obtained by *in vitro*
mutagenesis of the authentic DNA according to methods known in the art.

For the assembly of complete tetrameric immunoglobulin molecules and the
expression of chimeric antibodies, the recombinant DNA inserts coding for heavy and
15   light chain variable domains are fused with the corresponding DNAs coding for heavy
and light chain constant domains, then transferred into appropriate host cells, for example
after incorporation into hybrid vectors.

Recombinant DNAs including an insert coding for a heavy chain murine variable
domain of an anti-C5 antibody or a C5-expressing cell line fused to a human constant
20   domain IgG, for example γ1, γ2, γ3 or γ4, in particular embodiments γ1 or γ4, may be
used. Recombinant DNAs including an insert coding for a light chain murine variable
domain of an antibody fused to a human constant domain κ or λ, preferably κ, are also
provided.

Another embodiment pertains to recombinant DNAs coding for a recombinant
25   polypeptide wherein the heavy chain variable domain and the light chain variable domain
are linked by way of a spacer group, optionally comprising a signal sequence facilitating
the processing of the antibody in the host cell and/or a DNA sequence encoding a peptide
facilitating the purification of the antibody and/or a cleavage site and/or a peptide spacer
and/or an agent. The DNA coding for an agent is intended to be a DNA coding for the
30   agent useful in diagnostic or therapeutic applications. Thus, agent molecules which are
toxins or enzymes, especially enzymes capable of catalyzing the activation of prodrugs,

are particularly indicated. The DNA encoding such an agent has the sequence of a naturally occurring enzyme or toxin encoding DNA, or a mutant thereof, and can be prepared by methods well known in the art.

5      Accordingly, the monoclonal antibodies or antigen-binding fragments of the disclosure can be naked antibodies or antigen-binding fragments that are not conjugated to other agents, for example, a therapeutic agent or detectable label. Alternatively, the monoclonal antibody or antigen-binding fragment can be conjugated to an agent such as, for example, a cytotoxic agent, a small molecule, a hormone, an enzyme, a growth factor, a cytokine, a ribozyme, a peptidomimetic, a chemical, a prodrug, a nucleic acid molecule

10     including coding sequences (such as antisense, RNAi, gene-targeting constructs, etc.), or a detectable label (e.g., an NMR or X-ray contrasting agent, fluorescent molecule, etc.). In certain embodiments, an anti-C5 antigen or antigen-binding fragment (e.g., Fab, Fv, single-chain scFv, Fab', and F(ab')$_2$) is linked to a molecule that increases the half-life of the antibody or antigen-binding fragment (see above).

15     Several possible vector systems are available for the expression of cloned heavy chain and light chain genes in mammalian cells. One class of vectors relies upon the integration of the desired gene sequences into the host cell genome. Cells which have stably integrated DNA can be selected by simultaneously introducing drug resistance genes such as *E. coli* gpt (Mulligan and Berg (1981) *Proc. Natl. Acad. Sci. USA*,

20     78:2072) or Tn5 neo (Southern and Berg (1982) *Mol. Appl. Genet.* 1:327). The selectable marker gene can be either linked to the DNA gene sequences to be expressed, or introduced into the same cell by co-transfection (Wigler et al. (1979) *Cell* 16:77). A second class of vectors utilizes DNA elements which confer autonomously replicating capabilities to an extrachromosomal plasmid. These vectors can be derived from animal

25     viruses, such as bovine papillomavirus (Sarver et al. (1982) *Proc. Natl. Acad. Sci. USA*, 79:7147), polyoma virus (Deans et al. (1984) *Proc. Natl. Acad. Sci. USA* 81:1292), or SV40 virus (Lusky and Botchan (1981) *Nature* 293:79).

       Since an immunoglobulin cDNA is comprised only of sequences representing the mature mRNA encoding an antibody protein, additional gene expression elements regulating transcription of the gene and processing of the RNA are required for the

30     synthesis of immunoglobulin mRNA. These elements may include splice signals,

transcription promoters, including inducible promoters, enhancers, and termination signals. cDNA expression vectors incorporating such elements include those described by Okayama and Berg (1983) *Mol. Cell Biol*. 3:280; Cepko et al. (1984) *Cell* 37:1053; and Kaufman (1985) *Proc. Natl. Acad. Sci. USA* 82:689.

5          As is evident from the disclosure, the anti-C5 antibodies can be used in therapies (e.g., therapies for aHUS), including combination therapies, as well as in the monitoring of disease progression.

          In the therapeutic embodiments of the present disclosure, bispecific antibodies are contemplated. Bispecific antibodies are monoclonal, preferably human or humanized, 10   antibodies that have binding specificities for at least two different antigens. In the present case, one of the binding specificities is for the human complement component C5 antigen on a cell (such as, e.g., an immune cell), the other one is for any other antigen, and preferably for a cell-surface protein or receptor or receptor subunit.

          Methods for making bispecific antibodies are within the purview of those skilled 15   in the art. Traditionally, the recombinant production of bispecific antibodies is based on the co-expression of two immunoglobulin heavy-chain/light-chain pairs, where the two heavy chains have different specificities (Milstein and Cuello (1983) *Nature* 305:537-539). Antibody variable domains with the desired binding specificities (antibody-antigen combining sites) can be fused to immunoglobulin constant domain sequences. The fusion 20   preferably is with an immunoglobulin heavy-chain constant domain, including at least part of the hinge, $C_H2$, and $C_H3$ regions. DNAs encoding the immunoglobulin heavy-chain fusions and, if desired, the immunoglobulin light chain, are inserted into separate expression vectors, and are co-transfected into a suitable host organism. For further details of illustrative currently known methods for generating bispecific antibodies see, 25   e.g., Suresh et al. (1986) *Methods in Enzymology* 121:210; PCT Publication No. WO 96/27011; Brennan et al. (1985) *Science* 229:81; Shalaby et al., *J. Exp. Med.* (1992) 175:217-225; Kostelny et al. (1992) *J. Immunol.* 148(5):1547-1553; Hollinger et al. (1993) *Proc. Natl. Acad. Sci. USA* 90:6444-6448; Gruber et al. (1994) *J. Immunol.* 152:5368; and Tutt et al. (1991) J. Immunol. 147:60. Bispecific antibodies also include 30   cross-linked or heteroconjugate antibodies. Heteroconjugate antibodies may be made using any convenient cross-linking methods. Suitable cross-linking agents are well

known in the art, and are disclosed in U.S. Pat. No. 4,676,980, along with a number of cross-linking techniques.

Various techniques for making and isolating bispecific antibody fragments directly from recombinant cell culture have also been described. For example, bispecific

5     antibodies have been produced using leucine zippers. (See, e.g., Kostelny et al. (1992) *J. Immunol.* 148(5):1547-1553). The leucine zipper peptides from the Fos and Jun proteins may be linked to the Fab' portions of two different antibodies by gene fusion. The antibody homodimers may be reduced at the hinge region to form monomers and then re-oxidized to form the antibody heterodimers. This method can also be utilized for the

10    production of antibody homodimers. The "diabody" technology described by Hollinger et al. (1993) *Proc. Natl. Acad. Sci. USA* 90:6444-6448 has provided an alternative mechanism for making bispecific antibody fragments. The fragments comprise a heavy-chain variable domain (VH) connected to a light-chain variable domain (VL) by a linker which is too short to allow pairing between the two domains on the same chain.

15    Accordingly, the VH and VL domains of one fragment are forced to pair with the complementary VL and VH domains of another fragment, thereby forming two antigen-binding sites. Another strategy for making bispecific antibody fragments by the use of single-chain Fv (scFv) dimers has also been reported. (See, e.g., Gruber et al. (1994) *J. Immunol.* 152:5368.) Alternatively, the antibodies can be "linear antibodies" as

20    described in, e.g., Zapata et al. (1995) *Protein Eng.* 8(10):1057-1062. Briefly, these antibodies comprise a pair of tandem Fd segments ($V_H$-$C_H$1-$V_H$-$C_H$1) which form a pair of antigen binding regions. Linear antibodies can be bispecific or monospecific.

Methods for Treatment

25    The above-described compositions are useful in, *inter alia*, methods for treating or preventing aHUS in a subject (e.g., a human). The compositions can be administered to a subject, e.g., a human subject, using a variety of methods that depend, in part, on the route of administration. The route can be, e.g., intravenous injection or infusion (IV), subcutaneous injection (SC), intraperitoneally (IP), or intramuscular injection.

30    Administration can be achieved by, e.g., local infusion, injection, or by means of an implant. The implant can be of a porous, non-porous, or gelatinous material, including

ALXN-136-001

membranes, such as sialastic membranes, or fibers.  The implant can be configured for
sustained or periodic release of the composition to the subject.  (See, e.g., U.S. Patent
Publication No. 20080241223; U.S. Patent Nos. 5,501,856; 4,863,457; and 3,710,795;
EP488401; and EP 430539, the disclosures of each of which are incorporated herein by
5       reference in their entirety.)  The composition can be delivered to the subject by way of an
implantable device based on, e.g., diffusive, erodible or convective systems, e.g., osmotic
pumps, biodegradable implants, electrodiffusion systems, electroosmosis systems, vapor
pressure pumps, electrolytic pumps, effervescent pumps, piezoelectric pumps, erosion-
based systems, or electromechanical systems.

10      A suitable dose of an inhibitor of human complement component C5 (e.g., an
anti-C5 antibody or fragment thereof), which dose is capable of treating or preventing
aHUS in a subject, can depend on a variety of factors including, e.g., the age, sex, and
weight of a subject to be treated and the particular inhibitor compound used.  For
example, a different dose of an siRNA specific for human C5 may be required to treat a
15      subject with aHUS as compared to the dose of an anti-C5 antibody required to treat the
same patient.  Other factors affecting the dose administered to the subject include, e.g.,
the type or severity of the aHUS.  For example, a subject having CFH-associated aHUS
may require administration of a different dosage of the inhibitor than a subject with
MCP-associated aHUS.  Other factors can include, e.g., other medical disorders
20      concurrently or previously affecting the subject, the general health of the subject, the
genetic disposition of the subject, diet, time of administration, rate of excretion, drug
combination, and any other additional therapeutics that are administered to the subject.  It
should also be understood that a specific dosage and treatment regimen for any particular
subject will depend upon the judgment of the treating medical practitioner (e.g., doctor or
25      nurse).

The inhibitor can be administered as a fixed dose, or in a milligram per kilogram
"mg/kg" dose.  In some embodiments, the dose can also be chosen to reduce or avoid
production of antibodies or other host immune responses against one or more active
agents in the composition.  While in no way intended to be limiting, exemplary dosages
30      of an inhibitor, such as an anti-C5 antibody, include, e.g., 1-100 mg/kg, 0.5-50 mg/kg,
0.1-100 mg/kg, 0.5-25 mg/kg, 1-20 mg/kg, and 1-10 mg/kg.

Express Mail Label No. EV521708867US                    ALXN-136-001

In some embodiments, a human can be intravenously administered an anti-C5 antibody (e.g., eculizumab) at a dose of about 900 mg about every 12 (e.g., about every 10, 11, 13, 14, 15, 16, 17, 18, 19, 20, 21, 28, 30, 42, or 49 or more) days. (See, e.g., Hill et al. (2005) *Blood* 106(7):2559.)

5      In some embodiments, a human can be intravenously administered an anti-C5 antibody (e.g., eculizumab) at a dose of about 600 (e.g., about 625, 650, 700, 725, 750, 800, 825, 850, 875, 900, 925, 950, or 1,000 or more) mg every week, optionally, for two or more (e.g., three, four, five, six, seven, or eight or more) weeks. Following the initial treatment, the human can be administered the antibody at a dose of about 900 mg about

10     every 14 (e.g., about every 15, 16, 17, 18, 19, 20, 21, 28, 30, 42, or 49 or more) days, e.g., as a maintenance dose. (See, e.g., Hillmen et al. (2004) *N Engl J Med.* 350(6):552-9 and Dmytrijuk et al. (2008) *The Oncologist* 13(9):993.)

A pharmaceutical composition can include a therapeutically effective amount of an inhibitor of human complement component C5 (e.g., an anti-C5 antibody or antigen-

15     binding fragment thereof). Such effective amounts can be readily determined by one of ordinary skill in the art based, in part, on the effect of the administered inhibitor, or the combinatorial effect of the antibody and one or more additional active agents, if more than one agent is used. A therapeutically effective amount of an inhibitor of human complement component C5 (e.g., an anti-C5 antibody) can also vary according to factors

20     such as the disease state, age, sex, and weight of the individual, and the ability of the antibody (and one or more additional active agents) to elicit a desired response in the individual, e.g., amelioration of at least one condition parameter, e.g., amelioration of at least one symptom of aHUS. For example, a therapeutically effective amount of an inhibitor of human complement component C5 (e.g., an anti-C5 antibody) can inhibit

25     (lessen the severity of or eliminate the occurrence of) and/or prevent thrombocytopenia, microangiopathic hemolytic anemia, renal failure, and/or any one of the symptoms of aHUS known in the art or described herein. A therapeutically effective amount is also one in which any toxic or detrimental effects of the composition are outweighed by the therapeutically beneficial effects.

30         The terms "therapeutically effective amount" or "therapeutically effective dose," or similar terms used herein are intended to mean an amount of an agent (e.g., an

inhibitor of human complement component 5) that will elicit the desired biological or medical response (e.g., an improvement in one or more symptoms of aHUS). In some embodiments, a composition described herein contains a therapeutically effective amount of an inhibitor of human complement component C5. In some embodiments, a

5   composition described herein contains a therapeutically effective amount of an antibody, or antigen-binding fragment thereof, which binds to a complement component C5 protein. In some embodiments, the composition contains two or more (e.g., three, four, five, six, seven, eight, nine, 10, or 11 or more) different inhibitors of human complement component C5 such that the composition as a whole is therapeutically effective. For

10   example, a composition can contain an antibody that binds to a human C5 protein and an siRNA that binds to, and promotes the degradation of, an mRNA encoding a human C5 protein, wherein the antibody and siRNA are each at a concentration that when combined are therapeutically effective. In some embodiments, the composition contains the inhibitor and one or more second active agents such that the composition as a whole is

15   therapeutically effective. For example, the composition can contain an antibody that binds to a human C5 protein and another agent useful for treating or preventing aHUS.

Toxicity and therapeutic efficacy of such compositions can be determined by known pharmaceutical procedures in cell cultures or experimental animals (animal models of aHUS). These procedures can be used, e.g., for determining the $LD_{50}$ (the dose

20   lethal to 50% of the population) and the $ED_{50}$ (the dose therapeutically effective in 50% of the population). The dose ratio between toxic and therapeutic effects is the therapeutic index and it can be expressed as the ratio $LD_{50}/ED_{50}$. Compositions, or inhibitors (e.g., anti-C5 antibodies) of the compositions, that exhibit high therapeutic indices are preferred. While compositions that exhibit toxic side effects may be used, care should be

25   taken to design a delivery system that targets such compounds to the site of affected tissue and to minimize potential damage to normal cells and, thereby, reduce side effects.

The data obtained from the cell culture assays and animal studies can be used in formulating a range of dosage for use in humans. Suitable animal models of aHUS are known in the art and are described in, e.g., Atkinson et al. (2007) *Journal of*

30   *Experimental Medicine* 204(6):1245-1248. The dosage of such inhibitors lies generally within a range of circulating concentrations of the inhibitors (e.g., an anti-C5 antibody or

antigen-binding fragment thereof) that include the $ED_{50}$ with little or no toxicity. The dosage may vary within this range depending upon the dosage form employed and the route of administration utilized. For an inhibitor of human complement component C5 (e.g., an anti-C5 antibody) used as described herein (e.g., for treating or preventing

5     aHUS), the therapeutically effective dose can be estimated initially from cell culture assays. A dose can be formulated in animal models to achieve a circulating plasma concentration range that includes the $IC_{50}$ (i.e., the concentration of the test compound which achieves a half-maximal inhibition of symptoms) as determined in cell culture. Such information can be used to more accurately determine useful doses in humans.

10    Levels in plasma may be measured, for example, by high performance liquid chromatography.

In some embodiments, the required dose of an inhibitor of human complement component C5 can be determined based on the concentration of human C5 protein in the subject's blood. For example, a subject having a higher concentration of circulating

15    human C5 protein levels may require a higher dose of a human C5 inhibitor than a subject having lower levels of circulating human C5. Methods for determining the concentration of human complement component C5 in a blood-derived fluid sample from a subject are known in the art and described in, e.g., Rawal et al. (1998) *J Biol Chem* 273(27):16828-16835.

20    In some embodiments, the methods can be performed in conjunction with other therapies for aHUS. For example, the composition can be administered to a subject at the same time, prior to, or after, nephrectomy (e.g., bilateral nephrectomy), dialysis, a plasma exchange, or a plasma infusion (see, e.g., Noris et al. (2005) "Non-shiga toxin-associated hemolytic uremic syndrome." In: Zipfel P (ed). *Complement and Kidney Disease*. Basel:

25    Birkhauser-Verlag, 65-83).

A "subject," as used herein, can be any mammal. For example, a subject can be a human, a non-human primate (e.g., monkey, baboon, or chimpanzee), a horse, a cow, a pig, a sheep, a goat, a dog, a cat, a rabbit, a guinea pig, a gerbil, a hamster, a rat, or a mouse. In some embodiments, the subject is an infant (e.g., a human infant).

30    As used herein, a subject "in need of prevention," "in need of treatment," or "in need thereof," refers to one, who by the judgment of an appropriate medical practitioner

ALXN-136-001

(e.g., a doctor, a nurse, or a nurse practitioner in the case of humans; a veterinarian in the case of non-human mammals), would reasonably benefit from a given treatment (such as treatment with a composition comprising an inhibitor of human complement component C5).

5          As used herein, a subject "at risk for developing aHUS" is a subject having one or more (e.g., two, three, four, five, six, seven, or eight or more) risk factors for developing the disorder. Risk factors for aHUS are well known in the art of medicine and include, e.g., a predisposition to develop the condition, i.e., a family history of the condition or a genetic predisposition to develop the condition such as, e.g., one or more mutations in

10       complement Factor H (CFH), membrane cofactor protein (MCP; CD46), C4b-binding protein, complement factor B (CFB), or complement factor I (CFI). (See, e.g., Warwicker et al. (1998) *Kidney Int.* 53:836-844; Richards et al. (2001) *Am J Hum Genet* 68:485-490; Caprioli et al. (2001) *Am Soc Nephrol* 12:297-307; Neuman et al. (2003) *J Med Genet* 40:676-681; Richards et al. (2006) *Proc Natl Acad Sci USA* 100:12966-

15       12971; Fremeaux-Bacchi et al. (2005) *J Am Soc Nephrol* 17:2017-2025; Esparza-Gordillo et al. (2005) *Hum Mol Genet* 14:703-712; Goicoechea de Jorge et al. (2007) *Proc Natl Acad Sci USA* 104(1):240-245; Blom et al. (2008) *J Immunol.* 180(9):6385-91; and Fremeaux-Bacchi et al. (2004) *J Medical Genet* 41:e84). (See also Kavanagh et al. (2006) *supra.*) Risk factors also include, e.g., infection with *Streptococcus pneumoniae*,

20       pregnancy, cancer, exposure to anti-cancer agents (e.g., quinine, mitomycin C, cisplatin, or bleomycin), exposure to immunotherapeutic agents (e.g., cyclosporine, OKT3, or interferon), exposure to anti-platelet agents (e.g., ticlopidine or clopidogrel), HIV infection, transplantation, autoimmune disease, and combined methylmalonic aciduria and homocystinuria (cblC). See, e.g., Constantinescu et al. (2004) *Am J Kidney Dis*

25       43:976-982; George (2003) *Curr Opin Hematol* 10:339-344; Gottschall et al. (1994) *Am J Hematol* 47:283-289; Valavaara et al. (1985) *Cancer* 55:47-50; Miralbell et al. (1996) *J Clin Oncol* 14:579-585; Dragon-Durey et al. (2005) *J Am Soc Nephrol* 16:555-63; and Becker et al. (2004) *Clin Infect Dis* 39:S267-S275. Thus, a human at risk for developing aHUS can be, e.g., one who has a family history of aHUS and/or one who has an HIV

30       infection. From the above it will be clear that subjects "at risk for developing aHUS" are not all the subjects within a species of interest.

A subject "suspected of having aHUS" is one having one or more symptoms of the condition. Symptoms of this condition are well-known to those of skill in the art of medicine and include, e.g., severe hypertension, proteinuria, uremia, lethargy/fatigue, irritability, thrombocytopenia, thrombocytopenia, microangiopathic hemolytic anemia,
5      and renal function impairment (e.g., acute renal failure). It will be clear from the foregoing passage that subjects "suspected of having aHUS" are not all the subjects within a species of interest.

aHUS can be genetic, acquired, or idiopathic. aHUS can be considered genetic when two or more (e.g., three, four, five, or six or more) members of the same family are
10    affected by the disease at least six months apart and exposure to a common triggering agent has been excluded, or when one or more aHUS-associated gene mutations (e.g., one or more mutations in CFH, MCP/CD46, CFB, or CFI) are identified in a subject. For example, a subject can have CFH-associated aHUS, CFB-associated aHUS, CFI-associated aHUS, or MCP-associated aHUS. Up to 30% of genetic aHUS is associated
15    with mutations in CFH, 12% with mutations in MCP, 5-10% with mutations in CFI, and less than 2% with mutations in CFB. Genetic aHUS can be multiplex (i.e., familial; two or more affected family members) or simplex (i.e., a single occurrence in a family). aHUS can be considered acquired when an underlying environmental factor (e.g., a drug, systemic disease, or viral or bacterial agents that do not result in Shiga-like exotoxins)
20    can be identified. aHUS can be considered idiopathic when no trigger (genetic or environmental) is evident.

In some embodiments, the methods can include identifying the subject as one having, suspected of having, or at risk for developing aHUS. Suitable methods for identifying the subject are known in the art. For example, laboratory tests can be
25    performed to determine whether a human subject has thrombocytopenia, microangiopathic hemolytic anemia, or acute renal insufficiency. Thrombocytopenia can be diagnosed by a medical professional as one or more of: (i) a platelet count that is less than 150,000/mm$^3$ (e.g., less than 60,000/mm$^3$); (ii) a reduction in platelet survival time that is reduced, reflecting enhanced platelet disruption in the circulation; and (iii) giant
30    platelets observed in a peripheral smear, which is consistent with secondary activation of thrombocytopoiesis. Microangiopathic hemolytic anemia can be diagnosed by a medical

professional as one or more of: (i) hemoglobin concentrations that are less than 10 mg/dL
(e.g., less than 6.5 mg/dL); (ii) increased serum lactate dehydrogenase (LDH)
concentrations (>460 U/L); (iii) hyperbilirubinemia, reticulocytosis, circulating free
hemoglobin, and low or undetectable haptoglobin concentrations; and (iv) the detection

5   of fragmented red blood cells (schistocytes) with the typical aspect of burr or helmet cells
in the peripheral smear together with a negative Coombs test.  (See, e.g., Kaplan et al.
(1992) "Hemolytic Uremic Syndrome and Thrombotic Thrombocytopenic Purpura,"
Informa Health Care (ISBN 0824786637) and Zipfel (2005) "Complement and Kidney
Disease," Springer (ISBN 3764371668).)

10          A subject can also be identified as having aHUS by evaluating blood
concentrations of C3 and C4 as a measure of complement activation or dysregulation.  In
addition, as is clear from the foregoing disclosure, a subject can be identified as having
genetic aHUS by identifying the subject as harboring one or more mutations in a gene
associated with aHUS such as CFI, CFB, CFH, or MCP (*supra*).  Suitable methods for

15   detecting a mutation in a gene include, e.g., DNA sequencing and nucleic acid array
techniques.  (See, e.g., Breslin et al. (2006) *Clin Am Soc Nephrol* 1:88-99 and
Goicoechea de Jorge et al. (2007) *Proc Natl Acad Sci USA* 104:240-245.)

            In some embodiments, the inhibitor of human complement component C5 (e.g.,
an anti-C5 antibody or antigen-binding fragment thereof) can be administered to a subject

20   as a monotherapy.  Alternatively, as described above, the inhibitor can be administered to
a subject as a combination therapy with another treatment, e.g., another treatment for
aHUS.  For example, the combination therapy can include administering to the subject
(e.g., a human patient) one or more additional agents (e.g., anti-hypertensives) that
provide a therapeutic benefit to the subject who has, or is at risk of developing, aHUS.  In

25   some embodiments, the inhibitor of human complement component C5 and the one or
more additional active agents are administered at the same time.  In other embodiments,
the inhibitor is administered first in time and the one or more additional active agents are
administered second in time.  In some embodiments, the one or more additional active
agents are administered first in time and the inhibitor is administered second in time.

30          The inhibitor of human complement component C5 can replace or augment a
previously or currently administered therapy.  For example, upon treating with an anti-C5

antibody or antigen-binding fragment thereof, administration of the one or more additional active agents can cease or diminish, e.g., be administered at lower levels. In some embodiments, administration of the previous therapy can be maintained. In some embodiments, a previous therapy will be maintained until the level of inhibitor of human

5    C5 reaches a level sufficient to provide a therapeutic effect. The two therapies can be administered in combination.

       Monitoring a subject (e.g., a human patient) for an improvement in aHUS, as defined herein, means evaluating the subject for a change in a disease parameter, e.g., an improvement in one or more symptoms of the disease. Such symptoms include any of

10   the symptoms of aHUS described herein. In some embodiments, the evaluation is performed at least 1 hour, e.g., at least 2, 4, 6, 8, 12, 24, or 48 hours, or at least 1 day, 2 days, 4 days, 10 days, 13 days, 20 days or more, or at least 1 week, 2 weeks, 4 weeks, 10 weeks, 13 weeks, 20 weeks or more, after an administration. The subject can be evaluated in one or more of the following periods: prior to beginning of treatment; during

15   the treatment; or after one or more elements of the treatment have been administered. Evaluating can include evaluating the need for further treatment, e.g., evaluating whether a dosage, frequency of administration, or duration of treatment should be altered. It can also include evaluating the need to add or drop a selected therapeutic modality, e.g., adding or dropping any of the treatments for aHUS described herein.

20

       ***Ex vivo* approaches**. Where the inhibitor of human complement component C5 is a polypeptide (e.g., an antibody) or a nucleic acid (e.g., an siRNA or anti-sense nucleic acid), an *ex vivo* strategy for treating or preventing aHUS can involve transfecting or transducing one or more cells obtained from a subject with a polynucleotide encoding the

25   protein or nucleic acid. For example, the cells can be transfected with a single vector encoding a heavy and light chain of an anti-C5 antibody or the cells can be transfected with a first vector encoding a heavy chain and a second vector encoding a light chain of the antibody. In another example, the cells can be transfected with an expression vector encoding an siRNA specific for an mRNA encoding a human C5 protein.

30       The transfected or transduced cells are then returned to the subject. The cells can be any of a wide range of types including, without limitation, hemopoietic cells (e.g.,

bone marrow cells, macrophages, monocytes, dendritic cells, T cells, or B cells),
fibroblasts, epithelial cells, endothelial cells, keratinocytes, or muscle cells.  Such cells
can act as a source (e.g., sustained or periodic source) of the C5 inhibitor (e.g., the anti-
C5 antibody or antigen-binding fragment or anti-C5 siRNA) for as long as they survive in

5    the subject.  In some embodiments, the vectors and/or cells can be configured for
inducible or repressible expression of the antibody (see, e.g., Schockett et al. (1996)
*Proc. Natl. Acad. Sci. USA* 93: 5173-5176 and U.S. Patent No. 7,056,897.)

Preferably, the cells are obtained from the subject (autologous), but can
potentially be obtained from a subject of the same species other than the subject

10   (allogeneic).

Suitable methods for obtaining cells from a subject and transducing or
transfecting the cells are known in the art of molecular biology.  For example, the
transduction step can be accomplished by any standard means used for *ex vivo* gene
therapy, including calcium phosphate, lipofection, electroporation, viral infection (see

15   above), and biolistic gene transfer.  (See, e.g., Sambrook et al. (*supra*) and Ausubel et al.
(1992) "Current Protocols in Molecular Biology," Greene Publishing Associates).
Alternatively, liposomes or polymeric microparticles can be used.  Cells that have been
successfully transduced can be selected, for example, for expression of the coding
sequence or of a drug resistance gene.

20

Kits

The disclosure also features articles of manufacture or kits, which include a
container with a label; and a composition containing one or more (e.g., one, two, three,
four, five, six, seven, eight, nine, or 10 or more) inhibitor(s) of human complement

25   component C5 (e.g., an anti-C5 antibody or antigen-binding fragment thereof).  The label
indicates that the composition is to be administered to a subject having, suspected of
having, or at risk for developing, aHUS.  The kit can, optionally, include a means for
administering the composition to the subject.  For example, the kits can include one or
more syringes.

30          In some embodiments, the kits can contain two or more (e.g., three, four, five, six,
seven, eight, nine, or 10 or more) different types of inhibitors of human complement

component C5.  For example, a kit can contain an anti-C5 antibody (or antigen-binding fragment thereof) and an siRNA that binds to an mRNA that encodes a human C5 protein.  In some embodiments, the kit can contain an anti-C5 antibody, an siRNA, and a small molecule inhibitor of human C5.

5        In some embodiments, the kits can further include one or more additional active agents such as any of those described herein.  For example, the kits can include one or more anti-hypertensives.

The kits can also, optionally, include instructions and/or reagents for determining whether a subject has, is suspected of having, or is at risk for developing, aHUS.  For

10    example, the kits can include one or more reagents for sequencing a gene associated with aHUS such as the CFH, CFB, MCP, C4BP, or CFI genes.  Such reagents can include, e.g., one or more nucleic acid primers, an RNA or DNA polymerase (e.g., reverse transcriptase and/or a thermostable polymerase such as Taq, VENT, or DeepVENT DNA polymerase; New England Biolabs, Inc., Ipswich, MA), and/or nucleoside triphosphates.

15

The following examples are intended to illustrate, not limit, the invention.


Example 1

A human patient is identified by a medical practitioner as having CFB-associated

20    aHUS.  Once a week for four weeks the patient is administered a composition containing eculizumab at a dose of 600 mg.  Eculizumab is administered as a 35-minute intravenous infusion.  The patient and medical practitioner observe a substantial improvement in at least two known symptoms of aHUS during the initial treatment.  One week after the initial four week treatment, the patient receives intravenously administered "maintenance

25    doses" of eculizumab every two weeks, each dose being 900 mg.


Example 2

A human patient presenting with idiopathic aHUS is intravenously administered every two weeks a composition containing eculizumab at a dose of 900 mg.  The patient

30    and medical practitioner observe a substantial reduction in overall severity of the

Express Mail Label No. EV521708867US                                    ALXN-136-001

patient's aHUS symptoms during the initial treatment.  The patient is maintained on the same treatment regimen.

5          While the present disclosure has been described with reference to the specific embodiments thereof, it should be understood by those skilled in the art that various changes may be made and equivalents may be substituted without departing from the true spirit and scope of the disclosure.  In addition, many modifications may be made to adapt a particular situation, material, composition of matter, process, process step or steps, to the objective, spirit and scope of the present disclosure.  All such modifications are

10        intended to be within the scope of the disclosure.

Express Mail Label No. EV521708867US                    ALXN-136-001

What is claimed is:

1.      A method for treating atypical hemolytic uremic syndrome (aHUS) in a human, the method comprising administering to a human in need thereof a therapeutically effective amount of a composition comprising an inhibitor of human complement component C5.

2.      A method for treating atypical hemolytic uremic syndrome (aHUS) in a human, the method comprising administering to a human in need thereof a composition comprising a therapeutically effective amount of an inhibitor of human complement component C5.

3.      The method of claim 1 or 2, wherein the inhibitor inhibits the expression of a human complement component C5 protein.

4.      The method of claim 1 or 2, wherein the inhibitor inhibits the cleavage of human complement component C5 to form C5a and C5b.

5.      The method of any one of claims 1-4, wherein the inhibitor is selected from the group consisting of a polypeptide, a polypeptide analog, a nucleic acid, a nucleic acid analog, and a small molecule.

6.      The method of claim 5, wherein the polypeptide comprises an antibody, or antigen-binding fragment thereof, that binds to a human complement component C5 protein.

7.      The method of claim 6, wherein the antibody binds to the alpha chain of the complement component C5 protein.

8.      The method of claim 6 or 7, wherein the antibody binds to the alpha chain of human complement component C5, and wherein the antibody (i) inhibits complement activation in a human body fluid, (ii) inhibits the binding of purified human complement component C5 to either human complement component C3 or human complement component C4, and (iii) does not bind to the human complement activation product free C5a.

9.      The method of claim 6 or 7, wherein the antibody binds to the human complement component C5 protein having the amino acid sequence depicted in any one of SEQ ID NOs:1-11.

10.     The method of claim 6 or 7, wherein antibody binds to an isolated oligopeptide comprising an amino acid sequence corresponding to amino acid position 8 through amino acid position 12 of SEQ ID NO:5.

11.     The method of any one of claims 6-10, wherein the antibody is a monoclonal antibody.

12.     The method of any one of claims 6-10, wherein the antibody is a single-chain antibody.

13.     The method of any one of claims 6-12, wherein the antibody is a humanized antibody.

14.     The method of any one of claims 6-10, wherein the antibody or antigen-binding fragment thereof is selected from the group consisting of a polyclonal antibody, a recombinant antibody, a diabody, a chimerized or chimeric antibody, a deimmunized human antibody, a fully human antibody, a single chain antibody, an Fv fragment, an Fd fragment, an Fab fragment, an Fab' fragment, and an F(ab')$_2$ fragment.

15.     The method of claim 6, wherein the antibody is eculizumab.

Express Mail Label No. EV521708867US                    ALXN-136-001

16.     The method of any one of claims 1-15, wherein the composition is intravenously administered to the human.

17.     The method of any one of claims 1-16, wherein the aHUS is complement factor H (CFH)-associated aHUS.

18.     The method of any one of claims 1-16, wherein the aHUS is membrane cofactor protein (MCP)-associated aHUS.

19.     The method of any one of claims 1-16, wherein the aHUS is complement factor I (CFI)-associated aHUS, C4b-binding protein (C4BP)-associated aHUS, or complement factor B-(CFB)-associated aHUS.

20.     The method of any one of claims 1-19, further comprising identifying the human as one having, suspected of having, or at risk for developing, aHUS.

21.     The method of any one of claims 1-20, further comprising, after the administering, monitoring the human for an improvement in one or more symptoms of aHUS.

22.     The method of any of claims 1-21, wherein the composition is administered to the human prior to, during, or following a plasma exchange or plasma infusion.

23.     The method of any one of claims 1-22, further comprising administering to the human one or more additional active agents.

24.     The method of claim 23, wherein the one or more additional active agents are selected from the group consisting of anti-hypertensives, anti-platelet agents, prostacyclin, fibrinolytic agents, and anti-oxidants.

Express Mail Label No. EV521708867US                          ALXN-136-001

25.     The method of any of claims 1-24, wherein the human is an infant.


26.     A method for treating atypical hemolytic uremic syndrome (aHUS) in a human, the method comprising:

        identifying a human as having, suspected of having, or at risk for developing, aHUS; and

        administering to the human a composition comprising a therapeutically effective amount of an antibody, or antigen-binding fragment thereof, that binds to a human complement component C5 protein, wherein the antibody is eculizumab.


27.     An article of manufacture comprising:

        a container comprising a label; and

        a composition comprising an inhibitor of human complement component C5, wherein the label indicates that the composition is to be administered to a human having, suspected of having, or at risk for developing, aHUS.


28.     The article of manufacture of claim 25, wherein the inhibitor is an antibody or antigen-binding fragment thereof that binds to a human complement component C5 protein.


29.     The article of manufacture of claim 25 or 26, further comprising one or more additional active agents.

Express Mail Label No. EV521708867US                    ALXN-136-001

Abstract

The present disclosure relates to, *inter alia*, compositions containing an inhibitor of human complement component C5 and use of the compositions in methods for treating or preventing conditions related to aHUS in a subject. In some embodiments, the compositions contain an antibody, or antigen-binding fragment thereof, that binds to a human complement component C5 protein.

SEQUENCE LISTING

<110>  Rother, Russell P.

<120>  Methods and Compositions for Treating Atypical Hemolytic Uremic
       Syndrome

<130>  ALXN-136-001

<160>  11

<170>  PatentIn version 3.5

<210>  1
<211>  1676
<212>  PRT
<213>  Homo sapiens

<400>  1

```
Met Gly Leu Leu Gly Ile Leu Cys Phe Leu Ile Phe Leu Gly Lys Thr
1               5                   10                  15


Trp Gly Gln Glu Gln Thr Tyr Val Ile Ser Ala Pro Lys Ile Phe Arg
                20                  25                  30


Val Gly Ala Ser Glu Asn Ile Val Ile Gln Val Tyr Gly Tyr Thr Glu
            35                  40                  45


Ala Phe Asp Ala Thr Ile Ser Ile Lys Ser Tyr Pro Asp Lys Lys Phe
        50                  55                  60


Ser Tyr Ser Ser Gly His Val His Leu Ser Ser Glu Asn Lys Phe Gln
65                  70                  75                  80


Asn Ser Ala Ile Leu Thr Ile Gln Pro Lys Gln Leu Pro Gly Gly Gln
                85                  90                  95


Asn Pro Val Ser Tyr Val Tyr Leu Glu Val Val Ser Lys His Phe Ser
            100                 105                 110


Lys Ser Lys Arg Met Pro Ile Thr Tyr Asp Asn Gly Phe Leu Phe Ile
        115                 120                 125


His Thr Asp Lys Pro Val Tyr Thr Pro Asp Gln Ser Val Lys Val Arg
        130                 135                 140
```

```
Val Tyr Ser Leu Asn Asp Asp Leu Lys Pro Ala Lys Arg Glu Thr Val
145                 150                 155                 160

Leu Thr Phe Ile Asp Pro Glu Gly Ser Glu Val Asp Met Val Glu Glu
                165                 170                 175

Ile Asp His Ile Gly Ile Ile Ser Phe Pro Asp Phe Lys Ile Pro Ser
                180                 185                 190

Asn Pro Arg Tyr Gly Met Trp Thr Ile Lys Ala Lys Tyr Lys Glu Asp
            195                 200                 205

Phe Ser Thr Thr Gly Thr Ala Tyr Phe Glu Val Lys Glu Tyr Val Leu
    210                 215                 220

Pro His Phe Ser Val Ser Ile Glu Pro Glu Tyr Asn Phe Ile Gly Tyr
225                 230                 235                 240

Lys Asn Phe Lys Asn Phe Glu Ile Thr Ile Lys Ala Arg Tyr Phe Tyr
                245                 250                 255

Asn Lys Val Val Thr Glu Ala Asp Val Tyr Ile Thr Phe Gly Ile Arg
            260                 265                 270

Glu Asp Leu Lys Asp Asp Gln Lys Glu Met Met Gln Thr Ala Met Gln
        275                 280                 285

Asn Thr Met Leu Ile Asn Gly Ile Ala Gln Val Thr Phe Asp Ser Glu
    290                 295                 300

Thr Ala Val Lys Glu Leu Ser Tyr Tyr Ser Leu Glu Asp Leu Asn Asn
305                 310                 315                 320

Lys Tyr Leu Tyr Ile Ala Val Thr Val Ile Glu Ser Thr Gly Gly Phe
                325                 330                 335

Ser Glu Glu Ala Glu Ile Pro Gly Ile Lys Tyr Val Leu Ser Pro Tyr
            340                 345                 350

Lys Leu Asn Leu Val Ala Thr Pro Leu Phe Leu Lys Pro Gly Ile Pro
    355                 360                 365
```

```
Tyr Pro Ile Lys Val Gln Val Lys Asp Ser Leu Asp Gln Leu Val Gly
    370             375             380
```

```
Gly Val Pro Val Ile Leu Asn Ala Gln Thr Ile Asp Val Asn Gln Glu
385             390             395             400
```

```
Thr Ser Asp Leu Asp Pro Ser Lys Ser Val Thr Arg Val Asp Asp Gly
            405             410             415
```

```
Val Ala Ser Phe Val Leu Asn Leu Pro Ser Gly Val Thr Val Leu Glu
            420             425             430
```

```
Phe Asn Val Lys Thr Asp Ala Pro Asp Leu Pro Glu Glu Asn Gln Ala
        435             440             445
```

```
Arg Glu Gly Tyr Arg Ala Ile Ala Tyr Ser Ser Leu Ser Gln Ser Tyr
    450             455             460
```

```
Leu Tyr Ile Asp Trp Thr Asp Asn His Lys Ala Leu Leu Val Gly Glu
465             470             475             480
```

```
His Leu Asn Ile Ile Val Thr Pro Lys Ser Pro Tyr Ile Asp Lys Ile
            485             490             495
```

```
Thr His Tyr Asn Tyr Leu Ile Leu Ser Lys Gly Lys Ile Ile His Phe
        500             505             510
```

```
Gly Thr Arg Glu Lys Phe Ser Asp Ala Ser Tyr Gln Ser Ile Asn Ile
        515             520             525
```

```
Pro Val Thr Gln Asn Met Val Pro Ser Ser Arg Leu Leu Val Tyr Tyr
    530             535             540
```

```
Ile Val Thr Gly Glu Gln Thr Ala Glu Leu Val Ser Asp Ser Val Trp
545             550             555             560
```

```
Leu Asn Ile Glu Glu Lys Cys Gly Asn Gln Leu Gln Val His Leu Ser
            565             570             575
```

```
Pro Asp Ala Asp Ala Tyr Ser Pro Gly Gln Thr Val Ser Leu Asn Met
        580             585             590
```

```
Ala Thr Gly Met Asp Ser Trp Val Ala Leu Ala Ala Val Asp Ser Ala
        595             600             605

Val Tyr Gly Val Gln Arg Gly Ala Lys Lys Pro Leu Glu Arg Val Phe
        610             615             620

Gln Phe Leu Glu Lys Ser Asp Leu Gly Cys Gly Ala Gly Gly Gly Leu
625             630             635             640

Asn Asn Ala Asn Val Phe His Leu Ala Gly Leu Thr Phe Leu Thr Asn
                645             650             655

Ala Asn Ala Asp Asp Ser Gln Glu Asn Asp Glu Pro Cys Lys Glu Ile
            660             665             670

Leu Arg Pro Arg Arg Thr Leu Gln Lys Lys Ile Glu Glu Ile Ala Ala
        675             680             685

Lys Tyr Lys His Ser Val Val Lys Lys Cys Cys Tyr Asp Gly Ala Cys
        690             695             700

Val Asn Asn Asp Glu Thr Cys Glu Gln Arg Ala Ala Arg Ile Ser Leu
705             710             715             720

Gly Pro Arg Cys Ile Lys Ala Phe Thr Glu Cys Cys Val Val Ala Ser
            725             730             735

Gln Leu Arg Ala Asn Ile Ser His Lys Asp Met Gln Leu Gly Arg Leu
        740             745             750

His Met Lys Thr Leu Leu Pro Val Ser Lys Pro Glu Ile Arg Ser Tyr
        755             760             765

Phe Pro Glu Ser Trp Leu Trp Glu Val His Leu Val Pro Arg Arg Lys
        770             775             780

Gln Leu Gln Phe Ala Leu Pro Asp Ser Leu Thr Thr Trp Glu Ile Gln
785             790             795             800

Gly Ile Gly Ile Ser Asn Thr Gly Ile Cys Val Ala Asp Thr Val Lys
                805             810             815
```

```
Ala Lys Val Phe Lys Asp Val Phe Leu Glu Met Asn Ile Pro Tyr Ser
        820           825               830

Val Val Arg Gly Glu Gln Ile Gln Leu Lys Gly Thr Val Tyr Asn Tyr
        835           840               845

Arg Thr Ser Gly Met Gln Phe Cys Val Lys Met Ser Ala Val Glu Gly
    850           855               860

Ile Cys Thr Ser Glu Ser Pro Val Ile Asp His Gln Gly Thr Lys Ser
865               870           875               880

Ser Lys Cys Val Arg Gln Lys Val Glu Gly Ser Ser Ser His Leu Val
            885               890               895

Thr Phe Thr Val Leu Pro Leu Glu Ile Gly Leu His Asn Ile Asn Phe
            900               905               910

Ser Leu Glu Thr Trp Phe Gly Lys Glu Ile Leu Val Lys Thr Leu Arg
        915               920           925

Val Val Pro Glu Gly Val Lys Arg Glu Ser Tyr Ser Gly Val Thr Leu
    930               935               940

Asp Pro Arg Gly Ile Tyr Gly Thr Ile Ser Arg Arg Lys Glu Phe Pro
945               950               955               960

Tyr Arg Ile Pro Leu Asp Leu Val Pro Lys Thr Glu Ile Lys Arg Ile
            965               970               975

Leu Ser Val Lys Gly Leu Leu Val Gly Glu Ile Leu Ser Ala Val Leu
            980               985               990

Ser Gln Glu Gly Ile Asn Ile Leu  Thr His Leu Pro Lys  Gly Ser Ala
        995               1000              1005

Glu Ala Glu Leu Met Ser Val  Val Pro Val Phe Tyr  Val Phe His
    1010              1015              1020

Tyr Leu  Glu Thr Gly Asn His  Trp Asn Ile Phe His  Ser Asp Pro
    1025              1030              1035
```

```
Leu Ile  Glu Lys Gln Lys Leu  Lys Lys Lys Leu Lys  Glu Gly Met
    1040             1045              1050

Leu Ser  Ile Met Ser Tyr Arg  Asn Ala Asp Tyr Ser  Tyr Ser Val
    1055             1060              1065

Trp Lys  Gly Gly Ser Ala Ser  Thr Trp Leu Thr Ala  Phe Ala Leu
    1070             1075              1080

Arg Val  Leu Gly Gln Val Asn  Lys Tyr Val Glu Gln  Asn Gln Asn
    1085             1090              1095

Ser Ile  Cys Asn Ser Leu Leu  Trp Leu Val Glu Asn  Tyr Gln Leu
    1100             1105              1110

Asp Asn  Gly Ser Phe Lys Glu  Asn Ser Gln Tyr Gln  Pro Ile Lys
    1115             1120              1125

Leu Gln  Gly Thr Leu Pro Val  Glu Ala Arg Glu Asn  Ser Leu Tyr
    1130             1135              1140

Leu Thr  Ala Phe Thr Val Ile  Gly Ile Arg Lys Ala  Phe Asp Ile
    1145             1150              1155

Cys Pro  Leu Val Lys Ile Asp  Thr Ala Leu Ile Lys  Ala Asp Asn
    1160             1165              1170

Phe Leu  Leu Glu Asn Thr Leu  Pro Ala Gln Ser Thr  Phe Thr Leu
    1175             1180              1185

Ala Ile  Ser Ala Tyr Ala Leu  Ser Leu Gly Asp Lys  Thr His Pro
    1190             1195              1200

Gln Phe  Arg Ser Ile Val Ser  Ala Leu Lys Arg Glu  Ala Leu Val
    1205             1210              1215

Lys Gly  Asn Pro Pro Ile Tyr  Arg Phe Trp Lys Asp  Asn Leu Gln
    1220             1225              1230

His Lys  Asp Ser Ser Val Pro  Asn Thr Gly Thr Ala  Arg Met Val
    1235             1240              1245
```

```
Glu Thr  Thr Ala Tyr Ala Leu  Leu Thr Ser Leu Asn  Leu Lys Asp
    1250              1255              1260

Ile Asn  Tyr Val Asn Pro Val  Ile Lys Trp Leu Ser  Glu Glu Gln
    1265              1270              1275

Arg Tyr  Gly Gly Gly Phe Tyr  Ser Thr Gln Asp Thr  Ile Asn Ala
    1280              1285              1290

Ile Glu  Gly Leu Thr Glu Tyr  Ser Leu Leu Val Lys  Gln Leu Arg
    1295              1300              1305

Leu Ser  Met Asp Ile Asp Val  Ser Tyr Lys His Lys  Gly Ala Leu
    1310              1315              1320

His Asn  Tyr Lys Met Thr Asp  Lys Asn Phe Leu Gly  Arg Pro Val
    1325              1330              1335

Glu Val  Leu Leu Asn Asp Asp  Leu Ile Val Ser Thr  Gly Phe Gly
    1340              1345              1350

Ser Gly  Leu Ala Thr Val His  Val Thr Thr Val Val  His Lys Thr
    1355              1360              1365

Ser Thr  Ser Glu Glu Val Cys  Ser Phe Tyr Leu Lys  Ile Asp Thr
    1370              1375              1380

Gln Asp  Ile Glu Ala Ser His  Tyr Arg Gly Tyr Gly  Asn Ser Asp
    1385              1390              1395

Tyr Lys  Arg Ile Val Ala Cys  Ala Ser Tyr Lys Pro  Ser Arg Glu
    1400              1405              1410

Glu Ser  Ser Ser Gly Ser Ser  His Ala Val Met Asp  Ile Ser Leu
    1415              1420              1425

Pro Thr  Gly Ile Ser Ala Asn  Glu Glu Asp Leu Lys  Ala Leu Val
    1430              1435              1440

Glu Gly  Val Asp Gln Leu Phe  Thr Asp Tyr Gln Ile  Lys Asp Gly
    1445              1450              1455
```

```
His Val Ile Leu Gln Leu Asn Ser Ile Pro Ser Ser Asp Phe Leu
    1460                1465                1470

Cys Val Arg Phe Arg Ile Phe Glu Leu Phe Glu Val Gly Phe Leu
    1475                1480                1485

Ser Pro Ala Thr Phe Thr Val Tyr Glu Tyr His Arg Pro Asp Lys
    1490                1495                1500

Gln Cys Thr Met Phe Tyr Ser Thr Ser Asn Ile Lys Ile Gln Lys
    1505                1510                1515

Val Cys Glu Gly Ala Ala Cys Lys Cys Val Glu Ala Asp Cys Gly
    1520                1525                1530

Gln Met Gln Glu Glu Leu Asp Leu Thr Ile Ser Ala Glu Thr Arg
    1535                1540                1545

Lys Gln Thr Ala Cys Lys Pro Glu Ile Ala Tyr Ala Tyr Lys Val
    1550                1555                1560

Ser Ile Thr Ser Ile Thr Val Glu Asn Val Phe Val Lys Tyr Lys
    1565                1570                1575

Ala Thr Leu Leu Asp Ile Tyr Lys Thr Gly Glu Ala Val Ala Glu
    1580                1585                1590

Lys Asp Ser Glu Ile Thr Phe Ile Lys Lys Val Thr Cys Thr Asn
    1595                1600                1605

Ala Glu Leu Val Lys Gly Arg Gln Tyr Leu Ile Met Gly Lys Glu
    1610                1615                1620

Ala Leu Gln Ile Lys Tyr Asn Phe Ser Phe Arg Tyr Ile Tyr Pro
    1625                1630                1635

Leu Asp Ser Leu Thr Trp Ile Glu Tyr Trp Pro Arg Asp Thr Thr
    1640                1645                1650

Cys Ser Ser Cys Gln Ala Phe Leu Ala Asn Leu Asp Glu Phe Ala
    1655                1660                1665
```

```
Glu Asp Ile Phe Leu Asn Gly Cys
    1670                1675


<210> 2
<211> 1658
<212> PRT
<213> Homo sapiens

<400> 2

Gln Glu Gln Thr Tyr Val Ile Ser Ala Pro Lys Ile Phe Arg Val Gly
1               5                   10                  15


Ala Ser Glu Asn Ile Val Ile Gln Val Tyr Gly Tyr Thr Glu Ala Phe
                20                  25                  30


Asp Ala Thr Ile Ser Ile Lys Ser Tyr Pro Asp Lys Lys Phe Ser Tyr
            35                  40                  45


Ser Ser Gly His Val His Leu Ser Ser Glu Asn Lys Phe Gln Asn Ser
        50                  55                  60


Ala Ile Leu Thr Ile Gln Pro Lys Gln Leu Pro Gly Gly Gln Asn Pro
65                  70                  75                  80


Val Ser Tyr Val Tyr Leu Glu Val Val Ser Lys His Phe Ser Lys Ser
                85                  90                  95


Lys Arg Met Pro Ile Thr Tyr Asp Asn Gly Phe Leu Phe Ile His Thr
                100                 105                 110


Asp Lys Pro Val Tyr Thr Pro Asp Gln Ser Val Lys Val Arg Val Tyr
            115                 120                 125


Ser Leu Asn Asp Asp Leu Lys Pro Ala Lys Arg Glu Thr Val Leu Thr
        130                 135                 140


Phe Ile Asp Pro Glu Gly Ser Glu Val Asp Met Val Glu Glu Ile Asp
145                 150                 155                 160


His Ile Gly Ile Ile Ser Phe Pro Asp Phe Lys Ile Pro Ser Asn Pro
                165                 170                 175


Arg Tyr Gly Met Trp Thr Ile Lys Ala Lys Tyr Lys Glu Asp Phe Ser
                180                 185                 190
```

```
Thr Thr Gly Thr Ala Tyr Phe Glu Val Lys Glu Tyr Val Leu Pro His
        195             200             205

Phe Ser Val Ser Ile Glu Pro Glu Tyr Asn Phe Ile Gly Tyr Lys Asn
        210             215             220

Phe Lys Asn Phe Glu Ile Thr Ile Lys Ala Arg Tyr Phe Tyr Asn Lys
225             230             235             240

Val Val Thr Glu Ala Asp Val Tyr Ile Thr Phe Gly Ile Arg Glu Asp
            245             250             255

Leu Lys Asp Asp Gln Lys Glu Met Met Gln Thr Ala Met Gln Asn Thr
            260             265             270

Met Leu Ile Asn Gly Ile Ala Gln Val Thr Phe Asp Ser Glu Thr Ala
        275             280             285

Val Lys Glu Leu Ser Tyr Tyr Ser Leu Glu Asp Leu Asn Asn Lys Tyr
        290             295             300

Leu Tyr Ile Ala Val Thr Val Ile Glu Ser Thr Gly Gly Phe Ser Glu
305             310             315             320

Glu Ala Glu Ile Pro Gly Ile Lys Tyr Val Leu Ser Pro Tyr Lys Leu
            325             330             335

Asn Leu Val Ala Thr Pro Leu Phe Leu Lys Pro Gly Ile Pro Tyr Pro
        340             345             350

Ile Lys Val Gln Val Lys Asp Ser Leu Asp Gln Leu Val Gly Gly Val
        355             360             365

Pro Val Ile Leu Asn Ala Gln Thr Ile Asp Val Asn Gln Glu Thr Ser
        370             375             380

Asp Leu Asp Pro Ser Lys Ser Val Thr Arg Val Asp Asp Gly Val Ala
385             390             395             400

Ser Phe Val Leu Asn Leu Pro Ser Gly Val Thr Val Leu Glu Phe Asn
            405             410             415
```

```
Val Lys Thr Asp Ala Pro Asp Leu Pro Glu Glu Asn Gln Ala Arg Glu
        420             425             430

Gly Tyr Arg Ala Ile Ala Tyr Ser Ser Leu Ser Gln Ser Tyr Leu Tyr
        435             440             445

Ile Asp Trp Thr Asp Asn His Lys Ala Leu Leu Val Gly Glu His Leu
    450             455             460

Asn Ile Ile Val Thr Pro Lys Ser Pro Tyr Ile Asp Lys Ile Thr His
465             470             475             480

Tyr Asn Tyr Leu Ile Leu Ser Lys Gly Lys Ile Ile His Phe Gly Thr
            485             490             495

Arg Glu Lys Phe Ser Asp Ala Ser Tyr Gln Ser Ile Asn Ile Pro Val
            500             505             510

Thr Gln Asn Met Val Pro Ser Ser Arg Leu Leu Val Tyr Tyr Ile Val
            515             520             525

Thr Gly Glu Gln Thr Ala Glu Leu Val Ser Asp Ser Val Trp Leu Asn
    530             535             540

Ile Glu Glu Lys Cys Gly Asn Gln Leu Gln Val His Leu Ser Pro Asp
545             550             555             560

Ala Asp Ala Tyr Ser Pro Gly Gln Thr Val Ser Leu Asn Met Ala Thr
            565             570             575

Gly Met Asp Ser Trp Val Ala Leu Ala Ala Val Asp Ser Ala Val Tyr
            580             585             590

Gly Val Gln Arg Gly Ala Lys Lys Pro Leu Glu Arg Val Phe Gln Phe
            595             600             605

Leu Glu Lys Ser Asp Leu Gly Cys Gly Ala Gly Gly Gly Leu Asn Asn
    610             615             620

Ala Asn Val Phe His Leu Ala Gly Leu Thr Phe Leu Thr Asn Ala Asn
625             630             635             640
```

```
Ala Asp Asp Ser Gln Glu Asn Asp Glu Pro Cys Lys Glu Ile Leu Arg
                645             650             655

Pro Arg Arg Thr Leu Gln Lys Lys Ile Glu Glu Ile Ala Ala Lys Tyr
            660             665             670

Lys His Ser Val Val Lys Lys Cys Cys Tyr Asp Gly Ala Cys Val Asn
        675             680             685

Asn Asp Glu Thr Cys Glu Gln Arg Ala Ala Arg Ile Ser Leu Gly Pro
    690             695             700

Arg Cys Ile Lys Ala Phe Thr Glu Cys Cys Val Val Ala Ser Gln Leu
705             710             715             720

Arg Ala Asn Ile Ser His Lys Asp Met Gln Leu Gly Arg Leu His Met
            725             730             735

Lys Thr Leu Leu Pro Val Ser Lys Pro Glu Ile Arg Ser Tyr Phe Pro
            740             745             750

Glu Ser Trp Leu Trp Glu Val His Leu Val Pro Arg Arg Lys Gln Leu
        755             760             765

Gln Phe Ala Leu Pro Asp Ser Leu Thr Thr Trp Glu Ile Gln Gly Ile
    770             775             780

Gly Ile Ser Asn Thr Gly Ile Cys Val Ala Asp Thr Val Lys Ala Lys
785             790             795             800

Val Phe Lys Asp Val Phe Leu Glu Met Asn Ile Pro Tyr Ser Val Val
            805             810             815

Arg Gly Glu Gln Ile Gln Leu Lys Gly Thr Val Tyr Asn Tyr Arg Thr
        820             825             830

Ser Gly Met Gln Phe Cys Val Lys Met Ser Ala Val Glu Gly Ile Cys
        835             840             845

Thr Ser Glu Ser Pro Val Ile Asp His Gln Gly Thr Lys Ser Ser Lys
    850             855             860
```

```
Cys Val Arg Gln Lys Val Glu Gly Ser Ser Ser His Leu Val Thr Phe
865             870             875             880

Thr Val Leu Pro Leu Glu Ile Gly Leu His Asn Ile Asn Phe Ser Leu
            885             890             895

Glu Thr Trp Phe Gly Lys Glu Ile Leu Val Lys Thr Leu Arg Val Val
            900             905             910

Pro Glu Gly Val Lys Arg Glu Ser Tyr Ser Gly Val Thr Leu Asp Pro
            915             920             925

Arg Gly Ile Tyr Gly Thr Ile Ser Arg Arg Lys Glu Phe Pro Tyr Arg
            930             935             940

Ile Pro Leu Asp Leu Val Pro Lys Thr Glu Ile Lys Arg Ile Leu Ser
945             950             955             960

Val Lys Gly Leu Leu Val Gly Glu Ile Leu Ser Ala Val Leu Ser Gln
            965             970             975

Glu Gly Ile Asn Ile Leu Thr His Leu Pro Lys Gly Ser Ala Glu Ala
            980             985             990

Glu Leu Met Ser Val Val Pro Val Phe Tyr Val Phe His Tyr Leu Glu
            995             1000            1005

Thr Gly Asn His Trp Asn Ile Phe His Ser Asp Pro Leu Ile Glu
    1010            1015            1020

Lys Gln Lys Leu Lys Lys Lys Leu Lys Glu Gly Met Leu Ser Ile
    1025            1030            1035

Met Ser Tyr Arg Asn Ala Asp Tyr Ser Tyr Ser Val Trp Lys Gly
    1040            1045            1050

Gly Ser Ala Ser Thr Trp Leu Thr Ala Phe Ala Leu Arg Val Leu
    1055            1060            1065

Gly Gln Val Asn Lys Tyr Val Glu Gln Asn Gln Asn Ser Ile Cys
    1070            1075            1080
```

```
Asn Ser  Leu Leu Trp Leu Val  Glu Asn Tyr Gln Leu  Asp Asn Gly
    1085                 1090                 1095

Ser Phe  Lys Glu Asn Ser Gln  Tyr Gln Pro Ile Lys  Leu Gln Gly
    1100                 1105                 1110

Thr Leu  Pro Val Glu Ala Arg  Glu Asn Ser Leu Tyr  Leu Thr Ala
    1115                 1120                 1125

Phe Thr  Val Ile Gly Ile Arg  Lys Ala Phe Asp Ile  Cys Pro Leu
    1130                 1135                 1140

Val Lys  Ile Asp Thr Ala Leu  Ile Lys Ala Asp Asn  Phe Leu Leu
    1145                 1150                 1155

Glu Asn  Thr Leu Pro Ala Gln  Ser Thr Phe Thr Leu  Ala Ile Ser
    1160                 1165                 1170

Ala Tyr  Ala Leu Ser Leu Gly  Asp Lys Thr His Pro  Gln Phe Arg
    1175                 1180                 1185

Ser Ile  Val Ser Ala Leu Lys  Arg Glu Ala Leu Val  Lys Gly Asn
    1190                 1195                 1200

Pro Pro  Ile Tyr Arg Phe Trp  Lys Asp Asn Leu Gln  His Lys Asp
    1205                 1210                 1215

Ser Ser  Val Pro Asn Thr Gly  Thr Ala Arg Met Val  Glu Thr Thr
    1220                 1225                 1230

Ala Tyr  Ala Leu Leu Thr Ser  Leu Asn Leu Lys Asp  Ile Asn Tyr
    1235                 1240                 1245

Val Asn  Pro Val Ile Lys Trp  Leu Ser Glu Glu Gln  Arg Tyr Gly
    1250                 1255                 1260

Gly Gly  Phe Tyr Ser Thr Gln  Asp Thr Ile Asn Ala  Ile Glu Gly
    1265                 1270                 1275

Leu Thr  Glu Tyr Ser Leu Leu  Val Lys Gln Leu Arg  Leu Ser Met
    1280                 1285                 1290
```

```
Asp Ile  Asp Val Ser Tyr Lys  His Lys Gly Ala Leu  His Asn Tyr
    1295              1300              1305

Lys Met  Thr Asp Lys Asn Phe  Leu Gly Arg Pro Val  Glu Val Leu
    1310              1315              1320

Leu Asn  Asp Asp Leu Ile Val  Ser Thr Gly Phe Gly  Ser Gly Leu
    1325              1330              1335

Ala Thr  Val His Val Thr Thr  Val Val His Lys Thr  Ser Thr Ser
    1340              1345              1350

Glu Glu  Val Cys Ser Phe Tyr  Leu Lys Ile Asp Thr  Gln Asp Ile
    1355              1360              1365

Glu Ala  Ser His Tyr Arg Gly  Tyr Gly Asn Ser Asp  Tyr Lys Arg
    1370              1375              1380

Ile Val  Ala Cys Ala Ser Tyr  Lys Pro Ser Arg Glu  Glu Ser Ser
    1385              1390              1395

Ser Gly  Ser Ser His Ala Val  Met Asp Ile Ser Leu  Pro Thr Gly
    1400              1405              1410

Ile Ser  Ala Asn Glu Glu Asp  Leu Lys Ala Leu Val  Glu Gly Val
    1415              1420              1425

Asp Gln  Leu Phe Thr Asp Tyr  Gln Ile Lys Asp Gly  His Val Ile
    1430              1435              1440

Leu Gln  Leu Asn Ser Ile Pro  Ser Ser Asp Phe Leu  Cys Val Arg
    1445              1450              1455

Phe Arg  Ile Phe Glu Leu Phe  Glu Val Gly Phe Leu  Ser Pro Ala
    1460              1465              1470

Thr Phe  Thr Val Tyr Glu Tyr  His Arg Pro Asp Lys  Gln Cys Thr
    1475              1480              1485

Met Phe  Tyr Ser Thr Ser Asn  Ile Lys Ile Gln Lys  Val Cys Glu
    1490              1495              1500
```

```
Gly Ala  Ala Cys Lys Cys Val  Glu Ala Asp Cys Gly  Gln Met Gln
    1505          1510              1515

Glu Glu  Leu Asp Leu Thr Ile  Ser Ala Glu Thr Arg  Lys Gln Thr
    1520          1525              1530

Ala Cys  Lys Pro Glu Ile Ala  Tyr Ala Tyr Lys Val  Ser Ile Thr
    1535          1540              1545

Ser Ile  Thr Val Glu Asn Val  Phe Val Lys Tyr Lys  Ala Thr Leu
    1550          1555              1560

Leu Asp  Ile Tyr Lys Thr Gly  Glu Ala Val Ala Glu  Lys Asp Ser
    1565          1570              1575

Glu Ile  Thr Phe Ile Lys Lys  Val Thr Cys Thr Asn  Ala Glu Leu
    1580          1585              1590

Val Lys  Gly Arg Gln Tyr Leu  Ile Met Gly Lys Glu  Ala Leu Gln
    1595          1600              1605

Ile Lys  Tyr Asn Phe Ser Phe  Arg Tyr Ile Tyr Pro  Leu Asp Ser
    1610          1615              1620

Leu Thr  Trp Ile Glu Tyr Trp  Pro Arg Asp Thr Thr  Cys Ser Ser
    1625          1630              1635

Cys Gln  Ala Phe Leu Ala Asn  Leu Asp Glu Phe Ala  Glu Asp Ile
    1640          1645              1650

Phe Leu  Asn Gly Cys
    1655
```

```
<210>  3
<211>  999
<212>  PRT
<213>  Homo sapiens

<400>  3

Thr Leu Gln Lys Lys Ile Glu Glu Ile Ala Ala Lys Tyr Lys His Ser
1               5                   10                  15

Val Val Lys Lys Cys Cys Tyr Asp Gly Ala Cys Val Asn Asn Asp Glu
            20                  25                  30
```

```
Thr Cys Glu Gln Arg Ala Ala Arg Ile Ser Leu Gly Pro Arg Cys Ile
        35              40                  45
Lys Ala Phe Thr Glu Cys Cys Val Val Ala Ser Gln Leu Arg Ala Asn
        50              55                  60
Ile Ser His Lys Asp Met Gln Leu Gly Arg Leu His Met Lys Thr Leu
65              70                  75                  80
Leu Pro Val Ser Lys Pro Glu Ile Arg Ser Tyr Phe Pro Glu Ser Trp
                85                  90                  95
Leu Trp Glu Val His Leu Val Pro Arg Arg Lys Gln Leu Gln Phe Ala
                100                 105                 110
Leu Pro Asp Ser Leu Thr Thr Trp Glu Ile Gln Gly Ile Gly Ile Ser
                115                 120                 125
Asn Thr Gly Ile Cys Val Ala Asp Thr Val Lys Ala Lys Val Phe Lys
        130                 135                 140
Asp Val Phe Leu Glu Met Asn Ile Pro Tyr Ser Val Val Arg Gly Glu
145                 150                 155                 160
Gln Ile Gln Leu Lys Gly Thr Val Tyr Asn Tyr Arg Thr Ser Gly Met
                165                 170                 175
Gln Phe Cys Val Lys Met Ser Ala Val Glu Gly Ile Cys Thr Ser Glu
                180                 185                 190
Ser Pro Val Ile Asp His Gln Gly Thr Lys Ser Ser Lys Cys Val Arg
        195                 200                 205
Gln Lys Val Glu Gly Ser Ser Ser His Leu Val Thr Phe Thr Val Leu
        210                 215                 220
Pro Leu Glu Ile Gly Leu His Asn Ile Asn Phe Ser Leu Glu Thr Trp
225                 230                 235                 240
Phe Gly Lys Glu Ile Leu Val Lys Thr Leu Arg Val Val Pro Glu Gly
                245                 250                 255
```

```
Val Lys Arg Glu Ser Tyr Ser Gly Val Thr Leu Asp Pro Arg Gly Ile
            260                     265                 270

Tyr Gly Thr Ile Ser Arg Arg Lys Glu Phe Pro Tyr Arg Ile Pro Leu
            275                     280                 285

Asp Leu Val Pro Lys Thr Glu Ile Lys Arg Ile Leu Ser Val Lys Gly
    290                     295                 300

Leu Leu Val Gly Glu Ile Leu Ser Ala Val Leu Ser Gln Glu Gly Ile
305                     310                 315                 320

Asn Ile Leu Thr His Leu Pro Lys Gly Ser Ala Glu Ala Glu Leu Met
                325                 330                 335

Ser Val Val Pro Val Phe Tyr Val Phe His Tyr Leu Glu Thr Gly Asn
                340                 345                 350

His Trp Asn Ile Phe His Ser Asp Pro Leu Ile Glu Lys Gln Lys Leu
                355                 360                 365

Lys Lys Lys Leu Lys Glu Gly Met Leu Ser Ile Met Ser Tyr Arg Asn
    370                     375                 380

Ala Asp Tyr Ser Tyr Ser Val Trp Lys Gly Gly Ser Ala Ser Thr Trp
385                     390                 395                 400

Leu Thr Ala Phe Ala Leu Arg Val Leu Gly Gln Val Asn Lys Tyr Val
                405                     410                 415

Glu Gln Asn Gln Asn Ser Ile Cys Asn Ser Leu Leu Trp Leu Val Glu
            420                     425                 430

Asn Tyr Gln Leu Asp Asn Gly Ser Phe Lys Glu Asn Ser Gln Tyr Gln
            435                     440                 445

Pro Ile Lys Leu Gln Gly Thr Leu Pro Val Glu Ala Arg Glu Asn Ser
    450                     455                 460

Leu Tyr Leu Thr Ala Phe Thr Val Ile Gly Ile Arg Lys Ala Phe Asp
465                     470                 475                 480
```

```
Ile Cys Pro Leu Val Lys Ile Asp Thr Ala Leu Ile Lys Ala Asp Asn
                485             490             495

Phe Leu Leu Glu Asn Thr Leu Pro Ala Gln Ser Thr Phe Thr Leu Ala
            500             505             510

Ile Ser Ala Tyr Ala Leu Ser Leu Gly Asp Lys Thr His Pro Gln Phe
        515             520             525

Arg Ser Ile Val Ser Ala Leu Lys Arg Glu Ala Leu Val Lys Gly Asn
    530             535             540

Pro Pro Ile Tyr Arg Phe Trp Lys Asp Asn Leu Gln His Lys Asp Ser
545             550             555             560

Ser Val Pro Asn Thr Gly Thr Ala Arg Met Val Glu Thr Thr Ala Tyr
            565             570             575

Ala Leu Leu Thr Ser Leu Asn Leu Lys Asp Ile Asn Tyr Val Asn Pro
            580             585             590

Val Ile Lys Trp Leu Ser Glu Glu Gln Arg Tyr Gly Gly Gly Phe Tyr
        595             600             605

Ser Thr Gln Asp Thr Ile Asn Ala Ile Glu Gly Leu Thr Glu Tyr Ser
    610             615             620

Leu Leu Val Lys Gln Leu Arg Leu Ser Met Asp Ile Asp Val Ser Tyr
625             630             635             640

Lys His Lys Gly Ala Leu His Asn Tyr Lys Met Thr Asp Lys Asn Phe
            645             650             655

Leu Gly Arg Pro Val Glu Val Leu Leu Asn Asp Asp Leu Ile Val Ser
            660             665             670

Thr Gly Phe Gly Ser Gly Leu Ala Thr Val His Val Thr Thr Val Val
        675             680             685

His Lys Thr Ser Thr Ser Glu Glu Val Cys Ser Phe Tyr Leu Lys Ile
    690             695             700
```

```
Asp Thr Gln Asp Ile Glu Ala Ser His Tyr Arg Gly Tyr Gly Asn Ser
705             710             715             720

Asp Tyr Lys Arg Ile Val Ala Cys Ala Ser Tyr Lys Pro Ser Arg Glu
            725             730             735

Glu Ser Ser Ser Gly Ser Ser His Ala Val Met Asp Ile Ser Leu Pro
            740             745             750

Thr Gly Ile Ser Ala Asn Glu Glu Asp Leu Lys Ala Leu Val Glu Gly
            755             760             765

Val Asp Gln Leu Phe Thr Asp Tyr Gln Ile Lys Asp Gly His Val Ile
    770             775             780

Leu Gln Leu Asn Ser Ile Pro Ser Ser Asp Phe Leu Cys Val Arg Phe
785             790             795             800

Arg Ile Phe Glu Leu Phe Glu Val Gly Phe Leu Ser Pro Ala Thr Phe
            805             810             815

Thr Val Tyr Glu Tyr His Arg Pro Asp Lys Gln Cys Thr Met Phe Tyr
            820             825             830

Ser Thr Ser Asn Ile Lys Ile Gln Lys Val Cys Glu Gly Ala Ala Cys
            835             840             845

Lys Cys Val Glu Ala Asp Cys Gly Gln Met Gln Glu Glu Leu Asp Leu
    850             855             860

Thr Ile Ser Ala Glu Thr Arg Lys Gln Thr Ala Cys Lys Pro Glu Ile
865             870             875             880

Ala Tyr Ala Tyr Lys Val Ser Ile Thr Ser Ile Thr Val Glu Asn Val
            885             890             895

Phe Val Lys Tyr Lys Ala Thr Leu Leu Asp Ile Tyr Lys Thr Gly Glu
            900             905             910

Ala Val Ala Glu Lys Asp Ser Glu Ile Thr Phe Ile Lys Lys Val Thr
            915             920             925
```

```
Cys Thr Asn Ala Glu Leu Val Lys Gly Arg Gln Tyr Leu Ile Met Gly
    930                 935                 940

Lys Glu Ala Leu Gln Ile Lys Tyr Asn Phe Ser Phe Arg Tyr Ile Tyr
945                 950                 955                 960

Pro Leu Asp Ser Leu Thr Trp Ile Glu Tyr Trp Pro Arg Asp Thr Thr
                965                 970                 975

Cys Ser Ser Cys Gln Ala Phe Leu Ala Asn Leu Asp Glu Phe Ala Glu
                980                 985                 990

Asp Ile Phe Leu Asn Gly Cys
                995
```

<210> 4
<211> 655
<212> PRT
<213> Homo sapiens

<400> 4

```
Gln Glu Gln Thr Tyr Val Ile Ser Ala Pro Lys Ile Phe Arg Val Gly
1                   5                   10                  15

Ala Ser Glu Asn Ile Val Ile Gln Val Tyr Gly Tyr Thr Glu Ala Phe
                20                  25                  30

Asp Ala Thr Ile Ser Ile Lys Ser Tyr Pro Asp Lys Lys Phe Ser Tyr
                35                  40                  45

Ser Ser Gly His Val His Leu Ser Ser Glu Asn Lys Phe Gln Asn Ser
        50                  55                  60

Ala Ile Leu Thr Ile Gln Pro Lys Gln Leu Pro Gly Gly Gln Asn Pro
65                  70                  75                  80

Val Ser Tyr Val Tyr Leu Glu Val Val Ser Lys His Phe Ser Lys Ser
                85                  90                  95

Lys Arg Met Pro Ile Thr Tyr Asp Asn Gly Phe Leu Phe Ile His Thr
            100                 105                 110

Asp Lys Pro Val Tyr Thr Pro Asp Gln Ser Val Lys Val Arg Val Tyr
            115                 120                 125
```

```
Ser Leu Asn Asp Asp Leu Lys Pro Ala Lys Arg Glu Thr Val Leu Thr
    130                 135                 140

Phe Ile Asp Pro Glu Gly Ser Glu Val Asp Met Val Glu Glu Ile Asp
145                 150                 155                 160

His Ile Gly Ile Ile Ser Phe Pro Asp Phe Lys Ile Pro Ser Asn Pro
                165                 170                 175

Arg Tyr Gly Met Trp Thr Ile Lys Ala Lys Tyr Lys Glu Asp Phe Ser
            180                 185                 190

Thr Thr Gly Thr Ala Tyr Phe Glu Val Lys Glu Tyr Val Leu Pro His
            195                 200                 205

Phe Ser Val Ser Ile Glu Pro Glu Tyr Asn Phe Ile Gly Tyr Lys Asn
    210                 215                 220

Phe Lys Asn Phe Glu Ile Thr Ile Lys Ala Arg Tyr Phe Tyr Asn Lys
225                 230                 235                 240

Val Val Thr Glu Ala Asp Val Tyr Ile Thr Phe Gly Ile Arg Glu Asp
            245                 250                 255

Leu Lys Asp Asp Gln Lys Glu Met Met Gln Thr Ala Met Gln Asn Thr
            260                 265                 270

Met Leu Ile Asn Gly Ile Ala Gln Val Thr Phe Asp Ser Glu Thr Ala
    275                 280                 285

Val Lys Glu Leu Ser Tyr Tyr Ser Leu Glu Asp Leu Asn Asn Lys Tyr
    290                 295                 300

Leu Tyr Ile Ala Val Thr Val Ile Glu Ser Thr Gly Gly Phe Ser Glu
305                 310                 315                 320

Glu Ala Glu Ile Pro Gly Ile Lys Tyr Val Leu Ser Pro Tyr Lys Leu
                325                 330                 335

Asn Leu Val Ala Thr Pro Leu Phe Leu Lys Pro Gly Ile Pro Tyr Pro
            340                 345                 350
```

```
Ile Lys Val Gln Val Lys Asp Ser Leu Asp Gln Leu Val Gly Gly Val
        355             360             365

Pro Val Ile Leu Asn Ala Gln Thr Ile Asp Val Asn Gln Glu Thr Ser
    370             375             380

Asp Leu Asp Pro Ser Lys Ser Val Thr Arg Val Asp Asp Gly Val Ala
385             390             395             400

Ser Phe Val Leu Asn Leu Pro Ser Gly Val Thr Val Leu Glu Phe Asn
            405             410             415

Val Lys Thr Asp Ala Pro Asp Leu Pro Glu Glu Asn Gln Ala Arg Glu
        420             425             430

Gly Tyr Arg Ala Ile Ala Tyr Ser Ser Leu Ser Gln Ser Tyr Leu Tyr
        435             440             445

Ile Asp Trp Thr Asp Asn His Lys Ala Leu Leu Val Gly Glu His Leu
    450             455             460

Asn Ile Ile Val Thr Pro Lys Ser Pro Tyr Ile Asp Lys Ile Thr His
465             470             475             480

Tyr Asn Tyr Leu Ile Leu Ser Lys Gly Lys Ile Ile His Phe Gly Thr
            485             490             495

Arg Glu Lys Phe Ser Asp Ala Ser Tyr Gln Ser Ile Asn Ile Pro Val
            500             505             510

Thr Gln Asn Met Val Pro Ser Ser Arg Leu Leu Val Tyr Tyr Ile Val
        515             520             525

Thr Gly Glu Gln Thr Ala Glu Leu Val Ser Asp Ser Val Trp Leu Asn
        530             535             540

Ile Glu Glu Lys Cys Gly Asn Gln Leu Gln Val His Leu Ser Pro Asp
545             550             555             560

Ala Asp Ala Tyr Ser Pro Gly Gln Thr Val Ser Leu Asn Met Ala Thr
            565             570             575
```

```
Gly Met Asp Ser Trp Val Ala Leu Ala Ala Val Asp Ser Ala Val Tyr
            580             585             590

Gly Val Gln Arg Gly Ala Lys Lys Pro Leu Glu Arg Val Phe Gln Phe
            595             600             605

Leu Glu Lys Ser Asp Leu Gly Cys Gly Ala Gly Gly Gly Leu Asn Asn
    610             615             620

Ala Asn Val Phe His Leu Ala Gly Leu Thr Phe Leu Thr Asn Ala Asn
625             630             635             640

Ala Asp Asp Ser Gln Glu Asn Asp Glu Pro Cys Lys Glu Ile Leu
            645             650             655
```

```
<210>  5
<211>  21
<212>  PRT
<213>  Homo sapiens

<400>  5

Val Ile Asp His Gln Gly Thr Lys Ser Ser Lys Cys Val Arg Gln Lys
1               5               10              15

Val Glu Gly Ser Ser
            20
```

```
<210>  6
<211>  5
<212>  PRT
<213>  Homo sapiens

<400>  6

Lys Ser Ser Lys Cys
1               5
```

```
<210>  7
<211>  127
<212>  PRT
<213>  Homo sapiens

<400>  7

Asn Phe Ser Leu Glu Thr Trp Phe Gly Lys Glu Ile Leu Val Lys Thr
1               5               10              15
```

```
Leu Arg Val Val Pro Glu Gly Val Lys Arg Glu Ser Tyr Ser Gly Val
            20                  25                  30

Thr Leu Asp Pro Arg Gly Ile Tyr Gly Thr Ile Ser Arg Arg Lys Glu
            35                  40                  45

Phe Pro Tyr Arg Ile Pro Leu Asp Leu Val Pro Lys Thr Glu Ile Lys
        50                  55                  60

Arg Ile Leu Ser Val Lys Gly Leu Leu Val Gly Glu Ile Leu Ser Ala
65                      70                  75                  80

Val Leu Ser Gln Glu Gly Ile Asn Ile Leu Thr His Leu Pro Lys Gly
                85                  90                  95

Ser Ala Glu Ala Glu Leu Met Ser Val Val Pro Val Phe Tyr Val Phe
            100                 105                 110

His Tyr Leu Glu Thr Gly Asn His Trp Asn Ile Phe His Ser Asp
        115                 120                 125
```

```
<210>   8
<211>   200
<212>   PRT
<213>   Homo sapiens

<400>   8
```

```
Ser Glu Ser Pro Val Ile Asp His Gln Gly Thr Lys Ser Ser Lys Cys
1               5                   10                  15

Val Arg Gln Lys Val Glu Gly Ser Ser Ser His Leu Val Thr Phe Thr
            20                  25                  30

Val Leu Pro Leu Glu Ile Gly Leu His Asn Ile Asn Phe Ser Leu Glu
            35                  40                  45

Thr Trp Phe Gly Lys Glu Ile Leu Val Lys Thr Leu Arg Val Val Pro
        50                  55                  60

Glu Gly Val Lys Arg Glu Ser Tyr Ser Gly Val Thr Leu Asp Pro Arg
65                      70                  75                  80

Gly Ile Tyr Gly Thr Ile Ser Arg Arg Lys Glu Phe Pro Tyr Arg Ile
                85                  90                  95
```

```
Pro Leu Asp Leu Val Pro Lys Thr Glu Ile Lys Arg Ile Leu Ser Val
        100             105                 110

Lys Gly Leu Leu Val Gly Glu Ile Leu Ser Ala Val Leu Ser Gln Glu
        115             120                 125

Gly Ile Asn Ile Leu Thr His Leu Pro Lys Gly Ser Ala Glu Ala Glu
    130             135                 140

Leu Met Ser Val Val Pro Val Phe Tyr Val Phe His Tyr Leu Glu Thr
145                 150                 155                 160

Gly Asn His Trp Asn Ile Phe His Ser Asp Pro Leu Ile Glu Lys Gln
                165                 170                 175

Lys Leu Lys Lys Lys Leu Lys Glu Gly Met Leu Ser Ile Met Ser Tyr
        180             185                 190

Arg Asn Ala Asp Tyr Ser Tyr Ser
        195             200


<210>  9
<211>  30
<212>  PRT
<213>  Homo sapiens

<400>  9

Ser His Lys Asp Met Gln Leu Gly Arg Leu His Met Lys Thr Leu Leu
1               5                   10                  15

Pro Val Ser Lys Pro Glu Ile Arg Ser Tyr Phe Pro Glu Ser
            20              25                  30


<210>  10
<211>  325
<212>  PRT
<213>  Homo sapiens

<400>  10

Ser His Lys Asp Met Gln Leu Gly Arg Leu His Met Lys Thr Leu Leu
1               5                   10                  15
```

Pro Val Ser Lys Pro Glu Ile Arg Ser Tyr Phe Pro Glu Ser Trp Leu
             20            25                30

Trp Glu Val His Leu Val Pro Arg Arg Lys Gln Leu Gln Phe Ala Leu
         35            40            45

Pro Asp Ser Leu Thr Thr Trp Glu Ile Gln Gly Ile Gly Ile Ser Asn
    50            55            60

Thr Gly Ile Cys Val Ala Asp Thr Val Lys Ala Lys Val Phe Lys Asp
65            70            75            80

Val Phe Leu Glu Met Asn Ile Pro Tyr Ser Val Val Arg Gly Glu Gln
             85            90            95

Ile Gln Leu Lys Gly Thr Val Tyr Asn Tyr Arg Thr Ser Gly Met Gln
         100           105           110

Phe Cys Val Lys Met Ser Ala Val Glu Gly Ile Cys Thr Ser Glu Ser
         115           120           125

Pro Val Ile Asp His Gln Gly Thr Lys Ser Ser Lys Cys Val Arg Gln
    130           135           140

Lys Val Glu Gly Ser Ser Ser His Leu Val Thr Phe Thr Val Leu Pro
145           150           155           160

Leu Glu Ile Gly Leu His Asn Ile Asn Phe Ser Leu Glu Thr Trp Phe
         165           170           175

Gly Lys Glu Ile Leu Val Lys Thr Leu Arg Val Val Pro Glu Gly Val
         180           185           190

Lys Arg Glu Ser Tyr Ser Gly Val Thr Leu Asp Pro Arg Gly Ile Tyr
    195           200           205

Gly Thr Ile Ser Arg Arg Lys Glu Phe Pro Tyr Arg Ile Pro Leu Asp
    210           215           220

Leu Val Pro Lys Thr Glu Ile Lys Arg Ile Leu Ser Val Lys Gly Leu
225           230           235           240

```
Leu Val Gly Glu Ile Leu Ser Ala Val Leu Ser Gln Glu Gly Ile Asn
                245                 250                 255

Ile Leu Thr His Leu Pro Lys Gly Ser Ala Glu Ala Glu Leu Met Ser
                260                 265                 270

Val Val Pro Val Phe Tyr Val Phe His Tyr Leu Glu Thr Gly Asn His
                275                 280                 285

Trp Asn Ile Phe His Ser Asp Pro Leu Ile Glu Lys Gln Lys Leu Lys
                290                 295                 300

Lys Lys Leu Lys Glu Gly Met Leu Ser Ile Met Ser Tyr Arg Asn Ala
305                 310                 315                 320

Asp Tyr Ser Tyr Ser
                325


<210>  11
<211>  17
<212>  PRT
<213>  Homo sapiens

<400>  11

Asp His Gln Gly Thr Lys Ser Ser Lys Cys Val Arg Gln Lys Val Glu
1                 5                 10                 15

Gly
```

# EXHIBIT J

CONFIDENTIAL
EXECUTION COPY

## CONFIDENTIAL SETTLEMENT AND LICENSE AGREEMENT

This Confidential Settlement and License Agreement (this **Settlement Agreement**), is made effective as of May 28, 2020 (**Execution Date**), by and between Alexion Pharmaceuticals, Inc., a Delaware corporation having a place of business at 121 Seaport Blvd., Boston, Massachusetts 02210, and Alexion Pharma International Operations Unlimited Company, an Irish unlimited company having a place of business at College Business and Technology Park, Blanchardstown, Dublin 15, D15 R925 (collectively, **Alexion**); and Amgen Inc., a Delaware corporation having a place of business at One Amgen Center Drive, Thousand Oaks, California, 91320 (**Amgen**).  Each of Alexion and Amgen is sometimes individually referred to herein as a **Party** and collectively referred to herein as the **Parties**.

WHEREAS Alexion is the holder of Biologic License Application No. 125166 (**BLA No. 125166**), which is approved by the U.S. Food and Drug Administration (**FDA**) for the manufacture of eculizumab (injection for intravenous use), which Alexion currently markets and sells under the tradename SOLIRIS®;

WHEREAS Alexion is the owner of United States Patent Nos. 9,732,149 (**'149 Patent**), 9,718,880 (**'880 Patent**), 9,725,504 (**'504 Patent**), 10,590,189 (**'189 Patent**), and other United States patents and patent applications related to eculizumab and various aspects of the eculizumab product that Alexion currently markets and sells under the tradename SOLIRIS®, including those additional patents and patent applications listed in Schedule A (collectively, **Eculizumab Patents**);

WHEREAS, Amgen is interested in researching and developing one or more experimental eculizumab products (each an **Amgen Eculizumab Product**), including the ABP 959 product that, as of the Execution Date, Amgen is investigating in clinical trials;

WHEREAS, the Parties are currently involved in *inter partes* review (**IPR**) proceedings Nos. IPR2019-00739, IPR2019-00740, and IPR2019-00741 (collectively, **Eculizumab IPRs**) before the

ATTORNEYS' EYES ONLY (D. DEL. LR 26.2)

CONFIDENTIAL
EXECUTION COPY

United States Patent Trial and Appeal Board (**PTAB**), wherein Amgen has petitioned the PTAB for rulings that the claims of each of the '149, '880, and '504 patents (collectively, **Eculizumab IPR Patents**) are unpatentable, and Alexion maintains that Amgen has failed to prove unpatentability of the Eculizumab IPR Patents;

WHEREAS, the '189 Patent issued to Alexion on March 17, 2020, and is not at issue in the Eculizumab IPRs;

WHEREAS, Alexion and Amgen wish to resolve all current and potential patent disputes in the U.S. related to the Eculizumab IPRs, the Eculizumab Patents, and the Amgen Eculizumab Products without litigation, other proceedings, uncertainty, and expense; and

WHEREAS, no Party has received any consideration from the other Party for its entry into this Agreement other than that which is described in this Agreement.

NOW, THEREFORE, in consideration of the mutual execution of this Settlement Agreement and the promises and covenants made herein, the Parties agree as follows:

1.     Definitions.  Terms when used herein with initial capital letters shall have the meanings set forth below or as otherwise defined in this Settlement Agreement.

(a)     **Affiliate** of a Party means any person or entity that, directly or indirectly, through one (1) or more intermediaries, controls, is controlled by or is under common control with such Party, provided however, that in each case any such other person shall be considered to be an Affiliate only during the time period during which such control exists.  As used in this definition, "control" of an entity means having (A) the direct or indirect power to either: (i) direct decisions of the board of directors or similar body governing the management and policies of such entity; (ii) elect at least fifty percent (50%) of the members of the governing body of such entity; or (B)

**ATTORNEYS' EYES ONLY (D. DEL. LR 26.2)**                           **ALXN_PI_00000184**

CONFIDENTIAL
EXECUTION COPY

direct or indirect ownership of at least fifty percent (50%) of the shares of stock entitled to vote for the election of directors or other voting interest in such entity.

(b)     **aBLA** means an abbreviated Biologic License Application pursuant to 42 U.S.C. § 262(k).

(c)     **Alexion Eculizumab Product** means a product containing eculizumab sold by Alexion under a BLA, including SOLIRIS®.

(d)     **Amgen Partner** means ███████████████████████████████
███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
███████████████████████████

(e)     **Applicable Law** means all applicable provisions of constitutions, statutes, rules, regulations, ordinances, and orders of all Governmental Entities and all orders and decrees of all courts, tribunals and arbitrators.

(f)     **BLA** means a Biologic License Application pursuant to 42 U.S.C. § 262(a).

(g)     **FDA** means the United States Food and Drug Administration and any successor agency having the same functions.

(h)     **Final Court Decision** means a decision by a U.S. federal district court, or by the United States Court of Appeals for the Federal Circuit (**Federal Circuit**) in an appeal from a U.S. federal district court, in either case from which no appeal (other than a petition for a writ of certiorari or other proceedings before the United States Supreme Court) has been or can be taken.

(i)     **Final PTAB Decision** means a decision by the PTAB, or by the Federal Circuit in an appeal from the PTAB, in either case from which no appeal (other than a petition for a writ of certiorari or other proceedings before the United States Supreme Court) has been or can be taken.

**ATTORNEYS' EYES ONLY (D. DEL. LR 26.2)**                    **ALXN_PI_00000185**

CONFIDENTIAL
EXECUTION COPY

(j)      **Governmental Entity** means any (i) nation, state, county, city, town, village, district, or other jurisdiction of any nature, (ii) federal, state, local, municipal, foreign, or other government, (iii) governmental or quasi-governmental authority of any nature (including any governmental agency, branch, department, official, or entity and any court or other tribunal), (iv) multi-national organization or body, or (v) body exercising, or entitled to exercise, any administrative, executive, judicial, legislative, police, regulatory, or taxing authority or power of any nature.

(k)      **Licensed Patents** means the Eculizumab Patents (including any patents that issue from the pending applications listed in Schedule A), including any patent and regulatory extensions thereof, all divisionals, continuations, continuations-in-part, reexaminations or reissues thereof, and any applications (and patents issuing therefrom) that claim priority to any of the Eculizumab Patents and/or any of its priority filings, █████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████.

(l)      **Net Sales** means the gross amounts invoiced in an arm's length transaction by Amgen or any if its Affiliates or distributors or licensees to a Third Party in respect of the sale of an Amgen Eculizumab Product in the United States less the following deductions, calculated in all instances in accordance with United States generally accepted accounting principles (US-GAAP):

(i)      ████████████████████████████████████

███████████████

(ii)      ███████████████████████████████████

CONFIDENTIAL
EXECUTION COPY

(iii) ███████████████████████████████
█████████████████████████████████████
█████████████████████████████████████
██████████████████████

(iv) ████████████████████████████████
█████████████████████████████████████
█████████████████████████████████████
█████████████████████████████████████
████████████████████████████████████

(v) █████████████████████████████████
█████████████████████████████████████
██████████████████████

(vi) ███ ████ ███ ██ █ ████ █████ ███ ████
█████████████████████████████████████
███ ██ ███ █████ ██████ █ ██ ███ ████ ███
█████████████████████

(vii) ██████████████████████████████████
█████████████████████████████████████
██████████████████████████████

(viii) █████████████████████████████████
█████████████████████████████████████
██████████████████████

**ATTORNEYS' EYES ONLY (D. DEL. LR 26.2)**                    **ALXN_PI_00000187**

CONFIDENTIAL
EXECUTION COPY

All amounts shall be determined from the books and records of Amgen or any of its Affiliates maintained in accordance with United States generally accepted accounting principles consistently applied.

Provided, however, that where the Amgen Eculizumab Product is sold or supplied to a Third Party otherwise than in an arm's length transaction, the Net Sales of the Amgen Eculizumab Product is deemed to be the Net Sales amounts that would have been applied under this Settlement Agreement had the Amgen Eculizumab Product been sold or supplied to an independent arm's length Third Party.  Any disposal or use of the Amgen Eculizumab Product for compassionate use, indigent patient programs or clinical trials, in each case when the Amgen Eculizumab Product is provided free of charge, will not be deemed a sale or disposition for calculating the Net Sales under this Settlement Agreement.

(m)   **Royalty Term** means 

(n)   **SOLIRIS®** means the eculizumab product sold by Alexion under BLA No. 125166 or any replacement or substitute thereof, including all amendments and supplements to such BLAs.

(o)   **Third Party** means any person or entity other than the Parties and their respective Affiliates.

(p)   **Third Party Eculizumab Product** means a pharmaceutical product comprising eculizumab for which marketing approval was sought by a Third Party by means of a BLA filed pursuant to 42 U.S.C. § 262(a), or by means of an aBLA filed pursuant to 42 U.S.C. § 262(k) for which SOLIRIS® or another Alexion Eculizumab Product is the reference product.

**ATTORNEYS' EYES ONLY (D. DEL. LR 26.2)**                      **ALXN_PI_00000188**

CONFIDENTIAL
EXECUTION COPY

(q)    **United States** or **U.S.** means the United States of America and its territories, districts, commonwealths and possessions, including without limitation, the Commonwealth of Puerto Rico and the District of Columbia.

2.    Dismissal.

(a)    In consideration of the mutual benefits of entering into this Settlement Agreement, within three (3) business days of the Execution Date, the Parties shall request authorization from the PTAB to file a Joint Motion to Terminate Proceeding in the Eculizumab IPRs; and promptly upon receiving authorization from the PTAB, the Parties shall file (i) a Joint Motion to Terminate Proceeding in the form attached as Annex A to this Settlement Agreement, requesting that the PTAB terminate the Eculizumab IPRs in their entirety without costs or fees, and (ii) a Joint Motion to File Settlement Agreement as Business Confidential Information in the form attached as Annex B to this Settlement Agreement.

(b)    Nothing herein shall prevent or impair the right of Alexion or Amgen to bring a proceeding in court for a breach of, or to enforce any requirement or provision of, this Settlement Agreement or any representation, warranty, or covenant herein.

(c)    ████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████

3.    Compromise.  Each Party acknowledges and agrees that this Settlement Agreement is a compromise of existing and potential disputed claims. ████████████████████
████████████████████████████████████████████████

**ATTORNEYS' EYES ONLY (D. DEL. LR 26.2)**                    **ALXN_PI_00000189**

CONFIDENTIAL
EXECUTION COPY

███████████████████████████████████████████████

█████████████     ████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████

4.      <u>License, Release, and Covenant</u>.

(a)      Alexion, on its own behalf and behalf of its Affiliates, hereby grants Amgen and its Affiliates a non-exclusive, ████████████, royalty-free, ██████████████████████████ ██████████████████████████ license under the Licensed Patents to make, have made, use, import, have imported, sell, have sold, offer for sale, have offered for sale, distribute, and have distributed in or for the United States, commencing on the License Effective Date, the Amgen Eculizumab Products. ██████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████.

(b)      The "<u>License Effective Date</u>" shall be the earliest to occur of:

(i)      March 1, 2025;

(ii)     ████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

CONFIDENTIAL
EXECUTION COPY

(iii) ████████████████████████████████████

(iv) t███████████████████████████████████

     (c)    <u>Release</u>.  In consideration of the mutual benefits of entering into this Settlement

Agreement, as of the Execution Date, each of Alexion and Amgen hereby fully, finally and forever

ATTORNEYS' EYES ONLY (D. DEL. LR 26.2)           ALXN_PI_00000191

CONFIDENTIAL
EXECUTION COPY

releases, relinquishes, acquits, and discharges, and will cause its Affiliates, directors, officers, and employees, representatives, administrators and attorneys, agents, assigns, predecessors, successors, and all other persons or entities claiming by, through, and under them (along with Alexion, the **Alexion Releasors**; and along with Amgen, the **Amgen Releasors**, respectively) to fully, finally, and forever release, relinquish, acquit, and discharge, the other Party and its Affiliates, administrators, shareholders, directors, officers, employees, representatives, predecessors, successors, sublicensees, agents, and assigns, and with respect to Amgen, the Amgen Partners (the **Amgen Releasees**, and the **Alexion Releasees**, respectively) from any and all claims, demands, damages, liabilities, obligations, and causes of action accruing prior to the Execution Date (including without limitation, costs, expenses, and attorneys' fees, and those capable of being asserted in any complaint and amendments thereto) arising out of, related to, or in connection with█████████████████████████████████, whether known or unknown, and in each case arising before the Execution Date.  It is expressly understood and agreed that the Parties hereby waive any statutes or common law doctrines under which a general release would not extend to claims which the party releasing such claim does not know or suspect to exist in his favor at the time of executing the release, including but not limited to any and all rights and benefits conferred by § 1542 of the California Civil Code (if and to the extent applicable).  Alexion, on behalf of itself and any Affiliates, represents, warrants, and covenants that it has not heretofore assigned or transferred, and will not assign or otherwise transfer, to any Person any matters released in this Section 4(c), and Alexion agrees to indemnify and hold harmless Amgen from and against all such released matters arising from any such alleged or actual assignment or transfer.  This Settlement Agreement may be pleaded as a full and complete defense

CONFIDENTIAL
EXECUTION COPY

to, and used as a basis for injunction against, any proceeding that may be instituted, prosecuted, or attempted in breach of the Release stated in this Section 4(c).

(d)     Covenant Not to Sue.

(i)     The Alexion Releasors covenant that no Alexion Releasor will commence or cause to be commenced against any of the Amgen Releasees any action or other proceeding based upon any claim which has been released in Section 4(c) and will not challenge or seek to challenge the validity or enforceability of any portion of the release contained in Section 4(c).

(ii)     The Amgen Releasors covenant that no Amgen Releasor will commence or cause to be commenced against any of the Alexion Releasees any action or other proceeding based upon any claim which has been released in Section 4(c) and will not challenge or seek to challenge the validity or enforceability of any portion of the release contained in Section 4(c).

(iii)     With respect to the Amgen Eculizumab Products only, each of the Alexion Releasors covenant not to sue, assert any claim or counterclaim, or otherwise participate in or assist in any action or proceeding against any of the Amgen Releasees, or support or encourage any Third Party to sue any Amgen Releasee, for infringement of any Licensed Patent ███ ████████████████████████████████████████████████████ ███████████████████ based on (a) the making, using, selling, offering for sale, or distributing in or for the United States, or making or having made only for importation, distribution, use, sale or offering for sale into or for the United States of the Amgen Eculizumab Products as of and following the License Effective Date, (b) any of the activities allowed under Section 6(b) of this Settlement Agreement, or (c) in the event of a launch of an Amgen Eculizumab Product as contemplated in Section 5 herein.  Alexion shall impose this covenant not to sue on any Third Party to which Alexion and each of its Affiliates may later assign, license, or otherwise

ATTORNEYS' EYES ONLY (D. DEL. LR 26.2)                          ALXN_PI_00000193

CONFIDENTIAL
EXECUTION COPY

transfer or grant any patent rights that are the subject of this covenant to the extent that such assignment, license, or other transfer or grant includes the right to enforce the subject patent rights. Notwithstanding the foregoing, Alexion and its Affiliates maintain the right to bring an action for infringement of any of the Licensed Patents against any of the Amgen Releasees in the event of material breach by Amgen or its Affiliates of this Settlement Agreement.

(e) █████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

(f)     Alexion hereby irrevocably and unconditionally consents to Amgen seeking immediate entry of a temporary restraining order or preliminary injunction to enforce either of

**ATTORNEYS' EYES ONLY (D. DEL. LR 26.2)**                    **ALXN_PI_00000194**

CONFIDENTIAL
EXECUTION COPY

Sections 4(a) or 4(d) of this Settlement Agreement.  For the avoidance of doubt, Alexion's consent to Amgen seeking such equitable relief does not relieve Amgen of it burden of proving it is entitled to such relief.  Alexion irrevocably and unconditionally consents to personal jurisdiction and venue in the United States District Court for the District of Delaware for the purpose of enforcing this Settlement Agreement and those provisions.

5.   At-Risk Launch Rights

CONFIDENTIAL
EXECUTION COPY

CONFIDENTIAL
EXECUTION COPY

CONFIDENTIAL
EXECUTION COPY

**ATTORNEYS' EYES ONLY (D. DEL. LR 26.2)**

**ALXN_PI_00000198**

**CONFIDENTIAL
EXECUTION COPY**

[REDACTED]

6.    <u>Restrictions on Marketing/Sales</u>.

(a)    In return for Alexion's grant of a license, except as provided in Sections 5 and 6(b) and also excepting those actions which are exempt from patent infringement under 35 U.S.C. § 271(e)(1) or are not legally considered to be acts of patent infringement under 35 U.S.C. § 271, neither Amgen nor its Affiliates or any Amgen Partner shall market, sell or offer to sell, directly or indirectly, the Amgen Eculizumab Products in the United States prior to the License Effective Date. [REDACTED]

**ATTORNEYS' EYES ONLY (D. DEL. LR 26.2)**                          **ALXN_PI_00000199**

CONFIDENTIAL
EXECUTION COPY

(b)

ATTORNEYS' EYES ONLY (D. DEL. LR 26.2)                        ALXN_PI_00000200

CONFIDENTIAL
EXECUTION COPY

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████    For the avoidance of doubt, the performance of any of the activities in the time periods expressly provided for in the preceding sentences by Amgen, its Affiliates, the Amgen Partners, or any of the other Amgen Releasees shall not be construed as the sale, use, distribution, or commercial launch of the Amgen Eculizumab Products prior to the License Effective Date or a breach of this Settlement Agreement.  Also, for the avoidance of doubt, the Amgen Releasees may disclose the License Effective Date during the course of any of the activities expressly provided for in the preceding sentences without compliance with the confidentiality restrictions set forth in Section 10 of this Settlement Agreement.  Further, for the avoidance of doubt, prior to the License Effective Date, the Amgen Releasees may engage in all other activities with respect to preparing for the launch of the Amgen Eculizumab Products that are not acts considered to be, or are exempt from, patent infringement under U.S. law.

7.    Agreement.  This Settlement Agreement constitutes the complete agreement of the Parties with respect to the subject matter hereof and supersedes and replaces any prior negotiations, mediations, proposed agreements or agreements, whether written or oral.  This Settlement Agreement may be modified only by a writing signed by all Parties.

8.    Assignment.  ███████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

ATTORNEYS' EYES ONLY (D. DEL. LR 26.2)                    ALXN_PI_00000201

CONFIDENTIAL
EXECUTION COPY

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████    ██████████████

████████████████████████████████████

9.    <u>Attorneys' Fees and Costs</u>.  Each party shall bear its own attorneys' fees and costs incurred in connection with the Eculizumab IPRs and in connection with the preparation, execution, and performance of this Settlement Agreement.

10.    <u>Confidential Information</u>.

(a)    <u>Treatment of Confidential Information</u>.

(i)    During the term of this Settlement Agreement (as defined in Section 13 below) and continuing thereafter, each Party shall keep confidential and not disclose to others or use for any purpose, other than as authorized by this Settlement Agreement, all Confidential Information which was provided to it by any other Party or its Affiliates or their respective employees or representatives pursuant to this Settlement Agreement.  This Settlement Agreement does not constitute the conveyance of ownership with respect to or a license to any Confidential Information, except as otherwise provided in this Settlement Agreement.

(ii)    For purposes of this Settlement Agreement, the term **Confidential Information** means the terms of this Settlement Agreement and any information furnished in connection with this Settlement Agreement, including without limitation any and all know-how, trade secrets, formulae, data, inventions, technology and other information, including manufacturing techniques, processes, trade and financial information, related to the manufacture,

**ATTORNEYS' EYES ONLY (D. DEL. LR 26.2)**                    **ALXN_PI_00000202**

CONFIDENTIAL
EXECUTION COPY

use, sale or marketing of any products that are the subject of this Settlement Agreement, currently in the possession of, or developed during the term of the Settlement Agreement by the Parties or any of their respective Affiliates.  The restrictions of this Section 10 shall not apply to any Confidential Information which (i) is already known to the recipient at the time of disclosure, as reasonably documented by written records; (ii) is or later becomes public knowledge through no fault of the recipient; (iii) is received from a Third Party having the lawful right to disclose the information; or (iv) is independently developed by employees of the recipient without access to the disclosing Party's Confidential Information.

      (b)     <u>Permitted Disclosure</u>.

      (i)     For purposes of this Settlement Agreement, the existence of this Settlement Agreement and the Parties' agreement to seek termination of the Eculizumab IPRs pursuant to Section 2(a) above shall not be considered Confidential Information.  ███████████████

███████████████████████████████████████████████

█████████████████  Confidential Information may only be disclosed pursuant to Sections 10(b)(ii), 10(b)(iii), and 10(d) of this Settlement Agreement.

      (ii)     A Party may disclose Confidential Information relating to this Settlement Agreement or Confidential Information of another Party to (a) its Affiliates, and to its and their directors, employees, attorneys, advisors, consultants, representatives, and agents, and in the case of Amgen, to the Amgen Partners and other Amgen Releasees and to their directors, employees, attorneys, advisors, consultants, representatives, and agents, in each case to those who have a specific need to know such Confidential Information and who are bound by a like obligation of confidentiality and restriction on use; (b) any bona fide actual or prospective collaborators, underwriters, investors, lenders or other financing sources in each case to those who have a specific

ATTORNEYS' EYES ONLY (D. DEL. LR 26.2)      ALXN_PI_00000203

CONFIDENTIAL
EXECUTION COPY

need to know such Confidential Information and who are bound by a like obligation to keep such information confidential and restriction on use, and only to the extent reasonably necessary to enable such actual or prospective collaborators, underwriters, investors, lenders or other financing sources to determine their interest in collaborating with, underwriting or making an investment in, or otherwise providing financing to, the Party making the disclosure of the Confidential Information; (c) any Third Party in connection with a potential or actual merger, reorganization, change of control or sale of all or substantially all of the applicable business or assets of such Party to which this Settlement Agreement relates, in accordance with confidentiality terms at least as restrictive as the terms hereof; and (d) the extent such disclosure is required to comply with Applicable Law (including the regulations of the United States Securities and Exchange Commission or the rules of any stock exchange or listing entity) or to defend or prosecute litigation, provided, however, that the Party intending to make a disclosure to comply with Applicable Law complies with Section 10(d).

(iii)     If a Governmental Entity directs or recommends to Amgen that Amgen transfer any BLA or aBLA for the Amgen Eculizumab Products to a Third Party, Amgen may disclose a copy of this Settlement Agreement to a Third Party in connection with such a possible transfer so long as the Third Party agrees to confidential treatment of this Settlement Agreement.

(c)     Publicity.  No public announcement or, except as contemplated under Sections 6(b), 10(b)(ii), 10(b)(iii), and 10(d), other disclosure to Third Parties concerning the terms of this Settlement Agreement shall be made, either directly or indirectly, by any Party.

(d)     Disclosure to Government or in Discovery.  Specific terms or conditions of this Settlement Agreement may be disclosed if, in the opinion of a Party's counsel, this Settlement Agreement or such terms or conditions thereof are required to be disclosed (i) in order to comply

ATTORNEYS' EYES ONLY (D. DEL. LR 26.2)                    ALXN_PI_00000204

CONFIDENTIAL
EXECUTION COPY

with Applicable Law, including disclosures to Governmental Entities or other regulatory agencies, or the rules of any stock exchange or listing entity, or (ii) pursuant to a discovery demand; subpoena; order of a court, administrative body or arbitrator; or administrative guidance. Each Party agrees that it shall cooperate fully with the other Parties with respect to all disclosures regarding this Settlement Agreement (including good faith discussions as to the content of such disclosures) to comply with Applicable Law, including any disclosures to a Governmental Entity or other regulatory agencies, or the rules of any stock exchange or listing entity, or in discovery, including cooperation with respect to requests for confidential treatment of proprietary information of any Party included in any such disclosure. If, in the opinion of a Party's counsel, this Settlement Agreement or any terms or conditions thereof must be disclosed to comply with Applicable Law, including any disclosures to a Governmental Entity or other regulatory agencies, or the rules of any stock exchange or listing entity, such Party shall notify the other Parties of the intended disclosure at least ten (10) business days (or at least three (3) business days if the disclosure is made in compliance with the rules and regulations for reporting information in accordance with Current Report on Form 8-K) prior to disclosing any terms of this Settlement Agreement to allow the Parties time to discuss the content of the disclosure. If a Party receives a request to disclose any of the terms or conditions of this Settlement Agreement pursuant to a discovery demand; subpoena; order of a court, administrative body or arbitrator; or administrative guidance that in the opinion of such Party's counsel requires disclosure, such Party shall notify the other Parties within five (5) business days' after receiving such request and provide the other Parties with the intended disclosure at least ten (10) business days' prior to disclosing any terms of this Settlement Agreement to allow the Parties to discuss the content of the disclosure and/or allow the other Parties to oppose disclosure or seek an appropriate protective order. After the Party provides such

ATTORNEYS' EYES ONLY (D. DEL. LR 26.2)                                        ALXN_PI_00000205

CONFIDENTIAL
EXECUTION COPY

notice and after the Parties have discussed the content of the disclosure, such Party may then disclose the necessary terms and conditions of this Settlement Agreement, provided that it shall have used reasonable efforts to ensure that such disclosure is subject to, in the case of a disclosure to comply with Applicable Laws or to any Governmental Entity, adequate confidentiality protections, and, in the case of a disclosure in discovery, a protective order limiting access to the disclosure to outside counsel, expert witnesses and one employee or other representative of the entity receiving the Confidential Information.  Nothing herein shall preclude any Party from complying with an order requiring disclosure, or a guidance that in the opinion of such Party's counsel requires disclosure, of the terms of this Settlement Agreement that has been issued by a court, arbitrator or administrative agency of competent jurisdiction.  Nothing herein shall prohibit the Parties from disclosing this Settlement Agreement and its terms in confidential submissions to the Federal Trade Commission (FTC) and the Antitrust Division of the Department of Justice (DOJ) pursuant to the Medicare Prescription Drug, Improvement, and Modernization Act of 2003. Each Party reserves the right to communicate with the FTC and DOJ regarding such filings as it believes appropriate.

11.    <u>Additional Covenants</u>.

(a)    Each Party shall, to the extent permitted by law:

(i)    promptly inform the other Parties of any communication made or received by such Party to or from any Governmental Entity or other governmental authority regarding this Settlement Agreement and/or any related agreements; and

(ii)    use reasonable efforts to comply with and terminate any investigation or inquiry regarding the Settlement Agreement and/or any related agreements by any Governmental Entity or other government authority, including by providing requested information to such entity

ATTORNEYS' EYES ONLY (D. DEL. LR 26.2)                    ALXN_PI_00000206

**CONFIDENTIAL**
**EXECUTION COPY**

or authority and permitting reasonable access to its documents, officials and data related to the Settlement Agreement and/or any related agreements, subject to the terms and obligations in this Settlement Agreement.

(b) 

(c)     Alexion shall notify Amgen within ██████████ of the issuance of any court, patent office, or other tribunal decision finding invalid, unenforceable, or unpatentable any issued patent claims in any Licensed Patents in the U.S., that Alexion, in good faith, believes could be infringed by the making, using, selling, offering to sell, distributing, or importing the Amgen Eculizumab Products in/into the United States.

12.     <u>No Interference But No Consent For FDA Approval</u>.  Except in relation to public policy or safety, Alexion and its Affiliates shall not initiate or undertake, or cause or release any others to initiate or undertake, any activity directed against the Amgen Eculizumab Products or any BLA or aBLA relating to the Amgen Eculizumab Products, to interfere or seek to interfere with Amgen's, its Affiliates', or an Amgen Partner's efforts to: (a) carve out any information or indication from the label for the Amgen Eculizumab Products; (b) obtain FDA approval of any BLA or aBLA relating to the Amgen Eculizumab Products; (c) launch and sell the Amgen Eculizumab Products pursuant to the terms of this Settlement

**ATTORNEYS' EYES ONLY (D. DEL. LR 26.2)**                    **ALXN_PI_00000207**

CONFIDENTIAL
EXECUTION COPY

Agreement; or (d) maintain FDA approval of any BLA or aBLA relating to the Amgen Eculizumab Products. Nothing in this Settlement Agreement shall be interpreted as Alexion or any of its Affiliates consenting to the accuracy or sufficiency of any scientific, medical, regulatory, or other information contained in any BLA or aBLA relating to the Amgen Eculizumab Products.

13.     Expiration.  This Settlement Agreement shall continue from the Execution Date until the earlier of: (a) the expiration of the Licensed Patents, including any extensions and pediatric exclusivity; or (b) the date of a final judgment, from which no appeal has been or can be taken, that all of the claims of the Licensed Patents are invalid or unenforceable. The releases set forth in Section 4(c) shall survive expiration of this Settlement Agreement. The covenants provided in Section 4(c) shall survive until expiration of the latest expiring patent covered by this Settlement Agreement. The confidentiality obligations set forth in Section 10 shall survive for a period ████████████ from the Execution Date, notwithstanding any earlier expiration or termination of this Settlement Agreement.

14.     Representations and Warranties.

(a)     Each Party hereby represents, warrants, and covenants to the other Parties as follows:

(i)     It is a limited partnership, limited liability company, company or corporation duly organized, validly existing and in good standing under the laws of the jurisdiction in which it is incorporated or organized, and has full corporate power and authority and the legal right to own and operate its property and assets and to carry on its business as it is now being conducted and as contemplated in this Settlement Agreement, including, without limitation, the ability to grant the rights granted to the other Parties hereunder.

(ii)     As of the Execution Date: (i) it has the corporate power and authority and the legal right to enter into this Settlement Agreement and perform its obligations hereunder; (ii)

ATTORNEYS' EYES ONLY (D. DEL. LR 26.2)

CONFIDENTIAL
EXECUTION COPY

it has taken all necessary corporate action on its part required to authorize the execution and delivery of this Settlement Agreement and the performance of its obligations hereunder; and (iii) this Settlement Agreement has been duly executed and delivered on behalf of such Party and constitutes legal, valid and binding obligations of such Party that are enforceable against it in accordance with their terms.

(iii)    It has not entered, and shall not enter, into any agreement with any Third Party that is in conflict with the rights granted to the other Parties in this Settlement Agreement and has not taken and shall not take any action that would in any way prevent it from granting the rights granted to the other Parties under this Settlement Agreement or that would otherwise materially conflict with or adversely affect the rights granted to the other Parties under this Settlement Agreement.  Its performance and execution of this Settlement Agreement does not and will not result in a breach of any other contract to which it is a party.

(iv)    The execution and delivery of this Agreement and the performance by the Party or its Affiliates of any of its obligations hereunder do not and will not conflict with any judgment of any court or governmental body applicable to the Party or its Affiliates or its respective properties, or to the Party's knowledge, any statute, decree, order, rule or regulation of any court or governmental agency or body applicable to the Party or its properties.

(b)    Additional Alexion Representations and Warranties.

(i)    Alexion represents and warrants that, as of the Execution Date, (a) it has the necessary rights, title, interest, and authority to grant Amgen the license to the Licensed Patents contained herein; (b) Alexion owns or controls the Eculizumab Patents and all additional now-existing Licensed Patents; and (c) the Eculizumab Patents and all additional now-existing Licensed Patents are not subject to any liens or encumbrances.

ATTORNEYS' EYES ONLY (D. DEL. LR 26.2)                    ALXN_PI_00000209

CONFIDENTIAL
EXECUTION COPY

(ii) ███████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███   ███████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███ .

(c)    Except as expressly provided in this Settlement Agreement, neither Party makes any representations or warranties, express or implied, either in fact or by operation of applicable law.

**ATTORNEYS' EYES ONLY (D. DEL. LR 26.2)**                              **ALXN_PI_00000210**

CONFIDENTIAL
EXECUTION COPY

15.    <u>Notice</u>.  Any notice or other communication required to be delivered under or pursuant to this Settlement Agreement shall be in writing in the English language, delivered personally or sent by air mail or express courier service providing evidence of receipt, postage pre-paid where applicable, to the following addresses of the Parties (or such other address for a Party as it specifies by like notice):

> <u>For Alexion:</u>
> Alexion Pharmaceuticals, Inc.
> 121 Seaport Boulevard
> Boston, MA 02210
> Attn:  Chief Legal Officer
> Attn:  Head of Intellectual Property
> Facsimile:  (203) 271-8189
>
> <u>For Amgen:</u>
> Amgen Inc.
> One Amgen Center Drive
> Thousand Oaks, CA 91320
> Attn:  Jonathan Graham, Executive VP, General Counsel and Secretary

Any notice shall be effective upon receipt by the Party to which it is addressed.

16.    <u>Governing Law; Venue</u>.  This Settlement Agreement shall be governed by, and construed in accordance with, the laws of the State of Delaware governing agreements fully executed therein and to be performed therein, without regard for any conflict of law principles that would dictate the application of the laws of another jurisdiction.  The Parties agree that the United States District Court for the District of Delaware shall have exclusive and sole jurisdiction to enforce any violation of this Settlement Agreement, except that, if for any reason that Court does not accept jurisdiction, then the state courts located in the state of Delaware, shall have exclusive and sole jurisdiction to enforce any violation of this Settlement Agreement.  The Parties hereby consent to the personal jurisdiction of those courts for any dispute arising from or relating to this Settlement Agreement.

CONFIDENTIAL
EXECUTION COPY

17.   <u>Validity</u>.  If any provision of this Settlement Agreement shall be held by a court of competent jurisdiction to be illegal, invalid, or unenforceable, in whole or in part, the remaining provisions shall remain in full force and effect and the Parties shall negotiate in good faith to replace the invalid or unenforceable provision with a valid and enforceable provision that has the effect nearest to that of the provision to be replaced.

18.   <u>Construction</u>.  This Settlement Agreement has been negotiated by the Parties and their respective counsel and shall be interpreted fairly in accordance with its terms and without any strict construction in favor of or against any Party.  Headings of paragraphs or sections of this Settlement Agreement are for reference only and shall not be deemed to be a part of this Settlement Agreement.

19.   <u>Waiver</u>.  Waiver by a Party of any breach of any provision of this Settlement Agreement by another Party shall not operate or be construed as a waiver of any subsequent or other breach.  For the avoidance of doubt, no terms or conditions of this Agreement will be discharged, terminated, varied, or modified by any prior or subsequent written or oral statement, or by the conduct or act of any Party.  No provision of this Settlement Agreement may be waived except by a written instrument signed by the Party waiving compliance.

20.   <u>Counterparts</u>.  This Settlement Agreement may be executed in one or more counterparts (including via electronic copy), each of which when so executed and delivered shall be deemed to be an original, but all of which taken together form but one and the same instrument.

<u>**REMAINDER OF PAGE INTENTIONALLY LEFT BLANK**</u>

**ATTORNEYS' EYES ONLY (D. DEL. LR 26.2)**                                        **ALXN_PI_00000212**

CONFIDENTIAL
EXECUTION COPY

IN WITNESS HEREOF, the Parties have caused their duly authorized representatives to execute this Settlement Agreement to be effective as of the Execution Date.

ALEXION PHARMACEUTICALS, INC.

By: _____
     Name: Aradhana Sarin
     Title: EVP & CFO

Date:   5/28/2020

ALEXION PHARMA INTERNATIONAL OPERATIONS UNLIMITED COMPANY.

By: _____
     Name: Todd Spalding
     Title: Director

Date: _____

AMGEN INC.

By: _____
     Name: Peter H. Griffith
     Title: EVP & CFO

Date: _____

ATTORNEYS' EYES ONLY (D. DEL. LR 26.2)                        ALXN_PI_00000213

CONFIDENTIAL
EXECUTION COPY

IN WITNESS HEREOF, the Parties have caused their duly authorized representatives to execute this Settlement Agreement to be effective as of the Execution Date.

ALEXION PHARMACEUTICALS, INC.

By: _____
     Name:  Aradhana Sarin
     Title:  EVP & CFO

Date: _____

ALEXION PHARMA INTERNATIONAL OPERATIONS UNLIMITED COMPANY.

By: _____
     Name:  Todd Spalding
     Title:  Director

Date:  May 28, 2020

AMGEN INC.

By: _____
     Name:  Peter H. Griffith
     Title:  EVP & CFO

Date: _____

ATTORNEYS' EYES ONLY (D. DEL. LR 26.2)                    ALXN_PI_00000214

CONFIDENTIAL
EXECUTION COPY

IN WITNESS HEREOF, the Parties have caused their duly authorized representatives to execute this Settlement Agreement to be effective as of the Execution Date.

ALEXION PHARMACEUTICALS, INC.

By: _____
       Name: Aradhana Sarin
       Title: EVP & CFO

Date: _____

ALEXION PHARMA INTERNATIONAL OPERATIONS UNLIMITED COMPANY.

By: _____
       Name: Todd Spalding
       Title: Director

Date: _____

AMGEN INC.

By: _Peter H Griffith_____
       Name: Peter H. Griffith
       Title: EVP & CFO

Date: _5-28-2020_____

ATTORNEYS' EYES ONLY (D. DEL. LR 26.2)       ALXN_PI_00000215

CONFIDENTIAL
EXECUTION COPY

**SCHEDULE A**

| Alexion Reference Number | US Patent/Application Number |
|---|---|
| ■ | ■ |
| ■ | ■ |
| ■ | ■ |
| ■ | ■ |
| ■ | ■ |
| ■ | ■ |
| ■ | ■ |
| ■ | ■ |
| ■ | ■ |
| ■ | ■ |
| ■ | ■ |
| ■ | ■ |
| ■ | ■ |
| ■ | ■ |
| ■ | ■ |
| ■ | ■ |
| ■ | ■ |
| ■ | ■ |
| ■ | ■ |
| ■ | ■ |
| ■ | ■ |
| ■ | ■ |
| ■ | ■ |
| ■ | ■ |
| ■ | ■ |
| ■ | ■ |
| ■ | ■ |
| ■ | ■ |
| ■ | ■ |
| ■ | ■ |
| ■ | ■ |
| ■ | ■ |
| ■ | ■ |
| ■ | ■ |
| ■ | ■ |
| ■ | ■ |
| ■ | ■ |

**ATTORNEYS' EYES ONLY (D. DEL. LR 26.2)**                    **ALXN_PI_00000216**

CONFIDENTIAL
EXECUTION COPY

| Alexion Reference Number | US Patent/Application Number |
|---|---|
| ██ | ████████ |
| ██ | ████████ |
| ██ | ████████ |
| ██ | ████████ |
| ██ | ████████ |
| ██ | ████████ |
| ██ | ███████ |
| ███ | ████████ |

Confidential Settlement Agreement                                                    Schedule A

**ATTORNEYS' EYES ONLY (D. DEL. LR 26.2)**                          **ALXN_PI_00000217**

# ANNEX A

## UNITED STATES PATENT AND TRADEMARK OFFICE
_____

## BEFORE THE PATENT TRIAL AND APPEAL BOARD
_____

AMGEN INC.,
Petitioner,

v.

ALEXION PHARMACEUTICALS, INC.,
Patent Owner.

_____

Case IPR2019-00739[1]
Patent 9,725,504

_____

## JOINT MOTION TO TERMINATE PROCEEDING
## PURSUANT TO 35 U.S.C. § 317 and 37 C.F.R. § 42.74

**Mail Stop** PATENT BOARD
Patent Trial and Appeal Board
U.S. Patent & Trademark Office
P.O. Box 1450
Alexandria, VA 22313–1450

_____

[1]      Substantially the same paper will be filed in IPR2019-00740 and IPR2019-00741, if authorized by the PTAB.

**ATTORNEYS' EYES ONLY (D. DEL. LR 26.2)**                     **ALXN_PI_00000218**

## I.     Statement of Precise Relief Requested

Pursuant to 35 U.S.C. § 317(a) and as authorized by the Board on [DATE],

Petitioner Amgen Inc. ("Amgen") and Patent Owner Alexion Pharmaceuticals, Inc.

("Alexion") jointly request termination of the *Inter Partes* Review of U.S. Patent

No. 9,725,504 ("the '504 patent"), Case No. IPR2019-00739.

## II.    Argument

The parties have executed a settlement agreement that resolves all of their

disputes concerning the '504 patent, expressly including the present *Inter Partes*

Review (IPR). Termination of IPR by the Board is appropriate for a least the

following reasons:

a) The parties are jointly requesting termination. 77 Fed. Reg. 48756, 48768

   (Aug. 14, 2012) ("There are *strong public policy reasons to favor*

   *settlement* between the parties to a proceeding") (emphasis added);

b) The Board has not yet "decided the merits of the proceeding *before the*

   *request for termination is filed*." 35 U.S.C. § 317(a) (emphasis added); 77

   Fed. Reg. 48768 ("The Board expects that a proceeding will terminate

   after the filing of a settlement agreement, unless the Board has already

   decided the merits of the proceeding."). This supports the propriety of

   terminating this proceeding.. *See, e.g., Toyota Motor Corp. v. Blitzsafe*

   *Tex. LLC*, IPR2016-00421, Paper 28 (Feb. 21, 2017) (granting motion to

terminate even after all substantive papers were filed, "particularly in light of the fact that a final written decision is not due until more than four months from now"); *Plaid Techs., Inc. v. Yodlee, Inc.*, IPR2016-00273, Paper 29 (Feb. 8, 2017) (granting motion to terminate because "the parties' joint motions to terminate were filed prior to the oral hearings in these cases"); *Apex v. Resmed*, IPR2013-00512, Paper 39 (Sept. 12, 2014) (granting joint motion to terminate after the parties had fully briefed the matter); *Rackspace Hosting, Inc. v. Clouding IP, LLC*, CBM2014-00034, Paper 28 (Dec. 9, 2014) (granting motion to terminate after close of evidentiary record and less than ten days before trial); *Volution v. Versata Software*, CBM2013-00018, Paper 52 (June 17, 2014) (granting motion to terminate after oral hearing); *AM General LLC v. Uusi, LLC*, IPR2016-1050, Paper 44 (Nov. 7, 2017) (granting motion to terminate after oral hearing); and

c) No dispute remains between the Parties involving the '504 patent. The only related pending proceedings regarding the '504 patent before the Board are IPR2019-00740 (U.S. Patent No. 9,718,880) and IPR2019-00741 (U.S. Patent No. 9,732,149). Joint Motions to Terminate are being filed in these cases concurrently with this Joint Motion to Terminate.

*Joint Motion to Terminate*
*IPR2019-00739*

Further, maintaining this proceeding would contradict the Congressional

goal to establish a more efficient and streamlined patent system that limits

unnecessary and counterproductive litigation costs. *See, e.g., AM General LLC*,

IPR2016-01050, Paper 44 ("Generally, the Board expects that a proceeding will

terminate after the filing of a settlement agreement.").

## III.   Written Settlement Agreement

As set forth in 35 U.S.C. § 317 and 37 C.F.R. § 42.74, the agreement has

been made in writing in the form of a settlement agreement executed by the parties,

and a true and correct copy of that settlement agreement has been filed as Exhibit

_____.  The parties hereby represent that the document filed as Exhibit _____

represents all agreements made in connection with, or in contemplation of, the

termination of this proceeding.

As stated in 35 U.S.C. § 317(a), because Amgen and Alexion request this

termination, no estoppel under 35 U.S.C. § 315(e) shall attach to Amgen.

Submitted concurrently herewith is a joint request to file the settlement

agreement as business confidential information pursuant to 35 U.S.C. § 317(b) and

§ 42.74(c).

## IV.   Conclusion

*Joint Motion to Terminate*
*IPR2019-00739*

Based on the above, Petitioner and Patent Owner respectfully request

termination of the *Inter Partes* Review of U.S. Patent No. 9,725,504, Case No.

IPR2019-00739.

Respectfully submitted,

By:

Deborah A. Sterling, Ph.D.
Reg. No. 62,732
STERNE, KESSLER, GOLDSTEIN & FOX
P.L.L.C
1100 New York Avenue, N.W.
Washington, D.C. 20005-3934
Tel: (202) 371-2600

*Lead Attorney for Petitioner Amgen Inc.*

By:

Gerald J. Flattmann, Jr.
Reg. No. 37,324
KING AND SPALDING LLP
1185 Avenue of the Americas
New York, NY 10002
Tel: (212) 556-2100

*Lead Attorney for Patent Owner Alexion Pharmaceuticals, Inc.*

Dated:  [DATE]

**ANNEX B**

UNITED STATES PATENT AND TRADEMARK OFFICE
_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD
_____

AMGEN INC.,
Petitioner,

v.

ALEXION PHARMACEUTICALS, INC.,
Patent Owner.

_____

Case IPR2019-00739[1]
Patent 9,725,504

_____

**JOINT MOTION TO FILE SETTLEMENT AGREEMENT AS BUSINESS
CONFIDENTIAL INFORMATION UNDER 35 U.S.C. § 317**

**Mail Stop** PATENT BOARD
Patent Trial and Appeal Board
U.S. Patent & Trademark Office
P.O. Box 1450
Alexandria, VA 22313–1450

_____

[1]     Substantially the same paper will be filed in IPR2019-00740 and
IPR2019-00741, if authorized by the PTAB.

**ATTORNEYS' EYES ONLY (D. DEL. LR 26.2)**                    ALXN_PI_00000223

*Joint Motion to File Settlement Agreement*
*As Business Confidential Information*
*IPR2019-00739*

Pursuant to 35 U.S.C. § 317(b) and § 42.74, Petitioner Amgen Inc. and

Patent Owner Alexion Pharmaceuticals, Inc. jointly request to keep the Settlement

Agreement (Exhibit _____, which comprises business confidential information,

separate from the public files in accordance with this statute and regulation.

Respectfully submitted,

By:                                          By:

Deborah A. Sterling, Ph.D.                   Gerald J. Flattmann, Jr.
Reg. No. 62,732                              Reg. No. 37,324
STERNE, KESSLER, GOLDSTEIN & FOX             KING AND SPALDING LLP
P.L.L.C                                      1185 Avenue of the Americas
1100 New York Avenue, N.W.                   New York, NY 10002
Washington, D.C. 20005-3934                  Tel: (212) 556-2100
Tel: (202) 371-2600

                                             *Lead Attorney for Patent Owner*
*Lead Attorney for Petitioner Amgen*         *Alexion Pharmaceuticals, Inc.*
*Inc.*

Dated:  [DATE]

# EXHIBIT K

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

ALEXION PHARMACEUTICALS, INC. )
and ALEXION PHARMA               )
INTERNATIONAL OPERATIONS LTD.,)
                                 )
              Plaintiffs,       )
                                 )
vs.                              )   CA No. 24-005-GBW
                                 )
SAMSUNG BIOEPIS CO. LTD.,       )
                                 )
              Defendant.        )


DEPOSITION OF VINCENT A. THOMAS

TAKEN ON BEHALF OF DEFENDANT

MARCH 5, 2024

-CONFIDENTIAL-

-ATTORNEYS' EYES ONLY-


Reported by Celena D. Davis, RPR, CSR



Page 2

```
 1                    INDEX OF EXAMINERS
 2  DEPOSITION OF VINCENT A. THOMAS
 3                                              Page:
 4        Questions by Mr. Armon. . . . . . . . .  5
 5
 6                        EXHIBITS
 7  Exhibit 1. . . . . . . . . . . . . . . . . .  5
             (Declaration of Vincent A. Thomas)
 8  Exhibit 2. . . . . . . . . . . . . . . . . . 13
             (Complaint)
 9  Exhibit 3. . . . . . . . . . . . . . . . . . 36
             (Confidential Settlement Agreement)
10  Exhibit 4. . . . . . . . . . . . . . . . . . 38
             (Bates No. ALXN_PI_00000183-224)
11  Exhibit 5. . . . . . . . . . . . . . . . . . 71
             (████████████████████████████████)
12  Exhibit 6. . . . . . . . . . . . . . . . . . 77
             ████████████████████████████████
13           ███████████████████
    Exhibit 7. . . . . . . . . . . . . . . . . . 96
14           ████████████████████████████████,
             █████████████████████
15  Exhibit 8. . . . . . . . . . . . . . . . . .100
             (██████████████████████████████
16           ████████████████████████
    Exhibit 9. . . . . . . . . . . . . . . . . .102
17           (█████████████████████████████
             ██████████████████████████████
18  Exhibit 10 . . . . . . . . . . . . . . . . .104
             (Bates No. ALXN_PI_00000072)
19
20  (The exhibits are attached.)
21
22
23
24
25
```



```
                                                    Page 3
 1               IN THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF DELAWARE
 2

 3   ALEXION PHARMACEUTICALS, INC. )
     and ALEXION PHARMA              )
 4   INTERNATIONAL OPERATIONS LTD.,)
                                     )
 5                    Plaintiffs,   )
                                     )
 6   vs.                             )   CA No. 24-005-GBW
                                     )
 7   SAMSUNG BIOEPIS CO. LTD.,       )
                                     )
 8                    Defendant.    )
 9            IT IS STIPULATED AND AGREED by and between
10   counsel for Plaintiff and counsel for Defendant that the
11   deposition of VINCENT A. THOMAS, taken by and on behalf
12   of the Defendant, pursuant to the provisions of the
13   Supreme Court Rules pertaining to depositions taken for
14   the Defendant on March 5, 2024, via Zoom videoconference
15   in the State of Illinois, before CELENA D. DAVIS,
16   Registered Professional Reporter and Certified Shorthand
17   Reporter within and for the State of Illinois.
18
19
20
21
22
23
24
25
```



```
                                                     Page 4
 1                    APPEARANCES
 2
 3    COUNSEL FOR THE PLAINTIFFS:
      CAHILL GORDON & REINDEL, LLP
 4    by Mr. Gerald J. Flattmann, Jr.
      32 Old Slip
 5    New York, NY 10005
      gflattmann@cahill.com
 6
 7
      COUNSEL FOR THE DEFENDANT:
 8    COOLEY LLP
      by Mr. Orion Armon
 9    1144 15th Street - Suite 2300
      Denver, CO 80202
10    oarmon@cooley.com
11
12    REGISTERED PROFESSIONAL REPORTER
      CERTIFIED COURT REPORTER (MO)
13    CERTIFIED SHORTHAND REPORTER (IL)
      Celena D. Davis
14    MAGNA LEGAL SERVICES
15    Also Present:  Tara Rahemba
                     Christine Hlavka
16
17
18
19
20
21
22
23
24
25
```



Page 5

1                   (The deposition began at 9:00 CST.)

2                        VINCENT A. THOMAS,

3    duly sworn to tell the truth, the whole truth, and

4    nothing but the truth, testified as follows:

5                        EXAMINATION

6    QUESTIONS BY MR. ARMON:

7         Q.    Please state your full name for the record.

8         A.    Vincent Alexander Thomas.

9         Q.    And you work at FTI Consulting; correct?

10        A.    That's correct.

11        Q.    And you're a senior managing director in

12   the forensics and litigation consulting practice at FTI?

13        A.    I'm a senior managing director of the

14   forensic litigation consulting segment for FTI.  And I

15   lead our intellectual property practice, as well.

16        Q.    Okay.  You were asked to prepare a

17   declaration in this matter; correct?

18        A.    Yes.

19              (Exhibit 1 was marked for identification.)

20   BY MR. ARMON:

21        Q.    All right.  I just marked as Exhibit 1 a

22   document titled "Declaration of Vincent A. Thomas" with

23   credentials after it.  Let me know when you have it up,

24   please.

25        A.    I do.



Page 6

1          Q.    All right.  And this is the declaration
2   you've submitted in this matter; correct?
3          A.    That's correct.
4          Q.    And you understand that --
5          A.    Let me just say that appears to be the
6   case.  But I'm having trouble -- oh, there we go.  I
7   want to make sure I can move through the document.
8          Q.    All right.  Please go ahead and review it
9   and confirm that this is a complete copy of the
10  declaration you submitted.
11         A.    It is, yes.  I apologize.
12         Q.    And as an aside, you can scroll through the
13  thumbnails on the left side of your screen.  There's
14  also zoom buttons on the top of your screen so you can
15  adjust the document size.
16         A.    Okay.
17         Q.    Are you able to see Exhibit 1 all right?
18         A.    I am.  And I will just say for the record,
19  I do have a copy of my declaration with me --
20         Q.    Okay.
21         A.    -- as well as copies of various documents
22  that were cited in my declaration.  There's no markings
23  or anything on those documents.  But I just thought for
24  efficiency sake, if you're asking me questions, it may
25  be easier to look at a hard copy rather than the screen,



Page 25

1    part of my opinion.

2         Q.   And you'd expect, based on your 30 years of

3    experience, and the assumption that you'd have financial

4    information regarding sales of SB12, and financial

5    information from Alexion, that you would be able to

6    calculate with reasonable certainty by the time of trial

7    lost profits and price erosion damages; correct?

8         A.   I would be able to calculate.  I would only

9    support an opinion as to the amount of damages that I

10   could show with reasonable certainty.  But that doesn't

11   necessarily mean I would show the totality of damages if

12   I couldn't support that.

13        Q.   And sitting here today, you would expect

14   the information you would need to calculate price

15   erosion and lost profits data -- damages with reasonable

16   certainty would be available to you; correct?

17             MR. FLATTMANN:  Objection, asked and

18   answered.

19        A.   I guess I wouldn't assume that I would have

20   the information to be able to calculate the totality of

21   the damages for -- certainly for price erosion, as well

22   as for lost profits.  I would say in totality, there may

23   be some information that might allow me to calculate

24   some of those damages, but maybe not.

25   BY MR. ARMON:



Page 35

1    -- and shows damages with reasonable certainty.

2         Q.   Okay.  In preparing your opinions in

3    Exhibit 1, you haven't made any effort to allocate

4    future harms after March 1, 2025, between sales of an

5    Amgen Eculizumab biosimilar and SB12; correct?

6         A.   Well, I guess what I would say is that I

7    have discussed the fact that there will be a future

8    impact beyond a limited period of time for the launch of

9    SB12; even up through March of 2025, that the impact

10   will be felt further into the future.  But I have not

11   calculated any such impact at this point.

12        Q.   Okay.  You've made no effort in your

13   declaration, Exhibit 1, to parse out the competitive

14   impacts of branded drug sales on Soliris, separate and

15   apart from potential sales of SB12; correct?

16        A.   I have not calculated any damages at this

17   point, I guess is -- to answer your question somehow.

18        Q.   Right.  And you've also not attempted to

19   parse out the impacts on Soliris from competitive -- I'm

20   sorry.  Move to strike that.  Let me try it again.

21             You've made no effort to parse out the

22   impacts on Soliris from branded drug competition versus

23   SB12; correct?

24        A.   I've not calculated damages at this point,

25   so no.



Page 84

1          Q.    So when you were preparing your opinions in

2    your declaration, did you take any steps to ensure that

3    the types of alleged harms and the extent of alleged

4    harms you identified were associated only with the

5    patent claims at issue in the preliminary injunction

6    proceeding?

7          A.    Well, I took into consideration the harms

8    that would result from the launch of SB12 into the

9    market prior to March of -- that belongs to SB12 as of

10   ███████████████    That's what I took into consideration.

11         Q.    And you attempted to identify all of the

12   harms from sales of SB12 across all indications; is that

13   correct?

14         A.    In terms of what impact that will have,

15   yes.

16         Q.    Okay.  And in terms of the nexus

17   requirement for showing irreparable harm, what steps, if

18   any, did you take to ensure that the harms you were

19   identifying were tied to the alleged infringement of the

20   PI patent claims?

21         A.    Well, my understanding is that the alleged

22   infringement result -- would result from SB12 being

23   launched at risk.  And then based on that, I determined

24   what harm results from the launch of SB12.

25         Q.    Okay.  And did you do anything to try to



Page 85

1    isolate harm that would allegedly occur from the launch

2    of SB12, specifically in relation to the patent claims

3    that are identified in the preliminary injunctive

4    motion?

5         A.   I didn't do -- in terms of patent claims, I

6    didn't make a technical assessment in that regard.  I

7    assessed the economic impact of launching SB12.

8         Q.   Okay.  Did you speak with any technical

9    expert engaged by counsel for Alexion to try to ensure

10   that the economic impacts you identified were

11   specifically tied to the specific patent claims at issue

12   in the preliminary injunction?

13        A.   I didn't.  I'm sorry, Jerald, did you --

14             MR. FLATTMANN:  I just said objection to

15   form.  That's all.

16        A.   Okay.  I didn't talk to a technical expert

17   and try to match claims in some fashion, if that's your

18   question.

19   BY MR. ARMON:

20        Q.   Okay.  Did you speak -- did you get

21   guidance from anyone to help you tie the alleged

22   economic harms that you identified in your declaration

23   specifically to alleged infringement harms from the

24   specific patent claims that were included in the

25   preliminary injunction motion?



Page 86

```
 1              A.   I didn't do that technical analysis, if
 2   that's what you're asking.  Again, I assessed the impact
 3   of launching SB12.
 4              Q.   Okay.  Did anyone give you guidance that
 5   you should take onboard as an assumption to help you
 6   ensure that your identification of alleged irreparable
 7   harm from SB12's launch would be tied specifically to
 8   the patent claims that Alexion has included in its
 9   preliminary injunction motion?
10              MR. FLATTMANN:  Objection to form.
11              A.   I didn't do that specific analysis, other
12   than understanding the launch of SB12 is an infringing
13   action.
14   BY MR. ARMON:
15              Q.   Okay.  Your declaration recognizes that the
16   law includes a nexus requirement; correct?
17              A.   I believe so, yes.  Again, I'm not making
18   legal representations here.  I just have an
19   understanding that in terms of -- if you're asking about
20   the causal nexus, that that is something to investigate
21   as part of this analysis.
22              Q.   Okay.  I'll ask you to turn to paragraph 24
23   of Exhibit 1.  It's on page 11.
24              A.   Okay.
25              Q.   And there, you state, "I understand that
```



Page 87

1    irreparable harm requires evidence of a sufficient

2    causal nexus between the alleged harm and the alleged

3    infringing activity"; do you see that?

4         A.   Yes.

5         Q.   Okay.  What, specifically, is the alleged

6    infringing activity that you were establishing a nexus

7    to when you were developing your views on harm?

8         A.   The launch and sale of the biosimilar SB12.

9         Q.   Okay.  And with respect to that alleged

10   infringing activity, did you perform any sort of check

11   to ensure that the alleged harm identified in your

12   declaration was tied to infringement of the PI patent

13   claims?

14        MR. FLATTMANN:  Asked and answered.

15        A.   Again, I'm not providing legal or technical

16   opinions.  I gained an understanding that the infringing

17   activity is the launch of SB12.

18   BY MR. ARMON:

19        Q.   Okay.  So you don't know one way or the

20   other whether SB12 could be used to treat patients in a

21   way that wouldn't infringe the patents that are at issue

22   in the preliminary injunction?

23        A.   I think you're asking a technical and legal

24   question, and I did not investigate that on either

25   ground, whether technical or legal.



Page 88

1          Q.   Were you given any information that you

2    should assume to be true or any instruction about

3    whether SB12 could be used after launch in any way that

4    would not be covered by the claims of the preliminary

5    injunction patents at issue in the PI motion?

6          A.   I didn't investigate that specific issue,

7    if that's your question.

8          Q.   Okay.

9          A.   Or provide -- I should say or to provide

10   technical or legal opinions.

11         Q.   And you weren't given any information to

12   assume as true or to assume for purposes of your

13   investigation, either; correct?

14         A.   I don't believe so, no.

15         Q.   Okay.  All right.  I'll ask you to move to

16   paragraph 19 of your declaration on page 10 of

17   Exhibit 1.  This paragraph -- are you there?

18         A.   Yes.

19         Q.   Okay.  And this paragraph 19 of Exhibit 1

20   addresses Ultomiris's mechanism of action and frequency

21   of treatment; correct?

22         A.   Yes.

23         Q.   And in summary fashion, you describe here

24   that Soliris is indicated for IV administration every

25   two weeks, whereas Ultomiris is indicated for IV



Page 89

1    administration every eight weeks; correct?

2          A.   Yes.

3          Q.   As part of your -- the development of your

4    opinions for your declaration, did you investigate

5    health provider and patient preference for Ultomiris's

6    dosing schedule versus a biosimilar's biweekly dosing

7    schedule?

8          A.   Look, that I think, again, is a technical

9    opinion as to what dosing regimen patients prefer.  I

10   will say that a dosing regimen under Ultomiris is

11   something that Alexion touts, and has been successful in

12   converting Soliris patients to Ultomiris because they

13   believe that is better for the patient.  And I think

14   that that's reflected in the way in which they've been

15   able to convert patients.

16         Q.   Okay.  So you don't have an opinion on

17   whether patients or providers would prefer to receive

18   Ultomiris versus a biosimilar Eculizumab assuming that

19   both drugs are indicated for the patient's disease?

20         A.   Well, I think that there's information that

21   indicates that once a patient begins using Ultomiris,

22   they're less likely to switch to a biosimilar with a

23   different dosing regimen.

24         Q.   Okay.  And that's because, generally

25   speaking, there's an understanding that patients prefer





Page 90

1    less frequent dosing to more frequent dosing because of

2    impacts on their life; right?

3         A.   Well, I think that there are certain

4    patients that perhaps, with the understanding, will

5    convert to Ultomiris based on the dosing regimen.

6         Q.   Okay.  Let's move to, excuse me, paragraph

7    27 of your declaration, Exhibit 1, on page 13.  Are you

8    there?

9         A.   I am.

10        Q.   Did you speak with any employee of Alexion

11   concerning the potential impacts to reputation and

12   goodwill that would manifest from a launch of SB12?

13        A.   I did not.

14        Q.   Okay.  Did you speak with any employee of

15   Alexion regarding redeployment of Alexion's workforce

16   that might be necessitated by the launch of SB12?

17        A.   I did not.

18        Q.   Did you look at any Alexion or third-party

19   business advisor document that addresses whether Alexion

20   will need to redeploy workforce as a result of

21   Eculizumab biosimilar launching?

22        A.   There's no document that is based on the

23   assumption of SB12 launching, so the documents would not

24   reflect that scenario.  So I can't say that such

25   documents exist.



Page 97

```
1    this Exhibit 7.  Let me know when you're there.
2             A.    I'm here.
3             Q.    ████████████████████████████████
█    ███████████████████████████████████████████
█    ██████████████████████████████████████████
█    ███████████████████████████████████████████████
█    ██████████████████████████████████████████████████
█    █████████████████
9             A.    I see that.
10            Q.    Is that consistent with the understanding
11   you've developed?
12            A.    Yes.
13            Q.    ███████████████████████████████████████
█    ███████████████████████████████████████████
█    ████████████████████████████████████████████████████
█    █████████████████████████████████
17                  Is that also consistent with your
18   understanding?
19            A.    That's what this document says, yes.
20            Q.    Okay.  And do you have any information to
21   suggest that that's not accurate or untrue?
22            A.    Not as I sit here, no.
23            Q.    Okay.  Jumping down to page 49 of this same
24   document, Exhibit 7, let me know when you're there.
25            A.    Okay.
```



Page 98

```
 1          Q.    This one is titled, ███████████████
 ██ ████████████████████████████████████████████████
 ██ ████████  do you see that?
 4          A.    Yes.
 5          Q.    Is that consistent with your understanding?
 6          A.    ████████████████████████████████████████
 ██ ███████████████████████████████████████████████
 ██ ████████   ████████████████████████████████████████
 ██ ███████████████████████████████████████████████████
 ██ ███████████████████████████████████████████████
 ██ ████████████
12          Q.    ███████████████████████████████████████
 ██ ███████████████████████████████████████████████████
 ██ ████████████████████████████
15          A.    ███████████████████████████████████
16          Q.    The third bullet on the right-hand side of
17 page 49 of Exhibit 7 also notes that, █████████████
 ██ ███████████████████████████████████████████████
 ██ ███████████████████████████████████████████████████
 ██ ███████████████████████████████████; do you see that?
21          A.    I do see that, yes.
22          Q.    And that's consistent with what you earlier
23 testified, that patients and providers prefer the more
24 convenient eight-week Ultomiris regimen; correct?
25          A.    Well, and there are instances where, yes,
```



Page 99

1   when they've been converted, they prefer that dosing

2   regimen.  And I believe it's Alexion's position that can

3   be better for patients.

4        Q.   All right.  Let's jump to page 52 of

5   Exhibit 7.  I'll ask you to focus your attention on the

6   second bullet on the right-hand side of the slide.

7        A.   Yes.

8        Q.   It states, ███████████████████████████████

    ███████████████████████████████████████████████████

    ███████████████████████████████████████████████████

    ███████████████████████████  do you see that?

12       A.   I do.

13       Q.   And the oral regimens, in particular, is a

14  reference to Fabhalta or iptacopan; correct?

15       A.   I believe that's the case.

16       Q.   And you note that in your declaration, that

17  Fabhalta is an orally administered drug; correct?

18       A.   Yes.

19       Q.   Do you have any information suggesting that

20  this conclusion in the second bullet here on slide 52 is

21  incorrect?

22       A.   Well, not incorrect as it relates to the

23  expectation that Amgen would launch in March of 2025.

24  But this doesn't assume an earlier launch of SB12 and

25  having two biosimilars in the market.



```
                                                    Page 100

 1            Q.   ████████████████████████████████
   ████████████████████████████████████████████████
   ██████████      Ultomiris is priced lower than Solaris;
 4    correct?
 5            A.    That's my understanding.
 6            Q.    Right.  And so that implies that
 7    Ultomiris's pricing would be closer to an assumed
 8    biosimilar price than Solaris would be; correct?
 9            A.    Perhaps.
10            Q.    Okay.  Well, by definition, it would be,
11    correct, if we have a shared understanding that
12    Ultomiris is priced lower than Solaris; correct?
13            A.    I believe so, yes.
14            Q.    And in the fifth bullet of slide 52 of
15    Exhibit 7, it states, ████████████████████████████
   ██████████████████████████████████████████████████████
   ██████████████████████████████████████████████
   █████████████████████████████████████████████
   ██████  ; do you see that?
20            A.    Yes.
21            Q.    Do you have any information suggesting that
22    this assessment is incorrect?
23            A.    Not as I sit here, no.
24                  (Exhibit 8 was marked for identification.)
25    BY MR. ARMON:
```



Page 101

1          Q.   All right.  Marking another exhibit as

2     Exhibit 8, this document is labeled -- I'm sorry --

3     titled ████████████████████████████████████

      █  ███████████████      Let me know when you have it up.

5          A.   Yes, I do.

6          Q.   Have you seen this document before today?

7          A.   I have.

8          Q.   And did you review it prior to serving your

9     declaration Exhibit 1 or after?

10         A.   Prior to.

11         Q.   Okay.  Bear with me one moment here.  All

12    right.  Let's go to page 24 of Exhibit 8.  And let me

13    know when you're there.

14         A.   I'm here.

15         Q.   Okay.  And this slide on page 24 of

16    Exhibit 8 is titled ██████████████████████████

      █  ████████████████████████████  do you see that?

18         A.   Yes.

19         Q.   ████████████████████████████████████

      █  █████████████████████████████████████

21         A.   That's correct.

22         Q.   Okay.  And as far as you're aware, is there

23    any document in this case suggesting that any employees

24    with responsibility for Solaris will be laid off?

25         A.   Not specifically.  ████████████████████



Page 102

████████████████████████████████████

███████████████████

3       Q.   Right.  And that's a reflection of what's

4   shown on the bottom of this slide 24, ████████████

████████████████████████████████████

████████████████████████████   ████████

███████████████████████████████████

█████████████████████████████

9       A.   Yeah.  ███████████████████████

███████████████████████

11      Q.   Right.  █████████████████████████

████████████████████████████████████

██████████████████████████████

████████████████████████████████████

██████████████████████████

16      A.   Yes.  And████████████████████████

███████████████

18      Q.   Okay.  Have you seen any Alexion document

19   that projects workforce reduction, as opposed to

20   redeployment, as a result of biosimilar entry?

21      A.   As I said, that there are certain line

22   items on this chart -- well, no, I don't.

23           (Exhibit 9 was marked for identification.)

24   BY MR. ARMON:

25      Q.   All right.  I'll mark a new exhibit.  Okay.



Page 108

1                CERTIFICATE OF REPORTER

2

3

4        I, Celena D. Davis, Registered Professional

5   Reporter and Certified Shorthand Reporter within and for

6   the State of Illinois, do hereby certify that the

7   witness whose testimony appears in the foregoing

8   deposition was duly sworn by me; that the testimony of

9   said witness was taken by me to the best of my ability

10  and thereafter reduced to typewriting under my

11  direction; that I am neither counsel for, related to,

12  nor employed by any of the parties of the action in

13  which this deposition was taken, and further, that I am

14  not a relative or employee of any attorney or counsel

15  employed by the parties thereto, nor financially or

16  otherwise interested in the outcome of the action.

17

18

19

20        ____ *Celena D. Davis* _____

          CELENA D. DAVIS, RPR, CSR

21        State of Illinois

22

23

24

25



# EXHIBIT L

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE


| | | |
|---|---|---|
| ALEXION PHARMACEUTICALS, INC. | : | |
| AND ALEXION PHARMA | : | |
| INTERNATIONAL OPERATIONS LTD., | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | C.A. No. 1:24-cv-00005-GBW |
| | : | |
| SAMSUNG BIOEPIS CO. LTD., | : | |
| | : | |
| Defendant. | : | |


DECLARATION OF MOHAN RAO, PH.D.

# Contents

I       INTRODUCTION                                                                   3

II      ASSIGNMENT                                                                     4

III     SUMMARY OF OPINIONS                                                            5

IV      BASIS FOR OPINIONS                                                             7

        A       Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     7

                i       Parties . . . . . . . . . . . . . . . . . . . . . . . . . . . .     7

                ii      SOLIRIS and ULTOMIRIS . . . . . . . . . . . . . . . . . .           8

                iii     Patents-In-Suit . . . . . . . . . . . . . . . . . . . . . . . .     10

                iv      Biosimilars Market . . . . . . . . . . . . . . . . . . . . . .      11

                v       Biologic and Biosimilar Procurement and Reimbursement . . . . .     15

        B       Launch of Samsung Bioepis' SB12 Is Not Likely to Cause Alexion Irrepara-
                ble Harm . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     17

                i       Lost Sales and Market Share During the Relevant ███ Month
                        Period Can Be Empirically Measured in this Matter . . . . . . . .   17

                ii      Any Incremental Price Erosion that Alexion Is Likely to Suffer
                        During the Relevant ████ Month Period Can Be Empirically
                        Measured in this Matter . . . . . . . . . . . . . . . . . . . .     22

                iii     Alexion's Other Alleged Economic and Non-Economic Harms Are
                        Speculative . . . . . . . . . . . . . . . . . . . . . . . . . .     24

        C       Mr. Thomas Has Failed to Show Nexus to the PI Patents . . . . . . . .       27

# I   INTRODUCTION

**1.** I am an economist and the Chief Executive Officer of Epsilon Economics. I specialize in intellectual property and antitrust economics, with an emphasis on life sciences and technology. I was previously a professor at UCLA and Northwestern University and a Teaching Fellow at Harvard University. I was appointed as the first "Executive in Residence" — a recognized leader in the technology community — by the McCormick College of Engineering at Northwestern University. I also am the Chief Executive Officer of Expression Therapeutics Inc., a biotechnology company based in Atlanta that is focused on developing gene therapies for hematology and oncology.

**2.** I have a Bachelor of Science in Engineering from the University of Michigan, a pre-doctoral fellowship from Harvard University, and a Ph.D. from the University of Colorado. I have taught courses in finance, statistics, game theory, and competition policy and have written on these topics in academic and professional publications. I am an author of the chapter on "Econometric Analysis" in the *Litigation Services Handbook*, "Innovation Markets" in *Market Definition in Antitrust*, and "Valuing Intellectual Property in Licensing Transactions" in the *Licensing Journal*. I taught advanced courses on intellectual property valuation and transactions — with an emphasis on pharmaceuticals — at the Licensing Executives Society (LES), the leading professional organization for intellectual property valuation and licensing. I developed the course "Advanced Valuation Skills" in the Professional Development Series of LES.

**3.** I serve on the Board of Directors of the Children's Hospital of Chicago, one of the leading pediatric medical centers in the world, and the Stanley Manne Children's Research Institute, a premier pediatric research center.

**4.** I have served as an expert witness in litigation and as a consultant in valuation, licensing, and strategy engagements to several pharmaceutical, biotechnology, and medical devices companies. I have performed economic and damages analyses as an economics expert in a wide range of matters, including cases involving patent infringement. I have evaluated numerous pharmaceutical products, including those in early stages of

clinical trials and those that have been in the market for a number of years. In 2018, IAM, the publisher of *The World's Leading Patent Professionals* has described me as: "among the foremost experts when it comes to pharmaceutical economics."

**5.** I am a member of the American Economic Association, the American Society of Gene & Cell Therapy, the IEEE, and the LES. I served as the Chair of the Valuation Committee of the LES. A copy of my curriculum vitae is attached as Tab 1.

**6.** Epsilon Economics bills $1,195 per hour for my work on this matter. I have also been assisted by my team at Epsilon Economics.

# II   ASSIGNMENT

**7.** I have been asked by Cooley LLP, counsel for Samsung Bioepis Co. Ltd. ("Samsung Bioepis") to provide economic analysis related to the motion by Alexion Pharmaceuticals, Inc. and Alexion Pharma International Operations Ltd. (collectively, "Alexion") for a preliminary injunction.[1] Specifically, I have been asked to evaluate whether, pending a final decision in this matter, Alexion will suffer irreparable harm as a result of Samsung Bioepis' launch of its biosimilar (SB12) of Alexion's SOLIRIS.[2] I have also been asked to evaluate the analysis and opinions provided by Vincent A. Thomas.[3]

**8.** I understand that Samsung Bioepis submitted an abbreviated Biologic License Application ("aBLA") to the United States Food and Drug Administration ("FDA") seeking approval to manufacture and sell SB12, a biosimilar version of Alexion's eculizumab product (SOLIRIS), prior to the expiration of patents asserted by Alexion in the preliminary injunction proceeding: United States Patent Nos. 9,447,176 (the "'176 patent") and 10,590,189 (the "'189 patent") (collectively, the "PI Patents").[4] Alexion alleges that

---

[1] Plaintiffs Alexion Pharmaceuticals, Inc. and Alexion Pharma International Operations Ltd.'s Motion for a Preliminary Injunction, February 12, 2024; and Plaintiffs' Opening Brief in Support of Motion for a Preliminary Injunction, February 12, 2024.

[2] Plaintiffs' Opening Brief in Support of Motion for a Preliminary Injunction, February 12, 2024.

[3] Declaration of Vincent A. Thomas, February 12, 2024.

[4] I understand that Alexion has asserted six patents in this case, and these two PI Patents have been asserted in the preliminary injunction proceeding. See Plaintiffs' Opening Brief in Support of Motion for a Preliminary Injunction, February 12, 2024, pages 1-2 and 4-5.

the proposed biosimilar product for which Samsung Bioepis is requesting FDA approval infringes the PI Patents.[5] For the purposes of my analysis, I assume that the PI Patents are valid and infringed. However, I understand that Samsung Bioepis contends that both PI Patents are invalid.

9. I understand that, to obtain the extraordinary relief of a preliminary injunction, the moving party (Alexion) has the burden to establish that (1) it is likely to succeed on the merits, (2) it is likely to suffer irreparable harm in the absence of a preliminary injunction, (3) the balance of hardship tips in its favor, and (4) a preliminary injunction would be in the public interest.

10. It is my understanding that the moving party (Alexion) is required to make a clear showing that it is likely to suffer substantial and immediate irreparable harm in the absence of a preliminary injunction. I understand that the mere possibility or speculation of harm is insufficient to show a likelihood of irreparable harm. I also understand that harm is irreparable only if the harm cannot be adequately measured and compensated through an award of money damages.

11. In conducting my analysis in this matter, I have reviewed various documents produced in this litigation, including declarations, deposition testimony, business plans, forecasts, pricing, sales and promotional data, and publicly available information. A list of materials which I have considered in forming the opinions set forth in this Declaration is attached as Tab 2. I reserve the right to modify or supplement this Declaration as appropriate.

# III   SUMMARY OF OPINIONS

12. Alexion is not likely to suffer irreparable harm as a result of Samsung Bioepis entering the market with its biosimilar SB12 during the time period relevant to preliminary injunctive relief in this case. With respect to the relevant time period and certain

---

[5] Plaintiffs' Opening Brief in Support of Motion for a Preliminary Injunction, February 12, 2024, page 2.

market events, I assume that (1) Samsung Bioepis will launch its biosimilar SB12 no sooner than June 2024; (2) other biosimilar competitors (i.e., Amgen) will enter the market in March 2025 ███████████████████████; and (3) trial is expected to occur in late 2025 or in 2026.[6] Alexion is not likely to suffer irreparable harm during this ████ month time period as a result of Samsung Bioepis' market entry.[7]

**13.** Contrary to Mr. Thomas' assertions in his declaration, Alexion's lost profits from lost sales (in the event of the launch of Samsung Bioepis' biosimilar SB12) would be quantifiable within a reasonable degree of economic certainty before trial. As trial approaches, the parties will have the benefit of more information about the market and each actor's conduct, including any unit sales made by biosimilar eculizumab products. Combined with information regarding Alexion's profit on SOLIRIS, this allows one to calculate any lost profits from lost sales to Alexion. Such an analysis is routinely undertaken by economists. None of the market dynamics identified by Mr. Thomas preclude a quantification of damages within a reasonable degree of certainty.

**14.** Mr. Thomas has failed to show that the price erosion from Samsung Bioepis' advancement of biosimilar competition by at most ████████ (with ███████████████ ████████████████████ compared to Alexion's agreed upon launch date for Amgen's biosimilar in March 2025) is not quantifiable. Any price erosion that Alexion is likely to suffer during the relevant ████████████████ as a result of the launch of Samsung Bioepis' SB12 can be empirically measured in this matter.

**15.** Alexion's other alleged economic and non-economic harms — including harm to its reputation, inability to plan and redeploy its workforce, and the impact on ULTOMIRIS (Alexion's next-generation C5 inhibitor) — are speculative and unsubstantiated. Mr. Thomas fails to demonstrate the incremental harm to reputation or internal planning from Samsung Bioepis' advancement of biosimilar competition by at most

---

[6] I understand that the Court has not yet issued a scheduling order or set a trial date, but I have been informed that a trial is likely to occur in late 2025 or during 2026.

█ ████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
███████

███████████████████████████████████████████ Similarly, analysts have called Alexion's switching strategy from SOLIRIS to ULTOMIRIS an "overwhelming success" and anticipate this to provide protection against biosimilar competition.[8]

**16.** Alexion has failed to show a causal nexus between the alleged harm and alleged infringement of the PI Patents. Mr. Thomas has provided no evidence that customer demand for eculizumab products is driven by the claimed inventions covered by the PI Patents.

# IV   BASIS FOR OPINIONS

## A   Background

### i   Parties

**17.** Alexion is a biopharmaceutical company focused on the development of treatments for rare diseases.[9] I understand that Alexion is the owner of the PI Patents.[10] I understand that Alexion was acquired by AstraZeneca in July 2021, and operates as a wholly-owned subsidiary specializing in rare diseases.[11] Alexion currently sells four approved biologic products and one small molecule drug, and has 11 different therapeutics in its pipeline.[12]

**18.** Samsung Bioepis is a biopharmaceutical company focused on biologics and

---

[8] Anna Baran, "Alexion Pharmaceuticals Inc," Morningstar Equity Analyst Report, September 2, 2020, pages 1 and 3.

[9] <www.alexion.com>; and AstraZeneca Annual Report and Form 20-F Information 2023, page 193.

[10] Plaintiffs' Opening Brief in Support of Motion for a Preliminary Injunction, February 12, 2024; United States Patent No. 9,447,176; and United States Patent No. 10,590,189.

[11] "Acquisition of Alexion completed," AstraZeneca Press Release, July 21, 2021; and AstraZeneca Annual Report and Form 20-F Information 2023, pages 211-215.

[12] <www.alexion.com>; and "Purple Book Database of Licensed Biological Products," <purplebooksearch.fda.gov>. Alexion's FDA-approved biologic products include Kanuma (sebelipase alfa), Soliris (eculizumab), Strensiq (asfotase alfa), and Ultomiris (ravulizumab-cwvz). Alexion's other FDA-approved therapy is Koselugo (selumetinib). Alexion's pipeline products include ALXN2220, Anselamimab, Acoramidis, Efzimfotase alfa, Gefurulimab, Voydeya (danicopan), Vemircopan, ALXN1910, ALXN1920, ALXN2030, and ALXN2080. Alexion's pipeline also includes a number of phase three trials to expand two existing products, Ultomiris and Koselugo, into new indications.

biosimilars.[13] Samsung Bioepis currently sells seven approved biosimilar products world-wide and has three additional biosimilars in its pipeline, all of which have completed phase three trials.[14]

## ii   SOLIRIS and ULTOMIRIS

**19.** SOLIRIS (eculizumab) is a C5 inhibitor indicated for the treatment of:

- "patients with paroxysmal nocturnal hemoglobinuria (PNH) to reduce hemolysis,"

- "patients with atypical hemolytic uremic syndrome (aHUS) to inhibit complement-mediated thrombotic microangiopathy (TMA),"

- "generalized myasthenia gravis (gMG) in adult patients who are anti-acetylcholine receptor (AchR) antibody positive," and

- "neuromyelitis optica spectrum disorder (NMOSD) in adult patients who are anti-aquaporin-4 (AQP4) antibody positive."[15]

SOLIRIS is available in a single-dose vial and received FDA approval on March 16, 2007.[16] SOLIRIS is administered as an intravenous infusion weekly during the five-week induction phase, and biweekly afterwards during the maintenance phase.[17] I understand that patients with aHUS, gMG, or NMOSD may require plasma infusions — concomitant

---

[13] "An Introduction to Samsung Bioepis," Samsung Bioepis, May 22, 2023, pages 5-7.

[14] "An Introduction to Samsung Bioepis," Samsung Bioepis, May 22, 2023, pages 12-13 and 18; and <www.samsungbioepis.com>. Samsung Bioepis' FDA-approved biosimilar products include: Renflexis (infliximab-abda), Hadlima (adalimumab-bwwd), Ontruzant (trastuzumab-dttb), and Byooviz (ranibizumab-nuna). Eticovo (etanercept-ykro) is FDA-approved but unavailable in the U.S. Samsung Bioepis' pipeline biosimilar products include SB15 (investigational biosimilar to Eylea), SB16 (investigational biosimilar to Prolia), and SB17 (investigational biosimilar to Stelara). Samsung Bioepis' pipeline also includes a novel biologic, SB26, which is currently in phase one trials. See <www.samsungbioepis.com>; and "Purple Book Database of Licensed Biological Products," <purplebooksearch.fda.gov>.

[15] Soliris Label, February 8, 2024, page 1; <www.fda.gov>; Kioa Lente Wijnsma et al., "Pharmacology, Pharmacokinetics and Pharmacodynamics of Eculizumab, and Possibilities for an Individualized Approach to Eculizumab," *Clinical Pharmacokinetics*, February 13, 2019, page 859.

[16] Soliris Label, February 8, 2024, page 1; Soliris FDA Approval Letter, March 16, 2007.

[17] Soliris Label, February 8, 2024, pages 4 and 6.

CONFIDENTIAL — FILED UNDER SEAL                                                    9

plasmapheresis or plasma exchange, or fresh frozen plasma infusion ("PE/PI") — and require a supplemental dose of SOLIRIS within an hour of PE/PI.[18]

20.  In 2023, Alexion's U.S. SOLIRIS sales totaled approximately \$1.73 billion.[19] SOLIRIS has achieved approximately \$17.76 billion in U.S. sales from launch in 2007 through 2023.[20] ███████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████

21.  ULTOMIRIS (ravulizumab-cwvz) is a C5 inhibitor indicated for the treatment of:

- "adult and pediatric patients one month of age and older with [PNH]";

- "adult and pediatric patients one month of age and older with [aHUS] to inhibit complement-mediated [TMA]"; and

- "adult patients with [gMG] who are anti-[AchR] antibody-positive."[22]

ULTOMIRIS is available in a single-dose vial or prefilled cartridge and received FDA approval on December 21, 2018.[23]

22.  ULTOMIRIS is administered as an intravenous infusion with an initial loading dose followed by a maintenance dose every four to eight weeks afterwards, with both the loading and maintenance doses based on patient body weight.[24]  I understand that patients with aHUS or gMG may require PE/plasmapheresis ("PP") or an intravenous immunoglobulin ("IVIg") cycle and require a supplemental dose of ULTOMIRIS within

---

[18] Soliris Label, February 8, 2024, page 5.

[19] Global sales for SOLIRIS were approximately \$3.14 billion. See AstraZeneca Annual Report and Form 20-F Information 2023, page 160.

[20] Global sales for SOLIRIS from launch through 2023 are approximately \$37.99 billion. See Tab 3a.

[21] ████████████████████████████

[22] Ultomiris Label, February 8, 2024, page 1.

[23] Ultomiris Label, February 8, 2024, page 1; and Ultomiris FDA Approval Letter, December 21, 2018, page 12.

[24] Ultomiris Label, February 8, 2024, Table 1.

four hours of either procedure.[25]

**23.**   In 2023, Alexion's U.S. ULTOMIRIS sales totaled approximately $1.75 billion.[26] ULTOMIRIS has achieved approximately $4.54 billion in U.S. sales from launch in 2019 through 2023.[27]

### iii   Patents-In-Suit

**24.**   I understand that the '176 patent, titled "Methods and Compositions for Treating Complement-Associated Disorders," generally relates to "compositions containing an inhibitor of human complement and use of the compositions in methods for treating or preventing complement-associated disorders," specifically a method for treating aHUS by administering eculizumab intravenously once a week for four weeks and maintenance doses biweekly.[28] The '176 patent was issued by the United States Patent and Trademark Office ("USPTO") on September 20, 2016.[29]

**25.**   I understand that the '189 patent, titled "Treatment of Paroxysmal Nocturnal Hemoglobinuria Patients by an Inhibitor of Complement," generally relates to the treatment of PNH with eculizumab, specifically a method of treating PNH via a C5 inhibitor.[30] The '189 patent was issued by the USPTO on March 17, 2020.[31]

**26.**   In addition, I understand in its financial filings, Alexion states: "With respect to SOLIRIS, we owned an issued U.S. patent that covers the eculizumab composition of matter that will expire in 2021, taking into account patent term extension. We also own other issued U.S. patents that cover the composition, use and formulation of eculizumab, that expire in 2027."[32]

---

[25] Ultomiris Label, February 8, 2024, pages 6-7 and Table 4.

[26] Global sales for ULTOMIRIS were approximately $2.97 billion. See AstraZeneca Annual Report and Form 20-F Information 2023, page 160.

[27] Global sales for ULTOMIRIS from launch through 2023 are approximately $7.73 billion. See Tab 3a.

[28] United States Patent No. 9,447,176. Declaration of John Joseph Bissler, M.D., March 13, 2024, paragraphs 69-74.

[29] United States Patent No. 9,447,176.

[30] United States Patent No. 10,590,189.

[31] United States Patent No. 10,590,189.

[32] Alexion Pharmaceuticals, Inc., Form 10-K for fiscal year ended December 31, 2021, page 14; and Alexion Pharmaceuticals, Inc., Form 10-K for fiscal year ended December 31, 2019, page 10.

### iv   Biosimilars Market

**27.** Biologics are "generally large, complex molecules that are made from living sources such as bacteria, yeast, and animal cells."[33]  Due to their complex structures, biologics are often more difficult to manufacture than other medications and inherently may contain slight variations between batches.  There are many types of biologics approved by the FDA, such as monoclonal antibodies, that are used to treat illnesses such as chronic skin diseases and cancer.[34]

**28.** A biosimilar is a biologic that is highly similar to and has no clinically meaningful differences in terms of safety and effectiveness from an existing FDA-approved biologic, called the reference product.[35]  Biosimilars have the same strength and dosage, are administered through the same mechanism, and have the same potential treatment benefits and potential side effects as the reference biologic.[36]  The first biosimilar (Sandoz's Zarxio product) received FDA approval in March 2015, and 42 biosimilars have received FDA approval as of August 2023.[37]

**29.** Biosimilars are different from generic drugs.  In contrast to biosimilars, generic drugs are generally small molecule drugs such that their reference products are more straightforward to copy.  Whereas, biologics cannot be copied exactly due to their complex nature, which may include a mix of proteins with slight variations.  Therefore, biosimilars are generally not identical to the reference product.

**30.** A biosimilar manufacturer may undergo an additional approval process to receive FDA approval as an interchangeable biological product.[38]  Depending on state pharmacy laws, an interchangeable biosimilar may be substituted for its reference product without consulting the prescriber.  To be approved as an interchangeable biosimilar, manufacturers typically conduct studies to show that there is no decrease in effectiveness

---

[33] <www.fda.gov>.
[34] <www.fda.gov>.
[35] <www.fda.gov>.
[36] <www.fda.gov>.
[37] <www.fda.gov>.
[38] <www.fda.gov>.

or increase in safety risk when patients alternate between the biosimilar and the reference product, compared to exclusively using the reference product.[39] An interchangeable biosimilar is not necessarily safer or more effective than other biosimilars.[40]

**31.** Under the Biologics Price Competition and Innovation Act (BPCIA), biologics earn 12 years of market exclusivity in which the FDA is prevented from granting final approval to a biosimilar that references the originator biologic.[41] Further, interchangeable biosimilars also receive exclusivity. Once the first interchangeable biosimilar is approved, no other biosimilar can enter the market as an interchangeable biosimilar for the same reference product for between 12 months and 42 months, depending on various factors.[42]

**32.** The effect of the entry of biosimilars on the reference product is very different than the entry of generics on the branded product for small molecules. There, sales of a branded pharmaceutical product decrease rapidly after a generic version of the drug enters the market. This decline in sales typically occurs for a number of reasons. First, the generic version of the drug enters the market at a significantly lower price, thereby leading some customers to switch to the generic product.[43] Second, laws in many states allow and sometimes require pharmacists to substitute a generic version in

---

[39] <www.fda.gov>.

[40] <www.fda.gov>.

[41] 42 U.S.C. § 262: Regulation of biological products, (k)(7).

[42] 42 U.S.C. § 262: Regulation of biological products, (k)(6).

[43] See, for example, Ernst R. Berndt and Murray L. Aitken, "Brand Loyalty, Generic Entry and Price Competition in Pharmaceuticals in the Quarter Century After the 1984 Waxman-Hatch Legislation," National Bureau of Economic Research, Working Paper Series No. 16431, October 2010; Atanu Saha, Henry Grabowski, Howard Birnbaum, Paul Greenberg, and Oded Bizan, "Generic Competition in the US Pharmaceutical Industry," *International Journal of the Economics of Business*, Vol. 13, No. 1, February 2006, pages 15-38; David Reiffen and Michael R. Ward, "Generic Drug Industry Dynamics," *The Review of Economics and Statistics*, Vol. 87, No. 1, February 2005, pages 37-49; Henry Grabowski and John Vernon, "Brand Loyalty, Entry, and Price Competition in Pharmaceuticals After the 1984 Drug Act," *Journal of Law & Economics*, 35, October 1992, pages 331-350; Richard E. Caves, Michael D. Whinston, and Mark A. Hurwitz, "Patent Expiration, Entry, and Competition in the U.S. Pharmaceutical Industry," in: Martin Neil Baily and Clifford Winston, BROOKINGS PAPERS ON ECONOMIC ACTIVITY: MICROECONOMICS, Washington, D.C.: Brookings Institution, 1991; "Pricing and Competition in the Pharmaceutical Market," in: HOW INCREASED COMPETITION FROM GENERIC DRUGS HAS AFFECTED PRICES AND RETURNS IN THE PHARMACEUTICAL INDUSTRY, Congressional Budget Office, The Congress of the United States, July 1998; and Henry Grabowski and John Vernon, "Longer Patents for Increased Generic Competition in the US: The Waxman-Hatch Act after One Decade," *PharmacoEconomics*, 10, Suppl. 2, 1996, pages 110-123.

place of the corresponding brand name product unless a physician specifically overrides such substitution.[44]  As a result, brand name products lose up to 90 percent or more of their market share due to generic competition.[45]  IMS Health — an independent pharmaceutical market research firm — estimates that the typical loss expected when a generic version of a drug enters the market is 90 percent of the brand name product's sales within the first three months.[46] As a result, the market dynamics of the market for generics are very different from those for the market for biosimilars.

33.  In a 2023 report on biosimilars in the U.S., IQVIA — a leading market research firm in the pharmaceutical industry — reviewed the uptake of biosimilars launched between November 2013 and September 2022 for nine reference products.[47] Biosimilars for infliximab, which first launched in November 2016, achieved just 3 percent of the market after one year and 13 percent after three years.[48]  Biosimilars first introduced in 2018 for pegfilgrastim and epoetin alfa achieved approximately 20 percent market share after one year and 37 percent share after three years.[49]  More recent biosimilar launches for

---

[44] See, for example, Wan-Chih Tom and Kayla Dotson, "State Regulations on Generic Substitution," *Pharmacist's Letter / Prescriber's Letter* 22, No. 220901, July 3, 2007; and Jesse C. Vivian, "Generic-Substitution Laws," *U.S. Pharmacist*, Vol. 33, No. 6, June 19, 2008, pages 30-34.

[45] See, for example, Ernst R. Berndt and Murray L. Aitken, "Brand Loyalty, Generic Entry and Price Competition in Pharmaceuticals in the Quarter Century After the 1984 Waxman-Hatch Legislation," National Bureau of Economic Research, Working Paper Series No. 16431, October 2010; Atanu Saha, Henry Grabowski, Howard Birnbaum, Paul Greenberg, and Oded Bizan, "Generic Competition in the US Pharmaceutical Industry," *International Journal of the Economics of Business*, Vol. 13, No. 1, February 2006, pages 15-38; David Reiffen and Michael R. Ward, "Generic Drug Industry Dynamics," *The Review of Economics and Statistics*, Vol. 87, No. 1, February 2005, pages 37-49; Henry Grabowski and John Vernon, "Brand Loyalty, Entry, and Price Competition in Pharmaceuticals After the 1984 Drug Act," *Journal of Law & Economics*, 35, October 1992, pages 331-350; Richard E. Caves, Michael D. Whinston, and Mark A. Hurwitz, "Patent Expiration, Entry, and Competition in the U.S. Pharmaceutical Industry," in: Martin Neil Baily and Clifford Winston, Brookings Papers on Economic Activity: Microeconomics, Washington, D.C.: Brookings Institution, 1991; "Pricing and Competition in the Pharmaceutical Market," in: How Increased Competition from Generic Drugs Has Affected Prices and Returns in the Pharmaceutical Industry, Congressional Budget Office, The Congress of the United States, July 1998; and Henry Grabowski and John Vernon, "Longer Patents for Increased Generic Competition in the US: The Waxman-Hatch Act after One Decade," *PharmacoEconomics*, 10, Suppl. 2, 1996, pages 110-123.

[46] Wendy K. Bodine, "Generic Plavix Hits the Shelves, Temporarily?," *Pharmacy Times*, September 2006. In 2016, IMS Health and Quintiles merged to become IQVIA. <www.iqvia.com>.

[47] "Biosimilars in the United States 2023-2027," The IQVIA Institute, January 31, 2023.

[48] "Biosimilars in the United States 2023-2027," The IQVIA Institute, January 31, 2023.

[49] "Biosimilars in the United States 2023-2027," The IQVIA Institute, January 31, 2023.

bevacizumab, trastuzumab, and rituximab introduced in 2019 saw more effective market penetration, with shares of approximately 40 percent after one year and between 67 percent and 82 percent after three years.[50] However, biosimilars introduced in 2020 for teriparatide achieved approximately 10 percent market share after one year.[51] A 2022 study of 15 biosimilar launches found that uptake ranged between 3 percent and 36 percent one year after market entry.[52]

34. Amgen publishes an annual "Biosimilar Trends Report," which is described as "a point-in-time overview of key trends in the US biosimilars marketplace, and it is intended to be a resource to help stakeholders better understand the current and future state of the biosimilars marketplace, and key considerations related to the evolving biosimilars landscape."[53] According to Amgen's 2022 Biosimilars Trend Report, biosimilars have typically launched at a wholesale acquisition cost ("WAC") that is 10 percent to 57 percent lower than that of the reference product and the prices of biosimilars have decreased at a negative compound annual growth rate ("CAGR") of -9 percent to -24 percent, whereas the prices of reference products have decreased at a negative CAGR of -4 percent to -21 percent.[54]

35. According to Amgen's 2022 Biosimilars Trend Report:

> While financial savings are important for helping support biosimilar uptake, it is not the only consideration for payers and providers. Other factors include manufacturing experience with biologics; reliable supply of products; understanding provider and payer clinical, economic, operational, and decision-making drivers; and experience navigating retail operations, given the pending availability of biosimilars at retail pharmacies.[55]

---

[50] "Biosimilars in the United States 2023-2027," The IQVIA Institute, January 31, 2023.
[51] "Biosimilars in the United States 2023-2027," The IQVIA Institute, January 31, 2023.
[52] David L. Carl, et al., "Comparison of Uptake and Prices of Biosimilar in the US, Germany, and Switzerland," December 2, 2022, page 5. See also "2022 Biosimilar Trends Report," Amgen, page 14.
[53] "2022 Biosimilar Trends Report," Amgen.
[54] "2022 Biosimilar Trends Report," Amgen, pages 6 and 12.
[55] "2022 Biosimilar Trends Report," Amgen, page 8.

## v   Biologic and Biosimilar Procurement and Reimbursement

**36.** Biosimilars (and their respective biologics) are typically administered through injection or infusion under the supervision of a physician and are, therefore, not often received by patients from a retail pharmacy.[56] Thus, most biosimilars marketed in the U.S. are covered under the medical benefit by payers rather than the pharmacy benefit.[57] This is the case for Alexion's SOLIRIS as well as Samsung Bioepis' biosimilar SB12.[58] As of April 1, 2018, the Centers for Medicare & Medicaid Services ("CMS") assigns a unique payment code (known as a HCPCS code) to each biosimilar.[59] There are different drug-related types of HCPCS codes, including Q-codes (which are temporary codes and typically deleted once a drug receives a permanent code) and J-codes (permanent drug codes).[60] CMS has a quarterly process for assigning HCPCS codes for drugs and biologics, requiring manufacturers to submit applications for a new code based on specific coding cycles.[61]

**37.** Medicare Part B reimburses for biosimilars at their average sales price ("ASP") plus 6 percent of the reference product's ASP.[62] However, as part of the Inflation Reduction Act, signed into law in August 2022, qualifying biosimilars are temporarily reimbursed at ASP plus 8 percent of the reference biological product's ASP for a five-year

---

[56] "2022 Biosimilar Trends Report," Amgen, page 84.

[57] "2022 Biosimilar Trends Report," Amgen, page 84.

[58] See, for example, "Navigating Insurance for SOLIRIS® (eculizumab)," Alexion Presentation, June 2021, page 21.

[59] I understand prior to this change, all biosimilar products with the same reference product were grouped together within the same HCPCS code — therefore, physicians were reimbursed the same amount for all biosimilars of the same reference product. See "Medical Drug Coding and Reimbursement 101," IPD Analytics, December 16, 2021; and "2022 Biosimilar Trends Report," Amgen, page 84.

[60] "Medical Drug Coding and Reimbursement 101," IPD Analytics, December 16, 2021.

[61] CMS will determine which products require a temporary Q-code and assign them quarterly. "Medical Drug Coding and Reimbursement 101," IPD Analytics, December 16, 2021.

[62] "HHS Secretary Xavier Becerra, CMS Administrator Chiquita Brooks-LaSure Remark on Implementation of Inflation Reduction Act Provision Addressing Medicare Payments for Biosimilars," HHS Press Office, October 3, 2022. See also "2022 Biosimilar Trends Report," Amgen, page 6. The average sale price ("ASP") is net of discounts, rebates, and other modifications that more closely reflect the actual price of drugs. I understand that most private payers have adopted the Medicare Part B payment system for reimbursing providers for medications. See "Medicare Part B Reimbursement of Prescription Drugs," U.S. Department of Human Health and Services, June 2014, pages 2-3.

period that began on October 1, 2022.[63]  Additionally, for the first two quarters a biosimilar is on the market — before the ASP can be established — Medicare Part B reimburses the amount of the wholesale acquisition cost ("WAC") plus three percent.[64]  Starting in July 2024, the reimbursement amount for new biosimilars during the initial period when ASP data is not available will be the lesser of WAC plus three percent or the reference biologic product's ASP plus six percent.[65]

**38.**  The "buy-and-bill" pharmaceutical procurement model refers to providers purchasing medications (oftentimes injectables), administering the medication in a medical office, and then billing the patient (and/or the patient's insurance) for the product.[66]  "Bagging" is the alternative to buy-and-bill for provider-administered drugs, where a pharmacy or other third-party (i.e., non-provider or patient) purchases a drug for administration at the provider's office.[67]  "White bagging" is when a pharmacy sends the medication directly to the provider, and "brown bagging" is when the patient purchases the medication and is responsible for transporting the medication to the provider for administration.[68]

---

[63] "HHS Secretary Xavier Becerra, CMS Administrator Chiquita Brooks-LaSure Remark on Implementation of Inflation Reduction Act Provision Addressing Medicare Payments for Biosimilars," HHS Press Office, October 3, 2022. See also "2022 Biosimilar Trends Report," Amgen, page 8.

[64] Nguyen X. Nguyen et al., "Medicare Part B Drugs: Trends in Spending and Utilization, 2008–2021," Office of the Assistant Secretary for Planning and Evaluation, U.S. Department of Health and Human Services, June 9, 2023, page 5. With respect to a drug or biological, WAC refers to "the manufacturer's list price for the drug or biological to wholesalers or direct purchasers in the United States, not including prompt pay or other discounts, rebates or reductions in price, for the most recent month for which the information is available, as reported in wholesale price guides or other publications of drug or biological pricing data." See 42 U.S.C. § 1395.

[65] Nguyen X. Nguyen et al., "Medicare Part B Drugs: Trends in Spending and Utilization, 2008–2021," Office of the Assistant Secretary for Planning and Evaluation, U.S. Department of Health and Human Services, June 9, 2023, page 5, footnote a.

[66] "Understanding the buy-and-bill model," AmerisourceBergen, October 27, 2021.

[67] "The pros & cons of the 'buy and bill' model of pharmaceutical distribution: What's appropriate for your practice?," McKesson Medical-Surgical Inc., January 6, 2022.

[68] "The pros & cons of the 'buy and bill' model of pharmaceutical distribution: What's appropriate for your practice?," McKesson Medical-Surgical Inc., January 6, 2022.

## B   Launch of Samsung Bioepis' SB12 Is Not Likely to Cause Alexion Irreparable Harm

**39.**   As discussed above, there is a limited time period in which one needs to evaluate irreparable harm for this motion: the time between Samsung Bioepis' launch of its biosimilar (█████████████████████████) and either the date of anticipated biosimilar entry (Amgen's biosimilar launch in March 2025) or the date of trial in late 2025 – resulting in a relevant time frame of approximately ████████.[69]  Therefore, any evaluation of irreparable harm needs to be assessed in this context.  Mr. Thomas conflates the impact of the launch of all biosimilars to Alexion instead of analyzing the incremental impact due to Samsung Bioepis' launch of SB12.

### i   Lost Sales and Market Share During the Relevant ████ Month Period Can Be Empirically Measured in this Matter

**40.**   In his declaration, Mr. Thomas claims that Alexion would likely experience significant harm from the entry of Samsung's biosimilar in the form of lost sales and reduced market share.[70]  He states that data on what SOLIRIS's performance would have been in a "but-for" world without the entry of SB12 will not be known and Alexion has not estimated harm from such a scenario.[71]  For example, he contends that "[g]iven the complexities of the rare disease marketplace, calculating the actual losses Alexion will suffer under these circumstances becomes problematic, imprecise, and difficult to determine."[72]

**41.**   Alexion's request for preliminary injunction based on Mr. Thomas' opinion that lost profits from lost sales cannot be measured is flawed, because lost profits from lost sales are routinely estimated by economists.[73]  In particular, if Samsung Bioepis'

---

[69] I understand that the Court has not yet issued a scheduling order or set a trial date, but I am informed a trial is likely to occur in late 2025 or during 2026.
[70] Declaration of Vincent A. Thomas, February 12, 2024, paragraph 26.
[71] Declaration of Vincent A. Thomas, February 12, 2024, paragraph 26.
[72] Declaration of Vincent A. Thomas, February 12, 2024, paragraph 31.
[73] Declaration of Vincent A. Thomas, February 12, 2024; Roman L. Weil, Daniel G. Lentz, and David

CONFIDENTIAL — FILED UNDER SEAL

biosimilar were to launch, an economist could compare a trajectory based on historical sales of SOLIRIS with actual sales after Samsung Bioepis' biosimilar enters the market to estimate lost profits from lost sales.[74]  In addition, as trial approaches, both parties would have the benefit of sales data tracking the market performance of the Samsung Bioepis' SB12 as well as pricing information for both Alexion's reference product (SOLIRIS) and the available biosimilars (i.e., Samsung Bioepis' SB12 and Amgen's eculizumab biosimilar).

**42.**  I understand that damages in patent infringement cases are governed by 35 U.S.C. §284, which states:  "Upon finding for the claimant the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer…"[75]  In common usage, patent infringement damages fall into two broad categories: lost profits and reasonable royalties.

**43.**  In order to recover lost profits, the patent owner must show with reasonable certainty that, absent the infringement, it would have made all or some of the sales made by the infringer.  Frequently, proof of entitlement to lost profits looks to criteria outlined in *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*, or the "Panduit Test."[76]  Briefly stated, the Panduit Test provides a framework for inferring entitlement to lost profits based on consideration of four criteria: 1) demand for the patented product; 2) absence of acceptable non-infringing substitutes; 3) manufacturing and marketing capability to

P. Hoffman, "Litigation Services Handbook: The Role of the Financial Expert," *John Wiley & Sons*, Sixth Edition,  section 2.2:  "Experts often calculate damages in commercial litigation…Numerous types of damages occur — such as actual losses of cash or equivalents, or other property, or expected profits — and practitioners have developed methods to compute them."  See also, Daniel Slottje, "Economic Damages in Intellectual Property A Hands-on Guide to Litigation", Chapter 6: Loss of Profits as a Measure of Damages in Patent Infringement Methods, *John Wiley & Sons*, 2006; Gregory K. Leonard, Lauren J. Stiroh, "Economic Approaches To Intellectual Property Policy, Litigation, and Management", Chapter 3: A Practical Guide to Damages, *National Economic Research Associates*, 2005.

[74] See, for example, Roman L. Weil, Daniel G. Lentz, and David P. Hoffman, "Litigation Services Handbook: The Role of the Financial Expert," *John Wiley & Sons*, Sixth Edition, section 4.6.

[75] 35 U.S.C. § 284.

[76] *Panduit Corp v. Stahlin Bros. Fibre Works, Inc.*, 575 F.2d 1152, 2256, 197 U.S.P.Q. 726, 729-730 (6th Cir. 1978).

exploit the demand; and 4) ability to quantify the amount of lost profits.[77]

44. In the event that lost profits cannot be established with reasonable certainty, the appropriate measure of damages is a reasonable royalty.[78] To determine a reasonable royalty, courts typically consider a "hypothetical negotiation" between a willing licensor and a willing licensee to guide the analysis. In *Georgia-Pacific Corporation v. United States Plywood Corporation* ("*Georgia-Pacific*"), the court enumerated 15 factors that may be considered in determining a reasonable royalty.[79]

45. Mr. Thomas suggests that the circumstances in this case render performing such an analysis difficult. ████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████  ████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████  However, for purposes of this analysis, Mr. Thomas needs to assess the *incremental* loss of sales and market share resulting from Samsung Bioepis' SB12 entrant (i.e.,

---

[77] See, for instance, Landan Ansell, John Holzwarth, Vincent O'Brien, and William Scally, "Patent Infringement Damages," in: Roman Weil, Daniel Lentz, and David Hoffman, Editors, LITIGATION SERVICES HANDBOOK: THE ROLE OF THE FINANCIAL EXPERT, Sixth Edition (John Wiley & Sons), 2017, page 20-7.

[78] 35 U.S.C. § 284. See also, for example, Landan Ansell, John Holzwarth, Vincent O'Brien, and William Scally, "Patent Infringement Damages," in: Roman Weil, Daniel Lentz, and David Hoffman, Editors, LITIGATION SERVICES HANDBOOK: THE ROLE OF THE FINANCIAL EXPERT, Sixth Edition (John Wiley & Sons), 2017, pages 19-13 and 19-14; and Daniel Slottje, "Economic Damages in Intellectual Property A Hands-on Guide to Litigation", Chapter 6: Loss of Profits as a Measure of Damages in Patent Infringement Methods, *John Wiley & Sons*, 2006.

[79] *Georgia-Pacific v. United States Plywood Corporation*, 318 F. Supp. 1116 (S.D.N.Y. 1970).

██ ████████████████████████████████████████████████████

██ ████████████

██ ████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████

Amgen's biosimilar would enter the market irrespective of Samsung Bioepis' launch). He conflates the long-term effects that would be present due to any biosimilar competition (████████████████████████████████████████████████████ ██████ with the short-term effects during the relevant period required for evaluation in this matter of ███████████████

**46.** Mr. Thomas points to additional factors such as interchangeability and re-imbursement under the IRA that assist in biosimilar uptake.[83]  However, as discussed above, SOLIRIS is an infusion that is administered at a physician's office — therefore, likely a small proportion of SOLIRIS claims would be adjudicated through the phar-macy channel — the channel where one might expect an "interchangeable" designation to potentially have a meaningful impact. Further, there is no reason to believe that the IRA's impact on biosimilar adoption is dispositive. For example, Humira (adalimumab) has had biosimilar versions enter the market subject to the IRA, yet has maintained the majority of its sales volume: "AbbVie is showing off to the world how it's maintaining most of the sales volume for the Humira (adalimumab) franchise in the US, losing just 2% of market share since several biosimilars launched in July [2023], according to a new Samsung Bioepis biosimilars report."[84]  In addition, neither interchangeability or reim-bursement under the IRA preclude a quantification of damages at trial. In fact, the price increase limitation imposed under IRA would likely assist in estimating Alexion's pricing strategy "but-for" biosimilar competition. And, any sales made by Samsung Bioepis up to the time of trial would be known by the time of trial and any resulting lost sales to Alexion could be quantified with a reasonable degree of certainty.

**47.** In addition, market research suggests immediate uptake may be limited due to lack of biosimilar familiarity among health care providers in certain rare disease markets. I understand that SOLIRIS is prescribed by a variety of medical professionals, including hematologists, nephrologists, and neurologists.[85]  While healthcare professionals practic-

---

[83] Declaration of Vincent A. Thomas, February 12, 2024, paragraph 14.

[84] Zachary Brennan, "Humira biosimilar market remains stagnant, with AbbVie losing only 2% of market share, Samsung report shows," Endpoints News, January 17, 2024.

[85] ████████████████████████████████████████████████████████████████

ing oncology/hematology have significant experience in prescribing biosimilars, according to a study produced by Amgen, over half of physicians across all specialties do not have prior experience prescribing a biosimilar.[86]  For example, among physicians in nephrology — which I understand is a specialty that accounts for some of the use of eculizumab — approximately 53 percent had previous experience prescribing a biosimilar.[87]  Though all physicians surveyed in the study practiced in a specialty in which biosimilars have been approved and marketed, nearly half of those who did not want to prescribe a biosimilar said they were "waiting until biosimilar products [had] been on the market longer before prescribing them."[88]

**48.**  In any case, Mr. Thomas' argument with regard to Alexion's loss of sales and market share misses the point.  As trial approaches, both parties and their respective experts will have the benefit of unit sales data for Samsung Bioepis' biosimilar SB12.  Once sales data are available, calculating the erosion in SOLIRIS's market share due to the entry of Samsung Bioepis' biosimilar is a straightforward exercise.  During the relevant period, Alexion would likely argue that "but-for" Samsung Bioepis' launch, any sales made by biosimilars would have been made by Alexion at Alexion's price and profit margin pre-biosimilar entry.  All of those data will be available prior to trial.

**49.**  Therefore, contrary to Mr. Thomas' assertions, lost sales and market share by Alexion in the event of a launch of Samsung Bioepis' SB12 can be empirically measured during the relevant ███████ month period.

---

███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
████████████████████████████████████

[86] "2022 Biosimilar Trends Report," Amgen, page 72.
[87] "2022 Biosimilar Trends Report," Amgen, page 72; █████████████████████████████ ████████
████████████████████████████████████████████
[88] "2022 Biosimilar Trends Report," Amgen, page 72.

**ii    Any Incremental Price Erosion that Alexion Is Likely to Suffer During the Relevant ███ Month Period Can Be Empirically Measured in this Matter**

**50.** Mr. Thomas opines that SOLIRIS will experience price erosion as a result of Samsung Bioepis' launch of its biosimilar SB12.[89] However, Mr. Thomas fails to disentangle the price erosion effects already expected from Amgen's anticipated biosimilar launch in March 2025 — ████████████████████████████████████████████ ████ For purposes of this analysis, one needs to determine the incremental effects from ████████████████████, at the earliest. In addition, Mr. Thomas' opinions are inconsistent with market experience.

**51.** Mr. Thomas also states that "if another biosimilar were to enter the market before March 2025, Amgen may decide to accelerate its launch as a result."[90] ██████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████

**52.** The market for biologics and biosimilars is not like the market for small molecule drugs where generics enter the market at significant discounts to their branded counterparts, as described in further detail above. For example, Amgen's report on biosimilar trends shows that prices of generic drugs are, on average, 85 percent lower compared to branded small-molecule drugs, while biosimilar prices are 30 percent lower than their reference biologics.[92]

**53.** In a market where Samsung Bioepis' SB12 is the only biosimilar on the market

---

[89] Declaration of Vincent A. Thomas, February 12, 2024, paragraph 17.
[90] Declaration of Vincent A. Thomas, February 12, 2024, paragraph 23.
██ ████████████████████████████████████████

[92] "2022 Biosimilar Trends Report," Amgen, page 68. See also, "Biosimilars in the United States 2020-2024," The IQVIA Institute, October 2020.

for ▇▇▇▇ prior to the expected launch of Amgen's biosimilar, Samsung Bioepis has an incentive not to offer deep discounts over Alexion's reference product (SOLIRIS) during this relevant period. Instead, Samsung Bioepis would have an incentive to keep its price up prior to facing competition from other biosimilar entrants. Likewise, in this scenario, Alexion would not have an incentive to chase down the price of Samsung Bioepis' biosimilar product. Furthermore, in instances where only the original biologic and one biosimilar are on the market, public data on biologic pricing similarly shows limited price competition between the original product and the sole biosimilar.[93]

**54.** In the instance that Amgen's launch is accelerated from March 2025, resulting in the launch of both Samsung Bioepis' SB12 biosimilar and Amgen's biosimilar in June 2024, the biologic's price response could likewise be limited. For example, Genentech's Herceptin (trastuzumab) received FDA approval on September 25, 1998.[94] Herceptin currently has five biosimilars on the market: (1) Amgen's Kanjinti, which launched on July 18, 2019; (2) Mylan's Ogivri, which launched on December 2, 2019; (3) Pfizer's Trazimera, which launched on February 19, 2020; (4) Teva's Herzuma, which launched on March 16, 2020; and (5) Merck's Ontruzant, which launched on April 15, 2020.[95]

**55.** Based on my review of ASP data published by CMS, Herceptin maintained its ASP in the face of all five biosimilars entering the market during the four-quarter period between Q3 2019 and Q2 2020.[96] In Q4 2019, Herceptin's ASP had decreased by

---

[93] See, for example, "2022 Biosimilar Trends Report," Amgen, page 34.

[94] <www.fda.gov>; and "Purple Book Database of Licensed Biological Products," <purplebooksearch.fda.gov>.

[95] "Purple Book Database of Licensed Biological Products," <purplebooksearch.fda.gov>; <www.fda.gov>; "Amgen And Allergan's MVASI™ (bevacizumab-awwb) And KANJINTI™ (trastuzumab-anns) Now Available In The United States," Amgen Press Release, July 18, 2019; "Mylan and Biocon Launch Trastuzumab Biosimilar, Ogivri™ (trastuzumab-dkst), in the U.S.," Mylan Press Release, December 2, 2019; "Pfizer Launches Trastuzumab Biosimilar," The Center for Biosimilars, February 20, 2020; "Teva and Celltrion Healthcare Announce U.S. Availability of HERZUMA® (trastuzumab-pkrb) for Injection," Teva Press Release, March 16, 2020; "Merck Announces US Launch of ONTRUZANT® (trastuzumab-dttb), a Biosimilar of Herceptin® (trastuzumab)," Merck Press Release, April 15, 2020.

[96] I used quarterly ASP reported by CMS to evaluate what, if any, impact the entry of biosimilars had on the biologic's ASP. To quantify the impact on ASP, I calculated the percent difference between the biologic's ASP from the last quarter before any biosimilars had entered the market and its ASP four quarters after the first biosimilar launch.

approximately 2.3 percent after the launch of both Kanjinti in Q3 2019 and Ogivri in Q4 2019.[97]  In fact, even 9 months after the first biosimilar entry, Herceptin's ASP only decreased by 6.5 percent.[98]  However, as discussed above, this time period also saw the entry of four biosimilars, introducing greater downward pressure on the reference drug's ASP than what is expected to be observed with one or two biosimilar entrants.[99]

**56.**  The level of price erosion experienced by the biologic is also driven, in part, by the overall level of uptake of the biosimilars.  With a higher rate of biosimilar adoption, the originator is likely to lower its price to retain market share.  Therefore, to the extent certain markets or prescribers are less familiar with biosimilars (e.g., physicians in nephrology, as discussed above), one would expect slower uptake for Samsung Bioepis' biosimilar among this segment, resulting in a more resilient ASP than that of an oncology analog, such as Herceptin.[100]

**57.**  In any case, similar to the calculation of lost sales and market share, the actual pricing of Alexion's and Samsung Bioepis' eculizumab products would be known by the time of trial and that information can be used to calculate any harm from price erosion with a reasonable degree of economic certainty.

### iii   Alexion's Other Alleged Economic and Non-Economic Harms Are Speculative

**58.**  In his declaration, Mr. Thomas claims that Samsung Bioepis' biosimilar entry would "affect Alexion's reputation and goodwill," but offers no further explanation of how the launch of SB12 would do that.[101]  He also claims that Alexion would be unable to "have the opportunity to appropriately plan and redeploy its workforce which would result in loss of investment and knowhow," but again offers nothing further in support

---

[97] See Centers for Medicare & Medicaid Services ASP Pricing Files, Q3 2014 - Q1 2023; and Tab 4.

[98] See Centers for Medicare & Medicaid Services ASP Pricing Files, Q3 2014 - Q1 2023; and Tab 4.

[99] Approximately 18 months after biosimilar entry, Herceptin's ASP had decreased 14.7 percent (after five biosimilars had entered the market). See Centers for Medicare & Medicaid Services ASP Pricing Files, Q3 2014 - Q1 2023. See also, Tab 4.

[100] "2022 Biosimilar Trends Report," Amgen, page 72.

[101] Declaration of Vincent A. Thomas, February 12, 2024, paragraph 27.

of this assertion.[102]  Alexion's claim of any purported reputation harm related to its market recognition as an innovator is speculative and would presumably already occur with the anticipated launch of Amgen's biosimilar in March 2025 ███████████████ ████████████████.[103]  Similarly, Alexion would face the same need to plan and redeploy its workforce when faced with the launch of Amgen's biosimilar, expected in March 2025, ███████████████████████████████████████████ ████████████  Therefore, Mr. Thomas has failed to demonstrate any incremental harm attributable to Samsung Bioepis' launch of SB12 rather than effects from the launch of biosimilars in general.

**59.**  Mr. Thomas also claims that Samsung Bioepis' SB12 launch would "have an economic impact on Alexion's pricing and sales of Ultomiris," that it could result in "the loss of Alexion's ability to successfully market Ultomiris to Soliris patients."[104] Mr. Thomas also claims that "[t]he entrance of SB12 will certainly impact the rate at which patients may switch from Soliris to Ultomiris," and that due to biosimilar competition it would "not be possible to determine the extent to which patients would have switched to Ultomiris if SB12 were not launched."[105]  However, he does not point to any evidence to support this assertion. A biosimilar or generic is typically competing for sales and market share with its respective reference biologic or branded product — not a *different* biologic or branded product.  In fact, Alexion would be motivated to switch patients to ULTOMIRIS to protect against biosimilar competition to its SOLIRIS franchise. ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ████████████████████  In addition, a 2019 Morningstar report states:

[102] Declaration of Vincent A. Thomas, February 12, 2024, paragraph 27.
[103] Plaintiffs' Opening Brief in Support of Motion for a Preliminary Injunction, February 12, 2024, pages 3 and 18.
[104] Declaration of Vincent A. Thomas, February 12, 2024, paragraphs 20 and 21.
[105] Declaration of Vincent A. Thomas, February 12, 2024, paragraph 34.

CONFIDENTIAL — FILED UNDER SEAL                                    26

> We think Alexion has smartly priced Ultomiris, which was approved in December 2018 and offers a more convenient dosing schedule of six to seven times per year compared with Soliris' 26 or more infusions per year.  By offering it at a slight discount to Soliris, which has an average net annual price of over $450,000 by our estimates, the company should be able to efficiently convert patients to Ultomiris, allowing Alexion to maintain share even as biosimilars and potential branded competitors encroach.[107]

Further, a 2020 Morningstar report – also referenced by Mr. Thomas, states:

> Alexion's campaign to switch patients from Soliris to Ultomiris has been an overwhelming success, demonstrating the company's strong position in these rare diseases, and we expect that dynamic to continue as Ultomiris continues to win approvals.  The quick patient conversions and Alexion's ultimate goal of delivering a subcutaneous version of Ultomiris will be a strong deterrent to competitors in the pipeline.[108]

In fact, Mr. Thomas uses this same report to support his conclusion of harm to Alexion's ULTOMIRIS product, however, it seems to suggest otherwise:

> We believe that Alexion is well-positioned to withstand pressures from competitors (potential entry as early as 2021) and biosimilars (likely entry in 2022 for PNH) because it has expanded to other, larger patient populations, proactively priced Ultomiris at a discount, and offers more convenient dosing.  Soliris biosimilars would mean going back to 26 doctor visits per year for infusions, and we don't expect any reimbursement issues for Ultomiris.  Further, biosimilars are usually priced at about a 30% discount to the original drug.  Given that Ultomiris is

---

[107] Anna Baran, "Alexion's Rare-Disease Reign Not Over," Morningstar, March 6, 2019, page 2.
[108] Anna Baran, "Alexion Pharmaceuticals Inc," Morningstar Equity Analyst Report, September 2, 2020, page 1.

already priced at a 10% discount but offers much more convenient dosing, we think it is likely that Alexion will hold on to substantial share.[109]

**60.**  Therefore, Mr. Thomas' other alleged sources of irreparable harm to Alexion are speculative and unsubstantiated.

## C   Mr. Thomas Has Failed to Show Nexus to the PI Patents

**61.**  I understand that a showing of irreparable harm requires proof of a sufficiently strong casual nexus between the alleged harm and the alleged infringing activity.  It is my understanding that causal nexus requires a connection between the patented feature and demand for the accused product.  I further understand that a causal nexus can be established with evidence that a patented feature is one of several features that cause consumers to make their purchasing decisions, evidence that the inclusion of a patented feature makes a product significantly more desirable, or evidence that the absence of a patented feature would make a product significantly less desirable.

**62.**  Therefore, in this case, I understand that to support a claim of irreparable harm, Alexion must show a nexus between the alleged harm and the alleged infringement. In other words, Alexion must show a connection between the patented features of the PI Patents and demand for the product.  Mr. Thomas has not conducted any analysis demonstrating that the patented features of the PI Patents drive demand for eculizumab products.  In addition, Alexion states in its financial filings:  "With respect to SOLIRIS, we owned an issued U.S. patent that covers the eculizumab composition of matter that will expire in 2021, taking into account patent term extension.  We also own other issued U.S. patents that cover the composition, use and formulation of eculizumab, that expire in 2027."[110]  Mr. Thomas has not established the incremental features covered by the PI Patents and whether there is a nexus between the PI patents and any anticipated

---

[109] Anna Baran, "Alexion Pharmaceuticals Inc," Morningstar Equity Analyst Report, September 2, 2020, page 3.

[110] Alexion Pharmaceuticals, Inc., Form 10-K for fiscal year ended December 31, 2021, page 14; and Alexion Pharmaceuticals, Inc., Form 10-K for fiscal year ended December 31, 2019, page 10.

sales of Samsung Bioepis' biosimilar. Therefore, Mr. Thomas has not established a nexus between any alleged irreparable harm to Alexion resulting from Samsung Bioepis' alleged infringement of the PI Patents.

_____

Mohan Rao, Ph.D.

14 March 2024

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 15th day of March, 2024, the attached **DECLARATION OF**

**MOHAN RAO, PH.D.** was served upon the below-named counsel of record at the address and

in the manner indicated:

Daniel M. Silver, Esquire                                        <u>VIA ELECTRONIC MAIL</u>
MCCARTER &ENGLISH, LLP
Renaissance Centre
405 N. King St, 8th Floor
Wilmington, DE 19801

Gerald J. Flattmann, Jr., Esquire                          <u>VIA ELECTRONIC MAIL</u>
CAHILL GORDON & REINDEL LLP
32 Old Slip
New York, NY 10005


                                                          */s/ Andrew C. Mayo*
                                                          _____
                                                          Andrew C. Mayo

# Tab 1



**Mohan Rao, Ph.D.**
Chairman

Epsilon Economics                                    Direct: 312.637.2980
111 South Wacker Drive, 50th Floor                     Main: 312.637.2950
Chicago, Illinois 60606                         mrao@epsiloneconomics.com

## Summary

Dr. Mohan Rao is the Chairman of Epsilon Economics and specializes in antitrust and intellectual property economics, with an emphasis on life sciences and technology. He has testified as an expert in U.S. and foreign courts and in arbitration proceedings.

Dr. Rao also serves as the Chief Executive Officer of Expression Therapeutics, a biotechnology firm based in Atlanta that is focused on developing advanced therapies for hematology and oncology. Dr. Rao previously taught at Northwestern University and UCLA and was a Teaching Fellow at Harvard University. He was appointed as the first "Executive in Residence" — a recognized leader in the technology community — by the McCormick College of Engineering at Northwestern University. Prior to Epsilon Economics, Dr. Rao was the head of Navigant Economics, a global economics consulting firm. He has a Bachelor of Science in Engineering from the University of Michigan, a pre-doctoral fellowship from Harvard University, and a Ph.D. from the University of Colorado.

Dr. Rao serves on the Board of Directors of Expression Therapeutics, Inc., Epsilon Xi LLC, the Children's Hospital of Chicago, the Stanley Manne Children's Research Institute, and the Economic Club of Chicago, on the Board of Trustees of the Chicago Symphony Orchestra, and is a member of the Chicago Club.



## Academic and Professional Experience

- **Epsilon Economics**
  Chairman/Chief Executive Officer, 2015-present

- **Expression Therapeutics**
  Chief Executive Officer/Partner, 2007-present

- **Navigant Economics**
  Managing Director, 2010–2015

- **LECG**
  Managing Director, 2005–2010

- **Northwestern University**
  McCormick School of Engineering and Applied Science
  Adjunct Professor, 2006–2020

- **Charles River Associates / InteCap, Inc.**
  Vice President, CRA, 2004–2005
  Managing Director, InteCap, 2004–2005
  Director, InteCap, 2000–2003

- **University of California, Los Angeles**
  Assistant Professor, 1994–2001

- **Harvard University**
  Fellow, Government Data Center, 1993–1994
  Teaching Fellow, 1993–1994

## Education

- B.S. (Engineering), 1989, **University of Michigan**

- Pre-Doctoral Fellow, 1993–1994, **Harvard University**

- Ph.D.; M.A. (Economics; Political Science), 1994, **University of Colorado**

## Selected Fellowships and Awards

- Cooley Award, University of Michigan College of Engineering

- Government Data Center Fellowship, Harvard University



- David Cattell Fellowship, UCLA
- Faculty Career Development Award, UCLA

## Selected Affiliations

- Member, American Economic Association
- Member, Licensing Executives Society
- Member, American Society of Gene & Cell Therapy
- Member, Institute of Electrical and Electronics Engineers (IEEE)

## Expert Testimony

1. The Sanborn Library LLC et al. v. **ERIS Information Inc. et al.**
   U.S. District Court – Southern District of New York
   No. 1:19-cv-02049-LAK-OTW

2. **Arbor Pharmaceuticals, LLC and Takeda Pharmaceutical Company Limited** v. Saba Ilac Sanayii Ve Ticaret As et al.
   U.S. District Court — District of Delaware
   Civil Action No. 20-353-MN

3. **Puma Biotechnology, Inc. et al** v. AstraZeneca Pharmaceuticals LP et al
   U.S. District Court — District of Delaware
   C.A. No. 21-1338-MFK

4. Amgen, Inc. et al v. **Sandoz Inc.**
   U.S. District Court — District of New Jersey
   C.A. No. 1:23-CV-02406-CPO-EAP

5. **Curia Global, Inc. et al.** v. Cyprium Therapeutics, Inc.
   American Arbitration Association
   Case No. 01-22-0003-4042

6. **300 North LaSalle LLC** v. Hines Interests Limited Partnership
   Federal Arbitration, Inc.
   Case No. F22-JW-A-DFG-0603

7. In re: Certain Selective Thyroid Hormone Receptor-Beta Agonists. Processes for Manufacturing or Relating to Same, and Products Containing Same



On behalf of: **Viking Therapeutics, Inc.**
United States International Trade Commission
Investigation No. 337-TA-1352

8. **Azurity Pharmaceuticals, Inc.** v. Amneal Pharmaceuticals, LLC
   U.S. District Court — District of New Jersey
   Civil Action No. 3:21-cv-08717-FLW-DEA

9. **PhaseBio Pharmaceuticals, Inc.** v SFJ Pharmaceuticals X, Ltd.
   U.S. Bankruptcy Court — District of Delaware
   Case No. 22-10995 (LSS), Adv. Proc. No. 22-50456 (LSS)

10. Endo International plc et al. v **Nevakar, Inc., et al.**
    U.S. Bankruptcy Court — Southern District of New York
    Case No. 22-22549 (JLG), Adv. Proc. No. 22-07034 (ALG)

11. **Merck Sharp & Dohme Corp.** v Zydus Worldwide DMCC et al.
    U.S. District Court — District of Delaware
    No. 1:21-cv-00315-RGA

12. Novartis Pharma AG v **Incyte Corporation**
    U.S. District Court — Southern District of New York
    Civil Action No. 1:20-cv-00400-GHW

13. SmartSky Networks, LLC v. **Gogo Business Aviation, LLC et al.**
    U.S. District Court — District of Delaware
    C.A. No. 22-266 (VAC)

14. Celldex Therapeutics, Inc. v. **Shareholder Representative Services LLC**
    Court of Chancery — State of Delaware
    C.A. No. 2020-0682-MTZ

15. **Taiho Pharmaceutical Co., Ltd** v. Accord Healthcare Inc. et al
    U.S. District Court — District of Delaware
    Civil Action Nos. 1:19-cv-02321 (CFC), 1:19-cv-02309 (CFC)
    Civil Action Nos. 1:19-cv-02342 (UNA), 1:19-cv-02368 (UNA)

16. **Actelion Pharmaceuticals Ltd.** v. Mylan Pharmaceuticals Inc.
    U.S. District Court — Northern District of West Virginia
    Civil Action No. 1:20-CV-110 (Keeley)

17. Syngenta Crop Protection AG v. FMC Corporation
    FMC Corporation v. Syngenta Crop Protection AG
    American Arbitration Association



AAA Case No. 01-19-0002-4208, 01-19-0002-4192
**Neutral Expert to the Tribunal**

18. Novartis Pharma AG v. **Mitsubishi Tanabe Pharma Corporation**
    International Court of Arbitration
    Case No. 24256/PTA

19. **Wemade Co., Ltd. et al** v. Lansha Information Technology Co., Ltd. et al.
    International Court of Arbitration
    Case No. 22820/PTA/HTG

20. **Horizon Medicines LLC et al.** v. Dr. Reddy Laboratories Inc. et al.
    U.S. District Court — District of New Jersey
    Case No. 2:15-cv-03324 (SRC) (CLW)

21. Ravgen, Inc. v. **Natera, Inc. and NSTX, Inc.**
    U.S. District Court — Western Division of Texas (Austin Division)
    Civil Action No. 6-20-CV-00451

22. Seattle Genetics, Inc. v. **Daiichi Sankyo Co., Ltd.**
    American Arbitration Association
    Case No.: 01-19-0004-0115

23. **Humana Health Plan, Inc. et al.** v. Walgreen Co. et al.
    American Arbitration Association
    AAA Case 01-19-0002-5131

24. **Merck Sharp & Dohme Corp.** et al. v. Actavis Laboratories FL et al.
    U.S. District Court — District of New Jersey
    C.A. No. 2:15-CV-06541

25. Club Champion LLC v. **True Spec Golf LLC**
    U.S. Patent and Trademark Office — Patent Trial and Appeal Board
    Inter Partes Review No. IPR2019-01148

26. **Actelion Pharmaceuticals Ltd.** v. Zydus Pharmaceuticals (USA) Inc.
    U.S. District Court — District of New Jersey
    C.A. 18-1397 (FLW)(LHG)

27. **Treehouse Foods, Inc. et al.** v. Keurig Green Mountain, Inc.
    U.S. District Court — Southern District of New York
    No. 1:14-CV-00905-VSB

28. **Ingevity Corporation et al.** v. BASF Corporation
    U.S. District Court — District of Delaware



Case No. 18-1391-RGA

29. Niazi Licensing Corporation v. **St. Jude Medical S.C., Inc.**
U.S. District Court — District of Minnesota
C.A. No. 017-cv-5096-WMT-BRT

30. Glaukos Corporation v. **Ivantis, Inc.**
U.S. District Court – Central District of California
C.A. No. 8:18-cv-00620-JVS-JDE

31. C.R. Bard, Inc. v. **Medline Industries, Inc.**
U.S. Patent and Trademark Office — Patent Trial and Appeal Board
Inter Partes Review No. IPR2019-00035
Inter Partes Review No. IPR2019-00036
Inter Partes Review No. IPR2019-00109

32. **Sandoz Inc. et al.** v. United Therapeutics Corporation et al.
U.S. District Court — Northern District of New Jersey
Case No. 3:19-cv-10170-BRM-LHG

33. Maverick Therapeutics, Inc. et al. v. **Harpoon Therapeutics, Inc.**
Court of Chancery — State of Delaware
C.A. No. 2019-0002-SG

34. **Koppers (Jiangsu) Carbon Chemical Company Limited** v. Fangda C-Chem (Jiangsu) Needle Coke Co., Ltd.
China International Economic and Trade Arbitration Commission (CIETAC)
Case No. G20180547

35. **Rockwell Automation, Inc.** v. Radwell International, Inc.
U.S. District Court — District of New Jersey
Civil Action No.: 15-cv-05246 (RBK) (JS)

36. Delcor Asset Corporation et al. v. **Taro Pharmaceutical Industries et al.**
U.S. District Court — Southern District of New York
C.A. No.:1:17-cv-05405 (RJS)

37. Duke University and Allergan Sales, LLC v. **Sandoz, Inc.**
U.S. District Court — District of Colorado
Civil Action No.: 1:18-cv-00997-MSK-KLM

38. Juno Therapeutics, Inc. et al. v. **Kite Pharma, Inc.**
U.S. District Court — Central District of California
Case No.: 2:17-CV-07639



39. Välinge Innovation AB v. **Halstead International, The Home Depot, Inc.**
U.S. District Court — District of Delaware
C.A. No. 16-1082-LPS-CJB

40. In re: Merck Mumps Vaccine Antitrust Litigation
On behalf of: **Merck & Co., Inc.**
U.S. District Court — Eastern District of Pennsylvania
No. 2:12-cv-03555

41. Blue Cross Blue Shield Association, et al. v. **GlaxoSmithKline LLC.**
U.S. District Court — Eastern District of Pennsylvania
Civil Action No. 2:13-cv-4663-JS

42. In the Matter of Certain Programmable Logic Controllers (PLCs), Components
Thereof, and Products, Containing Same
On behalf of: **Rockwell Automation, Inc.**
United States International Trade Commission
Inv. No. 337-TA-1105

43. **Chuanqi IP Co., Ltd.** v. Zhejiang Huanyou Network Technology Co., Ltd.
International Court of Arbitration
Case No. 22593/PTA

44. Bio-Rad Laboratories, Inc. v. **Paladin III, L.P.**
Supreme Court of the State of New York — County of New York
Index No. 651641/2014

45. Tyntec Inc. et al. v. **Syniverse Technologies, LLC.**
U.S. District Court — Middle District of Florida (Tampa Division)
Case No. 8:17-CV-00591-RAL-MAP

46. **Gilead Sciences, Inc.** v. Roche Molecular Systems, Inc.
American Arbitration Association
AAA Case 01-16-0004-7625

47. Sanofi-Aventis US. LLC et al. v. **Merck Sharp & Dohme Corp.**
U.S. District Court — District of Delaware
C.A. No. 16-812-RGA

48. **Immunomedics, Inc.** v. Roger Williams Medical Center et al.
U.S. District Court — District of New Jersey
Civil Action No. 2:15-cv-04526

49. Purdue Pharma L.P. et al. v. **Amneal Pharmaceuticals, LLC**
U.S. District Court — District of Delaware



C.A. No. 15-1152-RGS-SRF

50. **KVK-Tech, Inc.** v. Valeant Pharmaceuticals International, Inc. et al.
American Arbitration Association
No. 01-15-0005-0393

51. Astrazeneca LP, et al. v. **Breath Limited, et al.**
U.S. District Court — District of New Jersey
08-cv-01512 (RMB) (AMD)

52. **Gilead Sciences, Inc.** v. Mylan Pharmaceuticals Inc.
U.S. District Court — District of Delaware
C.A. No. 1:16-cv-00192

53. **Bayer Consumer Care, AG., et al.** v. Belmora, LLC, et al.
United States District Court — Eastern District of Virginia (Alexandria Division)
Case No.: 1:14-cv-00847 (CMH)(JFA)

54. **Boehringer Ingelheim Pharma GmbH & Co. KG et al.** v. Teva Pharmaceuticals USA, Inc. et al.
United States District Court — District of New Jersey
No. 3:14-CV-7811 (MLC-TJB); No. 3:14-CV-1662 (MLC-TJB); No. 3:14-CV-7880 (MLC-TJB)

55. **Otsuka America Pharmaceutical, Inc.** v. Pfizer, Inc.
American Arbitration Association
Case No.: 01-16-0004-1233/01-16-0004-0951

56. **Momenta Pharmaceuticals, Inc., Sandoz Inc.** v. Amphastar Pharmaceuticals, Inc. et al.
United States District Court — District of Massachusetts
No. 1:11-CV-11681

57. **Dell Inc. and Dell Products L.P.** v. Hitachi, Ltd. et al.
United States District Court — Northern District of California
Case No. M:10-cv-02143-RD/3:13-cv-03350-RS

58. LG Display Co., Ltd. v. **Amtran Technology Co., Ltd. and Amtran Electronics (Suzhou) Co., Ltd. China**
International Court of Arbitration
Case No. 20946/CYK (c. 20963/CYK)

59. **Gilead Sciences, Inc. et al.** v. Watson Laboratories, Inc.
United States District Court — District of New Jersey



C.A. No. 15-CV-2350 (RMB) (JS)

60. **Copart, Inc.** v. Sparta Consulting, Inc.
United States District Court — Eastern District of California
No. 2:14-CV-00046-KJM-CKD

61. Elaine Ann Gold et al. v. **Dekalb County School District et al.**
Superior Court of Dekalb County — State of Georgia
Civil Action File No. 11-CV-3657-5

62. In re: Syngenta Litigation
County of Hennepin (Fourth Judicial District) — State of Minnesota
No. 27-CV-15-3785

63. **Sprint Communications Company L.P., et al.** v. Cox Communications,
Inc., et al.
U.S. District Court — District of Delaware
Case No. 1:12-cv-00487-SLR

64. **Endo Pharmaceuticals Solutions Inc., Bayer Intellectual Property
GMBH et al.** v. Paddock Laboratories, LLC et al.
U.S. District Court — District of Delaware
C.A. No. 14-1422-SLR

65. **GlaxoSmithKline LLC et al.** v. Pernix Therapeutics Holdings, Inc.
International Court of Arbitration
ICC Case No. 21284/RD

66. **Hospira, Inc. et al.** v. Eurohealth International SARL et al.
U.S. District Court — District of Delaware
Civil Action No. 1:14-cv-487-GMS

67. Nexus Display Technologies LLC v. **Dell Inc.**
U.S. District Court — District of Texas (Marshall Division)
Case No. 2:14-cv-00762

68. **Adidas AG et al.** v. Under Armour Inc. and MapMyFitness, Inc.
U.S. District Court — District of Delaware
C.A. No. 14-130 (GMS)

69. **Levi Strauss & Co.** v. Deloitte Consulting LLP et al.
Superior Court of the State of California — County of San Francisco
No. CGC-09-487219

70. Sanofi-Aventis U.S. LLC et al. v. **Eli Lilly and Company**



U.S. District Court — District of Delaware
Case No. 14-113-RGA-MPT

71. **Sprint Communications Company L.P.** v. Comcast Cable Communications, LLC, et al.
U.S. District Court — District of Kansas
Case No. 11-cv-2684 JWL/JPO

72. **Sprint Communications Company L.P.** v. Cable One, Inc.
U.S. District Court — District of Kansas
Case No. 11-cv-2685 JWL/JPO

73. **Sprint Communications Company L.P.** v. Time Warner Cable Inc. et al.
U.S. District Court — District of Kansas
Case No. 11-cv-2686 JWL/JPO

74. **Lavastone Capital LLC** v. Coventry First LLC, et al.
U.S. District Court — Southern District of New York
C.A. No.: 14-CV-7139 (Judge Jed S. Rakoff)

75. Pericor Therapeutics v. **Merck & Co., Inc.**
American Arbitration Association
AAA Arbitration No. 13 122 J03052

76. **Lufkin Industries, Inc.** v. International Business Machines et al.
District Court — Angelina County, Texas
Case No.: cv-02073-13-02

77. **Sunovion Pharmaceuticals Inc.** v. Takeda GMBH
International Court of Arbitration
ICC Case No. 19231/GFG

78. **LG Household and Health Care Limited** v. Akinari Ikka and Eri Ikka
International Court of Arbitration
ICC Arbitration No. 19421/CYK

79. **Mirowski Family Ventures, LLC.** v. Boston Scientific Corp. et al.
Circuit Court — Montgomery County, Maryland (Judge Ronald B. Rubin)
Civil No. 373798-V

80. **Dell Inc. et al** v. Hitachi, Ltd. et al.
U.S. District Court — Northern District of California (San Francisco Division)
Case No.: 3:13-cv-02171-SC

81. Purdue Pharma L.P. et al v. **Amneal Pharmaceuticals, LLC, Teva Phar-**



maceuticals USA, Inc.
U.S. District Court — Southern District of New York (Judge Stine)
Case No. 13-cv-3372 (SHS)
Case No. 13-cv-4606 (SHS)

82. **Gilead Sciences, Inc. and Emory University** v. Cipla Limited
U.S. District Court — Southern District of New York
Civil Action No. 12-CIV-6350 (RJS) (AJP)
Civil Action No. 12-CV-6351 (RJS) (AJP)

83. **Gilead Sciences, Inc. and Emory University** v. Lupin Limited
U.S. District Court — Southern District of New York
Civil Action No. 12-CIV-6293 (RJS) (AJP)
Civil Action No. 12-CV-6294 (RJS) (AJP)

84. Galderma Laboratories, L.P. et al v. **Actavis Mid Atlantic LLC**
U.S. District Court — Northern District of Texas
3:12-CV-2038

85. MPEG LA, L.L.C. v. **Dell Global B.V. and Dell Products, L.P.**
Court of Chancery — The State of Delaware
C.A. No. 7016-VCP

86. **Source Healthcare Analytics, Inc., Wolters Kluwer U.S. Corporation et al.** v. SDI Health LLC et al.
Court of Common Pleas — Philadelphia County (Commerce Court Program)
No. 02290

87. United States of America *ex rel.* Donald Gale v. **Omnicare, Inc.**
U.S. District Court — Northern District of Ohio (Eastern Division)
Case No. 1:10 CV-0127

88. **Scienton Technologies, Inc.** v. Computer Associates International, Inc.
U.S. District Court — Eastern District of New York
Case No. 04-CV-2652 (JS)(ETB)

89. In re Oxycontin Antitrust Litigation
U.S. District Court — Southern District of New York (Judge Stine)
Case No. 04-md-1603 (SHS)

90. **Avid Technology, Inc.** v. Harmonic Inc.
U.S. District Court — District of Delaware
Civil Action No. 1:11 CV-01040-GMS-SRF



91. **Gilead Sciences, Inc.** v. Sigmapharm Laboratories, LLC
U.S. District Court — District of New Jersey
C.A. No. 10-CV-4931 (SDW) (MCA)

92. **Bayer Healthcare LLC** v. Pfizer Inc.
U.S. District Court — Northern District of Illinois
Civil Action No. 1:12-cv-00630

93. Kimberly-Clark Corporation v. **Cardinal Health 200, LLC et al.**
U.S. District Court — Northern District of Georgia (Atlanta Division)
Civil Action No. 1:10 CV-0034-CAP

94. Multimedia Patent Trust v. **Apple Inc., LG Electronics, Inc. et al.**
U.S. District Court — Southern District of California
Case No. 10-CV-2618 JLS RBB

95. The Swatch Group Ltd. et al. v. **Tiffany and Company et al.**
Netherlands Arbitration Institute
NAI Case No. 3905

96. Boston Scientific Corporation et al. v. **Mirowski Family Ventures, LLC.**
U.S. District Court — Southern District of Indiana (Indianapolis Division)
Civil Action No. 1:11-cv-0736WTL DKL

97. **Tyco Healthcare Group LP et al.** v. Pharmaceutical Holdings Corp. et al.
U.S. District Court — District of New Jersey
C.A. No. 07-cv-1299 (SRC)(MAS)

98. Teva Neuroscience, Inc., et al. v. **Watson Laboratories, Inc., et al.**
U.S. District Court — District of New Jersey
C.A. No. 2:10-cv-05078 (CCC) (JAD); C.A. No. 2:11-cv-03076 (CCC) (JAD)

99. PSN Illinois, LLC. v. **Abbott Laboratories, Inc. and Abbott Bioresearch Center, Inc.**
U.S. District Court — Northern District of Illinois (Eastern Division)
Case No. 09-cv-05879

100. Hoffman-La Roche Inc. v. **Teva Pharmaceuticals USA, Inc. et al.**
U.S. District Court — New Jersey
Civ. Action No. 2:09-cv-05283; Civ. Action No. 2:09-cv-06335

101. Armando Plascencia et al. v. **Lending 1st Mortgage et al.**
U.S. District Court — Northern District of California
Case No. 4:07-cv-04485-CW



102. Aria Diagnostics, Inc. v. **Sequenom, Inc.**
U.S. District Court — Northern District of California
Case No. 3:11-cv-06391-SI

103. In re TFT-LCD (Flat Panel) Antitrust Litigation
On behalf of: **Dell Inc. and Dell Products L.P.**
U.S. District Court – Northern District of California (San Francisco Division)
Case No. 10 1064

104. MPEG-LA, L.L.C. v. **Audiovox Electronics Corporation et al.**
Supreme Court of the State of New York — County of Suffolk (Judge Emily Pines)
Index No. 24678/08

105. Genzyme Corporation v. **Seikagaku Corporation, Zimmer Holdings, Inc. et al.**
U.S. District Court — District of Massachusetts (Judge Douglas P. Woodlock)
C.A. NO.: 1:11-cv-1-636-DPW

106. Rembrandt Vision Technologies, LP et al. v. **Bausch & Lomb, Inc.**
American Arbitration Association
Case No. 14 122 Y 00403 09

107. **DSM Desotech Inc.** v. 3D Systems Corporation and 3D Systems, Inc.
U.S. District Court — Northern District of Illinois (Eastern Division)
Civil Case No. 08 C 1531

108. Onyx Pharmaceuticals, Inc. v. **Bayer Corporation et al.**
U.S. District Court — Northern District of California
Case No. 3:09-cv-02145-MHP

109. **Sanofi-Aventis Deutschland GMBH et al.** v. Glenmark Pharmaceuticals Inc., USA, et al.
U.S. District Court – District of New Jersey (Judge Dennis M. Cavanaugh)
C.A. No. 07-CV-05855 (DMC-JAD)

110. **Advanced Stent Technologies, Inc.** v. Boston Scientific Corporation
American Arbitration Association
Case Nos. 65 180 Y 00290 08 and 65 489 00292 08

111. Jayhawk Capital Management LLC, et al. v. **LSB Industries, Inc., et al.**
U.S. District Court – District of Kansas
Case No.: 08-CV-2561 EFM/JPO



112. Ortho-McNeil-Janssen Pharmaceuticals, Inc. et al. v. **Watson Laboratories, Inc., Sandoz, Inc., Lupin Pharmaceuticals, Inc. et al.**
U.S. District Court – District of New Jersey
Civil No.: 08-5103 (SRC)(MAS)

113. **Bristol-Myers Squibb Company (U.S.A.)** v. Daiichi Sankyo Company Limited (Japan)
International Court of Arbitration
ICC Case No. 15564/EC/VRO

114. Bayer Healthcare Pharmaceuticals, Inc. v. **Schering Corporation**
Court of Chancery of the State of Delaware
C.A. No. 3548-VCS

115. **LG Electronics U.S.A., Inc.** et al. v. Whirlpool Corporation et al.
U.S. District Court – District of Delaware (Judge Gregory M. Sleet)
Civil Action No.: 08-CV-234

116. **Microsoft Corporation** v. Franchise Tax Board
Superior Court of the State of California – For the County of San Francisco
Case No.: CGC 08-471260

117. Securities and Exchange Commission v. Biovail Corporation et al.
On behalf of: **John Miszuk**
U.S. District Court – Southern District of New York
Civil Action No.: 08 Civ. 02979(LAK)

118. **Claredi Corporation** v. SeeBeyond Technology Corporation
U.S. District Court – Eastern District of Missouri (Eastern Division)
Civil Action No.: 4:04-CV-1304RWS

119. **LG Electronics U.S.A., Inc.** v. Whirlpool Corporation
U.S. District Court – Northern District of Illinois (Eastern District)
Civil Action No.: 08 C 242

120. Unigene Laboratories, Inc. et al. v. **Apotex, Inc. et al.**
U.S. District Court – Southern District of New York
Civil Action No.: 06-CV-5571

121. Sanofi-Aventis Canada Inc. et al. v. **Novopharm Limited**
Federal Court of Canada – Toronto
Court File No. T-1161-07 Dated December 5, 2007

122. **3M Company et al.** v. Moldex-Metric, Inc.
U.S. District Court – District of Minnesota



Civil Action No.: 03-CV-5292 (MJD/AJB)

123. Boehringer Ingelheim Pharmaceuticals, Inc. v. **Abbott Laboratories et al.**
Private Arbitration — Chicago, Illinois

124. Thomas Johnson v. **Clark/McHugh/Rausch and Walsh/Riteway**
Circuit Court of Cook County, Illinois (County Department, Law Division)
Case No.: 03 L 015015

125. Aventis Pharma S.A. v. **Baxter Healthcare Corporation**
The International Institute for Conflict Prevention and Resolution
CPR File: G-08-05

126. In re K-DUR Antitrust Litigation
On behalf of: **Schering-Plough Corporation**
U.S. District Court – District of New Jersey
Civil Action No.: 01-1652 (JAG); MDL Docket No. 1419

127. The Procter & Gamble Company v. **Ultreo, Inc.**
U.S. District Court – Southern District of New York
Civil Action No. 07 CIV 8379 (HB) (Judge Richard Sullivan)

128. Church & Dwight Co., Inc. v. **Abbott Laboratories**
U.S. District Court – District of New Jersey
Civil Action No. 05 CV 2142 (GEB) (Judge Garrett E. Brown)

129. **Boehringer Ingelheim International GmbH and Boehringer Ingelheim Pharmaceuticals, Inc.** v. Barr Laboratories Inc.
U.S. District Court – District of Delaware
C.A. No. 05-700-(KAJ) (Judge Joseph J. Farnan, Jr.)

130. **The Dow Chemical Company** v. Shell Oil Company
Circuit Court of Cook County, Illinois (County Department, Law Division)
Civil Action No.: 00L13873

131. Fresenius Medical Care Holdings, Inc.  and Nabi Biopharmaceuticals, Inc.  v. **Roxane Laboratories, Inc.**
U.S. District Court – Southern District of Ohio (Eastern Division)
Case No.: C2 05 889

132. Dyson Technology Limited and Dyson, Inc. v. **Maytag Corporation**
U.S. District Court – District of Delaware
Civil Action No.: 05-434-GMS

133. Casmier Bobak and Jeanette Bobak v. **The City of Chicago et al.**



Circuit Court of Cook County, Illinois (County Department, Law Division)
Case No.: 02 L 6981

134. **Shuffle Master, Inc.** v. Yehia Awada and Gaming Entertainment, Inc.
U.S. District Court – Northern District of Illinois (Eastern Division)
Case No.: CV-S-05-1112-RCJ-RJJ

135. **Schering-Plough, Ltd.** v. Centocor, Inc.
American Arbitration Association
AAA No.: 50 181 T 00350 05 (Judge Edward N. Cahn)

136. Christopher Boyle et al.  v.  **Advanced Bio Prosthetic Surfaces, Ltd.,
ABPS Management, L.L.C., et al.**
American Arbitration Association
AAA No.: 70 180 Y 00655 04

137. Diodem, LLC v. **Biolase Technology, Inc.** et al.
U.S. District Court – Central Division of California (Western Division)
CV-03-2142 GAF (RCx)

138. Federal Trade Commission v. Mercury Marketing of Delaware, Inc. et al.
On behalf of: **Mercantile Capital LLC**
U.S. District Court – Eastern District of Pennsylvania
C.A. No. 00-CV-3281 (Judge Clifford Scott Green)

139. **Pfizer, Inc., Warner Lambert Company et al.** v. Ranbaxy Laboratories
Limited et al.
U.S. District Court – District of Delaware
Case No.: 03-209-JJF (Judge Joseph J. Farnan, Jr.)

140. **ATI Systems, Inc.** v. PECO Energy Company
American Arbitration Association
AAA No.: 14 117 00892 03 (Judge John J. Gibbons)

141. In re Relafen Antitrust Litigation
**Eon Labs, Inc.** v. GlaxoSmithKline PLC et al.
U.S. District Court – District of Massachusetts
Master File No.: 01-12239-WGY; Civil Action No.: 03-10506-WGY

## Preprints and Publications

1. "The Best Way to Value Biotech for Deal Making and Investments," *Intellectual
Asset Magazine*, Autumn 2020 (with Grace Park).



2. "Econometric Analysis," *Litigation Services Handbook: The Role of the Financial Expert*, Sixth Edition, Roman L. Weil, Daniel G. Lentz, Elizabeth A. Evans, Editors, New York: John Wiley, 2017 (with Anna C. King and Christian D. Tregillis).

3. "Economic Analysis in Securities Class Certification," *Litigation Services Handbook: The Role of the Financial Expert*, Sixth Edition, Roman L. Weil, Daniel G. Lentz, Elizabeth A. Evans, Editors, New York: John Wiley, 2017 (with Michal A. Malkiewicz and Cathy M. Niden).

4. "Innovation Markets," *Market Definition in Antitrust: Theory and Case Studies*, American Bar Association, 2012, Chapter XIII (with Robert Maness).

5. "The Demise of the 25% Rule," *Intellectual Asset Management*, May/June 2011 (with Jonathan Tomlin).

6. "25 Percent Rule Rest in Peace," *Viewpoints*, Vol. XVIII No. 2, April 2011.

7. "Valuing Intellectual Property in Licensing Transactions," *The Licensing Journal*, June/July 2008.

8. "Economic Analysis in Securities Class Certifications," *Litigation Services Handbook: The Role of the Financial Expert*, 2008 Supplement, Roman L. Weil, Michael J. Wagner, and Peter B. Frank, Editors, New York: John Wiley, 2008 (with Cathy M. Niden).

9. "Econometric Analysis," *Litigation Services Handbook: The Role of the Financial Expert*, Fourth Edition, Roman L. Weil, Michael J. Wagner, and Peter B. Frank, Editors, New York: John Wiley, 2007 (with Christian Tregillis).

10. "A Primer on Trademarks and Trademark Valuation," *Economic Damages in Intellectual Property*, Daniel Slottje, Editor, New York: John Wiley, 2006 (with Michaelyn Corbett and David Teece).

11. "What Experts Should Fear Most," *Expert Alert*, Vol. 1, No. 1, Winter 2005, American Bar Association (with John Bone).

12. "Econometric Analysis," *Litigation Services Handbook: The Role of the Financial Expert*, 2003 Supplement, Roman L. Weil, Michael J. Wagner, and Peter B. Frank, Editors, New York: John Wiley, 2004 (with Christian Tregillis).

13. "Inferring Micro– from Macrolevel Change: Ecological Panel Inference in Surveys." Working Paper, UCLA and New York University, 2001 (with Alexander A. Schuessler).



14. "The Dynamics of the Democratic Peace," *Journal of Conflict Resolution*, Vol. 45(6), p. 818–833, 2001 (with Lars–Erik Cederman).

15. "Intellectual Property Protection Improves as India Implements the TRIPS Agreement," *India Business & Investment Report*, June 2000.

16. "TRIPS and Global Trade in Pharmaceuticals," Working paper, UCLA, 2000.

17. "Democratie et Commerce International," *Arès*, Vol. XVIII(46), November 2000 (with Michael D. Ward).

18. "Intellectual Property Rights and Foreign Direct Investment," Working paper, UCLA, 1998 (with Keith Maskus).

19. "Indian Defense Expenditures in a Changed Global Security Environment." *International Studies*, 1998.

20. "The Strategic Design of Trade Policy Outcomes," Working paper, UCLA, 1997 (with Susanne Lohmann).

21. "Patents and International Trade: An Empirical Study." In Robert M. Stern, Edward E. Leamer, and Keith E. Maskus, editors, *Quiet Pioneering*. Ann Arbor: University of Michigan Press, 1997 (with Keith E. Maskus).

22. "Market Openness and Trade Conflict," Working paper, UCLA, 1996.

23. "How Trade–Related are Intellectual Property Rights?" *Journal of International Economics*, Vol. 39, p. 227–248, 1995 (with Keith E. Maskus).

24. "Guns and Growth Around the Globe." *International Interactions*, Vol. 21(2), p. 181–201, 1995 (with Michael D. Ward et al).

25. "North American Trade in the Post Debt Crises Era." In Khosrow Fatemi, editor, *North American Free Trade Agreement: Opportunities and Challenges*. London: Macmillan, 1993, p. 84–97 (with Barry W. Poulson).

26. "Canons et croissance dans le monde," *Arès*, Vol. XIV(4), p. 15–31, 1993 (with Michael D. Ward).

27. "Economic Growth, Investment, and Military Spending in India." In Steve Chan and Alex Mintz, editors, *Defense, Welfare, and Growth*. London: Routledge, 1992, p. 119—136 (with Michael D. Ward et al).

28. "Military Spending in India." *Defence Economics*, Vol. 3, p. 41–64, 1991 (with Michael D. Ward et al).



## Presentations and Speeches

1. "Economics of Intellectual Property in Life Sciences Litigation," New York University School of Law, March 23, 2022 (with Anna King).

2. "The Coming Transformation of Medicine," Multidisciplinary Training Program in Child and Adolescent Health (TL1), Northwestern University Clinical and Translational Sciences Institute (NUCATS), December 13, 2021.

3. "Regression Analysis in Litigation," Revenue Estimation Case Study, AICPA & CIMA Forensic & Valuation Services Conference, November 9, 2020 (with Christian Tregillis).

4. "Disruptive Innovations in Biotechnology," Invited Speaker, IEEE Technology & Engineering Management Society, Chicago, June 29, 2018.

5. "The New World of Marketing and Finance," Shirley Ryan Lecture Series on "Big Data: Impact On Our Lives," Northwestern University, November 5, 2014.

6. "Role of the Expert After Apple v. Motorola," Litigating Patent Damages, Law Seminars International, San Francisco, May 29-30, 2014.

7. "Dealing with Uncertainty of Damages and Injunctive Relief in the World of IP," Annual Conference of the Association of Corporate Counsel, Wisconsin Chapter, Elkhart Lake, Wisconsin, May 9-10, 2013.

8. "Game Theory Applications to BioPharma Deal Negotiations," Annual Meetings of the Licensing Executives Society, Chicago, September 29, 2010.

9. "Valuing Pharmaceutical and Biotechnology Pipelines," a Professional Development Series Workshop at the Annual Meetings of the Licensing Executives Society, Chicago, September 26, 2010.

10. "Commercializing Technology Through the Power of IP Licensing," a Professional Development Series Course, Licensing Executives Society, Chicago, April 26, 2010.

11. "How to Value High Risk Early Stage Technologies," Mornings@McCormick, Northwestern University, Evanston, April 13, 2010.

12. "Valuation of Early Stage Pharmaceutical and Biotechnology Pipelines," Workshop at the Annual Meetings of the Licensing Executives Society, San Francisco, October 21, 2009.

13. "Valuation, Taxation, and Pricing Issues with Intellectual Property," Workshop at the Annual Meetings of the Licensing Executives Society, Orlando, October



19, 2008.

14. "Valuation of Early Stage Technologies," Indian School of Business, Hyderabad, India, August 19, 2008.

15. "Valuation of Intellectual Property," 2nd Annual Patent Law Institute, Practising Law Institute, New York, New York, January 14-15, 2008.

16. "Economic Analysis in Class Actions," Seminar on Innovative Strategies for Litigating Class Actions, Law Seminars International, Los Angeles, California, November 12–13, 2007.

17. Recent Key Developments in Intellectual Property Law and Applicability at the Global Level, XPRT Forum, Sonoma, California, October 3-6, 2007.

18. Effective Development and Presentation of Expert Testimony, Law Seminars International, Chicago, Illinois, September 24–25, 2007 (co-chair w/ Alan Silberman).

19. "Intellectual Asset Management: Valuation," a Professional Development Series Intermediate Course, Licensing Executives Society, Chicago, July 10, 2007.

20. "Intellectual Asset Management: Advanced Valuation Skills," a Professional Development Series Advanced Course, Licensing Executives Society, Philadelphia, June 13–14, 2007.

21. "Intellectual Asset Management: Valuation," a Professional Development Series Intermediate Course, Licensing Executives Society, Philadelphia, March 13, 2007.

22. "Intellectual Asset Management: Advanced Valuation Skills," a Professional Development Series Advanced Course, Licensing Executives Society, San Francisco, November 1–2, 2006.

23. "Implementing Valuation Methods," a Professional Development Series Intermediate Workshop at the Annual Meetings of the Licensing Executives Society, New York, September 12, 2006.

24. "Intellectual Asset Management: Valuation," a Professional Development Series Intermediate Course, Licensing Executives Society, San Francisco, April 25, 2006.

25. Effective Development and Presentation of Expert Testimony, Law Seminars International, Chicago, Illinois, March 20–21, 2006 (co-chair w/ Alan Silberman).



26. "Lost Profits When the Patent is Only Part of the Whole," Seminar on Calculating and Proving Patent Damages, Law Seminars International, San Francisco, California, February 27–28, 2006.

27. "The Use and Misuse of Statistics," The American Institute of Certified Public Accountants, Jersey City, New Jersey, December 2, 2005.

28. "Use of Statistics in IP Litigation" Presentation to McAndrews, Held & Malloy, Chicago, December 1, 2005.

29. "Intellectual Asset Management: The Deal," a Professional Development Series Fundamentals Course, Licensing Executives Society, Arlington, Virginia, November 8-9, 2005.

30. "Implementing Valuation Methods," a Professional Development Series Intermediate Workshop at the Annual Meetings of the Licensing Executives Society, Phoenix, October 18, 2005.

31. "Damages and Antitrust Issues in Intellectual Property Litigation" Presentation to Dykema Gossett, Chicago, July 21, 2005 (w/ Kathi Kedrowski).

32. "Intellectual Asset Management: Valuation," a Professional Development Series Intermediate Course, Licensing Executives Society, Chicago, July 19, 2005.

33. "Implementing Valuation Methods," a Professional Development Series Intermediate Workshop at the Annual Meetings of the Licensing Executives Society, Boston, October 17, 2004.

34. "Use of Surveys and Statistics in Litigation," Workshop at the Advanced Business Litigation Institute, Palm Springs, May 9, 2003.

35. "Real Option Valuation," Presented at the 2002 Winter Meeting of the Licensing Executives Society, Lake Las Vegas, February 14, 2002.

36. "Networked Computer Simulations," CyberSpace@UCLA, UCLA Anderson School of Management, Los Angeles, May 2, 2002.

37. "Improving IP Financial Performance." Presentation to Jones, Day, Reavis & Pogue, Los Angeles, June 20, 2001 (w/ David Haas).

38. "Intellectual Property: The New Global Currency," Jacob Marschak Colloquium, UCLA Anderson School of Management, June 8, 2001.

39. "Commerce and Democracy." Presented at the conference on Spatial Analysis for Political Methodology, University of Colorado, Boulder, March 2000.



40. "Determinants of International Trade Flows in an Era of Globalization." Presented at the UCLA Conference on International Institutions, Lake Arrowhead, February 2000.

41. "Exploring the Dynamics of Interstate Conflict." Presented at the Meetings of the International Studies Association, Des Moines, Iowa, October 1999.

42. "Exploring the Dynamics of Interstate Conflict." Presented at the UCLA Conference on Norms in International Relations, Los Angeles, October 1999.

43. "Globalization and the Decline of Power Politics." Presented at the Annual Meetings of the APSA, Atlanta, September 1999.

44. "Inferring Micro– from Macrolevel Change." Presented at the Annual Meetings of the MPSA, Chicago, April 1998 (with Alexander A. Schuessler).

45. "Overtime Inference in Cross Sectional Surveys." Presented at California Institute of Technology, November 7, 1997.

46. "Overtime Inference in Cross Sectional Surveys." Presented at UCLA, October 8, 1997.

47. "Ecological Inference in Cross Sectional Surveys." Presented at the Annual Meetings of the APSA, Washington, D.C., August 1997 (with Alexander A. Schuessler).

48. "Governance in a Multinational World." Presented at the Workshop on Global and Regional Governance, Institute of Global Conflict and Cooperation, UC San Diego, May 1997.

49. "The Strategic Design of Trade Policy Outcomes: The Politics of Section 301." Presented at the Annual Meetings of the APSA, San Francisco, August 1996 (with Susanne Lohmann).

50. "Polarization and Political Violence." Presented at the Summer Methods Conference, Ann Arbor, Michigan, July 1996 (with Patrick Asea).

51. "How Trade–Related are Intellectual Property Rights?" Presented at the International Economics Workshop, UCLA, April 3, 1996.

52. "The Politics of Section 301: Institutional Design and Policy Outcomes." Presented at the Annual Meetings of the International Studies Association, San Diego, March 1996 (with Susanne Lohmann).

53. "Military Spending in India." Presented at the Conference on Security in South Asia, Jawaharlal Nehru University, New Delhi, January 1996.



54. "Patents, Trade, and Foreign Direct Investment."  Presented at the Annual Meetings of the Allied Social Science Associations, San Francisco, January 1996 (with Keith E. Maskus).

55. "Forecasting the Collapse of the Soviet Union."  Presented at the Annual Meetings of the Peace Science Society International, Urbana–Champaign, November 1994 (with Michael D. Ward).

56. "Trade and Market Openness."  Presented at the International Colloquium on Defining a New Partnership Between North America and Europe, Institute of Behavioral Science, Boulder, July 1994.

57. "Guns and Growth Around the World."  Presented at the Annual Meetings of the International Studies Association, Washington, D.C., March 1994 (with Michael D. Ward).

58. "Trade and Patents: An Empirical Study."  Presented at the National Bureau of Economic Research Universities Research Conference on International Trade Rules and Institutions, Cambridge, December 1993 (with Keith E. Maskus).

59. "The Trade Crises That Never Happened."  Presented at the 6th Hispanic Symposium on Business and the Economy, Boulder, October 1992 (with Barry W. Poulson).

60. "Export Orientation and Economic Growth: Stylized Facts for Select Developing Countries."  Presented at the Annual Meetings of the International Studies Association, Atlanta, April 1992 (with David R. Davis).

Tab 2

# Documents Considered List

## Pleadings

1. Notice of Allowance and Fee(s) Due for U.S. Patent Application No. 15/642,096, January 22, 2020.

2. Patent Owner Response for IPR2019-00741 between Amgen Inc. and Alexion Pharmaceuticals, Inc., November 22, 2019.

3. Patent Owner's Surreply to Petitioner's Reply for IPR2019-00741 between Amgen Inc. and Alexion Pharmaceuticals, Inc., April 27, 2020.

4. Petitioner's Reply to Patent Owner Response for IPR2019-00741 between Amgen Inc. and Alexion Pharmaceuticals, Inc., February 14, 2020.

5. Plaintiffs Alexion Pharmaceuticals, Inc. and Alexion Pharma International Operations Ltd.'s Motion for a Preliminary Injunction, February 12, 2024.

6. Plaintiffs' Opening Brief in Support of Motion for a Preliminary Injunction, February 12, 2024.

7. Remarks for U.S. Patent Application No. 15/642,096, December 11, 2019.

## Patents

1. United States Patent No. 10,590,189.

2. United States Patent No. 9,447,176.

3. United States Patent No. 9,732,149 B2.

## Depositions

1. Deposition of Vincent A. Thomas, March 5, 2024.

CONFIDENTIAL — FILED UNDER SEAL

Tab 2

### *Declarations*

1. Declaration of Andrew Cochran, February 12, 2024.

2. Declaration of Arturo Casadevall, February 12, 2024.

3. Declaration of Arturo Casadevall for IPR2019-00741 between Amgen Inc. and Alexion Pharmaceuticals, Inc., February 14, 2020.

4. Declaration of Bernhardt L. Trout, February 12, 2024.

5. Declaration of Dr. Deepak Jain for U.S. Patent Application No. 15/642,096, December 11, 2019.

6. Declaration of Ivan T. Hofmann for IPR2019-00741 between Amgen Inc. and Alexion Pharmaceuticals, Inc., February 14, 2020.

7. Declaration of John Joseph Bissler, M.D., March 13, 2024.

8. Declaration of Vincent A. Thomas and Supporting Documents, February 12, 2024.

### *Financial Documents and Data*

1. Alexion Pharmaceuticals, Inc., Form 10-K for fiscal year ended December 31, 2008.

2. Alexion Pharmaceuticals, Inc., Form 10-K for fiscal year ended December 31, 2010.

3. Alexion Pharmaceuticals, Inc., Form 10-K for fiscal year ended December 31, 2011.

4. Alexion Pharmaceuticals, Inc., Form 10-K for fiscal year ended December 31, 2013.

5. Alexion Pharmaceuticals, Inc., Form 10-K for fiscal year ended December 31, 2016.

6. Alexion Pharmaceuticals, Inc., Form 10-K for fiscal year ended December 31, 2017.

7. Alexion Pharmaceuticals, Inc., Form 10-K for fiscal year ended December 31, 2018.

8. Alexion Pharmaceuticals, Inc., Form 10-K for fiscal year ended December 31, 2019.

9.  Alexion Pharmaceuticals, Inc., Form 10-K for fiscal year ended December 31, 2020.

10.  Alexion Pharmaceuticals, Inc., Form 10-K for fiscal year ended December 31, 2021.

11.  Alexion Pharmaceuticals, Inc., Form 8-K, July 20, 2021.

12.  AstraZeneca Annual Report and Form 20-F Information 2023.

13.  Centers for Medicare & Medicaid Services ASP Pricing Files, Q3 2014 - Q1 2023.

**Websites**

1.  <www.alexion.com>.

2.  <www.fda.gov>.

3.  <www.iqvia.com>.

4.  <www.samsungbioepis.com>.

**Legal**

1.  35 U.S.C. § 284.

2.  42 U.S.C. § 1395.

3.  42 U.S.C. § 262: Regulation of biological products.

4.  *Georgia-Pacific v. United States Plywood Corporation*, 318 F. Supp. 1116 (S.D.N.Y. 1970).

5.  *Panduit Corp v. Stahlin Bros. Fibre Works, Inc.*, 575 F.2d 1152, 2256, 197 U.S.P.Q. 726, 729-730 (6th Cir. 1978).

## *Books, Articles and Other Information*

1. "2022 Biosimilar Trends Report," Amgen.

2. "Acquisition of Alexion completed," AstraZeneca Press Release, July 21, 2021.

3. "Amgen And Allergan's MVASI™ (bevacizumab-awwb) And KANJINTI™ (trastuzumab-anns) Now Available In The United States," Amgen Press Release, July 18, 2019.

4. "An Introduction to Samsung Bioepis," Samsung Bioepis, May 22, 2023.

5. Anna Baran, "Alexion Pharmaceuticals Inc," Morningstar Equity Analyst Report, September 2, 2020.

6. Anna Baran, "Alexion's Rare-Disease Reign Not Over," Morningstar, March 6, 2019.

7. Atanu Saha, Henry Grabowski, Howard Birnbaum, Paul Greenberg, and Oded Bizan, "Generic Competition in the US Pharmaceutical Industry," *International Journal of the Economics of Business*, Vol. 13, No. 1, February 2006, pages 15-38.

8. "Biosimilars in the United States 2020-2024," The IQVIA Institute, October 2020.

9. "Biosimilars in the United States 2023-2027," The IQVIA Institute, January 31, 2023.

10. Daniel Slottje, "Economic Damages in Intellectual Property A Hands-on Guide to Litigation", Chapter 6: Loss of Profits as a Measure of Damages in Patent Infringement Methods, *John Wiley & Sons*, 2006.

11. David L. Carl, et al., "Comparison of Uptake and Prices of Biosimilar in the US, Germany, and Switzerland," December 2, 2022.

12. David Reiffen and Michael R. Ward, "Generic Drug Industry Dynamics," *The Review of Economics and Statistics*, Vol. 87, No. 1, February 2005, pages 37-49.

13. Ernst R. Berndt and Murray L. Aitken, "Brand Loyalty, Generic Entry and Price Competition in Pharmaceuticals in the Quarter Century After the 1984 Waxman-Hatch Legislation," National Bureau of Economic Research, Working Paper Series No. 16431, October 2010.

Tab 2

14. Gregory K. Leonard, Lauren J. Stiroh, "Economic Approaches To Intellectual Property Policy, Litigation, and Management", Chapter 3: A Practical Guide to Damages, *National Economic Research Associates*, 2005.

15. Henry Grabowski and John Vernon, "Brand Loyalty, Entry, and Price Competition in Pharmaceuticals After the 1984 Drug Act," *Journal of Law & Economics*, 35, October 1992, pages 331-350.

16. Henry Grabowski and John Vernon, "Longer Patents for Increased Generic Competition in the US: The Waxman-Hatch Act after One Decade," *PharmacoEconomics*, 10, Suppl. 2, 1996, pages 110-123.

17. "HHS Secretary Xavier Becerra, CMS Administrator Chiquita Brooks-LaSure Remark on Implementation of Inflation Reduction Act Provision Addressing Medicare Payments for Biosimilars," HHS Press Office, October 3, 2022.

18. Jesse C. Vivian, "Generic-Substitution Laws," *U.S. Pharmacist*, Vol. 33, No. 6, June 19, 2008, pages 30-34.

19. Kioa Lente Wijnsma et al., "Pharmacology, Pharmacokinetics and Pharmacodynamics of Eculizumab, and Possibilities for an Individualized Approach to Eculizumab," *Clinical Pharmacokinetics*, February 13, 2019.

20. Landan Ansell, John Holzwarth, Vincent O'Brien, and William Scally, "Patent Infringement Damages," in: Roman Weil, Daniel Lentz, and David Hoffman, Editors, LITIGATION SERVICES HANDBOOK: THE ROLE OF THE FINANCIAL EXPERT, Sixth Edition (John Wiley & Sons), 2017.

21. "Medical Drug Coding and Reimbursement 101," IPD Analytics, December 16, 2021.

22. "Medicare Part B Reimbursement of Prescription Drugs," U.S. Department of Human Health and Services, June 2014.

23. "Merck Announces US Launch of ONTRUZANT® (trastuzumab-dttb), a Biosimilar of Herceptin® (trastuzumab)," Merck Press Release, April 15, 2020.

24. "Mylan and Biocon Launch Trastuzumab Biosimilar, Ogivri™ (trastuzumab-dkst), in the U.S.," Mylan Press Release, December 2, 2019.

25. "Navigating Insurance for SOLIRIS® (eculizumab)," Alexion Presentation, June 2021.

26. Nguyen X. Nguyen et al., "Medicare Part B Drugs: Trends in Spending and Utilization, 2008–2021," Office of the Assistant Secretary for Planning and Evaluation, U.S. Department of Health and Human Services, June 9, 2023.

27. "Pfizer Launches Trastuzumab Biosimilar," The Center for Biosimilars, February 20, 2020.

28. "Pricing and Competition in the Pharmaceutical Market," in: How Increased Competition from Generic Drugs Has Affected Prices and Returns in the Pharmaceutical Industry, Congressional Budget Office, The Congress of the United States, July 1998.

29. Richard E. Caves, Michael D. Whinston, and Mark A. Hurwitz, "Patent Expiration, Entry, and Competition in the U.S. Pharmaceutical Industry," in: Martin Neil Baily and Clifford Winston, Brookings Papers on Economic Activity: Microeconomics, Washington, D.C.: Brookings Institution, 1991.

30. Roman L. Weil, Daniel G. Lentz, and David P. Hoffman, "Litigation Services Handbook: The Role of the Financial Expert," *John Wiley & Sons*, Sixth Edition.

31. Soliris FDA Approval Letter, March 16, 2007.

32. Soliris Label, February 8, 2024.

33. "Purple Book Database of Licensed Biological Products," <purplebooksearch.fda.gov>.

34. "Teva and Celltrion Healthcare Announce U.S. Availability of HERZUMA® (trastuzumab-pkrb) for Injection," Teva Press Release, March 16, 2020.

35. "The pros & cons of the 'buy and bill' model of pharmaceutical distribution: What's appropriate for your practice?," McKesson Medical-Surgical Inc., January 6, 2022.

36. Ultomiris FDA Approval Letter, December 21, 2018.

37. Ultomiris Label, February 8, 2024.

38. "Understanding the buy-and-bill model," AmerisourceBergen, October 27, 2021.

CONFIDENTIAL — FILED UNDER SEAL

Tab 2

39. Wan-Chih Tom and Kayla Dotson, "State Regulations on Generic Substitution," *Pharmacist's Letter / Prescriber's Letter* 22, No. 220901, July 3, 2007.

40. Wendy K. Bodine, "Generic Plavix Hits the Shelves, Temporarily?," *Pharmacy Times*, September 2006.

41. Zachary Brennan, "Humira biosimilar market remains stagnant, with AbbVie losing only 2% of market share, Samsung report shows," Endpoints News, January 17, 2024.

### *Production*

████████████████████████████████████████████████████████████

████████████████████████████████████████████

3. ALXN_PI_00000180.

4. ALXN_PI_00000181–ALXN_PI_00000182.

5. ████████████████████████

████████████████████████████████████████████████████

   ████████████████████

████████████████████████████████████████████████

8. Confidential Settlement and License Agreement between Alexion and Amgen, May 28, 2020, ALXN_PI_00000183–ALXN_PI_00000224.

9. ████████████████████████████████████████████████

   ████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████.

CONFIDENTIAL — FILED UNDER SEAL

Tab 2

Tab 3

# Alexion Annual Sales, U.S.
## *SOLIRIS and ULTOMIRIS, 2007 - 2023*

| Year | SOLIRIS | ULTOMIRIS | Total |
|------|---------|-----------|-------|
| 2007 | $46,196,000 | - | **$46,196,000** |
| 2008 | $113,204,000 | - | **$113,204,000** |
| 2009 | $159,829,000 | - | **$159,829,000** |
| 2010 | $205,792,000 | - | **$205,792,000** |
| 2011 | $263,387,000 | - | **$263,387,000** |
| 2012 | $400,483,000 | - | **$400,483,000** |
| 2013 | $561,405,000 | - | **$561,405,000** |
| 2014 | $730,000,000 | - | **$730,000,000** |
| 2015 | $943,600,000 | - | **$943,600,000** |
| 2016 | $1,058,500,000 | - | **$1,058,500,000** |
| 2017 | $1,235,000,000 | - | **$1,235,000,000** |
| 2018 | $1,588,400,000 | - | **$1,588,400,000** |
| 2019 | $2,014,000,000 | $236,800,000 | **$2,250,800,000** |
| 2020 | $2,259,700,000 | $646,000,000 | **$2,905,700,000** |
| 2021 | $2,264,228,388 | $769,199,128 | **$3,033,427,516** |
| 2022 | $2,180,000,000 | $1,136,000,000 | **$3,316,000,000** |
| 2023 | $1,734,000,000 | $1,750,000,000 | **$3,484,000,000** |
| **Total** | **$17,757,724,388** | **$4,537,999,128** | **$22,295,723,516** |

**Notes and Sources**

Alexion Pharmaceuticals, Inc., Form 10-K for the fiscal year ending December 31, 2008, page 62.
Alexion Pharmaceuticals, Inc., Form 10-K for the fiscal year ending December 31, 2010, pages 44 and 48.
Alexion Pharmaceuticals, Inc., Form 10-K for the fiscal year ending December 31, 2011, pages 17 and 47.
Alexion Pharmaceuticals, Inc., Form 10-K for the fiscal year ending December 31, 2013, pages 23 and 56.
Alexion Pharmaceuticals, Inc., Form 10-K for the fiscal year ending December 31, 2016, pages 62-63.
Alexion Pharmaceuticals, Inc., Form 10-K for the fiscal year ending December 31, 2017, page 65.
Alexion Pharmaceuticals, Inc., Form 10-K for the fiscal year ending December 31, 2018, page 70.
Alexion Pharmaceuticals, Inc., Form 10-K for the fiscal year ending December 31, 2020, page 92.

For 2021, AstraZeneca reported post-acquisition figures only (July 21, 2021 - December 31, 2021). I apply the ratio of U.S. to Global sales from AstraZeneca's 2021 figures to the global figures from the first half of 2021 reported by Alexion to calculate U.S. sales for the first half of 2021. I did not include an estimate of sales between July 1, 2021 and July 21, 2021 in the 2021 annual figures. See AstraZeneca Annual Report and Form 20-F Information 2023, pages 160 and 195; and Alexion Pharmaceuticals, Inc., Form 8-K, July 20, 2021, page 3.

# Alexion Annual Sales, Global
## *SOLIRIS and ULTOMIRIS, 2007 - 2023*

| Year | SOLIRIS | ULTOMIRIS | Total |
|------|---------|-----------|-------|
| 2007 | $66,381,000 | - | **$66,381,000** |
| 2008 | $259,004,000 | - | **$259,004,000** |
| 2009 | $386,800,000 | - | **$386,800,000** |
| 2010 | $540,957,000 | - | **$540,957,000** |
| 2011 | $783,431,000 | - | **$783,431,000** |
| 2012 | $1,134,114,000 | - | **$1,134,114,000** |
| 2013 | $1,551,346,000 | - | **$1,551,346,000** |
| 2014 | $2,234,000,000 | - | **$2,234,000,000** |
| 2015 | $2,590,200,000 | - | **$2,590,200,000** |
| 2016 | $2,843,200,000 | - | **$2,843,200,000** |
| 2017 | $3,144,100,000 | - | **$3,144,100,000** |
| 2018 | $3,563,000,000 | - | **$3,563,000,000** |
| 2019 | $3,946,400,000 | $338,900,000 | **$4,285,300,000** |
| 2020 | $4,064,200,000 | $1,076,700,000 | **$5,140,900,000** |
| 2021 | $3,973,000,000 | $1,389,000,000 | **$5,362,000,000** |
| 2022 | $3,762,000,000 | $1,965,000,000 | **$5,727,000,000** |
| 2023 | $3,145,000,000 | $2,965,000,000 | **$6,110,000,000** |
| **Total** | **$37,987,133,000** | **$7,734,600,000** | **$45,721,733,000** |

**Notes and Sources**

Alexion Pharmaceuticals, Inc., Form 10-K for the fiscal year ending December 31, 2008, pages 22 and 52.
Alexion Pharmaceuticals, Inc., Form 10-K for the fiscal year ending December 31, 2010, pages 44 and 48.
Alexion Pharmaceuticals, Inc., Form 10-K for the fiscal year ending December 31, 2011, pages 17 and 47.
Alexion Pharmaceuticals, Inc., Form 10-K for the fiscal year ending December 31, 2013, pages 23 and 56.
Alexion Pharmaceuticals, Inc., Form 10-K for the fiscal year ending December 31, 2016, pages 58 and 63.
Alexion Pharmaceuticals, Inc., Form 10-K for the fiscal year ending December 31, 2017, page 65.
Alexion Pharmaceuticals, Inc., Form 10-K for the fiscal year ending December 31, 2020, page 92.
For 2021, AstraZeneca reported post-acquisition figures only (July 21, 2021 - December 31, 2021). I combined the H1 2021 results reported by Alexion with these to calculate 2021 global sales. I did not include an estimate of sales between July 1, 2021 and July 21, 2021 in the 2021 annual figures. See AstraZeneca Annual Report and Form 20-F Information 2023, pages 160 and 195; and Alexion Pharmaceuticals, Inc., Form 8-K, July 20, 2021, page 3.



**Alexion Annual Sales, U.S.**
*SOLIRIS and ULTOMIRIS, 2007 - 2023*

**Notes and Sources**
Tab 3a.

CONFIDENTIAL — FILED UNDER SEAL

Tab 3c



**Alexion Annual Sales, Global**
*SOLIRIS and ULTOMIRIS, 2007 - 2023*

**Notes and Sources**
Tab 3b.

Tab 4



**Herceptin (trastuzumab), Genentech**
*ASP by Quarter, Q3 2014 - Q3 2023*

**Notes and Sources**
Centers for Medicare & Medicaid Services ASP Pricing Files, Q3 2014 - Q3 2023.
Vertical lines denote biosimilar entry.
Herceptin's ASP decreased 6.5% from Q2 2019, the last quarter before biosimilar entry, through Q2 2020, nine months after the quarter of the first
biosimilar entry. From Q2 2019 through Q1 2021, 18 months after the quarter of the first biosimilar entry and with five biosimilars on the market,
Herceptin's ASP decreased 14.7%.
Trazimera (trastuzumab-qyyp) and Herzuma (trastuzumab-pkrb) both launched in Q1 2020.

# EXHIBIT M



www.archive.org
415.561.6767
415.840-0391 e-fax

Internet Archive
300 Funston Avenue
San Francisco, CA  94118

_____

# AFFIDAVIT OF DUNCAN HALL

1.  I am a Records Request Processor at the Internet Archive, located in San Francisco, California. I make this declaration of my own personal knowledge.

2.  The Internet Archive is a website that provides access to a digital library of Internet sites and other cultural artifacts in digital form. Like a paper library, we provide free access to researchers, historians, scholars, and the general public. The Internet Archive has partnered with and receives support from various institutions, including the Library of Congress.

3.  The Internet Archive has created a service known as the Wayback Machine. The Wayback Machine makes it possible to browse more than 450 billion pages stored in the Internet Archive's web archive. Visitors to the Wayback Machine can search archives by URL (i.e., a website address).  If archived records for a URL are available, the visitor will be presented with a display of available dates.  The visitor may select one of those dates, and begin browsing an archived version of the Web. Links on archived files in the Wayback Machine point to other archived files (whether HTML pages or other file types), if any are found for the URL indicated by a given link. For instance, the Wayback Machine is designed such that when a visitor clicks on a hyperlink on an archived page that points to another URL, the visitor will be served the archived file found for the hyperlink's URL with the closest available date to the initial file containing the hyperlink.

4.  The archived data made viewable and browseable by the Wayback Machine is obtained by use of web archiving software that automatically stores copies of files available via the Internet, each file preserved as it existed at a particular point in time.

5.  The Internet Archive assigns a URL on its site to the archived files in the format http://web.archive.org/web/[Year in yyyy][Month in mm][Day in dd][Time code in hh:mm:ss]/[Archived URL] aka an "extended URL".  Thus, the extended URL http://web.archive.org/web/19970126045828/http://www.archive.org/ would be the URL for the record of the Internet Archive home page HTML file (http://www.archive.org/) archived on January 26, 1997 at 4:58 a.m. and 28 seconds (1997/01/26 at 04:58:28). The date indicated by an extended URL applies to a preserved instance of a file for a given URL, but not necessarily to any other files linked therein. Thus, in the case of a page constituted by a primary HTML file and other separate files (e.g., files with images, audio, multimedia, design elements, or other embedded content) linked within that primary HTML file, the primary HTML file and the other files will each have their own respective extended URLs and may not have been archived on the same dates.

6.  Attached hereto as Exhibit A are true and accurate copies of screenshots of the Internet Archive's records of the archived files for the URLs and the dates specified in the attached coversheet of each printout.



7.   I declare under penalty of perjury that the foregoing is true and correct.


DATE:   06/14/2021                                    *Duncan Hall*
        _____              _____
                                                 Duncan Hall

# EXHIBIT A

https://web.archive.org/web/20081107072041/http://www.hematology.org/

http://www.hematology.org/    Go

INTERNET ARCHIVE
WayBackMachine

2,368 captures
19 Dec 1996 – 24 May 2021

SEP  NOV  DEC
◀  07  ▶
2007  2008  2009    ▼ About this capture

American Society of Hematology

helping **hematologists**
conquer **blood** diseases

About ASH | Patients | Media | Make a Gift | Corporate Supporters

Home >

E-Mail This Page | Print This Page

## News

- Special annual meeting sessions examine election results impact on hematology
- ASH working to add NIH funding to economic recovery package
- New leadership elected to the American Society of Hematology
- Watch "Blood Detectives," a hematology documentary premiering on Discovery Health, on December 19
- Medicare releases Hospital Outpatient/Ambulatory Surgical Center final rule
- CMS releases final 2009 payment regulations
- ASH members interested in working on the next edition of the *ASH-SAP* are now invited to apply!

## Important Dates

**November 6, 2008**
Annual meeting advance registration ends

**November 7, 2008**
Annual meeting materials mailed to advance registrants

**November 10, 2008**
Abstracts and program planner available online

**December 6-9, 2008 - ASH Annual Meeting**
ASH Bash - A Taste of San Francisco (Dec. 8)

Special Symposium on the Basic Science of Hemostasis and Thrombosis (Dec. 9)

Best of ASH (Dec. 9)

View More >>

## Blood



First Edition
Archive

- 50th anniversary review: The origins of the identification and isolation of hematopoietic stem cells >>
- Molecular mechanisms of thrombus formation in ischemic stroke >>
- Deep vein thrombosis after monoclonal gammopathy of undetermined significance and multiple myeloma >>
- A prospective PETHEMA study of tandem autologous transplantation versus autograft >>
- Mcl-1 expression has in vitro and in vivo significance in chronic lymphocytic leukemia >>
- Dietary flavonoids inhibit the anticancer effects of the proteasome inhibitor bortezomib >>

### Membership
### Meetings
### Publications
### Education & Careers
### Policy & Practice
### ASH Store

Search



AMERICAN SOCIETY OF HEMATOLOGY
50
Conquering Blood Diseases –
From Research to Patient Care

Find a Hematologist
Hematology Library
*Blood*
Image Bank
Education Program Book
*ASH-SAP*
Abstract Search



### ▶ 50th ASH Annual Meeting & Exposition

December 6-9, 2008
San Francisco, CA
- Schedule & Program
- Advance Registration
- Exhibitor Registration
- Abstracts

### ▶ Highlights of ASH - 2009

- January 30-31, Phoenix, AZ
- February 6-7, Miami, FL
- May 15-16, São Paulo, Brazil

### ▶ Patients



- Blood Disease Information
- Find a Hematologist

### ▶ The Hematologist - Nov/Dec 2008



- Diffusion
- The Practicing Hematologist
- Mini Review
- Profiles in Hematology
- Headlines From Washington

---

**Contact Us  |  Terms of Service  |  Privacy Policy  |  Photo Credit  |  RSS**

1900 M Street, NW, Suite 200    Washington, DC 20036    Phone: 202-776-0544    Fax: 202-776-0545    E-mail: ash@hematology.org

©2008 American Society of Hematology

https://web.archive.org/web/20200804025853/https://ir.alexion.com/news-media/press-releases?page=48



INTERNET ARCHIVE
WaybackMachine
44 captures
3 Aug 2020 – 1 Oct 2020

https://ir.alexion.com/news-media/press-releases?page=48   Go

2019  **04** 2020 2021
AUG SEP

About this capture

CONTACT US     ALEXION.COM

**ALEXION**

Overview     Financials     **News & Media**     Events & Presentations     Stock Information     Corporate Governance

# Press Releases

| NEWS CATEGORY | YEAR | | SEARCH |
|---|---|---|---|
| Choose from list ⌄ | None ⌄ | FILTER | Search 🔍 |

| DATE | TITLE | PDF VERSION |
|---|---|---|
| Jan 12, 2009 | Alexion Pharmaceuticals To Report Fourth Quarter and Full Year 2008 Results on February 12, 2009 | 📄 |
| Jan 12, 2009 | Soliris(R) Receives Orphan Drug Designation in Japan | 📄 |
| Jan 05, 2009 | Alexion Pharmaceuticals and PDL BioPharma Resolve Patent Dispute | 📄 |
| Jan 05, 2009 | Alexion to Present at the 27th Annual JP Morgan Healthcare Conference | 📄 |
| Dec 09, 2008 | Soliris(R) Reduced Measures of Thrombosis and Inflammation, and Decreased Indicators of Pulmonary Hypertension, in Studies of Patients with PNH | 📄 |
| Dec 08, 2008 | Alexion Reports Positive Results from AEGIS Registration Study of Soliris in Japanese Patients With PNH | 📄 |
| Dec 07, 2008 | First Clinical Experience With Soliris(R) in Treating Patients With Two Rare Complement-Mediated Diseases Presented at ASH Annual Meeting | 📄 |
| Nov 25, 2008 | Alexion to Present at the 20th Annual Piper Jaffray Health Care Conference | 📄 |
| Nov 11, 2008 | David W. Keiser to Retire as President of Alexion | 📄 |
| Nov 10, 2008 | Researchers to Present Additional Data on Soliris(R) (eculizumab) for the Treatment of PNH at the ASH Annual Meeting | 📄 |

« first   ‹ previous   …   45   46   47   48   **49**   50   51   52   53   …   next ›   last »

Displaying 481 - 490 of 578

**SHAREHOLDER TOOLS**

 Email Alerts →    RSS →    Print →    Share →    Inquiries →




Contact Us   ·   Legal Statement   ·   Privacy Notice   ·   Terms of Use

This website is intended only for residents of the United States. © 2020 Alexion Pharmaceuticals, Inc.

https://web.archive.org/web/20200927204634/https://ir.alexion.com/news-releases/news-release-details/researchers-present-additional-data-solirisr-eculizumab



https://ir.alexion.com/news-releases/news-release-details/researchers-present-additional-data-solirisr-eculizumab    Go

2 captures
22 Sep 2020 – 27 Sep 2020

SEP
27
2020

2019    2020    2021    ▼ About this capture

CONTACT US     ALEXION.COM

**ALEXION®**

Overview     Financials     **News & Media**     Events & Presentations     Stock Information     Corporate Governance

« **PRESS RELEASES**

*November 10, 2008 at 12:00 AM EST*

# Researchers to Present Additional Data on Soliris(R) (eculizumab) for the Treatment of PNH at the ASH Annual Meeting

CHESHIRE, Conn., Nov 10, 2008 /PRNewswire-FirstCall via COMTEX News Network/ -- Initial Physician Experience with Eculizumab in Patients with Other Rare Complement-Mediated Diseases also to be Presented

Alexion Pharmaceuticals, Inc. (Nasdaq: ALXN) today announced that the American Society of Hematology (ASH) has published additional data relating to Soliris(R) (eculizumab) as a treatment for patients with paroxysmal nocturnal hemoglobinuria (PNH). Data also have been published regarding initial experience with eculizumab in patients with two other rare diseases (Atypical Hemolytic Uremic Syndrome and Cold Agglutinin Disease). Abstracts will be presented at the 50th Annual Meeting of the American Society of Hematology, to be held December 6 to 9, 2008 at the Moscone Center in San Francisco.

The following abstracts will be presented as oral presentations on Monday, December 8, 2008. The abstracts and presentation information can be accessed through the links provided below.

>    --   "Eculizumab Therapy Results in Rapid and Sustained Decreases in
>         Markers of Thrombin Generation and Inflammation in Patients with
>         PNH," Dr. Ilene Weitz, et al.

Abstract: http://ash.confex.com/ash/2008/webprogram/Paper8206.html

>    --   "Eculizumab Reduces Pulmonary Hypertension Through Inhibition of
>         Hemolysis-Associated Nitric Oxide Consumption in Patients With
>         Paroxysmal Nocturnal Hemoglobinuria," Dr. Anita Hill, et al.

Abstract: http://ash.confex.com/ash/2008/webprogram/Paper9815.html

The following abstracts will be presented in poster sessions on Monday, December 8, 2008.

>    --   "Safety and Efficacy of the Terminal Complement Inhibitor
>         Eculizumab in Japanese Patients with Paroxysmal Nocturnal
>         Hemoglobinuria: AEGIS Phase II Clinical Study Results," Dr. Yuzuru
>         Kanakura, et al.

Abstract: http://ash.confex.com/ash/2008/webprogram/Paper8331.html

>    --   "Modification of the Eculizumab Dose to Successfully Manage
>         Intravascular Breakthrough Hemolysis in Patients with Paroxysmal
>         Nocturnal Hemoglobinuria," Dr. Richard Kelly, et al.

MEDIA FILES

Researchers to Present Additional Data on Soliris(R) (eculizumab) for the Treatment of PNH at the ASH Annual Meeting

Abstract: http://ash.confex.com/ash/2008/webprogram/Paper11166.html

-- "Effect of Reducing Intravascular Hemolysis on Ferritin Homeostasis
   in Eculizumab Treated Paroxysmal Nocturnal Hemoglobinuria (PNH)
   Patients," Dr. Alexander Roeth, et al.

Abstract: http://ash.confex.com/ash/2008/webprogram/Paper4867.html

The following abstracts will be presented in poster sessions on Sunday,
December 7, 2008.

-- "Successful Treatment of Atypical Hemolytic Uremic Syndrome with
   the Complement Inhibitor Eculizumab," Jens Nuernberger, et al.

Abstract: http://ash.confex.com/ash/2008/webprogram/Paper9272.html

-- "Long-term Efficacy of the Terminal Complement Inhibitor Eculizumab
   in a Patient with Cold Agglutinin Disease (CAD)," Dr. Alexander
   Roeth, et al.

Abstract: http://ash.confex.com/ash/2008/webprogram/Paper7013.html

The following abstract will be presented as an on-line publication.

-- "Efficacy of Eculizumab in a Plasmatherapy-Dependent Patient with
   Atypical Hemolytic Uremic Syndrome with C3 mutation Following
   Plasmatherapy Withdrawal," Dr Valerie Chatelet et al.

About Soliris

Soliris is the first product approved for the treatment of patients with PNH in
the U.S. and Europe. PNH is a rare, debilitating and life-threatening blood
disorder defined by the destruction of red blood cells, or hemolysis. In
patients with PNH, hemolysis can cause life-threatening thromboses,
recurrent pain, kidney disease, disabling fatigue, impaired quality of life,
severe anemia, pulmonary hypertension, shortness of breath and
intermittent episodes of dark-colored urine (hemoglobinuria). Soliris, or
eculizumab, is the only treatment that blocks this hemolysis.

Important Safety Information

Soliris is generally well tolerated. The most frequent adverse events observed
in clinical studies were headache, nasopharyngitis (a runny nose), back pain
and nausea.

The U.S. product label for Soliris also includes a boxed warning: "Soliris
increases the risk of meningococcal infections. Vaccinate patients with a
meningococcal vaccine at least two weeks prior to receiving the first dose of
Soliris; revaccinate according to current medical guidelines for vaccine use.
Monitor patients for early signs of meningococcal infections, evaluate
immediately if infection is suspected, and treat with antibiotics if necessary."
During clinical studies, two out of 196 vaccinated PNH patients treated with
Soliris experienced a serious meningococcal infection.

Please see full prescribing information at www.soliris.net.

About Alexion

Alexion Pharmaceuticals, Inc. is a biopharmaceutical company working to
develop and deliver life-changing drug therapies for patients with serious
and life-threatening medical conditions. The Company is engaged in the
discovery, development and commercialization of therapeutic products

aimed at treating patients with a wide array of severe disease states including hematologic diseases, cancer and autoimmune disorders. In March 2007, the FDA granted marketing approval for the Company's first product, Soliris for all patients with PNH. In June 2007, the European Commission granted marketing approval for Soliris in the European Union for all patients with PNH. The Company is evaluating other potential indications for Soliris, as well as other formulations of eculizumab for additional clinical indications. In addition, Alexion is pursuing development of an anti-CD200 monoclonal antibody as a treatment for patients with cancer, and evaluating development of other antibody product candidates in early stages of development. This press release and further information about Alexion Pharmaceuticals, Inc. can be found at: www.alexionpharma.com.

[ALXN:G]

SOURCE Alexion Pharmaceuticals, Inc.

http://www.alexionpharma.com

Copyright (C) 2008 PR Newswire. All rights reserved

News Provided by COMTEX

**SHAREHOLDER TOOLS**



Email Alerts →   RSS →   Print →   Share →   Inquiries →



Contact Us  ·  Legal Statement  ·  Privacy Notice  ·  Terms of Use

This website is intended only for residents of the United States. © 2020 Alexion Pharmaceuticals, Inc.

**JURAT**

State/Commonwealth of _____TEXAS_____ )
)
☐ City ☑ County of _____Bexar_____ )

On __06/14/2021__, before me, _____Jose Aaron Gutierrez Banda_____ ,
      *Date*                            *Notary Name*

the foregoing instrument was subscribed and sworn (or affirmed) before me by:

Duncan Hall
_____ .
*Name of Affiant(s)*

☐   Personally known to me  **-- OR --**

☐   Proved to me on the basis of the oath of _____ **-- OR --**
                                           *Name of Credible Witness*

☑   Proved to me on the basis of satisfactory evidence: _____driver_license_____
                                           *Type of ID Presented*

WITNESS my hand and official seal.

Notary Public Signature: *Jose Aaron Gutierrez Banda*

Notary Name: _____Jose Aaron Gutierrez Banda_____
Notary Commission Number: __13290519-6__
Notary Commission Expires: __02/02/2025__
*Notarized online using audio-video communication*

**Notary Seal:**
Jose Aaron Gutierrez Banda
NOTARY PUBLIC
STATE OF TEXAS
ID NUMBER
13290519-6
COMMISSION EXPIRES
February 2, 2025

**DESCRIPTION OF ATTACHED DOCUMENT**

Title or Type of Document: Affidavit of Duncan Hall

Document Date: __06/14/2021__

Number of Pages (including notarial certificate): __13__

Notarized online using audio-video communication

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS</u>

**Case Number:** 2024-1829

**Short Case Caption:** Alexion Pharmaceuticals, Inc. v. Samsung Bioepsis Co.

> **Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

☑ the filing has been prepared using a proportionally-spaced typeface and includes 5,192 words.

☐ the filing has been prepared using a monospaced typeface and includes _____ lines of text.

☐ the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Date: 07/01/2024

Signature: /s/ Michelle S. Rhyu

Name: Michelle S. Rhyu

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF CONFIDENTIAL MATERIAL

**Case Number:** 2024-1829 ⊞

**Short Case Caption:** Alexion Pharmaceuticals, Inc. v. Samsung Bioepsis Co.

---

**Instructions:** When computing a confidential word count, Fed. Cir. R. 25.1(d)(1)(C) applies the following exclusions:

- Only count each unique word or number once (repeated uses of the same word do not count more than once).

- For a responsive filing, do not count words marked confidential for the first time in the preceding filing.

The limitations of Fed. Cir. R. 25.1(d)(1) do not apply to appendices; attachments; exhibits; and addenda. *See* Fed. Cir. R. 25.1(d)(1)(D).

---

The foregoing document contains ___0___ number of unique words (including numbers) marked confidential.

☑ This number does not exceed the maximum of 15 words permitted by Fed. Cir. R. 25.1(d)(1)(A).

☐ This number does not exceed the maximum of 50 words permitted by Fed. Cir. R. 25.1(d)(1)(B) for cases under 19 U.S.C. § 1516a or 28 U.S.C. § 1491(b).

☐ This number exceeds the maximum permitted by Federal Circuit Rule 25.1(d)(1), and the filing is accompanied by a motion to waive the confidentiality requirements.

Date: 07/01/2024

Signature: /s/ Michelle S. Rhyu

Name: Michelle S. Rhyu